# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

## THE COCA-COLA CO. & SUBSIDIARIES,

*Petitioner-Appellant*,

v.

## COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

On Appeal from the United States Tax Court
Case No. 31183-15

## OPENING BRIEF FOR PETITIONER-APPELLANT THE COCA-COLA CO. & SUBSIDIARIES

Shay Dvoretzky
Christopher Bowers
Parker Rider-Longmaid
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005

Nathaniel Carden
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
320 S. Canal St.
Chicago, IL 60606

Raza Rasheed
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
2000 Avenue of the Stars, Ste. 200N
Los Angeles, CA 90067

Gregory G. Garre
Miriam L. Fisher
Eric J. Konopka
Blake E. Stafford
Sakina Haji*
LATHAM & WATKINS LLP
555 Eleventh St., NW, Ste. 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Shannon C. Fiedler
LATHAM & WATKINS LLP
200 Clarendon St.
Boston, MA 02116

*\* Admitted in New York.  All work
supervised by a member of the D.C. Bar.*

*Counsel for Petitioner-Appellant The Coca-Cola Co. & Subsidiaries*

March 12, 2025

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Petitioner-Appellant The Coca-Cola Co. ("Coca-Cola") makes the following disclosures:  Coca-Cola is a publicly traded corporation listed on the New York Stock Exchange under the ticker symbol KO.  Coca-Cola has no parent corporation, and no person or entity holds 10% or more of its stock.

Coca-Cola also certifies that the following individuals or entities have or may have an interest in the outcome of this case:

- Altman, John M., Counsel for Respondent-Appellee in the Tax Court

- Bailie, Huong T., Counsel for Respondent-Appellee in the Tax Court

- Bowers, Christopher, Counsel for Petitioner-Appellant in the Eleventh Circuit

- Campolieta, Justin L., Counsel for Respondent-Appellee in the Tax Court

- Carden, Nathaniel, Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court

- Christensen, Jacob Earl, Counsel for Respondent-Appellee in the Eleventh Circuit

- Craig, John F., III, Counsel for Petitioner-Appellant in the Tax Court

- Desmond, Michael J., Counsel for Respondent-Appellee in the Tax Court

- Dixon, Steven R., Counsel for Petitioner-Appellant in the Tax Court

- Dvoretzky, Shay, Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court

- Fiedler, Shannon C., Counsel for Petitioner-Appellant in the Eleventh Circuit

- Fisher, Miriam L., Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court

- Flores, Elizabeth P., Counsel for Respondent-Appellee in the Tax Court

- Franklin, Barbara B., Counsel for Respondent-Appellee in the Tax Court

- Frisch, Jill A., Counsel for Respondent-Appellee in the Tax Court

- Garre, Gregory G., Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court

- Garza, Steven D., Counsel for Respondent-Appellee in the Tax Court

- Gasper, Julie Ann P., Counsel for Respondent-Appellee in the Tax Court

- Gerling-Ritters, Hans D., Counsel for Petitioner-Appellant in the Tax Court

- Gibson Dunn & Crutcher LLP, Counsel for Petitioner-Appellant in the Tax Court

- Goldberg, Lisa M., Counsel for Respondent-Appellee in the Tax Court

- Greenhouse, Robin L., Counsel for Respondent-Appellee in the Tax Court

- Hagley, Judith A., Counsel for Respondent-Appellee in the Eleventh Circuit

- Haji, Sakina, Counsel for Petitioner-Appellant in the Eleventh Circuit

- Hintermeister, Anne O'Brien, Counsel for Respondent-Appellee in the Tax Court

- Hoory, Eli, Counsel for Respondent-Appellee in the Tax Court

- Hubbert, David A., Counsel for Respondent-Appellee in the Eleventh Circuit

- Internal Revenue Service, Respondent-Appellee

- Jacinto, Jarrett Y., Counsel for Petitioner-Appellant in the Tax Court

- Kaplan Hecker & Fink LLP, Counsel for Petitioner-Appellant in the Tax Court

- Kautter, David, Respondent-Appellee (Former Acting)

- Kenworthy, Kevin L., Counsel for Petitioner-Appellant in the Tax Court

- Konopka, Eric J., Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court

- Koskinen, John A., Respondent-Appellee (Former)

- Krause, Melanie, Respondent-Appellee (Acting)

- Kummer, Michael D., Counsel for Petitioner-Appellant in the Tax Court

- Lampert, Heather L., Counsel for Respondent-Appellee in the Tax Court

- Latham & Watkins LLP, Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court

- Lauber, Albert G., Tax Court Judge

- Luttig, Hon. J. Michael, Counsel for Petitioner-Appellant in the Tax Court

- Magee, John B., Counsel for Petitioner-Appellant in the Tax Court

- Massey, Jonathan S., Counsel for Petitioner-Appellant in the Tax Court

- Massey & Gail LLP, Counsel for Petitioner-Appellant in the Tax Court

- Matta, Lamia R., Counsel for Petitioner-Appellant in the Tax Court

- Metcalf, Nicholas R., Counsel for Petitioner-Appellant in the Tax Court

- Mezei, Saul, Counsel for Petitioner-Appellant in the Tax Court

- Miller & Chevalier Chartered, Counsel for Petitioner-Appellant in the Tax Court

- Morgan, Lewis & Bockius LLP, Counsel for Petitioner-Appellant in the Tax Court

- Morrison, Sean T., Counsel for Petitioner-Appellant in the Tax Court

- O'Donnell, Douglas, Respondent-Appellee (Former Acting)

- Ortiz, Lisandra, Counsel for Petitioner-Appellant in the Tax Court

- Patterson, Kathryn F., Counsel for Respondent-Appellee in the Tax Court

- Paul, William M., Counsel for Respondent-Appellee in the Tax Court

- Rasheed, Raza, Counsel for Petitioner-Appellant in the Eleventh Circuit

- Rettig, Charles P., Respondent-Appellee (Former)

- Richards, Veronica L., Counsel for Respondent-Appellee in the Tax Court

- Rider-Longmaid, Parker, Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court

- Rollinson, Marjorie A., Counsel for Respondent-Appellee in the Eleventh Circuit and the Tax Court

- Rubin, Curt M., Counsel for Respondent-Appellee in the Tax Court

- Skadden, Arps, Slate, Meagher & Flom LLP, Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court

- Stafford, Blake E., Counsel for Petitioner-Appellant in the Eleventh Circuit

- Stark, Sanford W., Counsel for Petitioner-Appellant in the Tax Court

- The Coca-Cola Co., NYSE:KO, Petitioner-Appellant

- Tonuzi, Drita, Counsel for Respondent-Appellee in the Tax Court

- Tribe, Laurence H., Counsel for Petitioner-Appellant in the Tax Court

- Ugolini, Francesca, Counsel for Respondent-Appellee in the Eleventh Circuit and the Tax Court

- U.S. Commissioner of Internal Revenue, Respondent-Appellee

- U.S. Department of Justice, Tax Division, Appellate Section, Counsel for Respondent-Appellee in the Eleventh Circuit and the Tax Court

- U.S. Department of the Treasury, Respondent-Appellee

- Ussing, Carl T., Counsel for Petitioner-Appellant in the Tax Court

- Werfel, Daniel I., Respondent-Appellee (Former)

- Wilkins, William J., Counsel for Respondent-Appellee in the Tax Court

- Zemil, Nicholas A., Counsel for Petitioner-Appellant in the Tax Court

In addition to the list above, Coca-Cola discloses that it has hundreds of subsidiaries. Many of these subsidiaries are wholly owned and not publicly traded.

Coca-Cola's subsidiaries that are less than wholly owned do not have an interest in the outcome of this appeal within the meaning of Eleventh Circuit Rule 26.1.

Dated:  March 12, 2025                      Respectfully submitted,

   /s/ *Gregory G. Garre*
Gregory G. Garre

*Counsel for Petitioner-Appellant*
*The Coca-Cola Co. & Subsidiaries*

## STATEMENT REGARDING ORAL ARGUMENT

This tax case presents exceptionally important questions about the protections regulated parties have against arbitrary and capricious agency action and the limitations on the government's reallocation of income for tax purposes through transfer-pricing determinations under 26 U.S.C. § 482. Petitioner-Appellant The Coca-Cola Co. ("Coca-Cola" and, together with its worldwide subsidiaries, the "Company") thus respectfully submits that oral argument is necessary and will significantly aid the Court's decisional process in this case.

**TABLE OF CONTENTS**

Page

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ...................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................i

TABLE OF AUTHORITIES ...........................................................................iv

INTRODUCTION .............................................................................................1

STATEMENT OF JURISDICTION...................................................................5

ISSUES PRESENTED.......................................................................................5

STATUTORY AND REGULATORY PROVISIONS INVOLVED ......................6

STATEMENT OF THE CASE...........................................................................6

     A.     Coca-Cola's Worldwide Market .................................................6

     B.     The Company's Multinational Operations...................................9

     C.     Transfer Pricing Of Royalties From Supply-Point Companies ..........13

     D.     This Litigation .........................................................................16

SUMMARY OF ARGUMENT ........................................................................19

STANDARD OF REVIEW ..............................................................................21

ARGUMENT ..................................................................................................22

I.     THE IRS'S SELECTIVE BAIT AND SWITCH IN TRANSFER-PRICING METHODS IS ARBITRARY AND CAPRICIOUS ...................22

II.    THE IRS'S NEW TRANSFER-PRICING METHOD IS ARBITRARY, CAPRICIOUS, AND UNLAWFUL ....................................32

A.    The IRS's CPM Directly Contravenes The Section 482 Regulations By Failing To Reward Supply-Point Companies For Their Significant Marketing Investments And Intangibles ..........32

    1.    The Regulations Recognize And Account For Supply-Point Companies' Marketing Investments And Intangibles ..................33

    2.    The IRS's CPM Failed To Credit Supply-Point Companies' Valuable Marketing Investments And Intangibles ..................35

    3.    The Tax Court Erred In Approving The IRS's CPM ...............38

        a.    The Tax Court's "Legal Ownership" Test Flouts The Regulations ............................39

        b.    The Tax Court Erroneously Erased The Costs— And Risks—Borne By Supply-Point Companies As To Their Substantial Marketing Investments...........43

B.    The IRS's CPM Rests On A Flawed Comparison Between Supply-Point Companies And Bottlers That Itself Violates The Regulations ..................46

III.    THE IRS WAS PROHIBITED FROM ALLOCATING "BLOCKED" BRAZILIAN INCOME TO COCA-COLA..........................51

CONCLUSION ..................................................................57

**Page(s)**

**CASES**

*3M Co. v. Commissioner*,
160 T.C. 50 (2023), *appeal pending*, No. 23-3772
(8th Cir. filed Dec. 29, 2023)..........................................................18, 54, 55, 56

*Amazon.com, Inc. v. Commissioner*,
148 T.C. 108 (2017), *aff'd*, 934 F.3d 976 (9th Cir. 2019)................................47

*Amazon.com, Inc. v. Commissioner*,
934 F.3d 976 (9th Cir. 2019) ............................................................................13

*ANR Storage Co. v. FERC*,
904 F.3d 1020 (D.C. Cir. 2018).........................................................................24

*Automobile Club of Michigan v. Commissioner*,
353 U.S. 180 (1957)...........................................................................................29

*Brittingham v. Commissioner*,
598 F.2d 1375 (5th Cir. 1979) .....................................................................21, 22

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984)...........................................................................................54

*Chock Full O' Nuts Corp. v. United States*,
453 F.2d 300 (2d Cir. 1971) ..............................................................................29

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012)...........................................................................................23

*Commissioner v. Danielson*,
378 F.2d 771 (3d Cir. 1967) ..............................................................................42

*Commissioner v. First Security Bank of Utah, N.A.*,
405 U.S. 394 (1972)......................................................................21, 52, 54, 57

*Commissioner v. Glenshaw Glass Co.*,
348 U.S. 426 (1955)...........................................................................................52

**Page(s)**

*Commissioner v. Neal*,
557 F.3d 1262 (11th Cir. 2009) .......................................................22

*De Niz Robles v. Lynch*,
803 F.3d 1165 (10th Cir. 2015) .......................................................23

*DHL Corp. v. Commissioner*,
285 F.3d 1210 (9th Cir. 2002) .......................................................34

*DHS v. Regents of the University of California*,
591 U.S. 1 (2020).......................................................31

*Dickman v. Commissioner*,
465 U.S. 330 (1984).......................................................29

*Eli Lilly & Co. v. Commissioner*,
856 F.2d 855 (7th Cir. 1988) .......................................................21, 51

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016).......................................................23, 24

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).......................................................22, 28

*G.U.R. Co. v. Commissioner*,
117 F.2d 187 (7th Cir. 1941) .......................................................22

*Hewitt v. Commissioner*,
21 F.4th 1336 (11th Cir. 2021) .......................................................22, 56

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024).......................................................54, 55

*Lyng v. Payne*,
476 U.S. 926 (1986).......................................................28

*Mayo Foundation for Medical Education & Research v. United
States*,
562 U.S. 44 (2011).......................................................28

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) .......................................................27

**Page(s)**

*Medtronic, Inc. v. Commissioner*,
900 F.3d 610 (8th Cir. 2018) ..............................................................42

*National Cable & Telecommunications Association v. Brand X*
*Internet Services*,
545 U.S. 967 (2005)............................................................................54

*Newark Morning Ledger Co. v. United States*,
507 U.S. 546 (1993)............................................................................44

*In re Northwestern Yeast Co.*,
5 B.T.A. 232 (1926)............................................................................44

*Ohio v. EPA*,
603 U.S. 279 (2024)............................................................................55

*Perez v. Mortgage Bankers Association*,
575 U.S. 92 (2015)..............................................................................56

*PHH Corp. v. CFPB*,
839 F.3d 1 (D.C. Cir. 2016), *reinstated in pertinent part on reh'g*
*en banc*, 881 F.3d 75 (D.C. Cir. 2018) (en banc) .........................................23, 24

*Pine Mountain Preserve LLLP v. Commissioner*,
978 F.3d 1200 (11th Cir. 2020) ..........................................................42

*Plante v. Commissioner*,
168 F.3d 1279 (11th Cir. 1999) ..........................................................42

*Procter & Gamble Co. v. Commissioner*,
961 F.2d 1255 (6th Cir. 1992) .......................................................53, 57

*RJR Nabisco Inc. v. Commissioner*,
76 T.C.M. (CCH) 71 (1998) ................................................................44

*Texaco, Inc. v. Commissioner*,
98 F.3d 825 (5th Cir. 1996) ................................................................53

*United States v. Basye*,
410 U.S. 441 (1973)............................................................................52

*United States v. Fort*,
638 F.3d 1334 (11th Cir. 2011) ......................................................42

*United States v. Home Concrete & Supply, LLC*,
566 U.S. 478 (2012) ........................................................................55

*United States v. Shamsid-Deen*,
61 F.4th 935 (11th Cir. 2023) .........................................................22

*United States Capitol Police v. Office of Compliance*,
908 F.3d 748 (Fed. Cir. 2018) ........................................................22

*Veritas Software Corp. v. Commissioner*,
133 T.C. 297 (2009) ........................................................................47

*Woodworth v. Kales*,
26 F.2d 178 (6th Cir. 1928) ............................................................29

## STATUTES AND REGULATIONS

5 U.S.C. § 551(1) ...............................................................................29

5 U.S.C. § 553(b) ...............................................................................56

5 U.S.C. § 553(c) ...............................................................................56

5 U.S.C. § 559 ....................................................................................29

26 U.S.C. § 61(a) ...............................................................................52

26 U.S.C. § 482 .................................................................2, 13, 32, 55

26 U.S.C. § 6212(a) .............................................................................5

26 U.S.C. § 6213(a) .............................................................................5

26 U.S.C. § 6214(a) .............................................................................5

26 U.S.C. § 6214(b) .............................................................................5

26 U.S.C. § 6512(b)(1) .........................................................................5

26 U.S.C. § 6662(a) .....................................................................14, 25

|  | **Page(s)** |
|---|---|
| 26 U.S.C. § 6662(h) | 25 |
| 26 U.S.C. § 7442 | 5 |
| 26 U.S.C. § 7459(c) | 5 |
| 26 U.S.C. § 7482(a)(1) | 5 |
| 26 U.S.C. § 7483 | 5 |
| 26 C.F.R. § 1.482-1(b)(1) | 13, 24 |
| 26 C.F.R. § 1.482-1(c)(1) | 32 |
| 26 C.F.R. § 1.482-1(c)(2)(ii) | 47 |
| 26 C.F.R. § 1.482-1(d) | 49 |
| 26 C.F.R. § 1.482-1(d)(1)(ii) | 42 |
| 26 C.F.R. § 1.482-1(d)(1)(iii) | 42 |
| 26 C.F.R. § 1.482-1(d)(3)(i) | 33 |
| 26 C.F.R. § 1.482-1(d)(3)(ii)(B)(1) | 43 |
| 26 C.F.R. § 1.482-1(g)(2) | 43 |
| 26 C.F.R. § 1.482-1(h)(2)(i)-(ii) | 53 |
| 26 C.F.R. § 1.482-1T(d)(3)(ii)(C), Example 4 | 35 |
| 26 C.F.R. § 1.482-4(b) | 33 |
| 26 C.F.R. § 1.482-4(c)(1) | 47 |
| 26 C.F.R. § 1.482-4T(f)(3)(i)(A) | 39 |
| 26 C.F.R. § 1.482-4T(f)(4)(i) | 33, 34, 40 |
| 26 C.F.R. § 1.482-4T(f)(4)(ii), Example 3 | 35 |
| 26 C.F.R. § 1.482-4T(f)(4)(ii), Example 4 | 35 |

26 C.F.R. § 1.482-4T(f)(4)(ii), Example 5 ...............................................35

26 C.F.R. § 1.482-4T(f)(4)(ii), Example 6 ...............................................35

26 C.F.R. § 1.482-5(a) .............................................................................15

26 C.F.R. § 1.482-5(b)(1) .........................................................................47

26 C.F.R. § 1.482-5(b)(2)(i).......................................................................48

26 C.F.R. § 1.482-5(c)(2)(ii)......................................................................49

## OTHER AUTHORITIES

*Black's Law Dictionary* (5th ed. 1979)...................................................52

Lorraine Eden, *Taxing Multinationals: Transfer Pricing and
Corporate Income Taxation in North America* (1998).......................48

58 Fed. Reg. 5310 (Jan. 21, 1993) ...........................................................56

59 Fed. Reg. 34971 (July 8, 1994)...............................................47, 48, 56

68 Fed. Reg. 53448 (Sept. 10, 2003) ........................................................40

71 Fed. Reg. 44466 (Aug. 4, 2006)...............................................33, 39, 40

2 Thomas McCarthy, *McCarthy on Trademarks and Unfair
Competition* (5th ed. 2025, online) ...................................................30

U.S. Model Income Tax Convention (Nov. 15, 2006),
https://www.irs.gov/pub/irs-trty/model006.pdf.................................16

*Webster's New Collegiate Dictionary* (1979 ed.)....................................52

## INTRODUCTION

This case involves a challenge to the IRS's attempt to increase Coca-Cola's taxes by billions of dollars by abruptly switching the longstanding method that Coca-Cola used—with the IRS's repeated approval—to determine the arm's-length price for certain transactions with its foreign subsidiaries, and retroactively imposing a new method that more than doubled that price. The Tax Court excused the IRS's bait and switch and approved the IRS's new method in a decision that ignores both fundamental limits on administrative action and the IRS's own regulations governing such pricing determinations. That decision should be reversed.

Like many U.S. companies, Coca-Cola has subsidiaries that do business around the world. When Coca-Cola and its subsidiaries transact with each other, they must determine the price of the transactions—or transfer price—so they can calculate the income that is subject to tax in the jurisdictions where they operate. For example, if Coca-Cola provided administrative services to a Canadian subsidiary, the parties would need to set a price for those services, which would be deductible by the subsidiary for Canadian tax purposes and income to Coca-Cola for U.S. tax purposes. Transactions such as this are common—indeed, necessary—for multinational enterprises like the Company with subsidiaries that, while related, are legally distinct entities for taxation and other purposes.

The price paid in any transaction is normally determined through arm's-length bargaining between unrelated parties. Transfer pricing of related-party transactions is based on the same concept. That is, while the parties are related to each other, they are supposed to price their transactions as if they were not. And when the price diverges from an arm's-length price, section 482 of the Internal Revenue Code, 26 U.S.C. § 482, grants the IRS limited authority to adjust the price to achieve an arm's-length result. So, in auditing the hypothetical related-party transaction above, the IRS would determine whether the price reflects the amount the Canadian subsidiary would pay an unrelated party for similar administrative services—and, if it does not, would make adjustments to bring the price in line with arm's-length pricing.

This case involves the application of section 482 to the royalties owed under licenses between Coca-Cola and six of its foreign affiliates, known as supply-point companies. Coca-Cola is one of the most well-known and successful companies today, but achieving that success was not easy. It took many decades of sustained effort in each country to develop and market products that appeal to consumers. And to preserve and grow consumer demand, the Company must continuously invest in marketing tailored to local cultures, tastes, interests, and so on. Coca-Cola thus licenses its trademarks and other intangibles to supply-point companies around the world, and those companies invest billions of dollars each year in localized marketing efforts to promote Coca-Cola brands and products.

That is where transfer pricing comes into play. Supply-point companies pay Coca-Cola billions of dollars in royalties each year for the right to license the familiar trademarks, brand names, and logos used to market Coca-Cola products, as well as other intangible property. For the 1987-1995 tax years, the IRS and Coca-Cola explicitly agreed on a transfer-pricing method—called "10-50-50"—to determine arm's-length royalties under section 482. The IRS then audited Coca-Cola for compliance with 10-50-50 as to such royalties for over a decade, granted Coca-Cola a rare and valuable form of forward-looking penalty protection as long it continued to comply with 10-50-50, and told Coca-Cola as late as 2009 that 10-50-50 was "appropriate." Then, in 2011, the IRS shockingly declared that it would no longer honor 10-50-50 for the 2007-2009 tax years—long after those tax years were over and Coca-Cola could do anything about it.

Without giving Coca-Cola any prior notice or identifying any change in law or facts, the IRS abandoned 10-50-50 and retroactively imposed a transfer-pricing method known as the comparable profits method, or "CPM." The IRS's new method more than doubled royalties from supply-point companies for 2007-2009, resulting in about $9 billion of additional taxable income to Coca-Cola. It did so by denying supply-point companies credit for billions of dollars they invested in marketing Coca-Cola's products. Yet the IRS abandoned 10-50-50 only for a minority of

3

supply-point companies while not disturbing 10-50-50 for supply-point companies in countries with tax treaties with the U.S. that could object to the switch.

The Tax Court's decision upholding the IRS's use of its new method for 2007-2009 cannot stand for three independent reasons. First, the IRS's decision to retroactively impose billions of dollars of additional tax liability on Coca-Cola by suddenly—and selectively—switching from 10-50-50 to its new CPM for 2007-2009 for the supply-point companies at issue is a classic bait and switch that is arbitrary and capricious under bedrock principles of administrative law. Second, the IRS's new CPM violates the IRS's own regulations because it fails to properly account for supply-point companies' extensive marketing investments and the value they created, is based on an inapt comparison between supply-point companies and bottlers of Coca-Cola products, and bears no rational relationship to what an unrelated party would pay to license intangibles. And, third, the IRS's allocation of certain "blocked income" from the Brazilian supply-point company independently violates section 482, as interpreted by the Supreme Court.

Allowing the Tax Court's decision to stand would exempt the IRS from the same administrative law safeguards that apply to other agencies. That would create a dangerous combination of the power to tax—and thus destroy—and the exercise of unchecked agency prerogative. The Tax Court's decision should be reversed.

## STATEMENT OF JURISDICTION

On September 15, 2015, the IRS mailed Coca-Cola a notice of deficiency for its 2007-2009 tax years. Doc.1, Exh.A, pg.1;[1] *see* 26 U.S.C. § 6212(a). On December 14, 2015, Coca-Cola timely petitioned the Tax Court for redetermination of the deficiencies asserted in the notice. Doc.1, pg.1; *see* 26 U.S.C. § 6213(a).[2] The Tax Court had jurisdiction to redetermine those asserted deficiencies. *See* 26 U.S.C. §§ 6214(a)-(b), 6512(b)(1), 7442.

The Tax Court entered its decision on August 2, 2024. Doc.799, pg.1; *see* 26 U.S.C. § 7459(c). Coca-Cola timely filed a notice of appeal on October 22, 2024. Doc.806; *see* 26 U.S.C. § 7483. This Court has jurisdiction to review the Tax Court's decision. *See* 26 U.S.C. § 7482(a)(1).

## ISSUES PRESENTED

Whether the IRS's section 482 transfer-pricing adjustments for the 2007-2009 tax years are arbitrary, capricious, or otherwise unlawful.

That question, in turn, has three principal subparts:

a.     Whether the IRS's selective bait and switch in transfer-pricing methods was arbitrary, capricious, or unlawful;

---

[1]   "Doc." refers to entries in Tax Court Docket No. 31183-15 and "Ex." refers to Trial Exhibits.

[2]   Unless otherwise specified, references to statutes and regulations are to the version in effect for the 2007-2009 tax years.

b.       Whether the IRS's new transfer-pricing method violates the regulations implementing section 482 or is otherwise unlawful; and

c.       Whether the IRS improperly allocated royalties to Coca-Cola from the Brazilian supply-point company that were blocked by Brazilian law.

## STATUTORY AND REGULATORY PROVISIONS INVOLVED

Pertinent statutory and regulatory provisions are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.       Coca-Cola's Worldwide Market

Coca-Cola was conceived in 1886 by an Atlanta pharmacist, Dr. J.S. Pemberton, who sold the beverage to customers at his soda fountain for a nickel a glass. Ex.155-J, pg.13. When Pemberton sold the rights to Coca-Cola to a local businessman just a few years later, he scarcely could have imagined how popular the beverage would become. Today, the Company owns, licenses, and markets not just its iconic soda but a spate of beverage brands that are sold in nearly every country on Earth. Doc.740, pgs.7-8. In 2007-2009, the relevant tax years here, roughly three-quarters of the Company's sales were from non-U.S. markets, and its portfolio included almost 500 brands spanning carbonated soft drinks, waters, juices, energy drinks, etc. Ex.7101-P, pgs.15, 27; Ex.7558-P-C, pg.1.

6

To create and sustain the Company's brands and demand for its products, the Company invests billions of dollars annually in marketing that keeps its products "at the top of consumers' minds." Doc.740, pg.30. And because consumers in different markets around the world have different preferences—owing to cultural, economic, and other forces—the Company invests significant resources to tailor consumer marketing and product development to each market. Doc.633, pgs.663:12-665:3; Doc.640, pgs.1360:7-1361:7; Doc.653, pg.2708:9-25; Doc.740, pgs.33-34.

Each country typically has a "local brand that is important." Doc.635, pg.899:10-12. In Brazil, for instance, beverages flavored with guaraná—"a fruit from the Amazon"—are extremely popular, so the Brazilian product portfolio includes Kuat, a locally developed guaraná beverage. Doc.637, pg.1055:13-14; *see* Doc.635, pg.893:10-17; Doc.637, pgs.1054:21-1056:3. Inca Kola (a "unique product" that tastes like "cream soda") and Mare Rosso (a bitter, non-alcoholic alternative to traditional aperitifs) similarly target the uniquely local consumer preferences in Peru and Spain. Doc.635, pg.898:3-4; *see id.*, pgs.897:24-898:18; Doc.639, pgs.1200:8-9, 1241:16-1242:13. And the list goes on. Such products are often so market-specific that efforts to commercialize them outside of their home markets have failed. *See, e.g.*, Doc.635, pg.898:4-7.

The Company also modifies products for local tastes in different markets and implements a locality-specific approach to marketing. Diet Coke "taste[s] different[]

7

in different countries," and is called Coca-Cola Light in many parts of the world, because of "different cultural connotations of the word 'diet.'" Ex.7151-P, pgs.60-61. Likewise, there are hundreds of formulations of Fanta that are "adjusted to the local taste." *Id.* at 60 (citation omitted). Identical products may also be marketed in different ways to target different demographics in different places. For instance, Sprite may be marketed as "cool, urban, [and] hip" in the U.S. but is associated "with family" in China. *Id.* (alteration in original).

Advertising is also fundamentally local in nature. As Coca-Cola's CEO testified, "the majority of the advertising [is] locally developed." Doc.634, pg.775:19-20. In Mexico, for example, global advertising campaigns might fill three out of 20 advertising spots. Doc.635, pg.914:9-21. Advertising that caters to the local market—centered around local concerns (e.g., HIV/AIDS awareness in South Africa), sporting events (e.g., soccer in Argentina), or holidays (e.g., Ramadan in Egypt)—would fill the rest. *See* Doc.634, pg.783:12-25; Doc.635, pgs.901:5-10, 914:9-21; Doc.672, pg.4899:22-24; Doc.740, pgs.34-35; Ex.7151-P, pgs.11-12. And even global advertising campaigns are not truly global. They must be "customized" using local actors, language, and music and avoid "themes and images that might offend local cultural and religious sensitivities." Doc.740, pg.34.

This focus on developing and sustaining demand in local markets is critical to the Company's success. *See, e.g.*, Doc.633, pg.714:22-23; Doc.699, pgs.8203:11-

8204:25, 8229:13-16, 8283:6-10.  As a former CEO testified, the Company is a "consumer-centric business of brands and consumer marketing is the key to keeping those brands relevant and healthy and dynamic and growing."  Doc.629, pg.243:2-7.  And that consumer marketing is "all driven locally," relying on "local insights, local knowledge, local partnerships."  *Id.*, pg.217:17; Doc.630, pg.335:12-13.  In short, the Company may be a "global business," but it "operates on a local scale in every community where [it] do[es] business."  Doc.629, pg.215:21-22.

### B.    The Company's Multinational Operations

To succeed at the local level, the Company—whose U.S. headquarters is in Atlanta—operates in a decentralized fashion through hundreds of affiliated and independent companies around the world.  The Company's international operations have three key planks:  supply-point companies, service companies, and bottlers.

*Supply-point companies.*  At the heart of the Company's global operations are 18 wholly owned foreign supply-point companies located around the world.  Doc.740, pg.28.  Coca-Cola licenses its intangibles—including the familiar trademarks, brand names, and logos—to these supply-point companies.  *Id.*, pgs.7, 13, 41-49.  Each supply-point company generally serves multiple countries and is responsible for all aspects of the markets it serves.

Supply-point companies own and operate plants that make concentrates (e.g., syrups, flavorings, and powders used to make beverages)—for Coca-Cola's products

and other products they independently own[3]—and distribute them to independent bottling companies in their markets. *Id.*, pgs.13-14.

But supply-point companies are also responsible for developing their local markets and for making the associated investments, including the consumer marketing that is necessary to sustain and grow the value of Coca-Cola products. *See, e.g.*, Doc.667, pg.4003:1-11; Doc.740, pg.56; Ex.7022-P, pg.1. Supply-point companies are responsible for determining what products to sell, under which brands, in what packaging, for what occasions, all depending on local preferences, and then for developing, financing, and running marketing campaigns to promote the products accordingly. *See, e.g.*, Doc.629, pgs.234:13-235:20; Doc.635, pgs.875:9-877:21; Doc.637, pg.1028:5-20; Doc.640, pg.1360:7-22; Doc.644, pgs.1898:11-1900:13; Doc.699, pgs.8228:24-8232:19; Doc.702, pgs.8718:18-8719:16.

Not surprisingly, these marketing activities require massive investment. During 2007-2009 alone, the six supply-point companies at issue in this case invested about $8.5 billion in consumer marketing. *See* Ex.7251-P, pg.54 n.123; *id.*, Exh.12 & App.A, pgs.1-8. Supply-point companies also pay billions of dollars to Coca-Cola each year for their licenses to use Coca-Cola's trademarks and other intangibles. *See* Doc.195, pgs.12-15; Doc.740, pgs.47-49.

---

[3] For example, Atlantic Industries, which owned and operated four of the six supply-point companies at issue here, owns the Schweppes trademarks in most jurisdictions. Doc.740, pg.42 n.14; *see id.*, pg.145 & nn.44-45.

*Service companies.*  Supply-point companies discharge their responsibilities in various ways.  Certain supply-point companies have in-house personnel that perform some or all of the relevant functions.  Doc.740, pgs.22-25 & n.9.  But supply-point companies also rely on a network of over 60 affiliated foreign service companies to perform some of these functions.  *Id.*, pgs.15, 22-25.  Service companies are located in or near the countries they serve, allowing them to develop relationships with the local bottlers and giving them on-the-ground knowledge of local customs that facilitates effective consumer marketing.  Doc.640, pgs.1357:21-1361:12; Doc.740, pgs.15, 19-20, 33-34.  Their employees, among other things, work with third-party firms to develop local advertising.  Doc.740, pgs.50, 198.

Some service companies are wholly owned by the supply-point companies they work with.  *Id.*, pg.15.  Others are wholly owned by other Coca-Cola subsidiaries.  *Id.*  But either way, supply-point companies pay for the service companies' costs, including marketing costs, plus an arm's-length profit—along with all other costs associated with their markets.  Doc.528, pgs.20-23; Doc.644, pg.899:8-16; Doc.667, pg.4045:2-9; Doc.740, pgs.25, 50-52, 56.  These costs therefore appear on the financial statements of the supply-point companies.  *See, e.g.*, Doc.186, pgs.5-8; Doc.644, pg.1899:8-22; Doc.645, pg.1939:2-5; Doc.667, pgs.3997:19-3998:9, 4003:1-11, 4045:2-9; Doc.706, pgs.9272:24-9273:7.

*Bottlers.* A separate set of companies—bottlers—purchase concentrates from supply-point companies, mix concentrates with other ingredients (such as purified water, carbon dioxide, and sugar), bottle finished drinks, and sell and distribute finished products to retailers within their territory. Doc.640, pg.1447:5-6; Doc.740, pg.17. Over 300 bottlers serve approximately 20 million stores, restaurants, bars, and other retail establishments globally. Doc.740, pg.16. For the most part, bottlers are independently owned and operated. *Id.*, pgs.16-18. In fact, many bottlers distribute *non*-Company products, such as beer. Doc.655, pg.3034:1-10; Doc.665, pgs.3719:20-3720:23; Doc.689, pg.7124:8-13.

Bottlers also play an independent role in marketing. As noted, supply-point companies are responsible for consumer marketing, including television and other advertising that builds brand equity. *See supra* at 9-10. Bottlers, by contrast, are responsible for marketing at retail locations where finished beverages are sold. Doc.740, pgs.37-38. For example, bottlers arrange in-store promotions and samples and invest in tangible promotional property, such as branded coolers used to chill and display products at retail establishments. *Id.*, pgs.39-40.

In contrast to supply-point companies, bottlers have extremely limited rights to Coca-Cola's intangible property. Bottlers can use Coca-Cola's trademarks for specific, limited purposes—namely, on packaging, delivery trucks, and coolers— but, unlike supply-point companies, have no other rights. *Id.*, pg.59.

### C. Transfer Pricing Of Royalties From Supply-Point Companies

This appeal concerns the amount of royalties due to Coca-Cola from six supply-point companies—specifically, those in Ireland, Brazil, Swaziland, Chile, Costa Rica, and Egypt—to license Coca-Cola's intangibles. *Id.*, pg.7. Although these supply-point companies are wholly owned by Coca-Cola, they are separate foreign entities that do business in foreign markets. As a result, they are not subject to U.S. income tax directly or as part of Coca-Cola—unlike Coca-Cola's domestic subsidiaries, which are consolidated in Coca-Cola's U.S. tax returns. Doc.740, pg.5.

The royalties that supply-point companies pay Coca-Cola affect how much of their income is subject to taxation by other countries and, as is important here, how much of Coca-Cola's income is subject to taxation by the U.S. *See, e.g., Amazon.com, Inc. v. Commissioner*, 934 F.3d 976, 980-81 (9th Cir. 2019). Generally speaking, these royalties are deductible by supply-point companies for foreign tax purposes and are income to Coca-Cola for U.S. tax purposes.

Transfer pricing seeks to ascertain the price that unrelated parties would reach when bargaining at arm's length. This arm's-length standard is grounded in section 482 of the Internal Revenue Code, which gives the IRS authority to allocate income among related entities if necessary to "clearly . . . reflect the income" of the entities, and in the regulations implementing section 482. 26 U.S.C. § 482; *see, e.g.,* 26 C.F.R. § 1.482-1(b)(1).

For many years, Coca-Cola and the IRS agreed on the method to determine arm's-length royalties from supply-point companies under section 482. Under that method, supply-point companies kept profits equal to 10% of gross sales and 50% of the remaining profits—an acknowledgment of their marketing and other investments—with the other 50% going to Coca-Cola as royalties. Doc.740, pgs.8-9; *see* Doc.642, pgs.1636:11-1637:3; Ex.242-J, pg.2. Given the percentage splits involved, this method is known as "10-50-50." Doc.740, pgs.8-9. In 1996, Coca-Cola and the IRS executed a closing agreement covering the 1987-1995 tax years that not only acknowledged that 10-50-50 produced an "arm's length amount of the Product Royalties . . . under Section 482 of the Internal Revenue Code," but also protected Coca-Cola from penalties as long as it followed 10-50-50—even as to "future" supply-point companies. Ex.242-J, pgs.3, 20-21; *see* 26 U.S.C. § 6662(a). The IRS then religiously audited Coca-Cola for compliance with 10-50-50 for over a decade after 1996. Doc.195, pgs.7-8; Doc.642, pg.1644:12-19.

The 1996 closing agreement was the "most important" agreement that Coca-Cola's then-general tax counsel ever signed. Doc.642, pg.1631:11-12. Although it roughly "doubl[ed]" royalties from supply-point companies, *id.*, pg.1633:5-6, to a rate Coca-Cola thought was "too high," Coca-Cola signed it because it created tax certainty for the Company, Doc.706, pg.9289:19-23. Thereafter, Coca-Cola "ma[d]e certain" it abided by 10-50-50, including by forgoing valuable tax-planning

opportunities and changes to its international structure. Doc.642, pg.1644:18-19; *see id.*, pg.1652:8-22; Doc.706, pg.9281:8-21. Coca-Cola used 10-50-50 in determining its taxes for 2007-2009—the tax years at issue here—just as it had for the previous 20 tax years with the IRS's blessing. Doc.195, pg.16; Doc.740, pg.78.

After Coca-Cola filed its 2007-2009 tax returns, however, the IRS abruptly switched course. *See* Doc.195, pgs.15-19. During the audit of those tax years, the IRS engaged Dr. T. Scott Newlon to prepare a transfer-pricing report for the six supply-point companies targeted by the IRS. Doc.698, pg.8029:9-22; Doc.740, pg.79; Ex.8294-R, App.G.[4] Newlon's report relied on a different transfer-pricing method—called the "comparable profits method" or "CPM"—which, as applied, artificially restricted the profitability of supply-point companies to the same return on tangible operating assets, or "ROA," as bottlers. Doc.740, pg.79; *see* 26 C.F.R. § 1.482-5(a); *infra* at 36-38. That method more than doubled the royalties that supply-point companies owed Coca-Cola to 45% of their revenues and 87% of their operating profits. Doc.740, pg.10; Ex.7251-P, pg.42.

---

[4] Newlon's report also considered the Mexican supply-point company. That company was different from the others at issue because it was a branch of Coca-Cola for U.S. tax purposes—meaning it was treated as part of Coca-Cola rather than as a separately taxable entity. Doc.740, pg.8 n.3. The IRS proposed royalty-related adjustments to Coca-Cola's credits for Mexican taxes paid by the Mexican supply-point company, but the Tax Court ruled on summary judgment that those adjustments were unwarranted. *See* Doc.106, pgs.31-32. The court's reasoning is not directly relevant to the issues in Coca-Cola's appeal, and the IRS did not cross-appeal. This brief therefore focuses on the other six supply-point companies.

In September 2015, the IRS issued Coca-Cola a notice of deficiency for 2007-2009. Doc.106, pg.11. Incorporating Newlon's CPM, the notice asserted adjustments of royalties owed to Coca-Cola totaling $9 billion for the six supply-point companies at issue. Doc.740, pg.83. Those select supply-point companies were not protected by double-taxation treaties with the U.S. Doc.113, pgs.4-5 n.5, 15-16. At the same time, however, the IRS did not disturb the use of 10-50-50 for the many other supply-point companies in countries with a taxation treaty with the U.S., such as France, China, and India. *Id.*, pgs.15-16.

That inconsistency was hardly accidental. Tax treaties between the U.S. and other countries allow taxpayers to seek assistance from designated taxing authorities in each country to ensure consistent adherence to the arm's-length standard and thereby avoid double taxation. *See, e.g.*, U.S. Model Income Tax Convention arts. 9(2), 23, 25 (Nov. 15, 2006), https://www.irs.gov/pub/irs-trty/model006.pdf. Taxpayers have no similar assistance mechanism for non-treaty countries. The IRS's selective implementation of its new method thus allowed it to evade scrutiny of its switch in methods by any other country's taxing authority.

### D. This Litigation

In December 2015, Coca-Cola petitioned the Tax Court for redetermination of the tax deficiencies asserted by the IRS, asserting that the IRS's adjustments were arbitrary, capricious, and unlawful in several respects. Doc.1, pgs.1, 3-7.

**1.**      In 2018, the Tax Court held a trial on the IRS's royalty adjustments for the six supply-point companies at issue. The Tax Court issued an opinion in November 2020 generally siding with the IRS. Doc.740, pg.1.

At the outset, the court rejected Coca-Cola's argument that the IRS had improperly "pulled the rug out from under it" by retroactively switching methods for the 2007-2009 tax years. *Id.*, pg.97. The court recognized that the IRS had expressly agreed that 10-50-50 produced "arm's length" results, *id.*, pg.95, and that Coca-Cola had relied on the IRS's "acquiesce[nce] in the use of [the 10-50-50] method during five prior audit cycles spanning a decade," *id.*, pg.11. But the court held that "each tax year stands on its own," Doc.762, pg.5, and the IRS could not be "estop[ped]" from changing methods, Doc.740, pg.98.

Next, the Tax Court upheld the IRS's new method—Newlon's CPM. *Id.*, pgs.109-46. In rejecting Coca-Cola's argument that the IRS's CPM was improper because it failed to account for supply-point companies' significant marketing investments to cultivate Coca-Cola's brands and other intangibles, the court explained that Coca-Cola—not the supply-point companies—owned the "trademarks and other intangible assets needed to manufacture and sell" beverages trademarked by Coca-Cola. *Id.*, pg.150. The court also concluded that supply-point companies did not actually engage in "marketing operations," and so did not bear any marketing investments, even though those investments were reflected on their

books.  *Id.*, pgs.130-31.  The court further rejected Coca-Cola's argument that the fundamental differences between supply-point companies and bottlers precluded the use of the IRS's CPM.  *Id.*, pgs.120-33.

Accordingly, the Tax Court concluded that the IRS "did not abuse [its] discretion in reallocating income from supply-point companies to [Coca-Cola] by use of the bottler CPM."  *Id.*, pg.146.[5]

2.      In November 2023, the Tax Court issued a separate opinion upholding the IRS's adjustment with respect to the Brazilian supply-point company.  As the court recognized, Brazilian law restricted the amount of royalties the Brazilian supply-point company could pay Coca-Cola to no more than $56 million—a tiny fraction of the roughly $1.8 billion the IRS claimed the supply-point company owed.  Doc.787, pg.8.  But, relying on a regulation that purported to allow the IRS to disregard such foreign legal restrictions—which a plurality of the full Tax Court had upheld in a splintered decision applying *Chevron* deference—the court nevertheless held that the IRS could allocate this "blocked" income to Coca-Cola.  Doc.787, pgs.4, 14; *see 3M Co. v. Commissioner*, 160 T.C. 50 (2023), *appeal pending*, No. 23-3772 (8th Cir. filed Dec. 29, 2023).

---

   [5]   Coca-Cola moved for leave to file a motion for reconsideration, arguing that the Tax Court should reconsider because of the IRS's bait and switch on 10-50-50 and because the IRS's CPM violates the section 482 regulations.  Doc.748, pgs.16-74.  The court denied that motion.  Doc.762, pg.1.

**3.** On August 2, 2024, the Tax Court entered a decision holding Coca-Cola liable for an additional $2.7 billion in federal income taxes for 2007-2009. Doc.799, pg.1. Coca-Cola timely appealed. Doc.806.

## SUMMARY OF ARGUMENT

The IRS's section 482 adjustments are arbitrary, capricious, and unlawful.

**I.** At the outset, the IRS's retroactive imposition of its new method for determining arm's-length royalties is arbitrary and capricious. The IRS agreed that 10-50-50 produced arm's-length results under section 482, granted Coca-Cola forward-looking penalty protection if Coca-Cola continued to follow that method, audited Coca-Cola for compliance with that method for over a decade, and, in 2009, reaffirmed that 10-50-50 was appropriate. Yet after the 2007-2009 tax years ended, the IRS suddenly switched methods. And even then, it did so only for the six supply-point companies at issue, while continuing to follow 10-50-50 for supply-point companies in countries with double-taxation treaties with the U.S. The IRS's decision to jettison 10-50-50—suddenly, selectively, and without notice or justification—is arbitrary and capricious many times over.

**II.** The new transfer-pricing method adopted by the IRS and approved by the Tax Court is arbitrary, capricious, and unlawful in its own right. Most problematically, the CPM as applied here contravenes section 482 as implemented by the IRS's own regulations and does not produce arm's-length results. The

section 482 regulations require that the transfer price of a related-party transaction reflect the parties' contributions, according with the economic common sense that unrelated parties would demand the same. But the IRS's new method completely ignores what supply-point companies bring to the table and defies economic sense.

Supply-point companies' primary and most valuable contributions are the billions of dollars they invest in consumer marketing to cultivate demand for Coca-Cola's products. But the IRS's CPM completely disregards those contributions, in violation of the regulations. Instead, it sets royalties to allow supply-point companies to earn the same fixed percentage of their *tangible* operating assets that bottlers earn, and no more. The only way for supply-point companies to reduce royalties, and keep more profits, is to invest more in their *physical* assets. As a result, under the IRS's method, a supply-point company would get zero credit in the calculation of royalty amounts if it invested billions of dollars in marketing that boosted sales of Coca-Cola's products, but the royalties it owed would *decrease* if it inflated its tangible assets by wastefully plating its buildings with gold.

The IRS's CPM also violates the regulations by failing to account for the supply-point companies' own valuable intangibles, and by adopting a fundamentally flawed comparison between supply-point companies and bottlers—entities that operate at different levels of the marketplace, have different functions, and own a

20

drastically different mix of tangible and intangible assets. Any one of these errors requires setting aside the Tax Court's decision blessing that method.

**III.** Finally, the IRS improperly required the Brazilian supply-point company to pay almost $1.8 billion to Coca-Cola in royalties that Brazilian law prohibited it from paying. Under longstanding precedent, an amount that a taxpayer may "not lawfully receive" is not "income" under section 482. *Commissioner v. First Sec. Bank of Utah, N.A.*, 405 U.S. 394, 405 (1972). The Tax Court allowed the IRS to override that plain-meaning interpretation of "income" based on a flawed decision from a plurality of the full Tax Court that invoked the *Chevron* doctrine to defer to the IRS's attempt to rewrite the meaning of "income." That decision cannot survive *Chevron*'s demise. And, under *First Security,* royalties blocked by Brazilian law are not "income" subject to allocation under section 482.

This Court should reverse.

**STANDARD OF REVIEW**

A court reviewing a section 482 determination by the IRS first considers whether that determination is "arbitrary, unreasonable or capricious." *Brittingham v. Commissioner*, 598 F.2d 1375, 1377 (5th Cir. 1979). If it is, then it must be set aside. *See Eli Lilly & Co. v. Commissioner*, 856 F.2d 855, 861, 868-73 (7th Cir. 1988). This Court "review[s] Tax Court decisions 'in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury.'"

21

*Commissioner v. Neal*, 557 F.3d 1262, 1268-69 (11th Cir. 2009) (citation omitted). It thus "review[s] the Tax Court's legal conclusions de novo and its factual findings for clear error." *Hewitt v. Commissioner*, 21 F.4th 1336, 1341-42 (11th Cir. 2021). "Rulings on issues of law, including those that apply law to fact," are reviewed de novo. *United States v. Shamsid-Deen*, 61 F.4th 935, 944-45 (11th Cir. 2023).

## ARGUMENT

**I.  THE IRS'S SELECTIVE BAIT AND SWITCH IN TRANSFER-PRICING METHODS IS ARBITRARY AND CAPRICIOUS**

The threshold problem with the Tax Court's decision is its ruling excusing the IRS's blatant bait and switch with respect to the method for determining arm's-length royalties under section 482 for the 2007-2009 tax years.

**A.**  Section 482 grants the IRS a measure of discretion to allocate income among related taxpayers to reflect their true incomes. But the IRS cannot wield that discretion in a manner that is "arbitrary, unreasonable or capricious." *Brittingham v. Commissioner*, 598 F.2d 1375, 1377 (5th Cir. 1979). The "ordinary" understanding of "arbitrary and capricious"—which pre-dates the Administrative Procedure Act ("APA")—imposes fundamental limitations on agencies. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009); *see U.S. Capitol Police v. Office of Compliance*, 908 F.3d 748, 756 (Fed. Cir. 2018); *G.U.R. Co. v. Commissioner*, 117 F.2d 187, 188 (7th Cir. 1941) (pre-APA decision applying arbitrary-and-capricious standard to determinations under section 482's predecessor). The IRS's

sudden, retroactive, and selective abandonment of 10-50-50 for the 2007-2009 tax years flouts these critical limitations.

Of course, an agency may change its position on a going-forward basis when circumstances warrant. But when it does so, it "must … be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account,'" including those that arise from the agency's course of conduct. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016) (citation omitted). An agency thus acts arbitrarily and capriciously if it "unfair[ly] surprise[s]" a regulated party by abruptly changing its position on what is allowed or forbidden without notice. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (citation omitted); *see, e.g.*, *De Niz Robles v. Lynch*, 803 F.3d 1165, 1169 (10th Cir. 2015) (Gorsuch, J.) (recognizing "the due process interests of 'fair notice, reasonable reliance, and settled expectations'" (citation omitted)).

The arbitrary and capricious nature of such an unfair surprise is magnified significantly if an agency attempts to "impose potentially massive liability" for "'past actions which were taken in good-faith reliance'" on its prior position. *Christopher*, 567 U.S. at 155, 157 (citation omitted). Doing so is not just arbitrary and capricious, but a violation of due process as well. *See, e.g.*, *PHH Corp. v. CFPB*, 839 F.3d 1, 46 (D.C. Cir. 2016) (Kavanaugh, J.), *reinstated in pertinent part on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018) (en banc). As then-Judge Kavanaugh put it,

"[n]o one would seriously contend" that a police officer acts "in a manner consistent with basic due process" if she directs a pedestrian to cross the street in a particular place, the pedestrian follows those directions, and "the officer hands the pedestrian a $1,000 jaywalking ticket" after arriving at the other side. *Id.* at 49.

In addition, even when an agency does not unfairly spring a new position on a party, it must still act consistently. An agency must treat like cases alike and "justify the disparate treatment" of those "that seem similarly situated." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018). Treating the same circumstances differently without any justification is another hallmark of arbitrary agency action. *See Encino Motorcars*, 579 U.S. at 222.

**B.** A highly unusual combination of circumstances here renders the IRS's attempt to retroactively impose a new transfer-pricing method on Coca-Cola for 2007-2009 arbitrary and capricious and, indeed, the epitome of an unfair surprise.

Coca-Cola reasonably believed that 10-50-50 complied with section 482's arm's-length standard. In the 1996 closing agreement, the IRS expressly stated that 10-50-50 produces "arm's length" results under section 482 and applied 10-50-50 to determine the 1987-1995 royalties. Ex.242-J, pg.3. As Coca-Cola's former general tax counsel testified, the IRS's agreement that 10-50-50 produced "arm's length" results, *id.*—the legal touchstone for transfer-pricing determinations, 26 C.F.R. § 1.482-1(b)(1)—was "really very, very critical" to Coca-Cola, Doc.642, pg.1631:7.

The closing agreement also granted an unusual and important form of forward-looking legal protection to Coca-Cola.  The agreement guaranteed that, as long as Coca-Cola applied 10-50-50 "with respect to existing or any future supply [p]oints," it would not face accuracy-related penalties from royalty adjustments. Ex.242-J, pg.20.  Conversely, if Coca-Cola had used a different method for 2007-2009, it would have risked penalties of up to 40%—possibly into the billions of dollars given the amounts involved.  *See* 26 U.S.C. § 6662(a), (h).  The prospect of such penalties created "a strong disincentive to change," confirming the IRS's endorsement of 10-50-50 for future tax years.  Doc.706, pg.9281:8-9.  Coca-Cola avoided taking "any steps" that could have put the penalty protection "at risk," including forgoing valuable tax-planning opportunities.  *Id.*, pg.9281:14-21.

Moreover, the IRS reinforced that 10-50-50 produces arm's-length results through over a decade's worth of subsequent conduct.  Coca-Cola was under continuous audit by the IRS, including as to its transfer pricing, and thus was in constant communication with the IRS.  *See, e.g.*, Doc.195, pgs.7-8.  Yet, for tax years 1996-2006, the IRS never "disturb[ed] the application of the [10-50-50] method." Doc.642, pg.1644:20-22.  On the contrary, the IRS audited Coca-Cola "to make certain [it was] *complying* with" 10-50-50.  *Id.*, pg.1644:12-19 (emphasis added); *see* Doc.195, pgs.6-12.  Each audit reinforced that Coca-Cola was required to remain in "compliance with . . . 10-50-50." Doc.644, pg.1854:9-16.  As the Tax

Court itself recognized, "[e]xplicitly or implicitly," the IRS approved the use of 10-50-50 "from 1987 through 2006"—two decades. Doc.106, pg.19.

Further, the IRS stipulated that, "[a]t no time prior to [Coca-Cola's] filing its 2009 Federal income tax return on September 1, 2010, did any IRS employee advise [Coca-Cola], in writing or otherwise, that the IRS would no longer accept [10-50-50]." Doc.195, pgs.15-16; *see* Doc.740, pgs.10-11, 97. Indeed, as late as June 2009 the IRS issued an audit report to Coca-Cola making clear that "the continuing application of [10-50-50] to the post 1995 years *seems appropriate.*" Ex.246-J, pg.2 (emphasis added); *see* Ex.245-J, pg.1. As the IRS admitted, it did not signal dissatisfaction with 10-50-50 until "2011, well *after* [Coca-Cola] filed its tax returns for 2007-2009," and did not unveil its new method until much later. Doc.106, pg.18 (emphasis added); *see* Doc.195, pgs.15-16; Ex.252-J-C, pg.1. As Coca-Cola's then-general tax counsel testified, he was "shocked" and "couldn't believe" the IRS's sudden about-face. Doc.642, pgs.1666:8-10, 1667:5.

Worse, the results produced by the IRS's CPM were unusually harsh. This method more than doubled royalties from 10-50-50 levels, increased royalties by billions of dollars a year for the six supply-point companies at issue, and reduced their operating income by close to 90%. Doc.740, pgs.75, 83; Ex.7251-P, Exh.7; Ex.8294-R, App.B, pgs.B1-B8. Yet the IRS did not even attempt to justify its

sudden switch to a new method that produced results so utterly divorced from what it historically recognized were arm's length under section 482.

In short, to use then-Judge Kavanaugh's "jaywalking" hypothetical, the IRS, in effect, handed Coca-Cola a $3 billion jaywalking ticket in the form of a transfer-pricing bill for following the same method repeatedly blessed by the IRS for over a decade. This Court should not tolerate the IRS's attempted bait and switch.

**C.** In blessing the IRS's about-face, the Tax Court adopted the startlingly broad proposition that the IRS can essentially *always* switch methods, no matter the surrounding circumstances, because "each tax year stands on its own." Doc.762, pg.5; *see* Doc.740, pgs.97-98. To start, section 482 does not confer carte blanche to rearrange affiliated entities' taxes; it grants limited authority to reallocate income to capture each entity's true income, and, like other agency power, that authority cannot be exercised arbitrarily. Each year may be new, but it does not exist in a vacuum. The validity of the IRS's actions in any given tax year must be evaluated in the context of preceding years. Here, the IRS has never pointed to *any* change in law or facts that supported its switch in methods or showed why 10-50-50 produced arm's-length results in 2006 but not in 2007. Approving the IRS's maneuver would grant it an authority no other agency has and would permit it to wield its vast taxing power—one that literally includes the "power to destroy," *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819)—unchecked.

27

Instead of analyzing the IRS's unfair surprise under the settled arbitrary-and-capricious standard, the Tax Court recast Coca-Cola's argument. It primarily reasoned that the government cannot be *estopped* from changing positions absent a specific "promise." Doc.762, pg.4 (citation omitted). But Coca-Cola's argument was not based on estoppel or an attempt to enforce any explicit "promise" that the IRS made to Coca-Cola. Rather, it was based on the fundamental prohibition against arbitrary and capricious agency action, which the Supreme Court long ago recognized exists independent of estoppel. *See Lyng v. Payne*, 476 U.S. 926, 936-37 (1986) (plaintiff not required "to satisfy the requirements of proving an equitable estoppel to obtain the relief specifically available under the APA").

Nor is the IRS exempt from the fundamental limitations that the arbitrary-and-capricious standard imposes on the exercise of agency power. As noted, the arbitrary-and-capricious standard has a deeper grounding in law than the APA itself, and all agree that the IRS's section 482 determinations are reviewed under that standard. *See Fox Television*, 556 U.S. at 516; Doc.762, pgs.6-7. Moreover, the Supreme Court has emphatically declined "to carve out an approach to administrative review good for tax law only." *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 55 (2011).[6]

---

[6] The Tax Court faulted Coca-Cola for relying in part on APA cases. Doc.762, pgs.5-6. But as noted, the arbitrary-and-capricious standard pre-dates the APA, so

In carving out just this sort of an approach, the Tax Court pointed to the fact that the Supreme Court has permitted the IRS to "change an earlier interpretation of law, even if such a change is made retroactive in effect." *Dickman v. Commissioner*, 465 U.S. 330, 343 (1984); *see* Doc.762, pg.6. But this case is different. Cases like *Dickman* allowed the IRS to enforce the correct meaning of a statute that existed all along, even if the IRS previously interpreted the statute incorrectly. *See* 465 U.S. at 342-43; *see also Chock Full O' Nuts Corp. v. United States*, 453 F.2d 300, 303 n.8 (2d Cir. 1971) (no retroactivity problem arises because the question is "what the statute has always meant" (citation omitted)). Here, the IRS did not change or correct its *interpretation* of section 482 or any other statute.

Rather, the IRS simply changed its mind about whether 10-50-50 continued to produce arm's-length results under section 482—under facts and law that did not change. The IRS was not free to do so retroactively as it did here. *See, e.g.*, *Automobile Club of Mich. v. Commissioner*, 353 U.S. 180, 183-84 (1957) (distinguishing cases involving "correction of an erroneous ruling of law" from cases involving the exercise of discretion); *Woodworth v. Kales*, 26 F.2d 178, 180 (6th Cir. 1928) (refusing to allow the Commissioner to change his determination of stock value based on a "matured and better judgment").

Coca-Cola's argument does not depend on the APA. In any event, the APA applies to all Executive Branch agencies except those Congress has exempted expressly. *See* 5 U.S.C. §§ 551(1), 559. Congress has not exempted the IRS.

**D.** But that is not all. The IRS also flouted the requirement that agencies must treat like circumstances alike by abandoning 10-50-50 only as to the six supply-point companies at issue here while still applying 10-50-50 to 11 others. As the IRS's own expert testified, the CPM the IRS applied to those six cannot coexist with the 10-50-50 method it applied elsewhere. *See* Doc.700, pg.8336:11-14 ("[I]f the facts were such that the 10-50-50 was the right transfer pricing method, then the facts wouldn't be consistent with the CPM being the right transfer pricing method."). In effect, this created two different arm's-length standards applicable to the same kinds of transactions—one for the supply-point companies at issue (for which 10-50-50 supposedly no longer produced arm's-length results under section 482), and one for the rest (for which 10-50-50 continued to produce arm's-length results). To the IRS, 10-50-50 is apparently Schrödinger's transfer-pricing method: producing arm's-length and non-arm's-length results at the same time.

Worse, this inconsistency was entirely opportunistic. The IRS abandoned 10-50-50 selectively—and only for supply-point companies that were not protected by a double-taxation treaty with the U.S.—to evade scrutiny of its new CPM by foreign taxing authorities.[7] Doc.113, pgs.4-5 n.5, 15-16; *see supra* at 16. If the IRS had

---

[7] The Mexican supply-point company is the sole exception. The IRS proposed royalty-related adjustments for this company despite the existence of a double-taxation treaty between the U.S. and Mexico. *See supra* at 15 n.4; Doc.113, pg.15 n.15. But when Coca-Cola and the Mexican supply-point company sought treaty-

applied its new method to supply-point companies protected by taxation treaties, then foreign taxing authorities could have—and almost certainly *would* have—challenged the IRS's adoption of a method that shifted billions of dollars of income—and thus tax revenues—from their countries to the U.S. The IRS has never identified any facts to support the conclusion that 10-50-50 produces arm's-length results in countries with double-taxation treaties, but not elsewhere.

Even though Coca-Cola pointed out the IRS's gross opportunism, the Tax Court just ignored it. But the IRS's selective application of section 482's arm's-length standard to supply-point companies that are similarly situated in all relevant respects alone renders the IRS's switch in methods arbitrary and capricious.

*     *     *

As the Supreme Court has admonished, just as the people have a duty to "turn square corners when they deal with the government," "the Government should turn square corners in dealing with the people." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020) (citations omitted). The IRS lost sight of that fundamental duty here. Whatever its ultimate tax objectives, the IRS acted arbitrarily and capriciously in retroactively and selectively springing its new method on Coca-Cola for the 2007-2009 tax years at issue. As a result, that method cannot lawfully be applied to Coca-

---

based relief, the IRS refused to participate, depriving Coca-Cola of its only opportunity to seek a foreign taxing authority's review of the IRS's adjustments. Doc.106, pgs.11-12.

Cola for those tax years. And because the IRS has never otherwise challenged Coca-Cola's compliance with 10-50-50 for those tax years, Coca-Cola is entitled to judgment that no section 482 adjustments were warranted.

## II. THE IRS'S NEW TRANSFER-PRICING METHOD IS ARBITRARY, CAPRICIOUS, AND UNLAWFUL

The IRS's new method—Newlon's CPM—also fails on its own terms. Section 482 allows the IRS to make limited adjustments to "clearly . . . reflect the income" of related entities. 26 U.S.C. § 482. All agree that such adjustments are governed by the arm's-length standard. And the IRS's regulations implementing section 482 set out a variety of rules and requirements for determining "the method that . . . provides the most reliable measure of an arm's length result." 26 C.F.R. § 1.482-1(c)(1). The IRS's CPM flunks these key requirements, especially insofar as it fails to account for the value created by the billions of dollars of marketing investments that supply-point companies make.

### A. The IRS's CPM Directly Contravenes The Section 482 Regulations By Failing To Reward Supply-Point Companies For Their Significant Marketing Investments And Intangibles

As discussed, Coca-Cola licenses its trademarks, processes, and other intangibles to supply-point companies to enable them to operate the Company's business in the markets they serve. The supply-point companies' biggest expense—billions of dollars a year—is for marketing, advertising, and other consumer-facing activities related to their markets. *See* Ex.7251-P, pg.54 n.123; *id.*, Exh.12, App.A,

pgs.1-8. These investments are critical to creating—and sustaining—demand for Coca-Cola products around the world. *See supra* at 6-9. Yet the IRS's CPM failed to account for the billions of dollars in marketing investments made by supply-point companies and other intangibles. That violates the section 482 regulations.

**1. The Regulations Recognize And Account For Supply-Point Companies' Marketing Investments And Intangibles**

The regulations require any method for producing an arm's-length result to take into account "the use of valuable intangibles." 26 C.F.R. § 1.482-1(d)(3)(i). The term "intangible" is defined broadly: It includes "licenses," "contracts," "processes," "know-how," and other specified things. *Id.* § 1.482-4(b). Moreover, for purposes of determining an arm's-length result, the regulations require "consideration" of any "contribution by one controlled taxpayer that develops or enhances the value . . . of an intangible owned by another taxpayer." *Id.* § 1.482-4T(f)(4)(i).

The regulations thus require that a transfer-pricing determination of supply-point companies' royalties reflect the massive investments they make in (at least) two different ways. First, supply-point companies must be rewarded for the investments they make to cultivate the value of their licenses with Coca-Cola and their other intangibles. *See id.* § 1.482-4(b); 71 Fed. Reg. 44466, 44476 (Aug. 4, 2006). The IRS and its own expert recognized these intangibles exist. *See, e.g.*, Doc.713, pg.10119:10-22 (IRS expert agreeing that marketing investments create

33

"enhanced contract value" or "enhanced relationship value" intangibles); Ex.46-J-C, pg.3 (1984 letter ruling from the IRS recognizing that investments made by supply-point companies generated goodwill); Ex.7101-P, pgs.20-22 (Coca-Cola expert stating that investments made by supply-point companies in marketing, advertising, and other consumer-facing activities "build product recognition" and "product differentiation" and "create . . . trademark-related intangible assets").

Second, and in any event, supply-point companies must get credit to the extent their billions of dollars of marketing investments enhanced the value of *Coca-Cola's* trademarks and other intangibles. Spending billions to market Coca-Cola, Sprite, Fanta, and other beverage brands around the world unquestionably enhances the value of Coca-Cola's trademarks and other intangibles related to those brands. *See* Doc.740, pg.156; Ex.7101-P, pgs.21-22. The regulations explicitly require "consideration" of supply-point companies' contributions that "develop[] or enhance[] the value" of those intangibles. 26 C.F.R. § 1.482-4T(f)(4)(i); *see DHL Corp. v. Commissioner*, 285 F.3d 1210, 1222 (9th Cir. 2002) (transfer-pricing analysis needed to reflect the value of the affiliate's contributions to trademark).

Examples in the regulations bring the point home. A recurring fact pattern in the examples is that of "FP, a foreign producer of athletic gear" under the "AA trademark," which licenses the "exclusive rights to certain manufacturing and marketing intangibles (including the AA trademark) for purposes of manufacturing

34

and marketing athletic gear in the United States" to its "United States subsidiary, USSub." 26 C.F.R. § 1.482-1T(d)(3)(ii)(C), Example 4; *see id.* § 1.482-4T(f)(4)(ii), Examples 3-6. The regulations make clear that the royalty USSub pays to FP should reflect the marketing activities that it and FP contractually agree to perform. *See id.* § 1.482-4T(f)(4)(ii), Example 3. And if USSub performs "incremental marketing activities," it must benefit from those activities too—either through "increased sales or revenues of trademarked products in the U.S. market" that "increase the value" of its "license to use the AA trademark," *id.*, Example 4, or through an adjustment that accounts for how those activities "contribut[e] to the value of the [AA] trademark owned by FP," *id.* § 1.482-1T(d)(3)(ii)(C), Example 4.

Here, the geographical positions are switched—Coca-Cola, the U.S. company, is the licensor receiving royalties, and supply-point companies, the foreign affiliates, are the licensees paying royalties—but there is no basis for the result to be any different. The royalties from supply-point companies, as licensees, to Coca-Cola, as licensor, must reflect the substantial marketing investments made by supply-point companies and allow them to profit from those investments.

### 2. The IRS's CPM Failed To Credit Supply-Point Companies' Valuable Marketing Investments And Intangibles

The critical flaw in the IRS's transfer-pricing method is that it did not give the supply-point companies credit for those investments. Accordingly, even the IRS's

35

own expert recognized that whether supply-point companies must earn a return on all of their marketing investments is "the crux of the case." Doc.713, pg.10203:12.

As noted, the IRS's CPM determined royalties by comparing the profitability of supply-point companies to that of supposedly comparable bottlers. The IRS's CPM allowed supply-point companies to earn the return on their tangible operating assets—physical assets like facilities and equipment—achieved by bottlers and then shifted any profits over that amount to Coca-Cola as royalties. Doc.698, pg.8051:17-20; Doc.740, pgs.80-81, 114; Ex.8294-R, pgs.42-43.

For example, the Costa Rican supply-point company had tangible operating assets of about $44 million. Ex.8294-R, App.B, pg.B8. The IRS's CPM compared it to bottlers with a median return on tangible assets, or ROA, of about 35%, and so determined that the supply-point company should earn operating profits of about $15 million a year ($44 million times 35%). Doc.740, pgs.75, 81, 144; Ex.8294-R, pgs.51-52. Any profits over that amount were shifted to Coca-Cola as additional royalties. Doc.740, pgs.75, 83; Ex.8294-R, pg.52; *see* Ex.7251-P, pgs.16-18.

Because the ROA-based analysis considered only *tangible* operating assets on the balance sheets of supply-point companies and bottlers, it completely excluded the value of licenses, goodwill, and intangibles created through marketing and similar investments. *See* Ex.7252-P, pgs.6-8. It also failed to credit supply-point companies' marketing investments in any other way.

This makes no sense. For example, during 2007-2009, the Costa Rican supply-point company generated about $212 million per year in revenue and spent about $53 million per year on direct marketing alone. Doc.740, pgs.72, 74. Yet the IRS's CPM allowed it to earn about $15 million per year no matter what. *See supra* at 36. So as Newlon himself admitted, the Costa Rican supply-point company would earn the same amount of money whether it spent "one dollar on consumer marketing" and sales plummeted, "or a billion dollars on consumer marketing" and sales skyrocketed. Doc.700, pg.8357:13-22. It could have earned more only by investing more in tangible operating assets like facilities. Put differently, under the IRS's CPM, it would have profited more by wastefully roofing its buildings with gold shingles than by investing in consumer marketing that boosted sales.

And consider the Egyptian supply-point company. It had operating *losses* during 2007-2009—reflecting the real risks that supply-point companies take in marketing products. Doc.740, pg.75. So the IRS's CPM worked in reverse: The IRS's CPM determined that, because the Egyptian supply-point company owned tangible operating assets, it should have been profitable and effectively forced Coca-Cola to return $95 million so that it would achieve an ROA on par with bottlers. *Id.*, pgs.10, 83. Yet the Egyptian supply-point company sustained millions of dollars of *losses* during this period. *Id.* There is no obvious (or economic) reason for Coca-

Cola to subsidize the Egyptian supply-point company for its unprofitable use of Coca-Cola's intangibles, as the IRS's flawed CPM does.

These irrational results demonstrate the arbitrariness and capriciousness that pervades the IRS's CPM. And the impact on royalties, and thus Coca-Cola's tax liability, is dramatic. One of Coca-Cola's experts, Dr. Robert Willig used the IRS's CPM to perform the same comparison between supply-point companies and bottlers, and merely adjusted the assets of supply-point companies and bottlers to take into account the marketing and other investments that the IRS's CPM ignores. *See* Ex.7251-P, pgs.50-62; Ex.7252-P, pgs.33-36. That one fix "eliminate[d] *substantially all*" of the royalty adjustments at issue in this case. Ex.7251-P, pg.50 (emphasis added); *see* Ex.7252-P, pg.35. In other words, when the supply-point companies' investments are properly considered, even the IRS's own transfer-pricing method shows that its adjustments are arbitrary and capricious.

### 3. The Tax Court Erred In Approving The IRS's CPM

The Tax Court's decision upholding the IRS's application of the CPM rests on two key premises: first, that Coca-Cola's legal ownership of the licensed intangibles was dispositive; and second, that the billions of dollars of investments in marketing and other consumer-facing activities made by supply-point companies did not count for anything. Both premises are demonstrably wrong.

### a. The Tax Court's "Legal Ownership" Test Flouts The Regulations

*i.* The Tax Court concluded that, because Coca-Cola "was the registered legal owner of virtually all trademarks and other intangible assets," supply-point companies were not entitled to profits from their use of those intangibles. Doc.740, pg.156; *see id.*, pg.119. The court's sole focus on Coca-Cola's legal ownership was wrong and incompatible with the section 482 regulations.

The regulations make clear that the holder of a license has a distinct ownership right. They provide that "[t]he legal owner of an intangible" and "the holder of rights constituting an intangible pursuant to contractual terms (such as the terms of a license)" "will be considered the sole owner of the respective intangible." 26 C.F.R. § 1.482-4T(f)(3)(i)(A). As the word "respective" indicates, the regulations contemplate two *separate* intangibles—an underlying intangible and a license to that intangible—each with a different "sole owner." *Id.*; *accord* 71 Fed. Reg. at 44476. And that makes sense. A license to a trademark, for example, grants the licensee valuable rights to exploit the trademark, even though it does not transfer legal ownership of the trademark. *See, e.g.*, 2 Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:45.50 (5th ed. 2025, online) ("[T]he licensee acquires no ownership rights in the mark itself."). So supply-point companies' *licenses* of Coca-Cola's trademarks and other intangibles were

39

independent intangibles that they owned, even though Coca-Cola was the legal owner of the underlying trademarks, etc.

The IRS itself has disavowed legal ownership of an underlying intangible as controlling under the arm's-length standard. The IRS expressed misgivings about the "'all or nothing' results" that a legal-ownership approach could produce "in cases where an arm's length analysis . . . would require that the income attributable to an intangible be divided among the controlled taxpayers that made significant contributions to develop or enhance that intangible, and that hold legal rights with respect to that intangible." 68 Fed. Reg. 53448, 53449 (Sept. 10, 2003). The IRS thus explained that when, as here, multiple parties contribute to "the development or enhancement of [an] intangible" like a trademark under a license, transfer pricing should permit them to share income attributable to the intangible "in accordance with each party's contributions . . . and its ownership interest (if any)." *Id.*; *see* 71 Fed. Reg. at 44477; 26 C.F.R. § 1.482-4T(f)(4)(i).

In fact, the IRS made the same point with respect to Coca-Cola specifically for the tax years at issue. A Canadian subsidiary of Coca-Cola is the legal owner of trademarks in Canada, including the trademarks for Coca-Cola, Diet Coke, Sprite, and Fanta. Doc.514, pgs.2-3. The IRS did not view that "legal ownership" as important. Ex.2921-P, pg.8. Instead, the IRS argued that transfer pricing should reflect "the relative responsibilities for intangible development costs and risks

40

necessary to develop the intangible." *Id.*, pgs.8-9. Because, in that situation, *Coca-Cola* had "borne all costs and risks associated with developing the trademarks through extensive marketing, R&D and manufacturing process developments," the IRS reasoned that Coca-Cola should not owe royalties to the Canadian subsidiary "under any applicable transfer pricing principles"—even though the Canadian subsidiary legally owned the trademarks—resulting in higher income subject to U.S. income tax. *Id.*, pg.8. When the hypocrisy of that approach compared to the IRS's position here became apparent during the early stages of this litigation, the IRS quickly resolved the matter through an agreement with the Canadian taxing authority. Doc.514, pgs.5-6. But it could not erase its prior finding.

Here, the supply-point companies at issue bore the costs and risks associated with developing Coca-Cola's trademarks and other intangibles, and their licenses to those intangibles, in their markets. Under the IRS's own reasoning, supply-point companies were entitled to the benefits of their investments, even though they did not own the trademarks. The IRS cannot take one position when it suits its tax-collection purposes and the exact opposite position when it doesn't.

*ii.* The Tax Court also justified its disregard of supply-point companies' licenses to Coca-Cola's intangibles because the court perceived the licenses to be terminable and non-exclusive. Doc.740, pgs.156-59, 172-75. But under the regulations, the court had to consider a number of factors, including "[r]isks."

41

26 C.F.R. § 1.482-1(d)(1)(ii)-(iii). If supply-point companies' licenses *were* terminable and non-exclusive, that would make them *riskier*, meaning Coca-Cola would have received a *smaller* royalty under such contracts at arm's length, as an IRS expert conceded. Doc.712, pg.9931:16-25. The court never explained why it declined to consider supply-point companies' economic risks in its analysis, as the regulations required. *Contra Pine Mountain Pres. LLLP v. Commissioner*, 978 F.3d 1200, 1210 (11th Cir. 2020); *Medtronic, Inc. v. Commissioner*, 900 F.3d 610, 614 (8th Cir. 2018).

*iii.* Finally, invoking the judge-made "*Danielson* rule," the Tax Court concluded that the supply-point companies at issue did not have any valuable intangibles because there was no written contract explicitly recognizing them. Doc.740, pgs.160-66; *see Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967) (en banc). The *Danielson* rule prevents the IRS from having to litigate against multiple taxpayers to collect a single tax by generally prohibiting taxpayers from "challeng[ing] the form of a transaction" they agreed to. *United States v. Fort*, 638 F.3d 1334, 1338 (11th Cir. 2011) (citation omitted); *see Plante v. Commissioner*, 168 F.3d 1279, 1281 (11th Cir. 1999) (per curiam). It has no place here.

Coca-Cola is not trying to change the transaction; it is *honoring* the form of the transaction because supply-point companies undisputedly had licenses to Coca-Cola's intangibles. There is also no risk of the IRS having to litigate against multiple

parties, because any section 482 adjustment to Coca-Cola requires a corresponding adjustment to the supply-point companies at issue. *See* 26 C.F.R. § 1.482-1(g)(2). And the regulations ultimately require an arm's-length result based on the economic substance of the transaction, not just the contractual terms. *See supra* at 41-42; *see also* 26 C.F.R. § 1.482-1(d)(3)(ii)(B)(1). *Danielson* is simply inapplicable here.

### b. The Tax Court Erroneously Erased The Costs—And Risks—Borne By Supply-Point Companies As To Their Substantial Marketing Investments

In an apparent attempt to wipe out supply-point companies' significant investments in marketing and other consumer-facing activities, the Tax Court also claimed that the supply-point companies at issue did not actually bear the costs—and risks—of those investments. That is nonsense.

First, the Tax Court dismissed those substantial investments on the ground that the supply-point companies at issue "had no legal obligation" to make them. Doc.740, pg.170. That was wrong twice over. To begin, the regulations recognize that, even absent a legal obligation, related parties must be compensated for investments that enhance the value of another party's intangibles. *See supra* at 33-35. And, in any event, supply-point companies also were required to make these investments by contracts, their longstanding course of dealing with Coca-Cola, and accounting and U.S. tax principles requiring them to bear the marketing investments for the markets in which they earn the associated revenue. *See, e.g.*, Doc.642,

pgs.1614:1-20, 1620:9-1621:9, 1656:22-1659:17; Doc.643, pgs.1747:3-10, 1806:1-4; Ex.7020-P, pg.2; Ex.7022-P, pg.1.  In fact, multiple closing agreements between the IRS and Coca-Cola specifically required marketing investments to be charged to the appropriate supply-point company and not to Coca-Cola.  *E.g.*, Doc.642, pgs.1656:22-1659:17; Ex.3290-P, pg.1; Ex.3291-P, pg.1; Ex.7021-P, pg.1; Ex.7022-P, pg.1.  Yet the IRS's CPM—and the Tax Court—gave supply-point companies zero credit for those marketing investments.

Second, the Tax Court reasoned that "spending money on consumer advertising" does not "give[] rise to freestanding intangible assets."  Doc.740, pg.168.  But it has long been accepted that marketing and similar investments that contribute to "'the expectancy of continued patronage'" create "customer-based intangibles."  *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555-57 (1993) (citation omitted); *see, e.g.*, *In re Northwestern Yeast Co.*, 5 B.T.A. 232, 237 (1926) ("[P]romotion expenditures . . . fertilize the field for new production.").  Such expenditures are not always recognized on the balance sheet as an accounting matter because of difficulties in allocating the value "between current and long-term benefits," but that does not mean they do not exist.  *RJR Nabisco Inc. v. Commissioner*, 76 T.C.M. (CCH) 71, 82 (1998); *see, e.g.*, Doc.700, pgs.8300:16-8301:1-24;  Doc.713,  pgs.10095:7-18,  10111:12-16;  Ex.7101-P,  pgs.20-21; Ex.7251-P, pgs.26-27; Ex.7252-P, pgs.8, 16.

Here, supply-point companies invested billions of dollars to develop, sustain, and grow demand for Coca-Cola products around the world. Whether or not those investments created "freestanding" intangibles or merely enhanced the value of other intangibles, supply-point companies are entitled to credit for the value generated by their investments. *See, e.g.*, Doc.713, pg.10119:10-22 (IRS expert agreeing that marketing investments would give rise to "enhanced contract value" or "enhanced relationship value" intangibles, whether or not there is a contract).

Third, the Tax Court suggested that supply-point companies did not bear "marketing risk" because they were "simply charged" for marketing and similar investments while service companies did the work. Doc.740, pgs.129-31, 167. In this respect, the court contradicted both itself and unrebutted evidence. As to the former, the Tax Court found that employees of the Brazilian, Chilean, and Egyptian supply-point companies *did* perform "marketing, sales, and finance" functions. *Id.*, pg.25. As to the latter, extensive and unrefuted testimony established that supply-point companies were responsible for marketing, including making sure marketing was effective, making sure they could pay for marketing, and actually bearing the cost of marketing in their region. *See, e.g.*, Doc.629, pgs.234:20-235:4; Doc.630, pg.437:15-24; Doc.633, pgs.634:21-636:23; Doc.635, pgs.875:14-876:6; Doc.637, pg.1028:3-20; Doc.644, pg.1899:5-16; Doc.667, pgs.4002:2-4005:8; Doc.702, pgs.8718:18-8719:16; *supra* at 43-44. The record was also unrebutted that, if they

"g[o]t [marketing] wrong," supply-point companies had to bear the risk and thus pay the "price" in lost "profits."  Doc.629, pgs.211:22-212:5.

Moreover, the Tax Court's dichotomy between supply-point companies and service companies does not hold up.  As the court recognized, supply-point companies paid the service companies' expenses, including an appropriate, arm's-length profit margin.  Doc.740, pgs.25, 50-52, 56.  As a result, supply-point companies bore the risk of loss while service companies were guaranteed profits regardless of whether the expenses and activities were successful. *See, e.g.*, Doc.705, pgs.9156:3-9159:16.  The Egyptian supply-point company's experience illustrates that those risks are real. *See supra* at 37-38.  So supply-point companies necessarily must get credit for the marketing and other activities that service companies performed—just as a business would get credit for similar activities done by any third-party firm it engaged to conduct them on its behalf. *See, e.g.*, Doc.699, pg.8167:3-11; Doc.714, pg.10233:1-5; Ex.7376-P, pgs.16-17.  For instance, when Nike hires a third party to advertise a new line of shoes, Nike bears the expense— and gets all the rewards or losses of those marketing efforts—even though the advertising firm conceives and implements the advertising campaign.  So too here.

**B.  The IRS's CPM Rests On A Flawed Comparison Between Supply-Point Companies And Bottlers That Itself Violates The Regulations**

The more fundamental problem is that the IRS tried to shoehorn this case into a transfer-pricing method that never made sense to begin with.

**1.**     **a.**     The regulations identify several possible methods to ascertain an arm's-length price.  Courts and the regulations have generally found "the amount charged in a comparable uncontrolled transaction," or "CUT," to be the most reliable transfer-pricing method.  26 C.F.R. § 1.482-4(c)(1); *see, e.g.*, *Amazon.com, Inc. v. Commissioner*, 148 T.C. 108, 164 (2017), *aff'd*, 934 F.3d 976 (9th Cir. 2019); *Veritas Software Corp. v. Commissioner*, 133 T.C. 297, 327-35 (2009).  That makes sense.  If unrelated parties, for example, license intangibles for a 10% royalty, that is powerful evidence of the arm's-length royalty that related parties should use when licensing comparable intangibles—and "will generally be the most direct and reliable measure of the arm's length result."  26 C.F.R. § 1.482-1(c)(2)(ii).

The CPM, by contrast, is *in*direct.  It is largely a math exercise:  It presumes that one party to the transaction (the "tested party") should earn the same level of profit as a comparable company—regardless of other factors—then adjusts the transfer price to shift any excess profit to the other party.  *See id.* § 1.482-5(b)(1).  So here, as shown above, the IRS's CPM deemed supply-point companies comparable to bottlers, allowed them to earn only the return on tangible operating assets that bottlers earn, and increased their royalties to Coca-Cola by billions of dollars to shift all excess profits to Coca-Cola.  *See supra* at 36-38.

Because the CPM is so indirect, other transfer-pricing methods "generally achieve a higher degree of comparability," 59 Fed. Reg. 34971, 34985 (July 8, 1994),

47

leading Newlon to admit the CPM was a "crude instrument," Doc.699, pgs.8220:24-8221:4, and the IRS to call it a "method of last resort," 59 Fed. Reg. at 34985. Moreover, as one of the IRS's own experts candidly acknowledged, the CPM is "potentially very attractive as a revenue raiser for the Internal Revenue Service" because it is "easy to calculate"—and "easily manipulated to produce almost any result one wants." Lorraine Eden, *Taxing Multinationals: Transfer Pricing and Corporate Income Taxation in North America* 625 (1998).[8] So even in "last resort" territory, the CPM must be used cautiously and with strict limitations in mind.

**b.** In blessing the IRS's application of the CPM, the Tax Court failed to heed those limitations, due in large part to the same errors highlighted above.

The CPM is typically not an appropriate method, much less the best method, when the tested party enjoys valuable and unique intangible assets. As the regulations state, "in most cases," the CPM should not be applied when the tested party "own[s] valuable intangible property or unique assets that distinguish it from potential uncontrolled comparables." 26 C.F.R. § 1.482-5(b)(2)(i). That makes sense; the tested party is unlikely to have a match in the marketplace that provides a suitable benchmark for profitability. *See* 59 Fed. Reg. at 34986. Applying the CPM in such cases would produce apples-to-oranges comparisons that distort results. Here, the tested parties—supply-point companies—*did* own valuable and unique

---

[8] The IRS submitted an expert report for Eden, but did not call her at trial.

licenses, goodwill, and intangibles created by their marketing and other investments. *See supra* at 33-35. That fact alone should have disqualified the CPM.

This shortcoming was all the more acute because supply-point companies were compared to bottlers—but were not *comparable* to bottlers. The regulations measure comparability along a variety of dimensions—and, with respect to the CPM, emphasize "functions performed," "risks assumed," and "resources employed" in the business. 26 C.F.R. § 1.482-5(c)(2)(ii); *see id.* § 1.482-1(d). Along these and other dimensions, supply-point companies and bottlers were simply not comparable:

|  | **Supply-Point Companies** | **Bottlers** |
|---|---|---|
| **Principal Assets** | • Licenses to Coca-Cola's most valuable intangibles<br>• Significant intangibles and goodwill<br>• Asset mix: 22% tangibles, 78% intangibles (Ex.7251-P, Exh.5) | • Limited use of Coca-Cola's trademarks<br>• Significant property, plant, and equipment, including coolers<br>• Asset mix: 77% tangibles, 23% intangibles |
| **Marketing Activities And Other Functions** | • Responsible for consumer marketing campaigns that build brand equity<br>• Bottler relations, quality control, public affairs, etc.<br>• Produce and sell concentrate to bottlers | • Market products at retail locations<br>• Purchase and mix concentrate with commodities and distribute finished beverages to many retailers |
| **Risks** | • Immense risk associated with large-scale consumer marketing campaigns | • Less risk associated with retail-oriented marketing that piggybacks on consumer marketing |
| **General Characteristics** | • Relatively scarce (18 foreign)<br>• Focus exclusively on the Company's products | • Numerous (over 300)<br>• Produce and distribute both the Company's products and other products |

The Tax Court disregarded many of these differences by deeming supply-point companies as not having intangibles and not investing in marketing and similar activities—points thoroughly addressed above. *See* Doc.740, pgs.123-33; *supra* at 38-46. Beyond that, the court proclaimed supply-point companies and bottlers comparable because both were involved in making, distributing, and marketing Coca-Cola products. *See, e.g.*, Doc.740, pgs.121, 127-28. But that is true only in the most general and superficial sense. It glosses over their stark differences: Supply-point companies and bottlers operated at different levels of the market, played very different roles with respect to Coca-Cola products, owned different types of assets, undertook completely different marketing functions, and had different rights to Coca-Cola's intangibles. The IRS's use of the CPM violated the regulations on this basis too.

Finally, the IRS's CPM also flouted arm's-length behavior by commercial parties. As one of Coca-Cola's experts, Michael Lasinski, opined, unrelated parties entering into licensor/licensee relationships *share* profits in such a way that "successful licensees retain a greater portion of the profits than unsuccessful licensees." Ex.7301-P, pg.4; *see also* Doc.665, pgs.3823:11-3824:3 (discussing how licensors and licensees share profits based on their relative contributions and risks). Yet the IRS's CPM *guaranteed* supply-point companies profits equal to a fixed percentage of their tangible operating assets; ignored their most important

50

contributions; and resulted in astronomical royalties of about 45% of revenues and 87% of operating profits for the supply-point companies at issue. *See* Ex.7251-P, pg.42; *supra* at 36-38. Lasinski, who had "more than 20 years" of licensing experience at the time of trial, had "never seen such a license structure." Ex.7301-P, pg.4. Yet the Tax Court ignored these fundamental defects as well.

*    *    *

Because the IRS's CPM was improper for the reasons discussed, the IRS's adoption of it was necessarily arbitrary and capricious. *See, e.g.*, *Eli Lilly & Co. v. Commissioner*, 856 F.2d 855, 861, 868-73 (7th Cir. 1988). The proper course is for the Tax Court to apply another method that produces arm's-length results, gives credit for supply-point companies' intangibles and investments, and otherwise complies with the regulations. *See id.* at 860; Doc.740, pgs.92-93. This Court should therefore vacate and remand for the Tax Court to do just that.[9]

## III. THE IRS WAS PROHIBITED FROM ALLOCATING "BLOCKED" BRAZILIAN INCOME TO COCA-COLA

Finally, the IRS's allocation of about $1.8 billion in royalties from the Brazilian supply-point company to Coca-Cola must be set aside because payment of royalties above $56 million for 2007-2009 was blocked by Brazilian law. Yet the

---

[9] Coca-Cola has already provided multiple alternative methods, including Willig's adjusted version of the IRS's CPM, that are superior to the IRS's CPM and could be applied on remand. *See supra* at 38.

IRS required the Brazilian supply-point company to pay Coca-Cola roughly *30 times* that amount. That error independently requires reversal.

**A.** As discussed, section 482 allows the IRS to "allocate gross income" among commonly controlled entities "clearly to reflect the income" of such entities. 26 U.S.C. § 482. But inherent in this provision is the limitation that the IRS cannot allocate amounts that are not "income" within the meaning of the statute. In ordinary, legal, and tax parlance, "income" refers to a "gain" or "benefit" that a person derives from an activity. *See, e.g., Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 429-31 (1955); *Webster's New Collegiate Dictionary* 576 (1979 ed.); *Black's Law Dictionary* 687 (5th ed. 1979); *see also* 26 U.S.C. § 61(a) (defining "gross income" to mean "all income from whatever source *derived*" (emphasis added)). It follows that funds a person is blocked—by legal restrictions—from receiving cannot be "income" to that person, and so cannot be allocated under section 482.

The Supreme Court has confirmed this straightforward interpretation of section 482. In *Commissioner v. First Security Bank of Utah, N.A.*, the Court concluded that "the concept of income" codified in section 482 presumes that "the person to whom the income was attributed could have received it." 405 U.S. 394, 403 (1972). Applying that principle, the Court held that the IRS could not allocate certain insurance premiums to affiliated banks as "income" because federal law barred the banks from receiving those premiums. *Id.* at 401; *see also United States*

52

*v. Basye*, 410 U.S. 441, 453 n.13 (1973) (noting *First Security*'s holding that the IRS cannot allocate income to a corporation under section 482 if "that corporation could not have received that income as a matter of law"). Other circuits have followed *First Security*'s "blocked income" rule in the context of transfer pricing between a U.S. company and its foreign affiliates. *See Texaco, Inc. v. Commissioner*, 98 F.3d 825, 828, 830 (5th Cir. 1996); *Procter & Gamble Co. v. Commissioner*, 961 F.2d 1255, 1259 (6th Cir. 1992). That rule controls this case.

As the Tax Court recognized, during 2007-2009, Brazilian law capped the amounts of royalties that a Brazilian subsidiary could remit to its parent company abroad. *See* Doc.787, pg.3. The IRS stipulated that, given these Brazilian legal restrictions, the Brazilian supply-point company could not have paid more than about $56 million of royalties to Coca-Cola during this period. *See* Doc.197, pg.36. Yet the IRS allocated $1.8 billion—roughly *30 times* the amount permitted by Brazilian law—as "income" under section 482 to Coca-Cola from the Brazilian supply-point company. *See id.*, pg.38. Section 482 forbids that result.

**B.** **1.** In upholding the IRS's allocation as to the Brazilian supply-point company, the Tax Court primarily relied on a regulation purporting to authorize the IRS to ignore foreign legal restrictions unless certain requirements are met. *See* 26 C.F.R. § 1.482-1(h)(2)(i)-(ii). That was error.

The Tax Court sustained the regulation as valid in *3M*, a deeply fractured 7-2-8 decision by the full court. The *3M* plurality reasoned that *First Security* did not resolve the unambiguous meaning of section 482 because the Supreme Court also cited a since-superseded regulation to support its decision. *See 3M*, 160 T.C. at 259. Relying on *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005), the plurality concluded that Treasury was free to take a contrary view of "income" in its regulation, and so long as that view was reasonable, the court had to defer to it under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See 3M*, 160 T.C. at 254-60.

The *3M* plurality's attempt to sidestep *First Security* fails. The first pillar of its reasoning—that the Supreme Court "relied on a regulation rather than the text of the relevant statute," *id.* at 259—is wrong. The crux of the Supreme Court's analysis was "the concept of income" in section 482. *First Security*, 405 U.S. at 403. The Court merely recognized that a regulation then in force accorded with the Court's reading of the statute. *See id.* at 404-05. The *3M* plurality thus erred in holding that *First Security* rested on the terms of the regulation rather than section 482.

The second key pillar of the *3M* plurality's reasoning—that a court must defer to an agency's interpretation of a statute under *Chevron* even if that interpretation conflicts with a court's earlier one—is equally untenable. In *Loper Bright Enterprises v. Raimondo*, the Supreme Court overruled *Chevron*. 603 U.S. 369, 412

(2024). Courts must now determine—and then give effect to—the "best" interpretation of a statute. *Id.* at 400. It does not matter whether an agency's different interpretation may in some sense be "permissible." *Id.* As the Court admonished: "[I]f it is not the best, it is not permissible." *Id.* Here, *First Security* already determined the best interpretation of "income" in section 482, so no other interpretation is available. *See supra* at 52-54.

The *3M* plurality alternatively suggested that the 1986 amendment to section 482 enabled Treasury to disregard *First Security*. *See 3M*, 160 T.C. at 267-75. The 1986 amendment added the second sentence of section 482: "In the case of any transfer (or license) of intangible property . . . , the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." 26 U.S.C. § 482. But the 1986 amendment "did not modify the meaning of 'income' in that section, so it could not open the door to the Treasury Department to issue a regulation that contravenes *First Security*." *3M*, 160 T.C. at 329 (Pugh, J., dissenting); *cf. United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 487 (2012) (rejecting regulation's subsequent construction of statute that was contrary to prior Supreme Court interpretation of statute).

The Tax Court's reliance on the blocked-income regulation was also flawed because that regulation was not promulgated in compliance with the APA. An agency's action must be "reasonable and reasonably explained." *Ohio v. EPA*, 603

U.S. 279, 292 (2024) (citation omitted).  And the agency must "consider and respond to significant comments received" during the notice-and-comment process.  *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015); *see* 5 U.S.C. § 553(b)-(c); *Hewitt v. Commissioner*, 21 F.4th 1336, 1351-53 (11th Cir. 2021).  In promulgating the blocked-income regulation, Treasury neither provided a reasoned explanation nor responded to significant comments.  *See* 59 Fed. Reg. at 34988; 58 Fed. Reg. 5310, 5310-11 (Jan. 21, 1993).  Instead, Treasury simply disclaimed that compliance with the APA was required.  *See* 59 Fed. Reg. at 34988; *see also 3M*, 160 T.C. 329-71 (Toro, J., dissenting).

 **2.** In dicta, the Tax Court also pointed to the fact that the Brazilian supply-point company remitted certain dividends to Coca-Cola during 2007-2009, in compliance with the 1996 closing agreement.  Doc.787, pgs.11-12; *see* Doc.740, pg.219; Ex.242-J, pgs.11-13.  The court suggested that even if the blocked-income regulation were invalid, the IRS may still ignore Brazilian legal restrictions on *royalties* because Brazilian law did not restrict the Brazilian supply-point company's ability to pay *dividends*.  *See* Doc.787, pgs.9-14.  Not so.

 As the Tax Court itself recognized, dividends and royalties are different.  *Id.*, pg.12.  And the IRS may not recharacterize dividends as royalties simply to circumvent Brazilian law—not to mention *First Security*.  In *First Security*, the Supreme Court could have required the banks to accept insurance premiums in a

form of payment that would not have violated federal law.  But it did no such thing, finding instead that "the Banks could *never* have received a share of [the] premiums." 405 U.S. at 401 (emphasis added).  Likewise, in *Procter & Gamble*, the Sixth Circuit expressly rejected the argument that a taxpayer must violate foreign legal restrictions on royalties by accepting dividends as royalties.  *See* 961 F.2d at 1259 ("A taxpayer need not arrange its affairs so as to maximize taxes as long as a transaction has a legitimate business purpose.").  The same conclusion follows here.

Accordingly, even if the IRS's use of the CPM is upheld, the allocation of blocked income from the Brazilian supply-point company cannot stand.

## CONCLUSION

The Tax Court's decision should be reversed, in whole or in part, and the case remanded, as necessary, for further proceedings.

Dated:  March 12, 2025

Shay Dvoretzky
Christopher Bowers
Parker Rider-Longmaid
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
(202) 371-7370
shay.dvoretzky@skadden.com

Respectfully submitted,

  /s/ *Gregory G. Garre*
Gregory G. Garre
Miriam L. Fisher
Eric J. Konopka
Blake E. Stafford
Sakina Haji*
LATHAM & WATKINS LLP
555 Eleventh St., NW, Ste. 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Nathaniel Carden
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
320 S. Canal St.
Chicago, IL 60606

Raza Rasheed
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
2000 Avenue of the Stars, Ste. 200N
Los Angeles, CA 90067

Shannon C. Fiedler
LATHAM & WATKINS LLP
200 Clarendon St.
Boston, MA 02116

*Admitted in New York.  All work
supervised by a member of the D.C. Bar.*

*Counsel for Petitioner-Appellant The Coca-Cola Co. & Subsidiaries*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,980 words as counted using the word-count feature in Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 with 14-point Times New Roman font.

Dated:  March 12, 2025                    Respectfully submitted,

     /s/ *Gregory G. Garre*
Gregory G. Garre

# CERTIFICATE OF SERVICE

I hereby certify that, on March 12, 2025, the foregoing brief was electronically filed with the Clerk of the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. All parties were served through the Court's CM/ECF system.

Dated: March 12, 2025

Respectfully submitted,

  /s/ *Gregory G. Garre*
Gregory G. Garre

# STATUTORY AND REGULATORY ADDENDUM

# ADDENDUM TABLE OF CONTENTS

**Page**

26 U.S.C. § 482 (eff. to Dec. 21, 2017) ................................................................ ADD1

26 C.F.R. § 1.482-1 (eff. Jan. 7, 2007 to Jan. 4, 2009) ....................................... ADD2

26 C.F.R. § 1.482-1T (eff. Jan. 1, 2007 to Jan. 4, 2009) .................................... ADD41

26 C.F.R. § 1.482-4 (eff. Jan. 1, 2007 to Aug. 3, 2009) ..................................... ADD51

26 C.F.R. § 1.482-4T (eff. Jan. 1, 2007 to Jan. 4, 2009) ................................... ADD70

26 C.F.R. § 1.482-5 (eff. to Jan. 4, 2009) .......................................................... ADD76

United States Code Annotated
  Title 26. Internal Revenue Code (Refs & Annos)
    Subtitle A. Income Taxes (Refs & Annos)
      Chapter 1. Normal Taxes and Surtaxes (Refs & Annos)
        Subchapter E. Accounting Periods and Methods of Accounting
          Part III. Adjustments

This section has been updated. Click here for the updated version.

26 U.S.C.A. § 482, I.R.C. §  482

## § 482. Allocation of income and deductions among taxpayers

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

### CREDIT(S)

(Aug. 16, 1954, c. 736, 68A Stat. 162; Pub.L. 94-455, Title XIX, § 1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1834; Pub.L. 99-514, Title XII, § 1231(e)(1), Oct. 22, 1986, 100 Stat. 2562.)

26 U.S.C.A. § 482, 26 USCA § 482
Current through P.L. 119-1. Some statute sections may be more current, see credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**ADD1**

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
     Subchapter A. Income Tax
      Part 1. Income Taxes (Refs & Annos)
       Normal Taxes and Surtaxes
        Deferred Compensation, Etc.
         Methods of Accounting
          Adjustments

This section has been updated. Click here for the updated version.

26 C.F.R. § 1.482–1, Treas. Reg. § 1.482–1

§ 1.482–1 Allocation of income and deductions among taxpayers.

**(a) In general—(1)** [Reserved]. For further guidance, see § 1.482–1T(a)(1).

**(2) Authority to make allocations.** The district director may make allocations between or among the members of a controlled group if a controlled taxpayer has not reported its true taxable income. In such case, the district director may allocate income, deductions, credits, allowances, basis, or any other item or element affecting taxable income (referred to as allocations). The appropriate allocation may take the form of an increase or decrease in any relevant amount.

**(3) Taxpayer's use of section 482.** If necessary to reflect an arm's length result, a controlled taxpayer may report on a timely filed U.S. income tax return (including extensions) the results of its controlled transactions based upon prices different from those actually charged. Except as provided in this paragraph, section 482 grants no other right to a controlled taxpayer to apply the provisions of section 482 at will or to compel the district director to apply such provisions. Therefore, no untimely or amended returns will be permitted to decrease taxable income based on allocations or other adjustments with respect to controlled transactions. See § 1.6662–6T(a)(2) or successor regulations.

**ADD2**

**(b) Arm's length standard—(1) In general.** In determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result). However, because identical transactions can rarely be located, whether a transaction produces an arm's length result generally will be determined by reference to the results of comparable transactions under comparable circumstances. See § 1.482–1(d)(2) (Standard of comparability). Evaluation of whether a controlled transaction produces an arm's length result is made pursuant to a method selected under the best method rule described in § 1.482–1(c).

**(2) (i)** [Reserved]. For further guidance, see § 1.482–1T(b)(2)(i).

**(ii) Selection of category of method applicable to transaction.** The methods listed in § 1.482–2 apply to different types of transactions, such as transfers of property, services, loans or advances, and rentals. Accordingly, the method or methods most appropriate to the calculation of arm's length results for controlled transactions must be selected, and different methods may be applied to interrelated transactions if such transactions are most reliably evaluated on a separate basis. For example, if services are provided in connection with the transfer of property, it may be appropriate to separately apply the methods applicable to services and property in order to determine an arm's length result. But see § 1.482–1(f)(2)(i) (Aggregation of transactions). In addition, other applicable provisions of the Code may affect the characterization of a transaction, and therefore affect the methods applicable under section 482. See for example section 467.

**(c) Best method rule—(1) In general.** The arm's length result of a controlled transaction must be determined under the method that, under the facts and circumstances, provides the most reliable measure of an arm's length result. Thus, there is no strict priority of methods, and no method will invariably be considered to be more reliable than others. An arm's length result may be determined under any method without establishing the inapplicability of another method, but if another method subsequently is shown to produce a more reliable measure of an arm's length

**ADD3**

result, such other method must be used. Similarly, if two or more applications of a single method provide inconsistent results, the arm's length result must be determined under the application that, under the facts and circumstances, provides the most reliable measure of an arm's length result. See § 1.482–8 for examples of the application of the best method rule. See § 1.482–7 for the applicable method in the case of a qualified cost sharing arrangement.

**(2) Determining the best method.** Data based on the results of transactions between unrelated parties provides the most objective basis for determining whether the results of a controlled transaction are arm's length. Thus, in determining which of two or more available methods (or applications of a single method) provides the most reliable measure of an arm's length result, the two primary factors to take into account are the degree of comparability between the controlled transaction (or taxpayer) and any uncontrolled comparables, and the quality of the data and assumptions used in the analysis. In addition, in certain circumstances, it also may be relevant to consider whether the results of an analysis are consistent with the results of an analysis under another method. These factors are explained in paragraphs (c)(2)(i), (ii), and (iii) of this section.

**(i) Comparability.** The relative reliability of a method based on the results of transactions between unrelated parties depends on the degree of comparability between the controlled transaction or taxpayers and the uncontrolled comparables, taking into account the factors described in § 1.482–1(d)(3) (Factors for determining comparability), and after making adjustments for differences, as described in § 1.482–1(d)(2) (Standard of comparability). As the degree of comparability increases, the number and extent of potential differences that could render the analysis inaccurate is reduced. In addition, if adjustments are made to increase the degree of comparability, the number, magnitude, and reliability of those adjustments will affect the reliability of the results of the analysis. Thus, an analysis under the comparable uncontrolled price method will generally be more reliable than analyses obtained under other methods if the analysis is based on closely comparable uncontrolled transactions, because such an analysis can be expected to achieve a higher degree of comparability and be susceptible to fewer differences than analyses under other methods. See § 1.482–3(b)(2)(ii)(A). An analysis will be relatively less reliable, however, as the uncontrolled transactions become less comparable to the controlled transaction.

**(ii) Data and assumptions.** Whether a method provides the most reliable measure of an arm's length result also depends upon the completeness and accuracy of the underlying data, the reliability of the assumptions, and the sensitivity of the results to possible

**ADD4**

deficiencies in the data and assumptions. Such factors are particularly relevant in evaluating the degree of comparability between the controlled and uncontrolled transactions. These factors are discussed in paragraphs (c)(2)(ii) (A), (B), and (C) of this section.

(A) Completeness and accuracy of data. The completeness and accuracy of the data affects the ability to identify and quantify those factors that would affect the result under any particular method. For example, the completeness and accuracy of data will determine the extent to which it is possible to identify differences between the controlled and uncontrolled transactions, and the reliability of adjustments that are made to account for such differences. An analysis will be relatively more reliable as the completeness and accuracy of the data increases.

(B) Reliability of assumptions. All methods rely on certain assumptions. The reliability of the results derived from a method depends on the soundness of such assumptions. Some assumptions are relatively reliable. For example, adjustments for differences in payment terms between controlled and uncontrolled transactions may be based on the assumption that at arm's length such differences would lead to price differences that reflect the time value of money. Although selection of the appropriate interest rate to use in making such adjustments involves some judgement, the economic analysis on which the assumption is based is relatively sound. Other assumptions may be less reliable. For example, the residual profit split method may be based on the assumption that capitalized intangible development expenses reflect the relative value of the intangible property contributed by each party. Because the costs of developing an intangible may not be related to its market value, the soundness of this assumption will affect the reliability of the results derived from this method.

(C) Sensitivity of results to deficiencies in data and assumptions. Deficiencies in the data used or assumptions made may have a greater effect on some methods than others. In particular, the reliability of some methods is heavily dependent on the similarity of property or services involved in the controlled and uncontrolled transaction. For certain other methods, such as the resale price method, the analysis of the extent to which controlled and uncontrolled taxpayers undertake the same or similar functions, employ similar resources, and bear similar risks is particularly important. Finally, under other methods, such as the profit split method, defining the relevant business activity and appropriate allocation of costs, income, and assets may

**ADD5**

be of particular importance. Therefore, a difference between the controlled and uncontrolled transactions for which an accurate adjustment cannot be made may have a greater effect on the reliability of the results derived under one method than the results derived under another method. For example, differences in management efficiency may have a greater effect on a comparable profits method analysis than on a comparable uncontrolled price method analysis, while differences in product characteristics will ordinarily have a greater effect on a comparable uncontrolled price method analysis than on a comparable profits method analysis.

**(iii) Confirmation of results by another method.** If two or more methods produce inconsistent results, the best method rule will be applied to select the method that provides the most reliable measure of an arm's length result. If the best method rule does not clearly indicate which method should be selected, an additional factor that may be taken into account in selecting a method is whether any of the competing methods produce results that are consistent with the results obtained from the appropriate application of another method. Further, in evaluating different applications of the same method, the fact that a second method (or another application of the first method) produces results that are consistent with one of the competing applications may be taken into account.

**(d) Comparability—(1) In general.** Whether a controlled transaction produces an arm's length result is generally evaluated by comparing the results of that transaction to results realized by uncontrolled taxpayers engaged in comparable transactions under comparable circumstances. For this purpose, the comparability of transactions and circumstances must be evaluated considering all factors that could affect prices or profits in arm's length dealings (comparability factors). While a specific comparability factor may be of particular importance in applying a method, each method requires analysis of all of the factors that affect comparability under that method. Such factors include the following—

**(i)** Functions;

**(ii)** Contractual terms;

**(iii)** Risks;

**ADD6**

**(iv)** Economic conditions; and

**(v)** Property or services.

**(2) Standard of comparability.** In order to be considered comparable to a controlled transaction, an uncontrolled transaction need not be identical to the controlled transaction, but must be sufficiently similar that it provides a reliable measure of an arm's length result. If there are material differences between the controlled and uncontrolled transactions, adjustments must be made if the effect of such differences on prices or profits can be ascertained with sufficient accuracy to improve the reliability of the results. For purposes of this section, a material difference is one that would materially affect the measure of an arm's length result under the method being applied. If adjustments for material differences cannot be made, the uncontrolled transaction may be used as a measure of an arm's length result, but the reliability of the analysis will be reduced. Generally, such adjustments must be made to the results of the uncontrolled comparable and must be based on commercial practices, economic principles, or statistical analyses. The extent and reliability of any adjustments will affect the relative reliability of the analysis. See § 1.482–1(c)(1) (Best method rule). In any event, unadjusted industry average returns themselves cannot establish arm's length results.

**(3) Factors for determining comparability.** The comparability factors listed in § 1.482–1(d)(1) are discussed in this section. Each of these factors must be considered in determining the degree of comparability between transactions or taxpayers and the extent to which comparability adjustments may be necessary. In addition, in certain cases involving special circumstances, the rules under paragraph (d)(4) of this section must be considered.

**(i) Functional analysis.** Determining the degree of comparability between controlled and uncontrolled transactions requires a comparison of the functions performed, and associated resources employed, by the taxpayers in each transaction. This comparison is based on a functional analysis that identifies and compares the economically significant activities undertaken, or to be undertaken, by the taxpayers in both controlled and uncontrolled transactions. A functional analysis should also include consideration of the resources that are employed, or to be employed, in conjunction with the activities undertaken, including

**ADD7**

consideration of the type of assets used, such as plant and equipment, or the use of valuable intangibles. A functional analysis is not a pricing method and does not itself determine the arm's length result for the controlled transaction under review. Functions that may need to be accounted for in determining the comparability of two transactions include—

(A) Research and development;

(B) Product design and engineering;

(C) Manufacturing, production and process engineering;

(D) Product fabrication, extraction, and assembly;

(E) Purchasing and materials management;

(F) Marketing and distribution functions, including inventory management, warranty administration, and advertising activities;

(G) Transportation and warehousing; and

(H) Managerial, legal, accounting and finance, credit and collection, training, and personnel management services.

**(ii) Contractual terms**—(A) In general. Determining the degree of comparability between the controlled and uncontrolled transactions requires a comparison of the significant contractual terms that could affect the results of the two transactions. These terms include—

(1) The form of consideration charged or paid;

**ADD8**

(2) Sales or purchase volume;

(3) The scope and terms of warranties provided;

(4) Rights to updates, revisions or modifications;

(5) The duration of relevant license, contract or other agreements, and termination or renegotiation rights;

(6) Collateral transactions or ongoing business relationships between the buyer and the seller, including arrangements for the provision of ancillary or subsidiary services; and

(7) Extension of credit and payment terms. Thus, for example, if the time for payment of the amount charged in a controlled transaction differs from the time for payment of the amount charged in an uncontrolled transaction, an adjustment to reflect the difference in payment terms should be made if such difference would have a material effect on price. Such comparability adjustment is required even if no interest would be allocated or imputed under § 1.482–2(a) or other applicable provisions of the Internal Revenue Code or regulations.

(B) Identifying contractual terms—(1) Written agreement. The contractual terms, including the consequent allocation of risks, that are agreed to in writing before the transactions are entered into will be respected if such terms are consistent with the economic substance of the underlying transactions. In evaluating economic substance, greatest weight will be given to the actual conduct of the parties, and the respective legal rights of the parties (see, for example, § 1.482–4(f)(3) (Ownership of intangible property)). If the contractual terms are inconsistent with the economic substance of the underlying transaction, the district director may disregard such terms and impute terms that are consistent with the economic substance of the transaction.

**ADD9**

(2) No written agreement. In the absence of a written agreement, the district director may impute a contractual agreement between the controlled taxpayers consistent with the economic substance of the transaction. In determining the economic substance of the transaction, greatest weight will be given to the actual conduct of the parties and their respective legal rights (see, for example, § 1.482–4(f)(3) (Ownership of intangible property)). For example, if, without a written agreement, a controlled taxpayer operates at full capacity and regularly sells all of its output to another member of its controlled group, the district director may impute a purchasing contract from the course of conduct of the controlled taxpayers, and determine that the producer bears little risk that the buyer will fail to purchase its full output. Further, if an established industry convention or usage of trade assigns a risk or resolves an issue, that convention or usage will be followed if the conduct of the taxpayers is consistent with it. See UCC 1–205. For example, unless otherwise agreed, payment generally is due at the time and place at which the buyer is to receive goods. See UCC 2–310.

(C) Examples. The following examples illustrate this paragraph (d)(3)(ii).

**Example 1**—Differences in volume. USP, a United States agricultural exporter, regularly buys transportation services from FSub, its foreign subsidiary, to ship its products from the United States to overseas markets. Although FSub occasionally provides transportation services to URA, an unrelated domestic corporation, URA accounts for only 10% of the gross revenues of FSub, and the remaining 90% of FSub's gross revenues are attributable to FSub's transactions with USP. In determining the degree of comparability between FSub's uncontrolled transaction with URA and its controlled transaction with USP, the difference in volumes involved in the two transactions and the regularity with which these services are provided must be taken into account if such difference would have a material effect on the price charged. Inability to make reliable adjustments for these differences would affect the reliability of the results derived from the uncontrolled transaction as a measure of the arm's length result.

**Example 2**—Reliability of adjustment for differences in volume. (i) FS manufactures product XX and sells that product to its parent corporation, P. FS also sells product XX to uncontrolled taxpayers at a price of $100 per unit. Except for the volume of each transaction, the sales to P and to uncontrolled taxpayers take place under substantially the same economic conditions and contractual terms. In uncontrolled transactions, FS offers a 2% discount for quantities of 20 per order, and a 5% discount for quantities of 100 per order. If P purchases product XX in quantities

**ADD10**

of 60 per order, in the absence of other reliable information, it may reasonably be concluded that the arm's length price to P would be $100, less a discount of 3.5%.

(ii) If P purchases product XX in quantities of 1,000 per order, a reliable estimate of the appropriate volume discount must be based on proper economic or statistical analysis, not necessarily a linear extrapolation from the 2% and 5% catalog discounts applicable to sales of 20 and 100 units, respectively.

**Example 3.** [Reserved]. For further guidance, see § 1.482–1T(d)(3)(ii)(C), Example 3.

**Examples 4 to 6**. [Reserved]. For further guidance, see 1.482–1T(d)(3)(ii)(C) Examples 4 through 6.

**(iii) Risk—**(A) Comparability. Determining the degree of comparability between controlled and uncontrolled transactions requires a comparison of the significant risks that could affect the prices that would be charged or paid, or the profit that would be earned, in the two transactions. Relevant risks to consider include—

(1) Market risks, including fluctuations in cost, demand, pricing, and inventory levels;

(2) Risks associated with the success or failure of research and development activities;

(3) Financial risks, including fluctuations in foreign currency rates of exchange and interest rates;

(4) Credit and collection risks;

(5) Product liability risks; and

**ADD11**

(6) General business risks related to the ownership of property, plant, and equipment.

(B) Identification of taxpayer that bears risk. In general, the determination of which controlled taxpayer bears a particular risk will be made in accordance with the provisions of § 1.482–1(d)(3)(ii)(B) (Identifying contractual terms). Thus, the allocation of risks specified or implied by the taxpayer's contractual terms will generally be respected if it is consistent with the economic substance of the transaction. An allocation of risk between controlled taxpayers after the outcome of such risk is known or reasonably knowable lacks economic substance. In considering the economic substance of the transaction, the following facts are relevant—

(1) Whether the pattern of the controlled taxpayer's conduct over time is consistent with the purported allocation of risk between the controlled taxpayers; or where the pattern is changed, whether the relevant contractual arrangements have been modified accordingly;

(2) Whether a controlled taxpayer has the financial capacity to fund losses that might be expected to occur as the result of the assumption of a risk, or whether, at arm's length, another party to the controlled transaction would ultimately suffer the consequences of such losses; and

(3) The extent to which each controlled taxpayer exercises managerial or operational control over the business activities that directly influence the amount of income or loss realized. In arm's length dealings, parties ordinarily bear a greater share of those risks over which they have relatively more control.

(C) Examples. The following examples illustrate this paragraph (d)(3)(iii).

**Example 1.** FD, the wholly-owned foreign distributor of USM, a U.S. manufacturer, buys widgets from USM under a written contract. Widgets are a generic electronic appliance. Under the terms of the contract, FD must buy and take title to 20,000 widgets for each of the five years of the contract at a price of $10 per widget. The widgets will be sold under FD's label, and FD must finance any marketing strategies to promote sales in the foreign market. There are no

**ADD12**

rebate or buy back provisions. FD has adequate financial capacity to fund its obligations under the contract under any circumstances that could reasonably be expected to arise. In Years 1, 2 and 3, FD sold only 10,000 widgets at a price of $11 per unit. In Year 4, FD sold its entire inventory of widgets at a price of $25 per unit. Since the contractual terms allocating market risk were agreed to before the outcome of such risk was known or reasonably knowable, FD had the financial capacity to bear the market risk that it would be unable to sell all of the widgets it purchased currently, and its conduct was consistent over time, FD will be deemed to bear the risk.

**Example 2.** The facts are the same as in Example 1, except that in Year 1 FD had only $100,000 in total capital, including loans. In subsequent years USM makes no additional contributions to the capital of FD, and FD is unable to obtain any capital through loans from an unrelated party. Nonetheless, USM continues to sell 20,000 widgets annually to FD under the terms of the contract, and USM extends credit to FD to enable it to finance the purchase. FD does not have the financial capacity in Years 1, 2 and 3 to finance the purchase of the widgets given that it could not sell most of the widgets it purchased during those years. Thus, notwithstanding the terms of the contract, USM and not FD assumed the market risk that a substantial portion of the widgets could not be sold, since in that event FD would not be able to pay USM for all of the widgets it purchased.

**Example 3.** S, a Country X corporation, manufactures small motors that it sells to P, its U.S. parent. P incorporates the motors into various products and sells those products to uncontrolled customers in the United States. The contract price for the motors is expressed in U.S. dollars, effectively allocating the currency risk for these transactions to S for any currency fluctuations between the time the contract is signed and payment is made. As long as S has adequate financial capacity to bear this currency risk (including by hedging all or part of the risk) and the conduct of S and P is consistent with the terms of the contract (i.e., the contract price is not adjusted to reflect exchange rate movements), the agreement of the parties to allocate the exchange risk to S will be respected.

**Example 4.** USSub is the wholly-owned U.S. subsidiary of FP, a foreign manufacturer. USSub acts as a distributor of goods manufactured by FP. FP and USSub execute an agreement providing that FP will bear any ordinary product liability costs arising from defects in the goods manufactured by FP. In practice, however, when ordinary product liability claims are sustained against USSub and FP, USSub pays the resulting damages. Therefore, the district director disregards the contractual arrangement regarding product liability costs between FP and USSub, and treats the risk as having been assumed by USSub.

**ADD13**

**(iv) Economic conditions.** Determining the degree of comparability between controlled and uncontrolled transactions requires a comparison of the significant economic conditions that could affect the prices that would be charged or paid, or the profit that would be earned in each of the transactions. These factors include—

(A) The similarity of geographic markets;

(B) The relative size of each market, and the extent of the overall economic development in each market;

(C) The level of the market (e.g., wholesale, retail, etc.);

(D) The relevant market shares for the products, properties, or services transferred or provided;

(E) The location-specific costs of the factors of production and distribution;

(F) The extent of competition in each market with regard to the property or services under review;

(G) The economic condition of the particular industry, including whether the market is in contraction or expansion; and

(H) The alternatives realistically available to the buyer and seller.

**(v)** [Reserved]. For further guidance, see § 1.482–1T(d)(3)(v).

**(4) Special circumstances—(i) Market share strategy.** In certain circumstances, taxpayers may adopt strategies to enter new markets or to increase a product's share of an

**ADD14**

existing market (market share strategy). Such a strategy would be reflected by temporarily increased market development expenses or resale prices that are temporarily lower than the prices charged for comparable products in the same market. Whether or not the strategy is reflected in the transfer price depends on which party to the controlled transaction bears the costs of the pricing strategy. In any case, the effect of a market share strategy on a controlled transaction will be taken into account only if it can be shown that an uncontrolled taxpayer engaged in a comparable strategy under comparable circumstances for a comparable period of time, and the taxpayer provides documentation that substantiates the following—

(A) The costs incurred to implement the market share strategy are borne by the controlled taxpayer that would obtain the future profits that result from the strategy, and there is a reasonable likelihood that the strategy will result in future profits that reflect an appropriate return in relation to the costs incurred to implement it;

(B) The market share strategy is pursued only for a period of time that is reasonable, taking into consideration the industry and product in question; and

(C) The market share strategy, the related costs and expected returns, and any agreement between the controlled taxpayers to share the related costs, were established before the strategy was implemented.

**(ii) Different geographic markets—**(A) In general. Uncontrolled comparables ordinarily should be derived from the geographic market in which the controlled taxpayer operates, because there may be significant differences in economic conditions in different markets. If information from the same market is not available, an uncontrolled comparable derived from a different geographic market may be considered if adjustments are made to account for differences between the two markets. If information permitting adjustments for such differences is not available, then information derived from uncontrolled comparables in the most similar market for which reliable data is available may be used, but the extent of such differences may affect the reliability of the method for purposes of the best method rule. For this purpose, a geographic market is any geographic area in which the economic conditions for the relevant product or service are substantially the same, and may include multiple countries, depending on the economic conditions.

**ADD15**

(B) Example. The following example illustrates this paragraph (d)(4)(ii).

**Example.** Manuco, a wholly-owned foreign subsidiary of P, a U.S. corporation, manufactures products in Country Z for sale to P. No uncontrolled transactions are located that would provide a reliable measure of the arm's length result under the comparable uncontrolled price method. The district director considers applying the cost plus method or the comparable profits method. Information on uncontrolled taxpayers performing comparable functions under comparable circumstances in the same geographic market is not available. Therefore, adjusted data from uncontrolled manufacturers in other markets may be considered in order to apply the cost plus method. In this case, comparable uncontrolled manufacturers are found in the United States. Accordingly, data from the comparable U.S. uncontrolled manufacturers, as adjusted to account for differences between the United States and Country Z's geographic market, is used to test the arm's length price paid by P to Manuco. However, the use of such data may affect the reliability of the results for purposes of the best method rule. See § 1.482–1(c).

(C) Location savings. If an uncontrolled taxpayer operates in a different geographic market than the controlled taxpayer, adjustments may be necessary to account for significant differences in costs attributable to the geographic markets. These adjustments must be based on the effect such differences would have on the consideration charged or paid in the controlled transaction given the relative competitive positions of buyers and sellers in each market. Thus, for example, the fact that the total costs of operating in a controlled manufacturer's geographic market are less than the total costs of operating in other markets ordinarily justifies higher profits to the manufacturer only if the cost differences would increase the profits of comparable uncontrolled manufacturers operating at arm's length, given the competitive positions of buyers and sellers in that market.

(D) Example. The following example illustrates the principles of this paragraph (d)(4)(ii)(C).

**Example.** Couture, a U.S. apparel design corporation, contracts with Sewco, its wholly owned Country Y subsidiary, to manufacture its clothes. Costs of operating in Country Y are significantly lower than the operating costs in the United States. Although clothes with the Couture label sell for a premium price, the actual production of the clothes does not require significant specialized knowledge that could not be acquired by actual or potential competitors

**ADD16**

to Sewco at reasonable cost. Thus, Sewco's functions could be performed by several actual or potential competitors to Sewco in geographic markets that are similar to Country Y. Thus, the fact that production is less costly in Country Y will not, in and of itself, justify additional profits derived from lower operating costs in Country Y inuring to Sewco, because the competitive positions of the other actual or potential producers in similar geographic markets capable of performing the same functions at the same low costs indicate that at arm's length such profits would not be retained by Sewco.

**(iii) Transactions ordinarily not accepted as comparables**—(A) In general. Transactions ordinarily will not constitute reliable measures of an arm's length result for purposes of this section if—

(1) They are not made in the ordinary course of business; or

(2) One of the principal purposes of the uncontrolled transaction was to establish an arm's length result with respect to the controlled transaction.

(B) Examples. The following examples illustrate the principle of this paragraph (d)(4)(iii).

**Example 1.** Not in the ordinary course of business. USP, a United States manufacturer of computer software, sells its products to FSub, its foreign distributor in country X. Compco, a United States competitor of USP, also sells its products in X through unrelated distributors. However, in the year under review, Compco is forced into bankruptcy, and Compco liquidates its inventory by selling all of its products to unrelated distributors in X for a liquidation price. Because the sale of its entire inventory was not a sale in the ordinary course of business, Compco's sale cannot be used as an uncontrolled comparable to determine USP's arm's length result from its controlled transaction.

**Example 2.** Principal purpose of establishing an arm's length result. USP, a United States manufacturer of farm machinery, sells its products to FSub, its wholly-owned distributor in Country Y. USP, operating at nearly full capacity, sells 95% of its inventory to FSub. To make use of its excess capacity, and also to establish a comparable uncontrolled price for its transfer price to FSub, USP increases its production to full capacity. USP sells its excess inventory to

**ADD17**

Compco, an unrelated foreign distributor in Country X. Country X has approximately the same economic conditions as that of Country Y. Because one of the principal purposes of selling to Compco was to establish an arm's length price for its controlled transactions with FSub, USP's sale to Compco cannot be used as an uncontrolled comparable to determine USP's arm's length result from its controlled transaction.

**(e) Arm's length range—(1) In general.** In some cases, application of a pricing method will produce a single result that is the most reliable measure of an arm's length result. In other cases, application of a method may produce a number of results from which a range of reliable results may be derived. A taxpayer will not be subject to adjustment if its results fall within such range (arm's length range).

**(2) Determination of arm's length range—(i) Single method.** The arm's length range is ordinarily determined by applying a single pricing method selected under the best method rule to two or more uncontrolled transactions of similar comparability and reliability. Use of more than one method may be appropriate for the purposes described in paragraph (c)(2)(iii) of this section (Best method rule).

**(ii) Selection of comparables.** Uncontrolled comparables must be selected based upon the comparability criteria relevant to the method applied and must be sufficiently similar to the controlled transaction that they provide a reliable measure of an arm's length result. If material differences exist between the controlled and uncontrolled transactions, adjustments must be made to the results of the uncontrolled transaction if the effect of such differences on price or profits can be ascertained with sufficient accuracy to improve the reliability of the results. See § 1.482–1(d)(2) (Standard of comparability). The arm's length range will be derived only from those uncontrolled comparables that have, or through adjustments can be brought to, a similar level of comparability and reliability, and uncontrolled comparables that have a significantly lower level of comparability and reliability will not be used in establishing the arm's length range.

**(iii) Comparables included in arm's length range—(A) In general.** The arm's length range will consist of the results of all of the uncontrolled comparables that meet the following conditions: the information on the controlled transaction and the uncontrolled

**ADD18**

comparables is sufficiently complete that it is likely that all material differences have been identified, each such difference has a definite and reasonably ascertainable effect on price or profit, and an adjustment is made to eliminate the effect of each such difference.

(B) Adjustment of range to increase reliability. If there are no uncontrolled comparables described in paragraph (e)(2)(iii)(A) of this section, the arm's length range is derived from the results of all the uncontrolled comparables, selected pursuant to paragraph (e)(2)(ii) of this section, that achieve a similar level of comparability and reliability. In such cases the reliability of the analysis must be increased, where it is possible to do so, by adjusting the range through application of a valid statistical method to the results of all of the uncontrolled comparables so selected. The reliability of the analysis is increased when statistical methods are used to establish a range of results in which the limits of the range will be determined such that there is a 75 percent probability of a result falling above the lower end of the range and a 75 percent probability of a result falling below the upper end of the range. The interquartile range ordinarily provides an acceptable measure of this range; however a different statistical method may be applied if it provides a more reliable measure.

(C) Interquartile range. For purposes of this section, the interquartile range is the range from the 25th to the 75th percentile of the results derived from the uncontrolled comparables. For this purpose, the 25th percentile is the lowest result derived from an uncontrolled comparable such that at least 25 percent of the results are at or below the value of that result. However, if exactly 25 percent of the results are at or below a result, then the 25th percentile is equal to the average of that result and the next higher result derived from the uncontrolled comparables. The 75th percentile is determined analogously.

**(3) Adjustment if taxpayer's results are outside arm's length range.** If the results of a controlled transaction fall outside the arm's length range, the district director may make allocations that adjust the controlled taxpayer's result to any point within the arm's length range. If the interquartile range is used to determine the arm's length range, such adjustment will ordinarily be to the median of all the results. The median is the 50th percentile of the results, which is determined in a manner analogous to that described in paragraph (e)(2)(iii)(C) of this section (Interquartile range). In other cases, an adjustment normally will be made to the arithmetic mean of all the results. See § 1.482–1(f)(2)(iii)(D) for determination of an adjustment when a controlled taxpayer's result for a multiple year

**ADD19**

period falls outside an arm's length range consisting of the average results of uncontrolled comparables over the same period.

**(4) Arm's length range not prerequisite to allocation.** The rules of this paragraph (e) do not require that the district director establish an arm's length range prior to making an allocation under section 482. Thus, for example, the district director may properly propose an allocation on the basis of a single comparable uncontrolled price if the comparable uncontrolled price method, as described in § 1.482–3(b), has been properly applied. However, if the taxpayer subsequently demonstrates that the results claimed on its income tax return are within the range established by additional equally reliable comparable uncontrolled prices in a manner consistent with the requirements set forth in § 1.482–1(e)(2)(iii), then no allocation will be made.

**(5) Examples.** The following examples illustrate the principles of this paragraph (e).

**Example 1** Selection of comparables. (i) To evaluate the arm's length result of a controlled transaction between USSub, the United States taxpayer under review, and FP, its foreign parent, the district director considers applying the resale price method. The district director identifies ten potential uncontrolled transactions. The distributors in all ten uncontrolled transactions purchase and resell similar products and perform similar functions to those of USSub.

(ii) Data with respect to three of the uncontrolled transactions is very limited, and although some material differences can be identified and adjusted for, the level of comparability of these three uncontrolled comparables is significantly lower than that of the other seven. Further, of those seven, adjustments for the identified material differences can be reliably made for only four of the uncontrolled transactions. Therefore, pursuant to § 1.482–1(e)(2)(ii) only these four uncontrolled comparables may be used to establish an arm's length range.

**Example 2** Arm's length range consists of all the results. (i) The facts are the same as in Example 1. Applying the resale price method to the four uncontrolled comparables, and making adjustments to the uncontrolled comparables pursuant to § 1.482–1(d)(2), the district director derives the following results:

**ADD20**

| Comparable | Result (price) |
|---|---|
| 1...................................................................................................... | $44.00 |
| 2...................................................................................................... | 45.00 |
| 3...................................................................................................... | 45.00 |
| 4...................................................................................................... | 45.50 |

(ii) The district director determines that data regarding the four uncontrolled transactions is sufficiently complete and accurate so that it is likely that all material differences between the controlled and uncontrolled transactions have been identified, such differences have a definite and reasonably ascertainable effect, and appropriate adjustments were made for such differences. Accordingly, if the resale price method is determined to be the best method pursuant to § 1.482–1(c), the arm's length range for the controlled transaction will consist of the results of all of the uncontrolled comparables, pursuant to paragraph (e)(2)(iii)(A) of this section. Thus, the arm's length range in this case would be the range from $44 to $45.50.

**Example 3** Arm's length range limited to interquartile range. (i) The facts are the same as in Example 2, except in this case there are some product and functional differences between the four uncontrolled comparables and USSub. However, the data is insufficiently complete to determine the effect of the differences. Applying the resale price method to the four uncontrolled comparables, and making adjustments to the uncontrolled comparables pursuant to § 1.482–1(d)(2), the district director derives the following results:

| Uncontrolled comparable | Result (price) |
|---|---|
| 1...................................................................................................... | $42.00 |
| 2...................................................................................................... | 44.00 |
| 3...................................................................................................... | 45.00 |
| 4...................................................................................................... | 47.50 |

**ADD21**

(ii) It cannot be established in this case that all material differences are likely to have been identified and reliable adjustments made for those differences. Accordingly, if the resale price method is determined to be the best method pursuant to § 1.482–1(c), the arm's length range for the controlled transaction must be established pursuant to paragraph (e)(2)(iii)(B) of this section. In this case, the district director uses the interquartile range to determine the arm's length range, which is the range from $43 to $46.25. If USSub's price falls outside this range, the district director may make an allocation. In this case that allocation would be to the median of the results, or $44.50.

**Example 4** Arm's length range limited to interquartile range. (i) To evaluate the arm's length result of controlled transactions between USP, a United States manufacturing company, and FSub, its foreign subsidiary, the district director considers applying the comparable profits method. The district director identifies 50 uncontrolled taxpayers within the same industry that potentially could be used to apply the method.

(ii) Further review indicates that only 20 of the uncontrolled manufacturers engage in activities requiring similar capital investments and technical know-how. Data with respect to five of the uncontrolled manufacturers is very limited, and although some material differences can be identified and adjusted for, the level of comparability of these five uncontrolled comparables is significantly lower than that of the other 15. In addition, for those five uncontrolled comparables it is not possible to accurately allocate costs between the business activity associated with the relevant transactions and other business activities. Therefore, pursuant to § 1.482–1(e)(2)(ii) only the other fifteen uncontrolled comparables may be used to establish an arm's length range.

(iii) Although the data for the fifteen remaining uncontrolled comparables is relatively complete and accurate, there is a significant possibility that some material differences may remain. The district director has determined, for example, that it is likely that there are material differences in the level of technical expertise or in management efficiency. Accordingly, if the comparable profits method is determined to be the best method pursuant to § 1.482–1(c), the arm's length range for the controlled transaction may be established only pursuant to paragraph (e)(2)(iii)(B) of this section.

**(f) Scope of review—(1) In general.** The authority to determine true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer is other than it would have been had the taxpayer, in the conduct of its affairs, been dealing at arm's length with an uncontrolled taxpayer.

**ADD22**

**(i) Intent to evade or avoid tax not a prerequisite.** In making allocations under section 482, the district director is not restricted to the case of improper accounting, to the case of a fraudulent, colorable, or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income, deductions, credits, or allowances.

**(ii) Realization of income not a prerequisite**—(A) In general. The district director may make an allocation under section 482 even if the income ultimately anticipated from a series of transactions has not been or is never realized. For example, if a controlled taxpayer sells a product at less than an arm's length price to a related taxpayer in one taxable year and the second controlled taxpayer resells the product to an unrelated party in the next taxable year, the district director may make an appropriate allocation to reflect an arm's length price for the sale of the product in the first taxable year, even though the second controlled taxpayer had not realized any gross income from the resale of the product in the first year. Similarly, if a controlled taxpayer lends money to a related taxpayer in a taxable year, the district director may make an appropriate allocation to reflect an arm's length charge for interest during such taxable year even if the second controlled taxpayer does not realize income during such year. Finally, even if two controlled taxpayers realize an overall loss that is attributable to a particular controlled transaction, an allocation under section 482 is not precluded.

(B) Example. The following example illustrates this paragraph (f)(1)(ii).

**Example.** USSub is a U.S. subsidiary of FP, a foreign corporation. Parent manufactures product X and sells it to USSub. USSub functions as a distributor of product X to unrelated customers in the United States. The fact that FP may incur a loss on the manufacture and sale of product X does not by itself establish that USSub, dealing with FP at arm's length, also would incur a loss. An independent distributor acting at arm's length with its supplier would in many circumstances be expected to earn a profit without regard to the level of profit earned by the supplier.

**(iii) Nonrecognition provisions may not bar allocation**—(A) In general. If necessary to prevent the avoidance of taxes or to clearly reflect income, the district director may make an allocation under section 482 with respect to transactions that otherwise qualify for

**ADD23**

nonrecognition of gain or loss under applicable provisions of the Internal Revenue Code (such as section 351 or 1031).

(B) Example. The following example illustrates this paragraph (f)(1)(iii).

**Example.** (i) In Year 1 USP, a United States corporation, bought 100 shares of UR, an unrelated corporation, for $100,000. In Year 2, when the value of the UR stock had decreased to $40,000, USP contributed all 100 shares of UR stock to its wholly-owned subsidiary in exchange for subsidiary's capital stock. In Year 3, the subsidiary sold all of the UR stock for $40,000 to an unrelated buyer, and on its U.S. income tax return, claimed a loss of $60,000 attributable to the sale of the UR stock. USP and its subsidiary do not file a consolidated return.

(ii) In determining the true taxable income of the subsidiary, the district director may disallow the loss of $60,000 on the ground that the loss was incurred by USP. National Securities Corp. v Commissioner, 137 F.2d 600 (3rd Cir. 1943), cert. denied, 320 U.S. 794 (1943).

**(iv) Consolidated returns.** Section 482 and the regulations thereunder apply to all controlled taxpayers, whether the controlled taxpayer files a separate or consolidated U.S. income tax return. If a controlled taxpayer files a separate return, its true separate taxable income will be determined. If a controlled taxpayer is a party to a consolidated return, the true consolidated taxable income of the affiliated group and the true separate taxable income of the controlled taxpayer must be determined consistently with the principles of a consolidated return.

**(2) Rules relating to determination of true taxable income.** The following rules must be taken into account in determining the true taxable income of a controlled taxpayer.

**(i) Aggregation of transactions**—(A) In general. The combined effect of two or more separate transactions (whether before, during, or after the taxable year under review) may be considered, if such transactions, taken as a whole, are so interrelated that consideration of multiple transactions is the most reliable means of determining the arm's length consideration for the controlled transactions. Generally, transactions will be aggregated only when they involve related products or services, as defined in § 1.6038A–3(c)(7)(vii).

**ADD24**

(B) Examples. The following examples illustrate this paragraph (f)(2)(i).

**Example 1.** P enters into a license agreement with S1, its subsidiary, that permits S1 to use a proprietary manufacturing process and to sell the output from this process throughout a specified region. S1 uses the manufacturing process and sells its output to S2, another subsidiary of P, which in turn resells the output to uncontrolled parties in the specified region. In evaluating the arm's length character of the royalty paid by S1 to P, it may be appropriate to consider the arm's length character of the transfer prices charged by S1 to S2 and the aggregate profits earned by S1 and S2 from the use of the manufacturing process and the sale to uncontrolled parties of the products produced by S1.

**Example 2.** S1, S2, and S3 are Country Z subsidiaries of U.S. manufacturer P. S1 is the exclusive Country Z distributor of computers manufactured by P. S2 provides marketing services in connection with sales of P computers in Country Z, and in this regard uses significant marketing intangibles provided by P. S3 administers the warranty program with respect to P computers in Country Z, including maintenance and repair services. In evaluating the arm's length character of the transfer price paid by S1 to P, of the fees paid by S2 to P for the use of P marketing intangibles, and of the service fees earned by S2 and S3, it may be appropriate to consider the combined effects of these separate transactions because they are so interrelated that they are most reliably analyzed on an aggregated basis.

**Example 3.** The facts are the same as in Example 2. In addition, U1, U2, and U3 are uncontrolled taxpayers that carry out functions comparable to those of S1, S2, and S3, respectively, with respect to computers produced by unrelated manufacturers. R1, R2, and R3 are a controlled group of taxpayers (unrelated to the P controlled group) that also carry out functions comparable to those of S1, S2, and S3 with respect to computers produced by their common parent. Prices charged to uncontrolled customers of the R group differ from the prices charged to customers of U1, U2, and U3. In determining whether the transactions of U1, U2, and U3, or the transactions of R1, R2, and R3 would provide a more reliable measure of the arm's length result, it is determined that the interrelated R group transactions are more reliable than the wholly independent transactions of U1, U2, and U3, given the interrelationship of the P group transactions.

**Example 4.** P enters into a license agreement with S1 that permits S1 to use a propriety process for manufacturing product X and to sell product X to uncontrolled parties throughout a specified region. P also sells to S1 product Y which is manufactured by P in the United States, and which is unrelated to product X. Product Y is resold by S1 to uncontrolled parties in the specified region. In evaluating the arm's length character of the royalty paid by S1 to P for the use of the

**ADD25**

manufacturing process for product X, and the transfer prices charged for unrelated product Y, it would not be appropriate to consider the combined effects of these separate and unrelated transactions.

**(ii)** (A) [Reserved]. For further guidance, see § 1.482–1T(f)(2)(ii)(A).

(B) Example. The following example illustrates this paragraph (f)(2)(ii).

**Example.** P and S are controlled taxpayers. P enters into a license agreement with S that permits S to use a proprietary process for manufacturing product X. Using its sales and marketing employees, S sells product X to related and unrelated customers outside the United States. If the license agreement between P and S has economic substance, the district director ordinarily will not restructure the taxpayer's transaction to treat P as if it had elected to exploit directly the manufacturing process. However, the fact that P could have manufactured product X may be taken into account under § 1.482–4(d) in determining the arm's length consideration for the controlled transaction. For an example of such an analysis, see Example in § 1.482–4(d)(2).

**(iii) Multiple year data**—(A) In general. The results of a controlled transaction ordinarily will be compared with the results of uncontrolled comparables occurring in the taxable year under review. It may be appropriate, however, to consider data relating to the uncontrolled comparables or the controlled taxpayer for one or more years before or after the year under review. If data relating to uncontrolled comparables from multiple years is used, data relating to the controlled taxpayer for the same years ordinarily must be considered. However, if such data is not available, reliable data from other years, as adjusted under paragraph (d)(2) (Standard of comparability) of this section may be used.

(B) [Reserved]. For further guidance, see § 1.482–1T(f)(3)(iii)(B).

(C) Comparable effect over comparable period. Data from multiple years may be considered to determine whether the same economic conditions that caused the controlled taxpayer's results had a comparable effect over a comparable period of time on the uncontrolled comparables that establish the arm's length range. For example, given that uncontrolled taxpayers enter into transactions with the ultimate expectation

**ADD26**

of earning a profit, persistent losses among controlled taxpayers may be an indication of non-arm's length dealings. Thus, if a controlled taxpayer that realizes a loss with respect to a controlled transaction seeks to demonstrate that the loss is within the arm's length range, the district director may take into account data from taxable years other than the taxable year of the transaction to determine whether the loss was attributable to arm's length dealings. The rule of this paragraph (f)(2)(iii)(C) is illustrated by Example 3 of paragraph (f)(2)(iii)(E) of this section.

(D) Applications of methods using multiple year averages. If a comparison of a controlled taxpayer's average result over a multiple year period with the average results of uncontrolled comparables over the same period would reduce the effect of short-term variations that may be unrelated to transfer pricing, it may be appropriate to establish a range derived from the average results of uncontrolled comparables over a multiple year period to determine if an adjustment should be made. In such a case the district director may make an adjustment if the controlled taxpayer's average result for the multiple year period is not within such range. Such a range must be determined in accordance with § 1.482–1(e) (Arm's length range). An adjustment in such a case ordinarily will be equal to the difference, if any, between the controlled taxpayer's result for the taxable year and the mid-point of the uncontrolled comparables' results for that year. If the interquartile range is used to determine the range of average results for the multiple year period, such adjustment will ordinarily be made to the median of all the results of the uncontrolled comparables for the taxable year. See Example 2 of § 1.482–5(e). In other cases, the adjustment normally will be made to the arithmetic mean of all the results of the uncontrolled comparables for the taxable year. However, an adjustment will be made only to the extent that it would move the controlled taxpayer's multiple year average closer to the arm's length range for the multiple year period or to any point within such range. In determining a controlled taxpayer's average result for a multiple year period, adjustments made under this section for prior years will be taken into account only if such adjustments have been finally determined, as described in § 1.482–1(g)(2)(iii). See Example 3 of § 1.482–5(e).

(E) Examples. The following examples, in which S and P are controlled taxpayers, illustrate this paragraph (f)(2)(iii). Examples 1 and 4 also illustrate the principle of the arm's length range of paragraph (e) of this section.

**Example 1.** P sold product Z to S for $60 per unit in 1995. Applying the resale price method to data from uncontrolled comparables for the same year establishes an arm's length range of prices for the controlled transaction from $52 to $59 per unit. Since the price charged in the controlled transaction falls outside the range, the district director would ordinarily make an allocation under section 482. However, in this case there are cyclical factors that affect the results of the uncontrolled comparables (and that of the controlled transaction) that cannot be adequately accounted for by specific adjustments to the data for 1995. Therefore, the district director considers results over multiple years to account for these factors. Under these circumstances, it is appropriate to average the results of the uncontrolled comparables over the years 1993, 1994, and 1995 to determine an arm's length range. The averaged results establish an arm's length range of $56 to $58 per unit. For consistency, the results of the controlled taxpayers must also be averaged over the same years. The average price in the controlled transaction over the three years is $57. Because the controlled transfer price of product Z falls within the arm's length range, the district director makes no allocation.

**Example 2.** (i) FP, a Country X corporation, designs and manufactures machinery in Country X. FP's costs are incurred in Country X currency. USSub is the exclusive distributor of FP's machinery in the United States. The price of the machinery sold by FP to USSub is expressed in Country X currency. Thus, USSub bears all of the currency risk associated with fluctuations in the exchange rate between the time the contract is signed and the payment is made. The prices charged by FP to USSub for 1995 are under examination. In that year, the value of the dollar depreciated against the currency of Country X, and as a result, USSub's gross margin was only 8%.

(ii) UD is an uncontrolled distributor of similar machinery that performs distribution functions substantially the same as those performed by USSub, except that UD purchases and resells machinery in transactions where both the purchase and resale prices are denominated in U.S. dollars. Thus, UD had no currency exchange risk. UD's gross margin in 1995 was 10%. UD's average gross margin for the period 1990 to 1998 has been 12%.

(iii) In determining whether the price charged by FP to USSub in 1995 was arm's length, the district director may consider USSub's average gross margin for an appropriate period before and after 1995 to determine whether USSub's average gross margin during the period was sufficiently greater than UD's average gross margin during the same period such that USSub was sufficiently compensated for the currency risk it bore throughout the period. See § 1.482–1(d)(3)(iii) (Risk).

**ADD28**

**Example 3.** FP manufactures product X in Country M and sells it to USSub, which distributes X in the United States. USSub realizes losses with respect to the controlled transactions in each of five consecutive taxable years. In each of the five consecutive years a different uncontrolled comparable realized a loss with respect to comparable transactions equal to or greater than USSub's loss. Pursuant to paragraph (f)(3)(iii)(C) of this section, the district director examines whether the uncontrolled comparables realized similar losses over a comparable period of time, and finds that each of the five comparables realized losses in only one of the five years, and their average result over the five-year period was a profit. Based on this data, the district director may conclude that the controlled taxpayer's results are not within the arm's length range over the five year period, since the economic conditions that resulted in the controlled taxpayer's loss did not have a comparable effect over a comparable period of time on the uncontrolled comparables.

**Example 4.** (i) USP, a U.S. corporation, manufactures product Y in the United States and sells it to FSub, which acts as USP's exclusive distributor of product Y in Country N. The resale price method described in § 1.482–3(c) is used to evaluate whether the transfer price charged by USP to FSub for the 1994 taxable year for product Y was arm's length. For the period 1992 through 1994, FSub had a gross profit margin for each year of 13%. A, B, C and D are uncontrolled distributors of products that compete directly with product Y in country N. After making appropriate adjustments in accordance with §§ 1.482–1(d)(2) and 1.482–3(c), the gross profit margins for A, B, C, and D are as follows:

|  | 1992 | 1993 | 1994 | Average |
| --- | --- | --- | --- | --- |
| A | 13 | 3 | 8 | 8.00 |
| B | 11 | 13 | 2 | 8.67 |
| 7C | 4 | 7 | 13 | 8.00 |
| 7D | 7 | 9 | 6 | 7.33 |

(ii) Applying the provisions of § 1.482–1(e), the district director determines that the arm's length range of the average gross profit margins is between 7.33 and 8.67. The district director concludes that FSub's average gross margin of 13% is not within the arm's length range, despite the fact that C's gross profit margin for 1994 was also 13%, since the economic conditions that caused S's result did not have a comparable effect over a comparable period of time on the results of C or the other uncontrolled comparables. In this case, the district director makes an allocation equivalent to adjusting FSub's gross profit margin for 1994 from 13% to the mean of the uncontrolled comparables' results for 1994 (7.25%).

**ADD29**

**(iv) Product lines and statistical techniques.** The methods described in §§ 1.482–2 through 1.482–6 are generally stated in terms of individual transactions. However, because a taxpayer may have controlled transactions involving many different products, or many separate transactions involving the same product, it may be impractical to analyze every individual transaction to determine its arm's length price. In such cases, it is permissible to evaluate the arm's length results by applying the appropriate methods to the overall results for product lines or other groupings. In addition, the arm's length results of all related party transactions entered into by a controlled taxpayer may be evaluated by employing sampling and other valid statistical techniques.

**(v) Allocations apply to results, not methods**—(A) In general. In evaluating whether the result of a controlled transaction is arm's length, it is not necessary for the district director to determine whether the method or procedure that a controlled taxpayer employs to set the terms for its controlled transactions corresponds to the method or procedure that might have been used by a taxpayer dealing at arm's length with an uncontrolled taxpayer. Rather, the district director will evaluate the result achieved rather than the method the taxpayer used to determine its prices.

(B) Example. The following example illustrates this paragraph (f)(2)(v).

**Example.** (i) FS is a foreign subsidiary of P, a U.S. corporation. P manufactures and sells household appliances. FS operates as P's exclusive distributor in Europe. P annually establishes the price for each of its appliances sold to FS as part of its annual budgeting, production allocation and scheduling, and performance evaluation processes. FS's aggregate gross margin earned in its distribution business is 18%.

(ii) ED is an uncontrolled European distributor of competing household appliances. After adjusting for minor differences in the level of inventory, volume of sales, and warranty programs conducted by FS and ED, ED's aggregate gross margin is also 18%. Thus, the district director may conclude that the aggregate prices charged by P for its appliances sold to FS are arm's length, without determining whether the budgeting, production, and performance evaluation processes of P are similar to such processes used by ED.

**ADD30**

**(g) Collateral adjustments with respect to allocations under** section 482—**(1) In general.** The district director will take into account appropriate collateral adjustments with respect to allocations under section 482. Appropriate collateral adjustments may include correlative allocations, conforming adjustments, and setoffs, as described in this paragraph (g).

**(2) Correlative allocations—(i) In general.** When the district director makes an allocation under section 482 (referred to in this paragraph (g)(2) as the primary allocation), appropriate correlative allocations will also be made with respect to any other member of the group affected by the allocation. Thus, if the district director makes an allocation of income, the district director will not only increase the income of one member of the group, but correspondingly decrease the income of the other member. In addition, where appropriate, the district director may make such further correlative allocations as may be required by the initial correlative allocation.

**(ii) Manner of carrying out correlative allocation.** The district director will furnish to the taxpayer with respect to which the primary allocation is made a written statement of the amount and nature of the correlative allocation. The correlative allocation must be reflected in the documentation of the other member of the group that is maintained for U.S. tax purposes, without regard to whether it affects the U.S. income tax liability of the other member for any open year. In some circumstances the allocation will have an immediate U.S. tax effect, by changing the taxable income computation of the other member (or the taxable income computation of a shareholder of the other member, for example, under the provisions of subpart F of the Internal Revenue Code). Alternatively, the correlative allocation may not be reflected on any U.S. tax return until a later year, for example when a dividend is paid.

**(iii) Events triggering correlative allocation.** For purposes of this paragraph (g)(2), a primary allocation will not be considered to have been made (and therefore, correlative allocations are not required to be made) until the date of a final determination with respect to the allocation under section 482. For this purpose, a final determination includes—

(A) Assessment of tax following execution by the taxpayer of a Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment) with respect to such allocation;

**ADD31**

(B) Acceptance of a Form 870–AD (Offer of Waiver of Restriction on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment);

(C) Payment of the deficiency;

(D) Stipulation in the Tax Court of the United States; or

(E) Final determination of tax liability by offer-in-compromise, closing agreement, or final resolution (determined under the principles of section 7481) of a judicial proceeding.

**(iv) Examples.** The following examples illustrate this paragraph (g)(2). In each example, X and Y are members of the same group of controlled taxpayers and each regularly computes its income on a calendar year basis.

**Example 1.** (i) In 1996, Y, a U.S. corporation, rents a building owned by X, also a U.S. corporation. In 1998 the district director determines that Y did not pay an arm's length rental charge. The district director proposes to increase X's income to reflect an arm's length rental charge. X consents to the assessment reflecting such adjustment by executing Form 870, a Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment. The assessment of the tax with respect to the adjustment is made in 1998. Thus, the primary allocation, as defined in paragraph (g)(2)(i) of this section, is considered to have been made in 1998.

(ii) The adjustment made to X's income under section 482 requires a correlative allocation with respect to Y's income. The district director notifies X in writing of the amount and nature of the adjustment made with respect to Y. Y had net operating losses in 1993, 1994, 1995, 1996, and 1997. Although a correlative adjustment will not have an effect on Y's U.S. income tax liability for 1996, an adjustment increasing Y's net operating loss for 1996 will be made for purposes of determining Y's U.S. income tax liability for 1998 or a later taxable year to which the increased net operating loss may be carried.

**ADD32**

**Example 2.** (i) In 1995, X, a U.S. construction company, provided engineering services to Y, a U.S. corporation, in the construction of Y's factory. In 1997, the district director determines that the fees paid by Y to X for its services were not arm's length and proposes to make an adjustment to the income of X. X consents to an assessment reflecting such adjustment by executing Form 870. An assessment of the tax with respect to such adjustment is made in 1997. The district director notifies X in writing of the amount and nature of the adjustment to be made with respect to Y.

(ii) The fees paid by Y for X's engineering services properly constitute a capital expenditure. Y does not place the factory into service until 1998. Therefore, a correlative adjustment increasing Y's basis in the factory does not affect Y's U.S. income tax liability for 1997. However, the correlative adjustment must be made in the books and records maintained by Y for its U.S. income tax purposes and such adjustment will be taken into account in computing Y's allowable depreciation or gain or loss on a subsequent disposition of the factory.

**Example 3.** In 1995, X, a U.S. corporation, makes a loan to Y, its foreign subsidiary not engaged in a U.S. trade or business. In 1997, the district director, upon determining that the interest charged on the loan was not arm's length, proposes to adjust X's income to reflect an arm's length interest rate. X consents to an assessment reflecting such allocation by executing Form 870, and an assessment of the tax with respect to the section 482 allocation is made in 1997. The district director notifies X in writing of the amount and nature of the correlative allocation to be made with respect to Y. Although the correlative adjustment does not have an effect on Y's U.S. income tax liability, the adjustment must be reflected in the documentation of Y that is maintained for U.S. tax purposes. Thus, the adjustment must be reflected in the determination of the amount of Y's earnings and profits for 1995 and subsequent years, and the adjustment must be made to the extent it has an effect on any person's U.S. income tax liability for any taxable year.

**(3) Adjustments to conform accounts to reflect section 482 allocations—(i) In general.** Appropriate adjustments must be made to conform a taxpayer's accounts to reflect allocations made under section 482. Such adjustments may include the treatment of an allocated amount as a dividend or a capital contribution (as appropriate), or, in appropriate cases, pursuant to such applicable revenue procedures as may be provided by the Commissioner (see § 601.601(d)(2) of this chapter), repayment of the allocated amount without further income tax consequences.

**ADD33**

**(ii) Example.** The following example illustrates the principles of this paragraph (g)(3).

**Example** Conforming cash accounts. (i) USD, a United States corporation, buys Product from its foreign parent, FP. In reviewing USD's income tax return, the district director determines that the arm's length price would have increased USD's taxable income by $5 million. The district director accordingly adjusts USD's income to reflect its true taxable income.

(ii) To conform its cash accounts to reflect the section 482 allocation made by the district director, USD applies for relief under Rev. Proc. 65–17, 1965–1 C.B. 833 (see § 601.601(d)(2)(ii)(b) of this chapter), to treat the $5 million adjustment as an account receivable from FP, due as of the last day of the year of the transaction, with interest accruing therefrom.

**(4) Setoffs—(i)** [Reserved]. For further guidance, see § 1.482–1T(g)(4)(i).

**(ii) Requirements.** The district director will take a setoff into account only if the taxpayer—

(A) Establishes that the transaction that is the basis of the setoff was not at arm's length and the amount of the appropriate arm's length charge;

(B) Documents, pursuant to paragraph (g)(2) of this section, all correlative adjustments resulting from the proposed setoff; and

(C) Notifies the district director of the basis of any claimed setoff within 30 days after the earlier of the date of a letter by which the district director transmits an examination report notifying the taxpayer of proposed adjustments or the date of the issuance of the notice of deficiency.

**(iii) Examples.** The following examples illustrate this paragraph (g)(4).

**Example 1.** [Reserved]. For further guidance, see § 1.482–1T(g)(4)(iii), Example 1.

**ADD34**

**Example 2.** The facts are the same as in Example 1, except that, if P had reported $25,000 as rental income and $25,000 less as service income, it would have been subject to the tax on personal holding companies. Allocations will be made to reflect the correct amounts of rental income and service income.

**(h) Special rules—(1) Small taxpayer safe harbor.** [Reserved]

**(2) Effect of foreign legal restrictions—(i) In general.** The district director will take into account the effect of a foreign legal restriction to the extent that such restriction affects the results of transactions at arm's length. Thus, a foreign legal restriction will be taken into account only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time. In the absence of evidence indicating the effect of the foreign legal restriction on uncontrolled taxpayers, the restriction will be taken into account only to the extent provided in paragraphs (h)(2)(iii) and (iv) of this section (Deferred income method of accounting).

**(ii) Applicable legal restrictions.** Foreign legal restrictions (whether temporary or permanent) will be taken into account for purposes of this paragraph (h)(2) only if, and so long as, the conditions set forth in paragraphs (h)(2)(ii) (A) through (D) of this section are met.

(A) The restrictions are publicly promulgated, generally applicable to all similarly situated persons (both controlled and uncontrolled), and not imposed as part of a commercial transaction between the taxpayer and the foreign sovereign;

(B) The taxpayer (or other member of the controlled group with respect to which the restrictions apply) has exhausted all remedies prescribed by foreign law or practice for obtaining a waiver of such restrictions (other than remedies that would have a negligible prospect of success if pursued);

(C) The restrictions expressly prevented the payment or receipt, in any form, of part or all of the arm's length amount that would otherwise be required under section 482 (for

**ADD35**

example, a restriction that applies only to the deductibility of an expense for tax purposes is not a restriction on payment or receipt for this purpose); and

(D) The related parties subject to the restriction did not engage in any arrangement with controlled or uncontrolled parties that had the effect of circumventing the restriction, and have not otherwise violated the restriction in any material respect.

**(iii) Requirement for electing the deferred income method of accounting.** If a foreign legal restriction prevents the payment or receipt of part or all of the arm's length amount that is due with respect to a controlled transaction, the restricted amount may be treated as deferrable if the following requirements are met—

(A) The controlled taxpayer establishes to the satisfaction of the district director that the payment or receipt of the arm's length amount was prevented because of a foreign legal restriction and circumstances described in paragraph (h)(2)(ii) of this section; and

(B) The controlled taxpayer whose U.S. tax liability may be affected by the foreign legal restriction elects the deferred income method of accounting, as described in paragraph (h)(2)(iv) of this section, on a written statement attached to a timely U.S. income tax return (or an amended return) filed before the IRS first contacts any member of the controlled group concerning an examination of the return for the taxable year to which the foreign legal restriction applies. A written statement furnished by a taxpayer subject to the Coordinated Examination Program will be considered an amended return for purposes of this paragraph (h)(2)(iii)(B) if it satisfies the requirements of a qualified amended return for purposes of § 1.6664–2(c)(3) as set forth in those regulations or as the Commissioner may prescribe by applicable revenue procedures. The election statement must identify the affected transactions, the parties to the transactions, and the applicable foreign legal restrictions.

**(iv) Deferred income method of accounting.** If the requirements of paragraph (h)(2)(ii) of this section are satisfied, any portion of the arm's length amount, the payment or receipt of which is prevented because of applicable foreign legal restrictions, will be treated as

**ADD36**

deferrable until payment or receipt of the relevant item ceases to be prevented by the foreign legal restriction. For purposes of the deferred income method of accounting under this paragraph (h)(2)(iv), deductions (including the cost or other basis of inventory and other assets sold or exchanged) and credits properly chargeable against any amount so deferred, are subject to deferral under the provisions of § 1.461–1(a)(4). In addition, income is deferrable under this deferred income method of accounting only to the extent that it exceeds the related deductions already claimed in open taxable years to which the foreign legal restriction applied.

**(v) Examples.** The following examples, in which Sub is a Country FC subsidiary of U.S. corporation, Parent, illustrate this paragraph (h)(2).

**Example 1.** Parent licenses an intangible to Sub. FC law generally prohibits payments by any person within FC to recipients outside the country. The FC law meets the requirements of paragraph (h)(2)(ii) of this section. There is no evidence of unrelated parties entering into transactions under comparable circumstances for a comparable period of time, and the foreign legal restrictions will not be taken into account in determining the arm's length amount. The arm's length royalty rate for the use of the intangible property in the absence of the foreign restriction is 10% of Sub's sales in country FC. However, because the requirements of paragraph (h)(2)(ii) of this section are satisfied, Parent can elect the deferred income method of accounting by attaching to its timely filed U.S. income tax return a written statement that satisfies the requirements of paragraph (h)(2)(iii)(B) of this section.

**Example 2.** (i) The facts are the same as in Example 1, except that Sub, although it makes no royalty payment to Parent, arranges with an unrelated intermediary to make payments equal to an arm's length amount on its behalf to Parent.

(ii) The district director makes an allocation of royalty income to Parent, based on the arm's length royalty rate of 10%. Further, the district director determines that because the arrangement with the third party had the effect of circumventing the FC law, the requirements of paragraph (h)(2)(ii)(D) of this section are not satisfied. Thus, Parent could not validly elect the deferred income method of accounting, and the allocation of royalty income cannot be treated as deferrable. In appropriate circumstances, the district director may permit the amount of the distribution to be treated as payment by Sub of the royalty allocated to Parent, under the provisions of § 1.482–1(g) (Collateral adjustments).

**ADD37**

**Example 3.** The facts are the same as in Example 1, except that the laws of FC do not prevent distributions from corporations to their shareholders. Sub distributes an amount equal to 8% of its sales in country FC. Because the laws of FC did not expressly prevent all forms of payment from Sub to Parent, Parent cannot validly elect the deferred income method of accounting with respect to any of the arm's length royalty amount. In appropriate circumstances, the district director may permit the 8% that was distributed to be treated as payment by Sub of the royalty allocated to Parent, under the provisions of § 1.482–1(g) (Collateral adjustments).

**Example 4.** The facts are the same as in Example 1, except that Country FC law permits the payment of a royalty, but limits the amount to 5% of sales, and Sub pays the 5% royalty to Parent. Parent demonstrates the existence of a comparable uncontrolled transaction for purposes of the comparable uncontrolled transaction method in which an uncontrolled party accepted a royalty rate of 5%. Given the evidence of the comparable uncontrolled transaction, the 5% royalty rate is determined to be the arm's length royalty rate.

**(3) Coordination with section 936—(i) Cost sharing under section 936.** If a possessions corporation makes an election under section 936(h)(5)(C)(i)(I), the corporation must make a section 936 cost sharing payment that is at least equal to the payment that would be required under section 482 if the electing corporation were a foreign corporation. In determining the payment that would be required under section 482 for this purpose, the provisions of §§ 1.482–1 and 1.482–4 will be applied, and to the extent relevant to the valuation of intangibles, §§ 1.482–5 and 1.482–6 will be applied. The provisions of section 936(h)(5)(C)(i)(II) (Effect of Election—electing corporation treated as owner of intangible property) do not apply until the payment that would be required under section 482 has been determined.

**(ii) Use of terms.** A cost sharing payment, for the purposes of section 936(h)(5)(C)(i)(I), is calculated using the provisions of section 936 and the regulations thereunder and the provisions of this paragraph (h)(3). The provisions relating to cost sharing under section 482 do not apply to payments made pursuant to an election under section 936(h)(5)(C)(i)(I). Similarly, a profit split payment, for the purposes of section 936(h)(5)(C)(ii)(I), is calculated using the provisions of section 936 and the regulations thereunder, not section 482 and the regulations thereunder.

**(i)** [Reserved]. For further guidance, see § 1.482–1T(i) introductory text.

**ADD38**

**(j) Effective dates—(1)** The regulations in this are generally effective for taxable years beginning after October 6, 1994.

**(2)** Taxpayers may elect to apply retroactively all of the provisions of these regulations for any open taxable year. Such election will be effective for the year of the election and all subsequent taxable years.

**(3)** Although these regulations are generally effective for taxable years as stated, the final sentence of section 482 (requiring that the income with respect to transfers or licenses of intangible property be commensurate with the income attributable to the intangible) is generally effective for taxable years beginning after December 31, 1986. For the period prior to the effective date of these regulations, the final sentence of section 482 must be applied using any reasonable method not inconsistent with the statute. The IRS considers a method that applies these regulations or their general principles to be a reasonable method.

**(4)** These regulations will not apply with respect to transfers made or licenses granted to foreign persons before November 17, 1985, or before August 17, 1986, for transfers or licenses to others. Nevertheless, they will apply with respect to transfers or licenses before such dates if, with respect to property transferred pursuant to an earlier and continuing transfer agreement, such property was not in existence or owned by the taxpayer on such date.

**(5)** The last sentences of paragraphs (b)(2)(i) and (c)(1) of this section and of paragraph (c)(2)(iv) of § 1.482–5 apply for taxable years beginning on or after August 26, 2003.

**(6)** [Reserved]. For further guidance, see § 1.482–1T(j)(6).

## Credits
[T.D. 8552, 59 FR 34990, July 8, 1994; T.D. 9088, 68 FR 51177, Aug. 26, 2003; T.D. 9278, 71 FR 44481, Aug. 4, 2006; 71 FR 76903, Dec. 22, 2006]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 31, 1960, unless otherwise noted.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**ADD40**

Code of Federal Regulations
 Title 26. Internal Revenue
  Chapter I. Internal Revenue Service, Department of the Treasury
   Subchapter A. Income Tax
    Part 1. Income Taxes (Refs & Annos)
     Normal Taxes and Surtaxes
      Deferred Compensation, Etc.
       Methods of Accounting
        Adjustments

This section has been updated. Click here for the updated version.

26 C.F.R. § 1.482–1T, Treas. Reg. § 1.482–1T

§ 1.482–1T Allocation of income and deductions among taxpayers (temporary).

**(a) In general—(1) Purpose and scope.** The purpose of section 482 is to ensure that taxpayers clearly reflect income attributable to controlled transactions and to prevent the avoidance of taxes with respect to such transactions. Section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer. This section sets forth general principles and guidelines to be followed under section 482. Section 1.482–2 provides rules for the determination of the true taxable income of controlled taxpayers in specific situations, including controlled transactions involving loans or advances or the use of tangible property. Sections 1.482–3 through 1.482–6 provide rules for the determination of the true taxable income of controlled taxpayers in cases involving the transfer of property. Section 1.482–7T sets forth the cost sharing provisions applicable to taxable years beginning on or after October 6, 1994, and before January 1, 1996. Section 1.482–7 sets forth the cost sharing provisions applicable to taxable years beginning on or after January 1, 1996. Section 1.482–8 provides examples illustrating the application of the best method rule. Finally, § 1.482–9T provides rules for the determination of the true taxable income of controlled taxpayers in cases involving the performance of services.

**(a)(2) to (b)(1)** [Reserved]. For further guidance, see § 1.482–1(a)(2) through (b)(1).

**ADD41**

**(b)(2) Arm's length methods—(i) Methods.** Sections 1.482–2 through 1.482–6 and § 1.482–9T provide specific methods to be used to evaluate whether transactions between or among members of the controlled group satisfy the arm's length standard and, if they do not, to determine the arm's length result. Section 1.482–7 provides the specific method to be used to evaluate whether a qualified cost sharing arrangement produces results consistent with an arm's length result.

> **(b)(2)(ii) to (d)(3)(ii)(C), Examples 1, and 2** [Reserved]. For further guidance, see § 1.482–1(b)(2)(ii) through (d)(3)(ii)(C), Examples 1 and 2.

**Example 3.** Contractual terms imputed from economic substance. (i) FP, a foreign producer of wristwatches, is the registered holder of the YY trademark in the United States and in other countries worldwide. In year 1, FP enters the United States market by selling YY wristwatches to its newly organized United States subsidiary, USSub, for distribution in the United States market. USSub pays FP a fixed price per wristwatch. USSub and FP undertake, without separate compensation, marketing activities to establish the YY trademark in the United States market. Unrelated foreign producers of trademarked wristwatches and their authorized United States distributors respectively undertake similar marketing activities in independent arrangements involving distribution of trademarked wristwatches in the United States market. In years 1 through 6, USSub markets and sells YY wristwatches in the United States. Further, in years 1 through 6, USSub undertakes incremental marketing activities in addition to the activities similar to those observed in the independent distribution transactions in the United States market. FP does not directly or indirectly compensate USSub for performing these incremental activities during years 1 through 6. Assume that, aside from these incremental activities, and after any adjustments are made to improve the reliability of the comparison, the price paid per wristwatch by the independent, authorized distributors of wristwatches would provide the most reliable measure of the arm's length price paid per YY wristwatch by USSub.

(ii) By year 7, the wristwatches with the YY trademark generate a premium return in the United States market, as compared to wristwatches marketed by the independent distributors. In year 7, substantially all the premium return from the YY trademark in the United States market is attributed to FP, for example through an increase in the price paid per watch by USSub, or by some other means.

(iii) In determining whether an allocation of income is appropriate in year 7, the Commissioner may consider the economic substance of the arrangements between USSub and FP, and the parties' course of conduct throughout their relationship. Based on this analysis, the

Commissioner determines that it is unlikely that, ex ante, an uncontrolled taxpayer operating at arm's length would engage in the incremental marketing activities to develop or enhance an intangible owned by another party unless it received contemporaneous compensation or otherwise had a reasonable anticipation of receiving a future benefit from those activities. In this case, USSub's undertaking the incremental marketing activities in years 1 through 6 is a course of conduct that is inconsistent with the parties' attribution to FP in year 7 of substantially all the premium return from the enhanced YY trademark in the United States market. Therefore, the Commissioner may impute one or more agreements between USSub and FP, consistent with the economic substance of their course of conduct, which would afford USSub an appropriate portion of the premium return from the YY trademark wristwatches. For example, the Commissioner may impute a separate services agreement that affords USSub contingent-payment compensation for its incremental marketing activities in years 1 through 6, which benefited FP by contributing to the value of the trademark owned by FP. In the alternative, the Commissioner may impute a long-term, exclusive agreement to exploit the YY trademark in the United States that allows USSub to benefit from the incremental marketing activities it performed. As another alternative, the Commissioner may require FP to compensate USSub for terminating USSub's imputed long-term, exclusive agreement to exploit the YY trademark in the United States, an agreement that USSub made more valuable at its own expense and risk. The taxpayer may present additional facts that could indicate which of these or other alternative agreements best reflects the economic substance of the underlying transactions, consistent with the parties' course of conduct in the particular case.

**Example 4.** Contractual terms imputed from economic substance. (i) FP, a foreign producer of athletic gear, is the registered holder of the AA trademark in the United States and in other countries worldwide. In year 1, FP enters into a licensing agreement that affords its newly organized United States subsidiary, USSub, exclusive rights to certain manufacturing and marketing intangibles (including the AA trademark) for purposes of manufacturing and marketing athletic gear in the United States under the AA trademark. The contractual terms of this agreement obligate USSub to pay FP a royalty based on sales, and also obligate both FP and USSub to undertake without separate compensation specified types and levels of marketing activities. Unrelated foreign businesses license independent United States businesses to manufacture and market athletic gear in the United States, using trademarks owned by the unrelated foreign businesses. The contractual terms of these uncontrolled transactions require the licensees to pay royalties based on sales of the merchandise, and obligate the licensors and licensees to undertake without separate compensation specified types and levels of marketing activities. In years 1 through 6, USSub manufactures and sells athletic gear under the AA trademark in the United States. Assume that, after adjustments are made to improve the reliability of the comparison for any material differences relating to marketing activities,

manufacturing or marketing intangibles, and other comparability factors, the royalties paid by independent licensees would provide the most reliable measure of the arm's length royalty owed by USSub to FP, apart from the additional facts in paragraph (ii) of this example.

(ii) In years 1 through 6, USSub performs incremental marketing activities with respect to the AA trademark athletic gear, in addition to the activities required under the terms of the license agreement with FP, that are also incremental as compared to those observed in the comparables. FP does not directly or indirectly compensate USSub for performing these incremental activities during years 1 through 6. By year 7, AA trademark athletic gear generates a premium return in the United States, as compared to similar athletic gear marketed by independent licensees. In year 7, USSub and FP enter into a separate services agreement under which FP agrees to compensate USSub on a cost basis for the incremental marketing activities that USSub performed during years 1 through 6, and to compensate USSub on a cost basis for any incremental marketing activities it may perform in year 7 and subsequent years. In addition, the parties revise the license agreement executed in year 1, and increase the royalty to a level that attributes to FP substantially all the premium return from sales of the AA trademark athletic gear in the United States.

(iii) In determining whether an allocation of income is appropriate in year 7, the Commissioner may consider the economic substance of the arrangements between USSub and FP and the parties' course of conduct throughout their relationship. Based on this analysis, the Commissioner determines that it is unlikely that, ex ante, an uncontrolled taxpayer operating at arm's length would engage in the incremental marketing activities to develop or enhance an intangible owned by another party unless it received contemporaneous compensation or otherwise had a reasonable anticipation of a future benefit. In this case, USSub's undertaking the incremental marketing activities in years 1 through 6 is a course of conduct that is inconsistent with the parties' adoption in year 7 of contractual terms by which FP compensates USSub on a cost basis for the incremental marketing activities that it performed. Therefore, the Commissioner may impute one or more agreements between USSub and FP, consistent with the economic substance of their course of conduct, which would afford USSub an appropriate portion of the premium return from the AA trademark athletic gear. For example, the Commissioner may impute a separate services agreement that affords USSub contingent-payment compensation for the incremental activities it performed during years 1 through 6, which benefited FP by contributing to the value of the trademark owned by FP. In the alternative, the Commissioner may impute a long-term, exclusive United States license agreement that allows USSub to benefit from the incremental activities. As another alternative, the Commissioner may require FP to compensate USSub for terminating USSub's imputed long-term United States license agreement, a license that USSub made more valuable at its own

expense and risk. The taxpayer may present additional facts that could indicate which of these or other alternative agreements best reflects the economic substance of the underlying transactions, consistent with the parties' course of conduct in this particular case.

**Example 5.** Non-arm's length compensation. (i) The facts are the same as in paragraph (i) of Example 4. As in Example 4, assume that, after adjustments are made to improve the reliability of the comparison for any material differences relating to marketing activities, manufacturing or marketing intangibles, and other comparability factors, the royalties paid by independent licensees would provide the most reliable measure of the arm's length royalty owed by USSub to FP, apart from the additional facts described in paragraph (ii) of this example.

(ii) In years 1 through 4, USSub performs certain incremental marketing activities with respect to the AA trademark athletic gear, in addition to the activities required under the terms of the basic license agreement, that are also incremental as compared with those activities observed in the comparables. At the start of year 1, FP enters into a separate services agreement with USSub, which states that FP will compensate USSub quarterly, in an amount equal to specified costs plus X%, for these incremental marketing functions. Further, these written agreements reflect the intent of the parties that USSub receive such compensation from FP throughout the term of the agreement, without regard to the success or failure of the promotional activities. During years 1 though 4, USSub performs marketing activities pursuant to the separate services agreement and in each year USSub receives the specified compensation from FP on a cost of services plus basis.

(iii) In evaluating year 4, the Commissioner performs an analysis of independent parties that perform promotional activities comparable to those performed by USSub and that receive separately-stated compensation on a current basis without contingency. The Commissioner determines that the magnitude of the specified cost plus X% is outside the arm's length range in each of years 1 through 4. Based on an evaluation of all the facts and circumstances, the Commissioner makes an allocation to require payment of compensation to USSub for the promotional activities performed in year 4, based on the median of the interquartile range of the arm's length markups charged by the uncontrolled comparables described in § 1.482–1(e)(3).

(iv) Given that based on facts and circumstances, the terms agreed by the controlled parties were that FP would bear all risks associated with the promotional activities performed by USSub to promote the AA trademark product in the United States market, and given that the parties' conduct during the years examined was consistent with this allocation of risk, the fact that the cost of services plus markup on USSub's services was outside the arm's length range does not, without more, support imputation of additional contractual terms based on alternative views of

**ADD45**

the economic substance of the transaction, such as terms indicating that USSub, rather than FP, bore the risk associated with these activities. In other facts and circumstances, had the compensation paid to USSub been significantly outside the arm's length range, that might lead the Commissioner to examine further whether, despite the contractual terms that require cost-plus reimbursement of USSub, the economic substance of the transaction was not consistent with FP's bearing the risk associated with promotional activities in the United States market.

**Example 6.** Contractual terms imputed from economic substance. (i) Company X is a member of a controlled group that has been in operation in the pharmaceutical sector for many years. In years 1 through 4, Company X undertakes research and development activities. As a result of those activities, Company X developed a compound that may be more effective than existing medications in the treatment of certain conditions.

(ii) Company Y is acquired in year 4 by the controlled group that includes Company X. Once Company Y is acquired, Company X makes available to Company Y a large amount of technical data concerning the new compound, which Company Y uses to register patent rights with respect to the compound in several jurisdictions, making Company Y the legal owner of such patents. Company Y then enters into licensing agreements with group members that afford Company Y 100% of the premium return attributable to use of the intangible by its subsidiaries.

(iii) In determining whether an allocation is appropriate in year 4, the Commissioner may consider the economic substance of the arrangements between Company X and Company Y, and the parties' course of conduct throughout their relationship. Based on this analysis, the Commissioner determines that it is unlikely that an uncontrolled taxpayer operating at arm's length would make available the results of its research and development or perform services that resulted in transfer of valuable know how to another party unless it received contemporaneous compensation or otherwise had a reasonable anticipation of receiving a future benefit from those activities. In this case, Company X's undertaking the research and development activities and then providing technical data and know-how to Company Y in year 4 is inconsistent with the registration and subsequent exploitation of the patent by Company Y. Therefore, the Commissioner may impute one or more agreements between Company X and Company Y consistent with the economic substance of their course of conduct, which would afford Company X an appropriate portion of the premium return from the patent rights. For example, the Commissioner may impute a separate services agreement that affords Company X contingent-payment compensation for its services in year 4 for the benefit of Company Y, consisting of making available to Company Y technical data, know-how, and other fruits of research and development conducted in previous years. These services benefited Company Y by giving rise to and contributing to the value of the patent rights that were ultimately registered by

**ADD46**

Company Y. In the alternative, the Commissioner may impute a transfer of patentable intangible rights from Company X to Company Y immediately preceding the registration of patent rights by Company Y. The taxpayer may present additional facts that could indicate which of these or other alternative agreements best reflects the economic substance of the underlying transactions, consistent with the parties' course of conduct in the particular case.

**(d)(3)(iii), (iv)** [Reserved]. For further guidance, see § 1.482–1(d)(3)(iii) and (d)(3)(iv).

**(d)(3)(v) Property or services.** Evaluating the degree of comparability between controlled and uncontrolled transactions requires a comparison of the property or services transferred in the transactions. This comparison may include any intangibles that are embedded in tangible property or services being transferred. The comparability of the embedded intangibles will be analyzed using the factors listed in § 1.482–4(c)(2)(iii)(B)(1) (comparable intangible property). The relevance of product comparability in evaluating the relative reliability of the results will depend on the method applied. For guidance concerning the specific comparability considerations applicable to transfers of tangible and intangible property and performance of services, see §§ 1.482–3 through 1.482–6 and § 1.482–9T; see also § 1.482–3(f), § 1.482–4T(f)(4), and § 1.482–9T(m), dealing with the coordination of the intangible and tangible property and performance of services rules.

**(d)(4) to (f)(2)(i)** [Reserved]. For further guidance, see § 1.482–1(d)(4) through (f)(2)(i).

**(f)(2)(ii) Allocation based on taxpayer's actual transactions**—(A) In general. The Commissioner will evaluate the results of a transaction as actually structured by the taxpayer unless its structure lacks economic substance. However, the Commissioner may consider the alternatives available to the taxpayer in determining whether the terms of the controlled transaction would be acceptable to an uncontrolled taxpayer faced with the same alternatives and operating under comparable circumstances. In such cases the Commissioner may adjust the consideration charged in the controlled transaction based on the cost or profit of an alternative as adjusted to account for material differences between the alternative and the controlled transaction, but will not restructure the transaction as if the alternative had been adopted by the taxpayer. See § 1.482–1(d)(3) (factors for determining comparability; contractual terms and risk); §§ 1.482–3(e), 1.482–4(d), and 1.482–9T(h) (unspecified methods).

ADD47

**(f)(2)(ii)**(B) **to** **(f)(2)(iii)**(A) [Reserved]. For further guidance, see § 1.482–1(f)(2)(ii)(B) through (f)(2)(iii)(A).

**(f)(2)(iii)**(B) Circumstances warranting consideration of multiple year data. The extent to which it is appropriate to consider multiple year data depends on the method being applied and the issue being addressed. Circumstances that may warrant consideration of data from multiple years include the extent to which complete and accurate data are available for the taxable year under review, the effect of business cycles in the controlled taxpayer's industry, or the effects of life cycles of the product or intangible being examined. Data from one or more years before or after the taxable year under review must ordinarily be considered for purposes of applying the provisions of paragraph (d)(3)(iii) of this section (risk), paragraph (d)(4)(i) of this section (market share strategy), § 1.482–4(f)(2) (periodic adjustments), § 1.482–5 (comparable profits method), § 1.482–9T(f) (comparable profits method for services), and § 1.482–9T(i) (contingent-payment contractual terms for services). On the other hand, multiple year data ordinarily will not be considered for purposes of applying the comparable uncontrolled price method of § 1.482–3(b) or the comparable uncontrolled services price method of § 1.482–9T(c) (except to the extent that risk or market share strategy issues are present).

**(f)(2)(iii)**(C) **to** **(g)(3)** [Reserved]. For further guidance, see § 1.482–1(f)(2)(iii)(C) through (g)(3).

**(g)(4) Setoffs—(i) In general.** If an allocation is made under section 482 with respect to a transaction between controlled taxpayers, the Commissioner will take into account the effect of any other non-arm's length transaction between the same controlled taxpayers in the same taxable year which will result in a setoff against the original section 482 allocation. Such setoff, however, will be taken into account only if the requirements of paragraph (g)(4)(ii) of this section are satisfied. If the effect of the setoff is to change the characterization or source of the income or deductions, or otherwise distort taxable income, in such a manner as to affect the U.S. tax liability of any member, adjustments will be made to reflect the correct amount of each category of income or deductions. For purposes of this setoff provision, the term arm's length

**ADD48**

refers to the amount defined in paragraph (b) of this section (Arm's length standard), without regard to the rules in § 1.482–2(a) that treat certain interest rates as arm's length rates of interest.

**(g)(4)(ii)** [Reserved]. For further guidance, see § 1.482–1(g)(4)(ii).

**(g)(4)(iii) Examples.** The following examples illustrate this paragraph (g)(4):

**Example 1.** P, a U.S. corporation, renders construction services to S, its foreign subsidiary in Country Y, in connection with the construction of S's factory. An arm's length charge for such services determined under § 1.482–9T would be $100,000. During the same taxable year P makes available to S the use of a machine to be used in the construction of the factory, and the arm's length rental value of the machine is $25,000. P bills S $125,000 for the services, but does not charge S for the use of the machine. No allocation will be made with respect to the undercharge for the machine if P notifies the district director of the basis of the claimed setoff within 30 days after the date of the letter from the district director transmitting the examination report notifying P of the proposed adjustment, establishes that the excess amount charged for services was equal to an arm's length charge for the use of the machine and that the taxable income and income tax liabilities of P are not distorted, and documents the correlative allocations resulting from the proposed setoff.

**(g)(4)(iii) Example 2 through (h)** [Reserved]. For further guidance, see § 1.482–1(g)(4)(iii) Example 2 through (h).

**(i) Definitions.** The definitions set forth in paragraphs (i)(1) through (i)(10) of this section apply to this section and §§ 1.482–2T through 1.482–9T.

**(i)(1) to (i)(10)** [Reserved]. For further guidance, see § 1.482–1(i)(1) through (i)(10).

**(j)(1) to (j)(5)** [Reserved]. For further guidance, see § 1.482–1(j)(1) through (j)(5).

ADD49

**(j)(6)(i)** The provisions of paragraphs (a)(1), (b)(2)(i), (d)(3)(ii)(C) Example 3, Example 4, Example 5, and Example 6, (d)(3)(v), (f)(2)(ii)(A), (f)(2)(iii)(B), (g)(4)(i), (g)(4)(iii), and (i) of this section are generally applicable for taxable years beginning after December 31, 2006.

**(ii)** A person may elect to apply the provisions of paragraphs (a)(1), (b)(2)(i), (d)(3)(ii)(C) Example 3, Example 4, Example 5, and Example 6, (d)(3)(v), (f)(2)(ii)(A), (f)(2)(iii)(B), (g)(4)(i), (g)(4)(iii), and (i) of this section to earlier taxable years in accordance with the rules set forth in § 1.482–9T(n)(2).

**(iii)** The applicability of § 1.482–1T expires on or before July 31, 2009.

**Credits**
[T.D. 9278, 71 FR 44481, Aug. 4, 2006; 71 FR 76903, Dec. 22, 2006]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 31, 1960, unless otherwise noted.

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**ADD50**

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter A. Income Tax
        Part 1. Income Taxes (Refs & Annos)
          Normal Taxes and Surtaxes
            Deferred Compensation, Etc.
              Methods of Accounting
                Adjustments

This section has been updated. Click here for the updated version.

26 C.F.R. § 1.482–4, Treas. Reg. § 1.482–4

§ 1.482–4 Methods to determine taxable income in connection with a transfer of intangible property.

**(a) In general.** The arm's length amount charged in a controlled transfer of intangible property must be determined under one of the four methods listed in this paragraph (a). Each of the methods must be applied in accordance with all of the provisions of § 1.482–1, including the best method rule of § 1.482–1(c), the comparability analysis of § 1.482–1(d), and the arm's length range of § 1.482–1(e). The arm's length consideration for the transfer of an intangible determined under this section must be commensurate with the income attributable to the intangible. See § 1.482–4(f)(2) (Periodic adjustments). The available methods are—

  **(1)** The comparable uncontrolled transaction method, described in paragraph (c) of this section;

  **(2)** The comparable profits method, described in § 1.482–5;

  **(3)** The profit split method, described in § 1.482–6; and

**ADD51**

**(4)** Unspecified methods described in paragraph (d) of this section.

**(b) Definition of intangible.** For purposes of section 482, an intangible is an asset that comprises any of the following items and has substantial value independent of the services of any individual—

**(1)** Patents, inventions, formulae, processes, designs, patterns, or know-how;

**(2)** Copyrights and literary, musical, or artistic compositions;

**(3)** Trademarks, trade names, or brand names;

**(4)** Franchises, licenses, or contracts;

**(5)** Methods, programs, systems, procedures, campaigns, surveys, studies, forecasts, estimates, customer lists, or technical data; and

**(6)** Other similar items. For purposes of section 482, an item is considered similar to those listed in paragraph (b)(1) through (5) of this section if it derives its value not from its physical attributes but from its intellectual content or other intangible properties.

**(c) Comparable uncontrolled transaction method—(1) In general.** The comparable uncontrolled transaction method evaluates whether the amount charged for a controlled transfer of intangible property was arm's length by reference to the amount charged in a comparable uncontrolled transaction. The amount determined under this method may be adjusted as required by paragraph (f)(2) of this section (Periodic adjustments).

**(2) Comparability and reliability considerations—(i) In general.** Whether results derived from applications of this method are the most reliable measure of an arm's length

**ADD52**

result is determined using the factors described under the best method rule in § 1.482–1(c). The application of these factors under the comparable uncontrolled transaction method is discussed in paragraphs (c)(2)(ii), (iii), and (iv) of this section.

**(ii) Reliability.** If an uncontrolled transaction involves the transfer of the same intangible under the same, or substantially the same, circumstances as the controlled transaction, the results derived from applying the comparable uncontrolled transaction method will generally be the most direct and reliable measure of the arm's length result for the controlled transfer of an intangible. Circumstances between the controlled and uncontrolled transactions will be considered substantially the same if there are at most only minor differences that have a definite and reasonably ascertainable effect on the amount charged and for which appropriate adjustments are made. If such uncontrolled transactions cannot be identified, uncontrolled transactions that involve the transfer of comparable intangibles under comparable circumstances may be used to apply this method, but the reliability of the analysis will be reduced.

**(iii) Comparability**—(A) In general. The degree of comparability between controlled and uncontrolled transactions is determined by applying the comparability provisions of § 1.482–1(d). Although all of the factors described in § 1.482–1(d)(3) must be considered, specific factors may be particularly relevant to this method. In particular, the application of this method requires that the controlled and uncontrolled transactions involve either the same intangible property or comparable intangible property, as defined in paragraph (c)(2)(iii)(B)(1) of this section. In addition, because differences in contractual terms, or the economic conditions in which transactions take place, could materially affect the amount charged, comparability under this method also depends on similarity with respect to these factors, or adjustments to account for material differences in such circumstances.

(B) Factors to be considered in determining comparability—(1) Comparable intangible property. In order for the intangible property involved in an uncontrolled transaction to be considered comparable to the intangible property involved in the controlled transaction, both intangibles must—

ADD53

(i) Be used in connection with similar products or processes within the same general industry or market; and

(ii) Have similar profit potential. The profit potential of an intangible is most reliably measured by directly calculating the net present value of the benefits to be realized (based on prospective profits to be realized or costs to be saved) through the use or subsequent transfer of the intangible, considering the capital investment and start-up expenses required, the risks to be assumed, and other relevant considerations. The need to reliably measure profit potential increases in relation to both the total amount of potential profits and the potential rate of return on investment necessary to exploit the intangible. If the information necessary to directly calculate net present value of the benefits to be realized is unavailable, and the need to reliably measure profit potential is reduced because the potential profits are relatively small in terms of total amount and rate of return, comparison of profit potential may be based upon the factors referred to in paragraph (c)(2)(iii)(B)(2) of this section. See Example 3 of § 1.482–4(c)(4). Finally, the reliability of a measure of profit potential is affected by the extent to which the profit attributable to the intangible can be isolated from the profit attributable to other factors, such as functions performed and other resources employed.

(2) Comparable circumstances. In evaluating the comparability of the circumstances of the controlled and uncontrolled transactions, although all of the factors described in § 1.482–1(d)(3) must be considered, specific factors that may be particularly relevant to this method include the following—

(i) The terms of the transfer, including the exploitation rights granted in the intangible, the exclusive or nonexclusive character of any rights granted, any restrictions on use, or any limitations on the geographic area in which the rights may be exploited;

(ii) The stage of development of the intangible (including, where appropriate, necessary governmental approvals, authorizations, or licenses) in the market in which the intangible is to be used;

**ADD54**

(iii) Rights to receive updates, revisions, or modifications of the intangible;

(iv) The uniqueness of the property and the period for which it remains unique, including the degree and duration of protection afforded to the property under the laws of the relevant countries;

(v) The duration of the license, contract, or other agreement, and any termination or renegotiation rights;

(vi) Any economic and product liability risks to be assumed by the transferee;

(vii) The existence and extent of any collateral transactions or ongoing business relationships between the transferee and transferor; and

(viii) The functions to be performed by the transferor and transferee, including any ancillary or subsidiary services.

**(iv) Data and assumptions.** The reliability of the results derived from the comparable uncontrolled transaction method is affected by the completeness and accuracy of the data used and the reliability of the assumptions made to apply this method. See § 1.482–1(c) (Best method rule).

**(3) Arm's length range.** See § 1.482–1(e)(2) for the determination of an arm's length range.

**(4) Examples.** The following examples illustrate the principles of this paragraph (c).

**Example 1.** (i) USpharm, a U.S. pharmaceutical company, develops a new drug Z that is a safe and effective treatment for the disease zeezee. USpharm has obtained patents covering drug Z in the United States and in various foreign countries. USpharm has also obtained the regulatory authorizations necessary to market drug Z in the United States and in foreign countries.

ADD55

(ii) USpharm licenses its subsidiary in country X, Xpharm, to produce and sell drug Z in country X. At the same time, it licenses an unrelated company, Ydrug, to produce and sell drug Z in country Y, a neighboring country. Prior to licensing the drug, USpharm had obtained patent protection and regulatory approvals in both countries and both countries provide similar protection for intellectual property rights. Country X and country Y are similar countries in terms of population, per capita income and the incidence of disease zeezee. Consequently, drug Z is expected to sell in similar quantities and at similar prices in both countries. In addition, costs of producing and marketing drug Z in each country are expected to be approximately the same.

(iii) USpharm and Xpharm establish terms for the license of drug Z that are identical in every material respect, including royalty rate, to the terms established between USpharm and Ydrug. In this case the district director determines that the royalty rate established in the Ydrug license agreement is a reliable measure of the arm's length royalty rate for the Xpharm license agreement.

**Example 2.** The facts are the same as in Example 1, except that the incidence of the disease zeezee in Country Y is much higher than in Country X. In this case, the profit potential from exploitation of the right to make and sell drug Z is likely to be much higher in country Y than it is in Country X. Consequently, the Ydrug license agreement is unlikely to provide a reliable measure of the arm's length royalty rate for the Xpharm license.

**Example 3.** (i) FP, is a foreign company that designs, manufactures and sells industrial equipment. FP has developed proprietary components that are incorporated in its products. These components are important in the operation of FP's equipment and some of them have distinctive features, but other companies produce similar components and none of these components by itself accounts for a substantial part of the value of FP's products.

(ii) FP licenses its U.S. subsidiary, USSub, exclusive North American rights to use the patented technology for producing component X, a heat exchanger used for cooling operating mechanisms in industrial equipment. Component X incorporates proven technology that makes it somewhat more efficient than the heat exchangers commonly used in industrial equipment. FP also agrees to provide technical support to help adapt component X to USSub's products and to assist with initial production. Under the terms of the license agreement USSub pays FP a royalty equal to 3 percent of sales of USSub equipment incorporating component X.

(iii) FP does not license unrelated parties to use component X, but many similar components are transferred between uncontrolled taxpayers. Consequently, the district director decides to apply

**ADD56**

the comparable uncontrolled transaction method to evaluate whether the 3 percent royalty for component X is an arm's length royalty.

(iv) The district director uses a database of company documents filed with the Securities and Exchange Commission (SEC) to identify potentially comparable license agreements between uncontrolled taxpayers that are on file with the SEC. The district director identifies 40 license agreements that were entered into in the same year as the controlled transfer or in the prior or following year, and that relate to transfers of technology associated with industrial equipment that has similar applications to USSub's products. Further review of these uncontrolled agreements indicates that 25 of them involved components that have a similar level of technical sophistication as component X and could be expected to play a similar role in contributing to the total value of the final product.

(v) The district director makes a detailed review of the terms of each of the 25 uncontrolled agreements and finds that 15 of them are similar to the controlled agreement in that they all involve—

(A) The transfer of exclusive rights for the North American market;

(B) Products for which the market could be expected to be of a similar size to the market for the products into which USSub incorporates component X;

(C) The transfer of patented technology;

(D) Continuing technical support;

(E) Access to technical improvements;

(F) Technology of a similar age; and

(G) A similar duration of the agreement.

(vi) Based on these factors and the fact that none of the components to which these license agreements relate accounts for a substantial part of the value of the final products, the district director concludes that these fifteen intangibles have similar profit potential to the component X technology.

(vii) The 15 uncontrolled comparables produce the following royalty rates:

**ADD57**

| License | Royalty rate (percent) |
|---|---|
| 1...................................................................................................................... | 1.0 |
| 2...................................................................................................................... | 1.0 |
| 3...................................................................................................................... | 1.25 |
| 4...................................................................................................................... | 1.25 |
| 5...................................................................................................................... | 1.5 |
| 6...................................................................................................................... | 1.5 |
| 7...................................................................................................................... | 1.75 |
| 8...................................................................................................................... | 2.0 |
| 9...................................................................................................................... | 2.0 |
| 10.................................................................................................................... | 2.0 |
| 11.................................................................................................................... | 2.25 |
| 12.................................................................................................................... | 2.5 |
| 13.................................................................................................................... | 2.5 |
| 14.................................................................................................................... | 2.75 |
| 15.................................................................................................................... | 3.0 |

(viii) Although the uncontrolled comparables are clearly similar to the controlled transaction, it is likely that unidentified material differences exist between the uncontrolled comparables and the controlled transaction. Therefore, an appropriate statistical technique must be used to establish the arm's length range. In this case the district director uses the interquartile range to determine the arm's length range. Therefore, the arm's length range covers royalty rates from 1.25 to 2.5 percent, and an adjustment is warranted to the 3 percent royalty charged in the

**ADD58**

controlled transfer. The district director determines that the appropriate adjustment corresponds to a reduction in the royalty rate to 2.0 percent, which is the median of the uncontrolled comparables.

**Example 4.** (i) USdrug, a U.S. pharmaceutical company, has developed a new drug, Nosplit, that is useful in treating migraine headaches and produces no significant side effects. Nosplit replaces another drug, Lessplit, that USdrug had previously produced and marketed as a treatment for migraine headaches. A number of other drugs for treating migraine headaches are already on the market, but Nosplit can be expected rapidly to dominate the worldwide market for such treatments and to command a premium price since all other treatments produce side effects. Thus, USdrug projects that extraordinary profits will be derived from Nosplit in the U.S. market and other markets.

(ii) USdrug licenses its newly established European subsidiary, Eurodrug, the rights to produce and market Nosplit in the European market. In setting the royalty rate for this license, USdrug considers the royalty that it established previously when it licensed the right to produce and market Lessplit in the European market to an unrelated European pharmaceutical company. In many respects the two license agreements are closely comparable. The drugs were licensed at the same stage in their development and the agreements conveyed identical rights to the licensees. Moreover, there appear to have been no significant changes in the European market for migraine headache treatments since Lessplit was licensed. However, at the time that Lessplit was licensed there were several other similar drugs already on the market to which Lessplit was not in all cases superior. Consequently, the projected and actual Lessplit profits were substantially less than the projected Nosplit profits. Thus, USdrug concludes that the profit potential of Lessplit is not similar to the profit potential of Nosplit, and the Lessplit license agreement consequently is not a comparable uncontrolled transaction for purposes of this paragraph (c) in spite of the other indicia of comparability between the two intangibles.

**(d) Unspecified methods—(1) In general.** Methods not specified in paragraphs (a)(1), (2), and (3) of this section may be used to evaluate whether the amount charged in a controlled transaction is arm's length. Any method used under this paragraph (d) must be applied in accordance with the provisions of § 1.482–1. Consistent with the specified methods, an unspecified method should take into account the general principle that uncontrolled taxpayers evaluate the terms of a transaction by considering the realistic alternatives to that transaction, and only enter into a particular transaction if none of the alternatives is preferable to it. For example, the comparable uncontrolled transaction method compares a controlled transaction to

**ADD59**

similar uncontrolled transactions to provide a direct estimate of the price the parties would have agreed to had they resorted directly to a market alternative to the controlled transaction. Therefore, in establishing whether a controlled transaction achieved an arm's length result, an unspecified method should provide information on the prices or profits that the controlled taxpayer could have realized by choosing a realistic alternative to the controlled transaction. As with any method, an unspecified method will not be applied unless it provides the most reliable measure of an arm's length result under the principles of the best method rule. See § 1.482–1(c). Therefore, in accordance with § 1.482–1(d) (Comparability), to the extent that a method relies on internal data rather than uncontrolled comparables, its reliability will be reduced. Similarly, the reliability of a method will be affected by the reliability of the data and assumptions used to apply the method, including any projections used.

**(2) Example.** The following example illustrates an application of the principle of this paragraph (d).

**Example.** (i) USbond is a U.S. company that licenses to its foreign subsidiary, Eurobond, a proprietary process that permits the manufacture of Longbond, a long-lasting industrial adhesive, at a substantially lower cost than otherwise would be possible. Using the proprietary process, Eurobond manufactures Longbond and sells it to related and unrelated parties for the market price of $550 per ton. Under the terms of the license agreement, Eurobond pays USbond a royalty of $100 per ton of Longbond sold. USbond also manufactures and markets Longbond in the United States.

(ii) In evaluating whether the consideration paid for the transfer of the proprietary process to Eurobond was arm's length, the district director may consider, subject to the best method rule of § 1.482–1(c), USbond's alternative of producing and selling Longbond itself. Reasonably reliable estimates indicate that if USbond directly supplied Longbond to the European market, a selling price of $300 per ton would cover its costs and provide a reasonable profit for its functions, risks and investment of capital associated with the production of Longbond for the European market. Given that the market price of Longbond was $550 per ton, by licensing the proprietary process to Eurobond, USbond forgoes $250 per ton of profit over the profit that would be necessary to compensate it for the functions, risks and investment involved in supplying Longbond to the European market itself. Based on these facts, the district director concludes that a royalty of $100 for the proprietary process is not arm's length.

**ADD60**

**(e) Coordination with tangible property rules.** See § 1.482–3(f) for the provisions regarding the coordination between the tangible property and intangible property rules.

**(f) Special rules for transfers of intangible property—(1) Form of consideration.** If a transferee of an intangible pays nominal or no consideration and the transferor has retained a substantial interest in the property, the arm's length consideration shall be in the form of a royalty, unless a different form is demonstrably more appropriate.

**(2) Periodic adjustments—(i) General rule.** If an intangible is transferred under an arrangement that covers more than one year, the consideration charged in each taxable year may be adjusted to ensure that it is commensurate with the income attributable to the intangible. Adjustments made pursuant to this paragraph (f)(2) shall be consistent with the arm's length standard and the provisions of § 1.482–1. In determining whether to make such adjustments in the taxable year under examination, the district director may consider all relevant facts and circumstances throughout the period the intangible is used. The determination in an earlier year that the amount charged for an intangible was an arm's length amount will not preclude the district director in a subsequent taxable year from making an adjustment to the amount charged for the intangible in the subsequent year. A periodic adjustment under the commensurate with income requirement of section 482 may be made in a subsequent taxable year without regard to whether the taxable year of the original transfer remains open for statute of limitation purposes. For exceptions to this rule see paragraph (f)(2)(ii) of this section.

**(ii) Exceptions—(A)** Transactions involving the same intangible. If the same intangible was transferred to an uncontrolled taxpayer under substantially the same circumstances as those of the controlled transaction; this transaction serves as the basis for the application of the comparable uncontrolled transaction method in the first taxable year in which substantial periodic consideration was required to be paid; and the amount paid in that year was an arm's length amount, then no allocation in a subsequent year will be made under paragraph (f)(2)(i) of this paragraph for a controlled transfer of intangible property.

**(B)** Transactions involving comparable intangible. If the arm's length result is derived from the application of the comparable uncontrolled transaction method based on the

**ADD61**

transfer of a comparable intangible under comparable circumstances to those of the controlled transaction, no allocation will be made under paragraph (f)(2)(i) of this section if each of the following facts is established—

(1) The controlled taxpayers entered into a written agreement (controlled agreement) that provided for an amount of consideration with respect to each taxable year subject to such agreement, such consideration was an arm's length amount for the first taxable year in which substantial periodic consideration was required to be paid under the agreement, and such agreement remained in effect for the taxable year under review;

(2) There is a written agreement setting forth the terms of the comparable uncontrolled transaction relied upon to establish the arm's length consideration (uncontrolled agreement), which contains no provisions that would permit any change to the amount of consideration, a renegotiation, or a termination of the agreement, in circumstances comparable to those of the controlled transaction in the taxable year under review (or that contains provisions permitting only specified, non-contingent, periodic changes to the amount of consideration);

(3) The controlled agreement is substantially similar to the uncontrolled agreement, with respect to the time period for which it is effective and the provisions described in paragraph (f)(2)(ii)(B)(2) of this section;

(4) The controlled agreement limits use of the intangible to a specified field or purpose in a manner that is consistent with industry practice and any such limitation in the uncontrolled agreement;

(5) There were no substantial changes in the functions performed by the controlled transferee after the controlled agreement was executed, except changes required by events that were not foreseeable; and

(6) The aggregate profits actually earned or the aggregate cost savings actually realized by the controlled taxpayer from the exploitation of the intangible in the

**ADD62**

year under examination, and all past years, are not less than 80% nor more than 120% of the prospective profits or cost savings that were foreseeable when the comparability of the uncontrolled agreement was established under paragraph (c)(2) of this section.

(C) Methods other than comparable uncontrolled transaction. If the arm's length amount was determined under any method other than the comparable uncontrolled transaction method, no allocation will be made under paragraph (f)(2)(i) of this section if each of the following facts is established—

(1) The controlled taxpayers entered into a written agreement (controlled agreement) that provided for an amount of consideration with respect to each taxable year subject to such agreement, and such agreement remained in effect for the taxable year under review;

(2) The consideration called for in the controlled agreement was an arm's length amount for the first taxable year in which substantial periodic consideration was required to be paid, and relevant supporting documentation was prepared contemporaneously with the execution of the controlled agreement;

(3) There have been no substantial changes in the functions performed by the transferee since the controlled agreement was executed, except changes required by events that were not foreseeable; and

(4) The total profits actually earned or the total cost savings realized by the controlled transferee from the exploitation of the intangible in the year under examination, and all past years, are not less than 80% nor more than 120% of the prospective profits or cost savings that were foreseeable when the controlled agreement was entered into.

(D) Extraordinary events. No allocation will be made under paragraph (f)(2)(i) of this section if the following requirements are met—

**ADD63**

(1) Due to extraordinary events that were beyond the control of the controlled taxpayers and that could not reasonably have been anticipated at the time the controlled agreement was entered into, the aggregate actual profits or aggregate cost savings realized by the taxpayer are less than 80% or more than 120% of the prospective profits or cost savings; and

(2) All of the requirements of paragraph (f)(2)(ii) (B) or (C) of this section are otherwise satisfied.

(E) Five-year period. If the requirements of § 1.482–4 (f)(2)(ii)(B) or (f)(2)(ii)(C) are met for each year of the five-year period beginning with the first year in which substantial periodic consideration was required to be paid, then no periodic adjustment will be made under paragraph (f)(2)(i) of this section in any subsequent year.

**(iii) Examples.** The following examples illustrate this paragraph (f)(2).

**Example 1.** (i) USdrug, a U.S. pharmaceutical company, has developed a new drug, Nosplit, that is useful in treating migraine headaches and produces no significant side effects. A number of other drugs for treating migraine headaches are already on the market, but Nosplit can be expected rapidly to dominate the worldwide market for such treatments and to command a premium price since all other treatments produce side effects. Thus, USdrug projects that extraordinary profits will be derived from Nosplit in the U.S. and European markets.

(ii) USdrug licenses its newly established European subsidiary, Eurodrug, the rights to produce and market Nosplit for the European market for 5 years. In setting the royalty rate for this license, USdrug makes projections of the annual sales revenue and the annual profits to be derived from the exploitation of Nosplit by Eurodrug. Based on the projections, a royalty rate of 3.9% is established for the term of the license.

(iii) In Year 1, USdrug evaluates the royalty rate it received from Eurodrug. Given the high profit potential of Nosplit, USdrug is unable to locate any uncontrolled transactions dealing with licenses of comparable intangible property. USdrug therefore determines that the comparable uncontrolled transaction method will not provide a reliable measure of an arm's length royalty. However, applying the comparable profits method to Eurodrug, USdrug determines that a royalty rate of 3.9% will result in Eurodrug earning an arm's length return for its manufacturing and marketing functions.

**ADD64**

(iv) In Year 5, the U.S. income tax return for USdrug is examined, and the district director must determine whether the royalty rate between USdrug and Eurodrug is commensurate with the income attributable to Nosplit. In making this determination, the district director considers whether any of the exceptions in § 1.482–4(f)(2)(ii) are applicable. In particular, the district director compares the profit projections attributable to Nosplit made by USdrug against the actual profits realized by Eurodrug. The projected and actual profits are as follows:

|  | Profit projections | Actual profits |
| --- | --- | --- |
| Year 1 ....................................................................... | 200 | 250 |
| Year 2 ....................................................................... | 250 | 300 |
| Year 3 ....................................................................... | 500 | 600 |
| Year 4 ....................................................................... | 350 | 200 |
| Year 5 ....................................................................... | 100 | 100 |
| Total......................................................................... | 1400 | 1450 |

(v) The total profits earned through Year 5 were not less than 80% nor more than 120% of the profits that were projected when the license was entered into. If the district director determines that the other requirements of § 1.482–4(f)(2)(ii)(C) were met, no adjustment will be made to the royalty rate between USdrug and Eurodrug for the license of Nosplit.

**Example 2.** (i) The facts are the same as in Example 1, except that Eurodrug's actual profits earned were much higher than the projected profits, as follows:

|  | Profit projections | Actual profits |
| --- | --- | --- |
| Year 1 ....................................................................... | 200 | 250 |
| Year 2 ....................................................................... | 250 | 500 |

**ADD65**

| | | |
|---|---|---|
| Year 3 ......................................................................... | 500 | 800 |
| Year 4 ......................................................................... | 350 | 700 |
| Year 5 ......................................................................... | 100 | 600 |
| Total.......................................................................... | 1400 | 2850 |

(ii) In examining USdrug's tax return for Year 5, the district director considers the actual profits realized by Eurodrug in Year 5, and all past years. Accordingly, although Years 1 through 4 may be closed under the statute of limitations, for purposes of determining whether an adjustment should be made with respect to the royalty rate in Year 5 with respect to Nosplit, the district director aggregates the actual profits from those years with the profits of Year 5. However, the district director will make an adjustment, if any, only with respect to Year 5.

**Example 3.** (i) FP, a foreign corporation, licenses to USS, its U.S. subsidiary, a new air-filtering process that permits manufacturing plants to meet new environmental standards. The license runs for a 10–year period, and the profit derived from the new process is projected to be $15 million per year, for an aggregate profit of $150 million.

(ii) The royalty rate for the license is based on a comparable uncontrolled transaction involving a comparable intangible under comparable circumstances. The requirements of paragraphs (f)(2)(ii)(B)(1) through (5) of this section have been met. Specifically, FP and USS have entered into a written agreement that provides for a royalty in each year of the license, the royalty rate is considered arm's length for the first taxable year in which a substantial royalty was required to be paid, the license limited the use of the process to a specified field, consistent with industry practice, and there are no substantial changes in the functions performed by USS after the license was entered into.

(iii) In examining Year 4 of the license, the district director determines that the aggregate actual profits earned by USS through Year 4 are $30 million, less than 80% of the projected profits of $60 million. However, USS establishes to the satisfaction of the district director that the aggregate actual profits from the process are less than 80% of the projected profits in Year 3 because an earthquake severely damaged USS's manufacturing plant. Because the difference between the projected profits and actual profits was due to an extraordinary event that was beyond the control of USS, and could not reasonably have been anticipated at the time the license was entered into, the requirement under § 1.482–4(f)(2)(ii)(D) has been met, and no adjustment under this section is made.

**ADD66**

**(3)** [Reserved]. For further guidance, see § 1.482–4T(f)(3).

**(4)** [Reserved]. For further guidance, see § 1.482–4T(f)(4).

**(5) Consideration not artificially limited.** The arm's length consideration for the controlled transfer of an intangible is not limited by the consideration paid in any uncontrolled transactions that do not meet the requirements of the comparable uncontrolled transaction method described in paragraph (c) of this section. Similarly, the arm's length consideration for an intangible is not limited by the prevailing rates of consideration paid for the use or transfer of intangibles within the same or similar industry.

**(6) Lump sum payments—(i) In general.** If an intangible is transferred in a controlled transaction for a lump sum, that amount must be commensurate with the income attributable to the intangible. A lump sum is commensurate with income in a taxable year if the equivalent royalty amount for that taxable year is equal to an arm's length royalty. The equivalent royalty amount for a taxable year is the amount determined by treating the lump sum as an advance payment of a stream of royalties over the useful life of the intangible (or the period covered by an agreement, if shorter), taking into account the projected sales of the licensee as of the date of the transfer. Thus, determining the equivalent royalty amount requires a present value calculation based on the lump sum, an appropriate discount rate, and the projected sales over the relevant period. The equivalent royalty amount is subject to periodic adjustments under § 1.482–4(f)(2)(i) to the same extent as an actual royalty payment pursuant to a license agreement.

**(ii) Exceptions.** No periodic adjustment will be made under paragraph (f)(2)(i) of this section if any of the exceptions to periodic adjustments provided in paragraph (f)(2)(ii) of this section apply.

**(iii) Example.** The following example illustrates the principle of this paragraph (f)(5).

**Example.** Calculation of the equivalent royalty amount. (i) FSub is the foreign subsidiary of USP, a U.S. company. USP licenses FSub the right to produce and sell the whopperchopper, a patented new kitchen appliance, for the foreign market. The license is for a period of five years,

**ADD67**

and payment takes the form of a single lump-sum charge of $500,000 that is paid at the beginning of the period.

(ii) The equivalent royalty amount for this license is determined by deriving an equivalent royalty rate equal to the lump-sum payment divided by the present discounted value of FSub's projected sales of whopperchoppers over the life of the license. Based on the riskiness of the whopperchopper business, an appropriate discount rate is determined to be 10 percent. Projected sales of whopperchoppers for each year of the license are as follows:

| Year | Projected sales |
|---|---|
| 1 | $2,500,000 |
| 2 | 2,600,000 |
| 3 | 2,700,000 |
| 4 | 2,700,000 |
| 5 | 2,750,000 |

(iii) Based on this information, the present discounted value of the projected whopperchopper sales is approximately $10 million, yielding an equivalent royalty rate of approximately 5%. Thus, the equivalent royalty amounts for each year are as follows:

| Year | Projected sales | Equivalent royalty amount |
|---|---|---|
| 1 | 2,500,000 | 125,000 |
| 2 | 2,600,000 | 130,000 |
| 3 | 2,700,000 | 135,000 |
| 4 | 2,700,000 | 135,000 |
| 5 | 2,750,000 | 137,500 |

**ADD68**

(iv) If in any of the five taxable years the equivalent royalty amount is determined not to be an arm's length amount, a periodic adjustment may be made pursuant to § 1.482–4(f)(2)(i). The adjustment in such case would be equal to the difference between the equivalent royalty amount and the arm's length royalty in that taxable year.

**(7)** [Reserved]. For further guidance, see § 1.482–4T(f)(7).

**Credits**
[T.D. 8552, 59 FR 35016, July 8, 1994; T.D. 9278, 71 FR 44484, Aug. 4, 2006]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 31, 1960, unless otherwise noted.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**ADD69**

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter A. Income Tax
        Part 1. Income Taxes (Refs & Annos)
          Normal Taxes and Surtaxes
            Deferred Compensation, Etc.
              Methods of Accounting
                Adjustments

This section has been updated. Click here for the updated version.

26 C.F.R. § 1.482–4T, Treas. Reg. § 1.482–4T

§ 1.482–4T Methods to determine taxable income in connection with a transfer of intangible property (temporary).

**(a) to (f)(2)** [Reserved]. For further guidance, see § 1.482–4(a) through (f)(2).

**(f)(3) Ownership of intangible property—(i) Identification of owner—**(A) In general. The legal owner of an intangible pursuant to the intellectual property law of the relevant jurisdiction, or the holder of rights constituting an intangible pursuant to contractual terms (such as the terms of a license) or other legal provision, will be considered the sole owner of the respective intangible for purposes of this section unless such ownership is inconsistent with the economic substance of the underlying transactions. See § 1.482–1(d)(3)(ii)(B) (identifying contractual terms). If no owner of the respective intangible is identified under the intellectual property law of the relevant jurisdiction, or pursuant to contractual terms (including terms imputed pursuant to § 1.482–1(d)(3)(ii)(B)) or other legal provision, then the controlled taxpayer who has control of the intangible, based on all the facts and circumstances, will be considered the sole owner of the intangible for purposes of this section.

ADD70

(B) Cost sharing arrangements. The rule in paragraph (f)(3)(i)(A) of this section will apply to interests in covered intangibles, as defined in § 1.482–7(b)(4)(iv), only as provided in § 1.482–7 (sharing of costs).

(ii) Examples. The principles of this paragraph (f)(3) are illustrated by the following examples:

Example 1. FP, a foreign corporation, is the registered holder of the AA trademark in the United States. FP licenses to its U.S. subsidiary, USSub, the exclusive rights to manufacture and market products in the United States under the AA trademark. FP is the owner of the trademark pursuant to intellectual property law. USSub is the owner of the license pursuant to the terms of the license, but is not the owner of the trademark. See paragraphs (b)(3) and (4) of this section (defining an intangible as, among other things, a trademark or a license).

Example 2. The facts are the same as in Example 1. As a result of its sales and marketing activities, USSub develops a list of several hundred creditworthy customers that regularly purchase AA trademarked products. Neither the terms of the contract between FP and USSub nor the relevant intellectual property law specify which party owns the customer list. Because USSub has knowledge of the contents of the list, and has practical control over its use and dissemination, USSub is considered the sole owner of the customer list for purposes of this paragraph (f)(3).

(4) Contribution to the value of an intangible owned by another—(i) In general. The arm's length consideration for a contribution by one controlled taxpayer that develops or enhances the value, or may be reasonably anticipated to develop or enhance the value, of an intangible owned by another controlled taxpayer will be determined in accordance with the applicable rules under section 482. If the consideration for such a contribution is embedded within the contractual terms for a controlled transaction that involves such intangible, then ordinarily no separate allocation will be made with respect to such contribution. In such cases, pursuant to § 1.482–1(d)(3), the contribution must be accounted for in evaluating the comparability of the controlled transaction to uncontrolled comparables, and accordingly in determining the arm's length consideration in the controlled transaction.

(ii) Examples. The principles of this paragraph (f)(4) are illustrated by the following examples:

**ADD71**

**Example 1.** A, a member of a controlled group, allows B, another member of the controlled group, to use tangible property, such as laboratory equipment, in connection with B's development of an intangible that B owns. By furnishing tangible property, A makes a contribution to the development of an intangible owned by another controlled taxpayer, B. Pursuant to paragraph (f)(4)(i) of this section, the arm's length charge for A's furnishing of tangible property will be determined under the rules for use of tangible property in § 1.482–2(c).

**Example 2.** (i) Facts. FP, a foreign producer of wristwatches, is the registered holder of the YY trademark in the United States and in other countries worldwide. FP enters into an exclusive, five-year, renewable agreement with its newly organized U.S. subsidiary, USSub. The contractual terms of the agreement grant USSub the exclusive right to re-sell trademark YY wristwatches in the United States, obligate USSub to pay a fixed price per wristwatch throughout the entire term of the contract, and obligate both FP and USSub to undertake without separate compensation specified types and levels of marketing activities.

(ii) The consideration for FP's and USSub's marketing activities, as well as the consideration for the exclusive right to re-sell YY trademarked merchandise in the United States, are embedded in the transfer price paid for the wristwatches. Accordingly, pursuant to paragraph (f)(4)(i) of this section, ordinarily no separate allocation would be appropriate with respect to these embedded contributions.

(iii) Whether an allocation is warranted with respect to the transfer price for the wristwatches is determined under §§ 1.482–1, 1.482–3, and this section through § 1.482–6. The comparability analysis would include consideration of all relevant factors, including the nature of the intangible embedded in the wristwatches and the nature of the marketing activities required under the agreement. This analysis would also take into account that the compensation for the activities performed by USSub and FP, as well as the consideration for USSub's use of the YY trademark, is embedded in the transfer price for the wristwatches, rather than provided for in separate agreements. See §§ 1.482–3(f) and 1.482–9T(m)(4).

**Example 3.** (i) Facts. FP, a foreign producer of athletic gear, is the registered holder of the AA trademark in the United States and in other countries. In year 1, FP licenses to a newly organized U.S. subsidiary, USSub, the exclusive rights to use certain manufacturing and marketing intangibles to manufacture and market athletic gear in the United States under the AA trademark. The license agreement obligates USSub to pay a royalty based on sales of trademarked merchandise. The license agreement also obligates FP and USSub to perform

**ADD72**

without separate compensation specified types and levels of marketing activities. In year 1, USSub manufactures and sells athletic gear under the AA trademark in the United States.

(ii) The consideration for FP's and USSub's respective marketing activities is embedded in the contractual terms of the license for the AA trademark. Accordingly, pursuant to paragraph (f)(4)(i) of this section, ordinarily no separate allocation would be appropriate with respect to the embedded contributions in year 1. See § 1.482–9T(m)(4).

(iii) Whether an allocation is warranted with respect to the royalty under the license agreement would be analyzed under § 1.482–1 and this section through § 1.482–6. The comparability analysis would include consideration of all relevant factors, such as the term and geographical exclusivity of the license, the nature of the intangibles subject to the license, and the nature of the marketing activities required to be undertaken pursuant to the license. Pursuant to paragraph (f)(4)(i) of this section, the analysis would also take into account the fact that the compensation for the marketing services is embedded in the royalty paid for use of the AA trademark, rather than provided for in a separate services agreement. For illustrations of application of the best method rule, see § 1.482–8T Example 10, Example 11, and Example 12.

**Example 4.** (i) Facts. The year 1 facts are the same as in Example 3, with the following exceptions. In year 2, USSub undertakes certain incremental marketing activities, in addition to those required by the contractual terms of the license for the AA trademark executed in year 1. The parties do not execute a separate agreement with respect to these incremental marketing activities performed by USSub The license agreement executed in year 1 is of sufficient duration that it is reasonable to anticipate that USSub will obtain the benefit of its incremental activities, in the form of increased sales or revenues of trademarked products in the U.S. market.

(ii) To the extent that it was reasonable to anticipate that USSub's incremental marketing activities would increase the value only of USSub's intangible (that is, USSub's license to use the AA trademark for a specified term), and not the value of the AA trademark owned by FP, USSub's incremental activities do not constitute a contribution for which an allocation is warranted under paragraph (f)(4)(i) of this section.

**Example 5.** (i) Facts. The year 1 facts are the same as in Example 3. In year 2, FP and USSub enter into a separate services agreement that obligates USSub to perform certain incremental marketing activities to promote AA trademark athletic gear in the United States, above and beyond the activities specified in the license agreement executed in year 1. In year 2, USSub begins to perform these incremental activities, pursuant to the separate services agreement with FP.

ADD73

(ii) Whether an allocation is warranted with respect to USSub's incremental marketing activities covered by the separate services agreement would be evaluated under §§ 1.482–1 and 1.482–9T, including a comparison of the compensation provided for the services with the results obtained under a method pursuant to § 1.482–9T, selected and applied in accordance with the best method rule of § 1.482–1(c).

(iii) Whether an allocation is warranted with respect to the royalty under the license agreement is determined under § 1.482–1 and this section through § 1.482–6. The comparability analysis would include consideration of all relevant factors, such as the term and geographical exclusivity of the license, the nature of the intangibles subject to the license, and the nature of the marketing activities required to be undertaken pursuant to the license. The comparability analysis would take into account that the compensation for the incremental activities by USSub is provided for in the separate services agreement, rather than embedded in the royalty paid for use of the AA trademark. For illustrations of application of the best method rule, see § 1.482–8T Example 10, Example 11, and Example 12.

**Example 6.** (i) Facts. The year 1 facts are the same as in Example 3. In year 2, FP and USSub enter into a separate services agreement that obligates FP to perform incremental marketing activities, not specified in the year 1 license, by advertising AA trademarked athletic gear in selected international sporting events, such as the Olympics and the soccer World Cup. FP's corporate advertising department develops and coordinates these special promotions. The separate services agreement obligates USSub to pay an amount to FP for the benefit to USSub that may reasonably be anticipated as the result of FP's incremental activities. The separate services agreement is not a qualified cost sharing arrangement under § 1.482–7. FP begins to perform the incremental activities in year 2 pursuant to the separate services agreement.

(ii) Whether an allocation is warranted with respect to the incremental marketing activities performed by FP under the separate services agreement would be evaluated under § 1.482–9T. Under the circumstances, it is reasonable to anticipate that FP's activities would increase the value of USSub's license as well as the value of FP's trademark. Accordingly, the incremental activities by FP may constitute in part a controlled services transaction for which USSub must compensate FP. The analysis of whether an allocation is warranted would include a comparison of the compensation provided for the services with the results obtained under a method pursuant to § 1.482–9T, selected and applied in accordance with the best method rule of § 1.482–1(c).

(iii) Whether an allocation is appropriate with respect to the royalty under the license agreement would be evaluated under § 1.482–1 through § 1.482–6 of this section. The comparability

**ADD74**

analysis would include consideration of all relevant factors, such as the term and geographical exclusivity of USSub's license, the nature of the intangibles subject to the license, and the marketing activities required to be undertaken by both FP and USSub pursuant to the license. This comparability analysis would take into account that the compensation for the incremental activities performed by FP was provided for in the separate services agreement, rather than embedded in the royalty paid for use of the AA trademark. For illustrations of application of the best method rule, see § 1.482–8T, Example 10, Example 11, and Example 12.

**(f)(5), (f)(6)** [Reserved]. For further guidance, see § 1.482–4(f)(5) and (f)(6).

**(f)(7) Effective date. (i) In general.** The provisions of paragraphs (f)(3) and (f)(4) are generally applicable for taxable years beginning after December 31, 2006.

**(ii) Election to apply regulation to earlier taxable years.** A person may elect to apply the provisions of paragraphs (f)(3) and (f)(4) of this section to earlier taxable years in accordance with the rules set forth in § 1.482–9T(n)(2).

**(iii) Expiration date.** The applicability of § 1.482–4T expires on or before July 31, 2009.

**Credits**
[T.D. 9278, 71 FR 44484, Aug. 4, 2006]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 31, 1960, unless otherwise noted.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

ADD75

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter A. Income Tax
        Part 1. Income Taxes (Refs & Annos)
          Normal Taxes and Surtaxes
            Deferred Compensation, Etc.
              Methods of Accounting
                Adjustments

This section has been updated. Click here for the updated version.

26 C.F.R. § 1.482–5, Treas. Reg. § 1.482–5

§ 1.482–5 Comparable profits method.

**(a) In general.** The comparable profits method evaluates whether the amount charged in a controlled transaction is arm's length based on objective measures of profitability (profit level indicators) derived from uncontrolled taxpayers that engage in similar business activities under similar circumstances.

**(b) Determination of arm's length result—(1) In general.** Under the comparable profits method, the determination of an arm's length result is based on the amount of operating profit that the tested party would have earned on related party transactions if its profit level indicator were equal to that of an uncontrolled comparable (comparable operating profit). Comparable operating profit is calculated by determining a profit level indicator for an uncontrolled comparable, and applying the profit level indicator to the financial data related to the tested party's most narrowly identifiable business activity for which data incorporating the controlled transaction is available (relevant business activity). To the extent possible, profit level indicators should be applied solely to the tested party's financial data that is related to controlled transactions. The tested party's reported operating profit is compared to the comparable operating profits derived from the profit level indicators of uncontrolled comparables to determine whether the reported operating profit represents an arm's length result.

**ADD76**

**(2) Tested party—(i) In general.** For purposes of this section, the tested party will be the participant in the controlled transaction whose operating profit attributable to the controlled transactions can be verified using the most reliable data and requiring the fewest and most reliable adjustments, and for which reliable data regarding uncontrolled comparables can be located. Consequently, in most cases the tested party will be the least complex of the controlled taxpayers and will not own valuable intangible property or unique assets that distinguish it from potential uncontrolled comparables.

**(ii) Adjustments for tested party.** The tested party's operating profit must first be adjusted to reflect all other allocations under section 482, other than adjustments pursuant to this section.

**(3) Arm's length range.** See § 1.482–1(e)(2) for the determination of the arm's length range. For purposes of the comparable profits method, the arm's length range will be established using comparable operating profits derived from a single profit level indicator.

**(4) Profit level indicators.** Profit level indicators are ratios that measure relationships between profits and costs incurred or resources employed. A variety of profit level indicators can be calculated in any given case. Whether use of a particular profit level indicator is appropriate depends upon a number of factors, including the nature of the activities of the tested party, the reliability of the available data with respect to uncontrolled comparables, and the extent to which the profit level indicator is likely to produce a reliable measure of the income that the tested party would have earned had it dealt with controlled taxpayers at arm's length, taking into account all of the facts and circumstances. The profit level indicators should be derived from a sufficient number of years of data to reasonably measure returns that accrue to uncontrolled comparables. Generally, such a period should encompass at least the taxable year under review and the preceding two taxable years. This analysis must be applied in accordance with § 1.482–1(f)(2)(iii)(D). Profit level indicators that may provide a reliable basis for comparing operating profits of the tested party and uncontrolled comparables include the following—

**(i) Rate of return on capital employed.** The rate of return on capital employed is the ratio of operating profit to operating assets. The reliability of this profit level indicator increases as operating assets play a greater role in generating operating profits for both the tested party and the uncontrolled comparable. In addition, reliability under this profit level

**ADD77**

indicator depends on the extent to which the composition of the tested party's assets is similar to that of the uncontrolled comparable. Finally, difficulties in properly valuing operating assets will diminish the reliability of this profit level indicator.

**(ii) Financial ratios.** Financial ratios measure relationships between profit and costs or sales revenue. Since functional differences generally have a greater effect on the relationship between profit and costs or sales revenue than the relationship between profit and operating assets, financial ratios are more sensitive to functional differences than the rate of return on capital employed. Therefore, closer functional comparability normally is required under a financial ratio than under the rate of return on capital employed to achieve a similarly reliable measure of an arm's length result. Financial ratios that may be appropriate include the following—

(A) Ratio of operating profit to sales; and

(B) Ratio of gross profit to operating expenses. Reliability under this profit level indicator also depends on the extent to which the composition of the tested party's operating expenses is similar to that of the uncontrolled comparables.

**(iii) Other profit level indicators.** Other profit level indicators not described in this paragraph (b)(4) may be used if they provide reliable measures of the income that the tested party would have earned had it dealt with controlled taxpayers at arm's length. However, profit level indicators based solely on internal data may not be used under this paragraph (b)(4) because they are not objective measures of profitability derived from operations of uncontrolled taxpayers engaged in similar business activities under similar circumstances.

**(c) Comparability and reliability considerations—(1) In general.** Whether results derived from application of this method are the most reliable measure of the arm's length result must be determined using the factors described under the best method rule in § 1.482–1(c).

**(2) Comparability—(i) In general.** The degree of comparability between an uncontrolled taxpayer and the tested party is determined by applying the provisions of § 1.482–1(d)(2).

**ADD78**

The comparable profits method compares the profitability of the tested party, measured by a profit level indicator (generally based on operating profit), to the profitability of uncontrolled taxpayers in similar circumstances. As with all methods that rely on external market benchmarks, the greater the degree of comparability between the tested party and the uncontrolled taxpayer, the more reliable will be the results derived from the application of this method. The determination of the degree of comparability between the tested party and the uncontrolled taxpayer depends upon all the relevant facts and circumstances, including the relevant lines of business, the product or service markets involved, the asset composition employed (including the nature and quantity of tangible assets, intangible assets and working capital), the size and scope of operations, and the stage in a business or product cycle.

**(ii) Functional, risk and resource comparability.** An operating profit represents a return for the investment of resources and assumption of risks. Therefore, although all of the factors described in § 1.482–1(d)(3) must be considered, comparability under this method is particularly dependent on resources employed and risks assumed. Moreover, because resources and risks usually are directly related to functions performed, it is also important to consider functions performed in determining the degree of comparability between the tested party and an uncontrolled taxpayer. The degree of functional comparability required to obtain a reliable result under the comparable profits method, however, is generally less than that required under the resale price or cost plus methods. For example, because differences in functions performed often are reflected in operating expenses, taxpayers performing different functions may have very different gross profit margins but earn similar levels of operating profit.

**(iii) Other comparability factors.** Other factors listed in § 1.482–1(d)(3) also may be particularly relevant under the comparable profits method. Because operating profit usually is less sensitive than gross profit to product differences, reliability under the comparable profits method is not as dependent on product similarity as the resale price or cost plus method. However, the reliability of profitability measures based on operating profit may be adversely affected by factors that have less effect on results under the comparable uncontrolled price, resale price, and cost plus methods. For example, operating profit may be affected by varying cost structures (as reflected, for example, in the age of plant and equipment), differences in business experience (such as whether the business is in a start-up phase or is mature), or differences in management efficiency (as indicated, for example, by objective evidence such as expanding or contracting sales or executive compensation over

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 4

**ADD79**

time). Accordingly, if material differences in these factors are identified based on objective evidence, the reliability of the analysis may be affected.

**(iv) Adjustments for the differences between the tested party and the uncontrolled taxpayers.** If there are differences between the tested party and an uncontrolled comparable that would materially affect the profits determined under the relevant profit level indicator, adjustments should be made according to the comparability provisions of § 1.482–1(d)(2). In some cases, the assets of an uncontrolled comparable may need to be adjusted to achieve greater comparability between the tested party and the uncontrolled comparable. In such cases, the uncontrolled comparable's operating income attributable to those assets must also be adjusted before computing a profit level indicator in order to reflect the income and expense attributable to the adjusted assets. In certain cases it may also be appropriate to adjust the operating profit of the tested party and comparable parties. For example, where there are material differences in accounts payable among the comparable parties and the tested party, it will generally be appropriate to adjust the operating profit of each party by increasing it to reflect an imputed interest charge on each party's accounts payable. As another example, it may be appropriate to adjust the operating profit of a party to account for material differences in the utilization of or accounting for stock-based compensation (as defined by § 1.482–7(d)(2)(i)) among the tested party and comparable parties.

**(3) Data and assumptions—(i) In general.** The reliability of the results derived from the comparable profits method is affected by the quality of the data and assumptions used to apply this method.

**(ii) Consistency in accounting.** The degree of consistency in accounting practices between the controlled transaction and the uncontrolled comparables that materially affect operating profit affects the reliability of the result. Thus, for example, if differences in inventory and other cost accounting practices would materially affect operating profit, the ability to make reliable adjustments for such differences would affect the reliability of the results.

**(iii) Allocations between the relevant business activity and other activities.** The reliability of the allocation of costs, income, and assets between the relevant business activity and other activities of the tested party or an uncontrolled comparable will affect the

**ADD80**

reliability of the determination of operating profit and profit level indicators. If it is not possible to allocate costs, income, and assets directly based on factual relationships, a reasonable allocation formula may be used. To the extent direct allocations are not made, the reliability of the results derived from the application of this method is reduced relative to the results of a method that requires fewer allocations of costs, income, and assets. Similarly, the reliability of the results derived from the application of this method is affected by the extent to which it is possible to apply the profit level indicator to the tested party's financial data that is related solely to the controlled transactions. For example, if the relevant business activity is the assembly of components purchased from both controlled and uncontrolled suppliers, it may not be possible to apply the profit level indicator solely to financial data related to the controlled transactions. In such a case, the reliability of the results derived from the application of this method will be reduced.

**(d) Definitions.** The definitions set forth in paragraphs (d)(1) through (6) of this section apply for purposes of this section.

**(1) Sales revenue** means the amount of the total receipts from sale of goods and provision of services, less returns and allowances. Accounting principles and conventions that are generally accepted in the trade or industry of the controlled taxpayer under review must be used.

**(2) Gross profit** means sales revenue less cost of goods sold.

**(3) Operating expenses** includes all expenses not included in cost of goods sold except for interest expense, foreign income taxes (as defined in § 1.901–2(a)), domestic income taxes, and any other expenses not related to the operation of the relevant business activity. Operating expenses ordinarily include expenses associated with advertising, promotion, sales, marketing, warehousing and distribution, administration, and a reasonable allowance for depreciation and amortization.

**(4) Operating profit** means gross profit less operating expenses. Operating profit includes all income derived from the business activity being evaluated by the comparable profits method, but does not include interest and dividends, income derived from activities not

**ADD81**

being tested by this method, or extraordinary gains and losses that do not relate to the continuing operations of the tested party.

**(5) Reported operating profit** means the operating profit of the tested party reflected on a timely filed U.S. income tax return. If the tested party files a U.S. income tax return, its operating profit is considered reflected on a U.S. income tax return if the calculation of taxable income on its return for the taxable year takes into account the income attributable to the controlled transaction under review. If the tested party does not file a U.S. income tax return, its operating profit is considered reflected on a U.S. income tax return in any taxable year for which income attributable to the controlled transaction under review affects the calculation of the U.S. taxable income of any other member of the same controlled group. If the comparable operating profit of the tested party is determined from profit level indicators derived from financial statements or other accounting records and reports of comparable parties, adjustments may be made to the reported operating profit of the tested party in order to account for material differences between the tested party's operating profit reported for U.S income tax purposes and the tested party's operating profit for financial statement purposes. In addition, in accordance with § 1.482–1(f)(2)(iii)(D), adjustments under section 482 that are finally determined may be taken into account in determining reported operating profit.

**(6) Operating assets.** The term operating assets means the value of all assets used in the relevant business activity of the tested party, including fixed assets and current assets (such as cash, cash equivalents, accounts receivable, and inventories).

The term does not include investments in subsidiaries, excess cash, and portfolio investments. Operating assets may be measured by their net book value or by their fair market value, provided that the same method is consistently applied to the tested party and the comparable parties, and consistently applied from year to year. In addition, it may be necessary to take into account recent acquisitions, leased assets, intangibles, currency fluctuations, and other items that may not be explicitly recorded in the financial statements of the tested party or uncontrolled comparable. Finally, operating assets must be measured by the average of the values for the beginning of the year and the end of the year, unless substantial fluctuations in the value of operating assets during the year make this an inaccurate measure of the average value over the year. In such a case, a more accurate measure of the average value of operating assets must be applied.

**(e) Examples.** The following examples illustrate the application of this section.

**Example 1.** Transfer of tangible property resulting in no adjustment. (i) FP is a publicly traded foreign corporation with a U.S. subsidiary, USSub, that is under audit for its 1996 taxable year. FP manufactures a consumer product for worldwide distribution. USSub imports the assembled product and distributes it within the United States at the wholesale level under the FP name.

(ii) FP does not allow uncontrolled taxpayers to distribute the product. Similar products are produced by other companies but none of them is sold to uncontrolled taxpayers or to uncontrolled distributors.

(iii) Based on all the facts and circumstances, the district director determines that the comparable profits method will provide the most reliable measure of an arm's length result. USSub is selected as the tested party because it engages in activities that are less complex than those undertaken by FP.

There is data from a number of independent operators of wholesale distribution businesses. These potential comparables are further narrowed to select companies in the same industry segment that perform similar functions and bear similar risks to USSub. An analysis of the information available on these taxpayers shows that the ratio of operating profit to sales is the most appropriate profit level indicator, and this ratio is relatively stable where at least three years are included in the average. For the taxable years 1994 through 1996, USSub shows the following results:

|  | 1994 | 1995 | 1996 | Average |
| --- | --- | --- | --- | --- |
| Sales | $500,000 | $560,000 | $500,000 | $520,000 |
| Cost of Goods Sold | 393,000 | 412,400 | 400,000 | 401,800 |
| Operating Expenses | 80,000 | 110,000 | 104,600 | 98,200 |
| Operating Profit | 27,000 | 37,600 | (4,600) | 20,000 |

(iv) After adjustments have been made to account for identified material differences between USSub and the uncontrolled distributors, the average ratio of operating profit to sales is calculated for each of the uncontrolled distributors. Applying each ratio to USSub would lead to the following comparable operating profit (COP) for USSub:

**ADD83**

| Uncontrolled distributor | OP/S (percent) | USSub COP |
|---|---|---|
| A...................................................................................... | 1.7 | $8,840 |
| B...................................................................................... | 3.1 | 16,120 |
| C...................................................................................... | 3.8 | 19,760 |
| D...................................................................................... | 4.5 | 23,400 |
| E...................................................................................... | 4.7 | 24,440 |
| F...................................................................................... | 4.8 | 24,960 |
| G...................................................................................... | 4.9 | 25,480 |
| H...................................................................................... | 6.7 | 34,840 |
| I ...................................................................................... | 9.9 | 51,480 |
| J...................................................................................... | 10.5 | 54,600 |

(v) The data is not sufficiently complete to conclude that it is likely that all material differences between USSub and the uncontrolled distributors have been identified. Therefore, an arm's length range can be established only pursuant to § 1.482–1(e)(2)(iii)(B). The district director measures the arm's length range by the interquartile range of results, which consists of the results ranging from $19,760 to $34,840. Although USSub's operating income for 1996 shows a loss of $4,600, the district director determines that no allocation should be made, because USSub's average reported operating profit of $20,000 is within this range.

**Example 2.** Transfer of tangible property resulting in adjustment. (i) The facts are the same as in Example 1 except that USSub reported the following income and expenses:

| | 1994 | 1995 | 1996 | Average |
|---|---|---|---|---|
| Sales................................................. | $500,000 | $560,000 | $500,000 | $520,000 |
| Cost of Goods Sold........................................... | 370,000 | 460,000 | 400,000 | 410,000 |
| Operating Expenses.......................................... | 110,000 | 110,000 | 110,000 | 110,000 |

**ADD84**

| | | | | |
|---|---|---|---|---|
| Operating Profit ................................................. | 20,000 | (10,000) | (10,000) | 0 |

(ii) The interquartile range of comparable operating profits remains the same as derived in Example 1: $19,760 to $34,840. USSub's average operating profit for the years 1994 through 1996 ($0) falls outside this range. Therefore, the district director determines that an allocation may be appropriate.

(iii) To determine the amount, if any, of the allocation, the district director compares USSub's reported operating profit for 1996 to comparable operating profits derived from the uncontrolled distributors' results for 1996. The ratio of operating profit to sales in 1996 is calculated for each of the uncontrolled comparables and applied to USSub's 1996 sales to derive the following results:

| Uncontrolled distributor | OP/S (percent) | USSub COP |
|---|---|---|
| C ....................................................................................... | 0.5 | $2,500 |
| D ....................................................................................... | 1.5 | 7,500 |
| E ....................................................................................... | 2.0 | 10,000 |
| A ....................................................................................... | 1.6 | 13,000 |
| F ....................................................................................... | 2.8 | 14,000 |
| B ....................................................................................... | 2.9 | 14,500 |
| J ....................................................................................... | 3.0 | 15,000 |
| I ....................................................................................... | 4.4 | 22,000 |
| H ....................................................................................... | 6.9 | 34,500 |
| G ....................................................................................... | 7.4 | 37,000 |

(iv) Based on these results, the median of the comparable operating profits for 1996 is $14,250. Therefore, USSub's income for 1996 is increased by $24,250, the difference between USSub's reported operating profit for 1996 and the median of the comparable operating profits for 1996.

**ADD85**

**Example 3.** Multiple year analysis. (i) The facts are the same as in Example 2. In addition, the district director examines the taxpayer's results for the 1997 taxable year. As in Example 2, the district director increases USSub's income for the 1996 taxable year by $24,250. The results for the 1997 taxable year, together with the 1995 and 1996 taxable years, are as follows:

|  | 1995 | 1996 | 1997 | Average |
|---|---|---|---|---|
| Sales................................................... | $560,000 | $500,000 | $530,000 | $530,000 |
| Cost of Goods Sold............................. | 460,000 | 400,000 | 430,000 | 430,000 |
| Operating Expenses............................ | 110,000 | 110,000 | 110,000 | 110,000 |
| Operating Profit................................. | (10,000) | (10,000) | (10,000) | (10,000) |

(ii) The interquartile range of comparable operating profits, based on average results from the uncontrolled comparables and average sales for USSub for the years 1995 through 1997, ranges from $15,500 to $30,000. In determining whether an allocation for the 1997 taxable year may be made, the district director compares USSub's average reported operating profit for the years 1995 through 1997 to the interquartile range of average comparable operating profits over this period. USSub's average reported operating profit is determined without regard to the adjustment made with respect to the 1996 taxable year. See § 1.482–1(f)(2)(iii)(D). Therefore, USSub's average reported operating profit for the years 1995 through 1997 is ($10,000). Because this amount of income falls outside the interquartile range, the district director determines that an allocation may be appropriate.

(iii) To determine the amount, if any, of the allocation for the 1997 taxable year, the district director compares USSub's reported operating profit for 1997 to the median of the comparable operating profits derived from the uncontrolled distributors' results for 1997. The median of the comparable operating profits derived from the uncontrolled comparables results for the 1997 taxable year is $12,000. Based on this comparison, the district director increases USSub's 1997 taxable income by $22,000, the difference between the median of the comparable operating profits for the 1997 taxable year and USSub's reported operating profit of ($10,000) for the 1997 taxable year.

**Example 4.** Transfer of intangible to offshore manufacturer. (i) DevCo is a U.S. developer, producer and marketer of widgets. DevCo develops a new "high tech widget" (htw) that is manufactured by its foreign subsidiary ManuCo located in Country H. ManuCo sells the htw to MarkCo (a U.S. subsidiary of DevCo) for distribution and marketing in the United States. The

taxable year 1996 is under audit, and the district director examines whether the royalty rate of 5 percent paid by ManuCo to DevCo is an arm's length consideration for the htw technology.

(ii) Based on all the facts and circumstances, the district director determines that the comparable profits method will provide the most reliable measure of an arm's length result. ManuCo is selected as the tested party because it engages in relatively routine manufacturing activities, while DevCo engages in a variety of complex activities using unique and valuable intangibles. Finally, because ManuCo engages in manufacturing activities, it is determined that the ratio of operating profit to operating assets is an appropriate profit level indicator.

(iii) Uncontrolled taxpayers performing similar functions cannot be found in country H. It is determined that data available in countries M and N provides the best match of companies in a similar market performing similar functions and bearing similar risks. Such data is sufficiently complete to identify many of the material differences between ManuCo and the uncontrolled comparables, and to make adjustments to account for such differences. However, data is not sufficiently complete so that it is likely that no material differences remain. In particular, the differences in geographic markets might have materially affected the results of the various companies.

(iv) In a separate analysis, it is determined that the price that ManuCo charged to MarkCo for the htw's is an arm's length price under § 1.482–3(b). Therefore, ManuCo's financial data derived from its sales to MarkCo are reliable. ManuCo's financial data from 1994–1996 is as follows:

|  | 1994 | 1995 | 1996 | Average |
|---|---|---|---|---|
| Assets | $24,000 | $25,000 | $26,000 | $25,000 |
| Sales to MarkCo | 25,000 | 30,000 | 35,000 | 30,000 |
| Cost of Goods Sold | 6,250 | 7,500 | 8,750 | 7,500 |
| Royalty to DevCo (5%) | 1,250 | 1,500 | 1,750 | 1,500 |
| Other | 5,000 | 6,000 | 7,000 | 6,000 |
| Operating Expenses | 1,000 | 1,000 | 1,000 | 1,000 |
| Operating Profit | 17,750 | 21,500 | 25,250 | 21,500 |

(v) Applying the ratios of average operating profit to operating assets for the 1994 through 1996 taxable years derived from a group of similar uncontrolled comparables located in country M

**ADD87**

and N to ManuCo's average operating assets for the same period provides a set of comparable operating profits. The interquartile range for these average comparable operating profits is $3,000 to $4,500. ManuCo's average reported operating profit for the years 1994 through 1996 ($21,500) falls outside this range. Therefore, the district director determines that an allocation may be appropriate for the 1996 taxable year.

(vi) To determine the amount, if any, of the allocation for the 1996 taxable year, the district director compares ManuCo's reported operating profit for 1996 to the median of the comparable operating profits derived from the uncontrolled distributors' results for 1996. The median result for the uncontrolled comparables for 1996 is $3,750. Based on this comparison, the district director increases royalties that ManuCo paid by $21,500 (the difference between $25,250 and the median of the comparable operating profits, $3,750).

**Example 5.** Adjusting operating assets and operating profit for differences in accounts receivable. (i) USM is a U.S. company that manufactures parts for industrial equipment and sells them to its foreign parent corporation. For purposes of applying the comparable profits method, 15 uncontrolled manufacturers that are similar to USM have been identified.

(ii) USM has a significantly lower level of accounts receivable than the uncontrolled manufacturers. Since the rate of return on capital employed is to be used as the profit level indicator, both operating assets and operating profits must be adjusted to account for this difference. Each uncontrolled comparable's operating assets is reduced by the amount (relative to sales) by which they exceed USM's accounts receivable. Each uncontrolled comparable's operating profit is adjusted by deducting imputed interest income on the excess accounts receivable. This imputed interest income is calculated by multiplying the uncontrolled comparable's excess accounts receivable by an interest rate appropriate for short-term debt.

**Example 6.** Adjusting operating profit for differences in accounts payable. (i) USD is the U.S. subsidiary of a foreign corporation. USD purchases goods from its foreign parent and sells them in the U.S. market. For purposes of applying the comparable profits method, 10 uncontrolled distributors that are similar to USD have been identified.

(ii) There are significant differences in the level of accounts payable among the uncontrolled distributors and USD. To adjust for these differences, the district director increases the operating profit of the uncontrolled distributors and USD to reflect interest expense imputed to the accounts payable. The imputed interest expense for each company is calculated by multiplying the company's accounts payable by an interest rate appropriate for its short-term debt.

**ADD88**

**Credits**

[T.D. 8552, 59 FR 35021, July 8, 1994; 60 FR 16703, March 31, 1995; T.D. 9088, 68 FR 51177, Aug. 26, 2003]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 31, 1960, unless otherwise noted.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**ADD89**