**NO. 24-13470**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

**The Coca-Cola Company and Subsidiaries**,
Petitioner-Appellant,

v.

**Commissioner of Internal Revenue**,
Respondent-Appellee

---

On Appeal from the United States Tax Court, Case No. 31183-15

---

# BRIEF OF NATIONAL FOREIGN TRADE COUNCIL, INC. AS *AMICUS CURIAE* IN SUPPORT OF PETITIONER-APPELLANT AND REVERSAL

HOLLAND & KNIGHT LLP
Charles E. Borden
Joshua D. Odintz
800 17th Street N.W., Suite 1100
Washington, D.C. 20006
Tel: (202) 469-5207

HOLLAND & KNIGHT LLP
Sarah Molinoff
Paul W. Matthias-Bennetch
601 SW 2nd Avenue, Suite 1800
Portland, OR 97204
Tel: (503) 243-2300

National Foreign Trade Council, Inc.
Anne Gordon
1225 New York Ave., NW
Suite 650B
Washington, DC 20005
Tel: (202) 887-0278

*Counsel for National Foreign Trade Council, Inc.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1, 26.1-2, and 26.1-3, *amicus curiae* National Foreign Trade Council hereby submits the following list of the trial judges, attorneys, persons, associations of persons, firms, partnerships, corporations, including subsidiaries, conglomerates, affiliates and parent corporations, or other identifiable legal entities related to a party that have an interest in the outcome of this appeal:

- Altman, John M., Counsel for Respondent-Appellee in the Tax Court
- Bailie, Huong T., Counsel for Respondent-Appellee in the Tax Court
- Borden, Charles, Counsel for *Amicus Curiae* National Foreign Trade Council, Inc. in the Eleventh Circuit
- Bowers, Christopher, Counsel for Petitioner-Appellant in the Eleventh Circuit
- Campolieta, Justin L., Counsel for Respondent-Appellee in the Tax Court
- Carden, Nathaniel, Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court
- Christensen, Jacob Earl, Counsel for Respondent-Appellee in the Eleventh Circuit
- Craig, John F., III, Counsel for Petitioner-Appellant in the Tax Court
- Desmond, Michael J., Counsel for Respondent-Appellee in the Tax Court
- Dixon, Steven R., Counsel for Petitioner-Appellant in the Tax Court
- Dvoretzky, Shay, Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court

- Fiedler, Shannon C., Counsel for Petitioner-Appellant in the Eleventh Circuit
- Fisher, Miriam L., Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court
- Flores, Elizabeth P., Counsel for Respondent-Appellee in the Tax Court
- Franklin, Barbara B., Counsel for Respondent-Appellee in the Tax Court
- Frisch, Jill A., Counsel for Respondent-Appellee in the Tax Court
- Garre, Gregory G., Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court
- Garza, Steven D., Counsel for Respondent-Appellee in the Tax Court
- Gasper, Julie Ann P., Counsel for Respondent-Appellee in the Tax Court
- Gerling-Ritters, Hans D., Counsel for Petitioner-Appellant in the Tax Court
- Gibson Dunn & Crutcher LLP, Counsel for Petitioner-Appellant in the Tax Court
- Goldberg, Lisa M., Counsel for Respondent-Appellee in the Tax Court
- Gordon, Anne, Counsel for *Amicus Curiae* National Foreign Trade Council, Inc. in the Eleventh Circuit
- Greenhouse, Robin L., Counsel for Respondent-Appellee in the Tax Court
- Hagley, Judith A., Counsel for Respondent-Appellee in the Eleventh Circuit
- Haji, Sakina, Counsel for Petitioner-Appellant in the Eleventh Circuit

- Hintermeister, Anne O'Brien, Counsel for Respondent-Appellee in the Tax Court
- Holland & Knight, LLP, Counsel for *Amicus Curiae* National Foreign Trade Council, Inc. in the Eleventh Circuit
- Hoory, Eli, Counsel for Respondent-Appellee in the Tax Court
- Hubbert, David A., Counsel for Respondent-Appellee in the Eleventh Circuit
- Internal Revenue Service, Respondent-Appellee
- Jacinto, Jarrett Y., Counsel for Petitioner-Appellant in the Tax Court
- Kaplan Hecker & Fink LLP, Counsel for Petitioner-Appellant in the Tax Court
- Kautter, David, Respondent-Appellee (Former Acting)
- Kenworthy, Kevin L., Counsel for Petitioner-Appellant in the Tax Court
- Konopka, Eric J., Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court
- Koskinen, John A., Respondent-Appellee (Former)
- Kummer, Michael D., Counsel for Petitioner-Appellant in the Tax Court
- Lampert, Heather L., Counsel for Respondent-Appellee in the Tax Court
- Latham & Watkins LLP, Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court
- Lauber, Albert G., Tax Court Judge
- Luttig, Hon. J. Michael, Counsel for Petitioner-Appellant in the Tax Court
- Magee, John B., Counsel for Petitioner-Appellant in the Tax Court

- Massey, Jonathan S., Counsel for Petitioner-Appellant in the Tax Court
- Massey & Gail LLP, Counsel for Petitioner-Appellant in the Tax Court
- Matta, Lamia R., Counsel for Petitioner-Appellant in the Tax Court
- Matthias-Bennetch, Paul W., Counsel for *Amicus Curiae* National Foreign Trade Council, Inc. in the Eleventh Circuit
- Metcalf, Nicholas R., Counsel for Petitioner-Appellant in the Tax Court
- Mezei, Saul, Counsel for Petitioner-Appellant in the Tax Court
- Miller & Chevalier Chartered, Counsel for Petitioner-Appellant in the Tax Court
- Molinoff, Sarah, Counsel for *Amicus Curiae* National Foreign Trade Council, Inc. in the Eleventh Circuit
- Morgan, Lewis & Bockius LLP, Counsel for Petitioner-Appellant in the Tax Court
- Morrison, Sean T., Counsel for Petitioner-Appellant in the Tax Court
- National Foreign Trade Council, Inc., *Amicus Curiae* in the Eleventh Circuit
- O'Donnell, Douglas, Respondent-Appellee (Acting)
- Odintz, Joshua, Counsel for *Amicus Curiae* National Foreign Trade Council, Inc. in the Eleventh Circuit
- Ortiz, Lisandra, Counsel for Petitioner-Appellant in the Tax Court
- Patterson, Kathryn F., Counsel for Respondent-Appellee in the Tax Court
- Paul, William M., Counsel for Respondent-Appellee in the Tax Court

- Rasheed, Raza, Counsel for Petitioner-Appellant in the Eleventh Circuit
- Rettig, Charles P., Respondent-Appellee (Former)
- Richards, Veronica L., Counsel for Respondent-Appellee in the Tax Court
- Rider-Longmaid, Parker, Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court
- Rollinson, Marjorie A., Counsel for Respondent-Appellee in the Eleventh Circuit and the Tax Court
- Rubin, Curt M., Counsel for Respondent-Appellee in the Tax Court
- Skadden, Arps, Slate, Meagher & Flom LLP, Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court
- Stafford, Blake E., Counsel for Petitioner-Appellant in the Eleventh Circuit
- Stark, Sanford W., Counsel for Petitioner-Appellant in the Tax Court
- The Coca-Cola Co., NYSE:KO, Petitioner-Appellant
- Tonuzi, Drita, Counsel for Respondent-Appellee in the Tax Court
- Tribe, Laurence H., Counsel for Petitioner-Appellant in the Tax Court
- Ugolini, Francesca, Counsel for Respondent-Appellee in the Eleventh Circuit and the Tax Court
- U.S. Commissioner of Internal Revenue, Respondent-Appellee
- U.S. Department of Justice, Tax Division, Appellate Section, Counsel for Respondent-Appellee in the Eleventh Circuit and the Tax Court
- U.S. Department of the Treasury, Respondent-Appellee
- Ussing, Carl T., Counsel for Petitioner-Appellant in the Tax Court
- Werfel, Daniel I., Respondent-Appellee (Former)

- Wilkins, William J., Counsel for Respondent-Appellee in the Tax Court
- Zemil, Nicholas A., Counsel for Petitioner-Appellant in the Tax Court

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amicus Curiae* National Foreign Trade Council, Inc. states that it does not have a parent corporation and that no publicly held company owns 10% or more of the stock of the *amicus*.

/s/ *Charles E. Borden*

Charles E. Borden

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........ C-1

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ iii

INTEREST OF THE *AMICUS CURIAE* ........ 1

CONSENT OF THE PARTIES ........ 2

STATEMENT OF THE ISSUES ........ 3

SUMMARY OF THE ARGUMENT ........ 3

ARGUMENT ........ 5

I. The Tax Court Erred in Applying the IRS's Invalid Blocked Income Rule. ........ 5

**A. The Blocked Income Rule does not provide the "single, best meaning" of Section 482, as *Loper Bright* requires.** ........ 5

*i. The Blocked Income Rule contravenes the Supreme Court's interpretation of Section 482 in* First Security. ........ 6

*ii. The Blocked Income Rule leads to manifestly unjust results that Congress did not authorize and could not have intended.* ........ 9

**B. The Blocked Income Rule is also procedurally invalid because the IRS failed to consider comments alerting the agency to significant problems and potential remedies.** ........ 14

II. The Commissioner's Inconsistent and Unexplained Application of Its Transfer Pricing Method Is Arbitrary and Capricious. ........ 20

**A. Federal agencies may not treat similar situations differently without reasonable explanation.** ........ 21

**B. The IRS's inconsistent treatment of Coca-Cola's various Supply Points was unexplained and inexplicable.** ........................................22

III. The Commissioner Cannot—Retroactively and Without Notice or Explanation—Pull the Rug out from Under Taxpayers Who Have Relied on the Agency's Longstanding Practices and Guidance. ....................25

CONCLUSION ..........................................................................................28

CERTIFICATE OF COMPLIANCE ......................................................30

CERTIFICATE OF SERVICE ..............................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Co. & Subsidiaries v. Comm'r*,
160 T.C. 50 (2023)....................5, 6

*Agostini v. Felton*,
521 U.S. 203 (1997)....................8

*Baltimore Gas & Elec. Co. v. United States*,
817 F.2d 108 (D.C. Cir. 1987)....................15

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012)....................27

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)....................14, 19

*Coca-Cola Co. & Subsidiaries v. Comm'r of Internal Revenue*,
T.C.M. (RIA) 2023-135 (T.C. 2023)....................5, 6, 7

*Comm'r v. First Security Bank of Utah, N.A.*,
405 U.S. 394 (1972)....................6, 7, 8, 9, 16

*DHS v. Regents of the Univ. of Cal.*,
591 U.S 1 (2020)....................22, 25

*Doe v. Hampton*,
566 F.2d 265 (D.C. Cir. 1977)....................26

*Eaton Corp. v. Comm'r*,
47 F.4th 434 (6th Cir. 2022)....................26

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)....................21, 22, 27

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)....................27

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)....................................................................................20

*Gates & Fox Co. v. Occupational Safety & Health Review Comm'n*,
790 F.2d 154 (D.C. Cir. 1986).....................................................................28

*Hussion v. Madigan*,
950 F.2d 1546 (11th Cir. 1992) ...........................................................15, 20

*Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*,
874 F.2d 205 (4th Cir. 1989) .......................................................................26

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)......................................................................................6

*McKay v. Wahlenmaier*,
226 F.2d 35 (D.C. Cir. 1955).......................................................................26

*Michigan v. EPA*,
576 U.S. 743 (2015)....................................................................................22

*Moore v. United States*,
602 U.S. 572 (2024)......................................................................................7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).......................................................................14, 15, 19

*Nat'l Cable & Telecomm'n Assn. v. Brand X Internet Servs.*,
545 U.S. 967 (2005)....................................................................................22

*Nat'l Conserv. Political Action Comm. v. FEC*,
626 F.2d 953 (D.C. Cir. 1980).....................................................................27

*Ngure v. Ashcroft*,
367 F.3d 975 (8th Cir. 2004) .......................................................................27

*Ohio v. EPA*,
603 U.S. 279 (2024)....................................................................................20

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*,
494 F.3d 188 (D.C. Cir. 2007).....................................................................14

*Padula v. Webster*,
822 F.2d 97 (D.C. Cir. 1987) .......... 25, 26

*Paige v. Harris*,
584 F.2d 178 (7th Cir. 1978) .......... 26, 27

*PHH Corp. v. CFPB*,
839 F.3d 1 (D.C. Cir. 2016) .......... 27

*Procter & Gamble v. Comm'r*,
961 F.2d 1255 (6th Cir. 1992) .......... 16, 17, 18

*Rauenhorst v. Comm'r*,
119 T.C. 157 (2002) .......... 25

*Rink v. Comm'r*,
47 F.3d 168 (6th Cir. 1995) .......... 27

*Sangamon Valley Television Corp. v. United States*,
269 F.2d 221 (D.C. Cir. 1959) .......... 26

*Sierra Club v. Davies*,
955 F.2d 1188 (8th Cir. 1992) .......... 14

*Smriko v. Ashcroft*,
387 F.3d 279 (3d Cir. 2004) .......... 26

*Transactive Corp. v. United States*,
91 F.3d 232 (D.C. Cir. 1996) .......... 21

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954) .......... 25

*United States v. Elbeblawy*,
899 F.3d 925 (11th Cir. 2018) .......... 8

*United States v. Leahey*,
434 F.2d 7 (1st Cir. 1970) .......... 26

*Univ. of Texas M.D. Anderson Cancer Ctr. v. United States Dep't of Health & Hum. Servs.*,
985 F.3d 472 (5th Cir. 2021) .......... 21

**Statutes**

5 U.S.C. § 706 .......... 14

I.R.C. § 482 .......... 3–9, 12–13, 18–20, 23

I.R.C. § 965 .......... 7

**Regulations**

26 C.F.R. § 1.482-1(c)(1) .......... 20, 21, 23, 24

26 C.F.R. § 1.482-1(h)(2)(ii)(A) .......... 7

**Rules**

Fed. R. App. P. 29(a)(2) .......... 2

Fed. R. App. P. 29(a)(5) .......... 30

Fed. R. App. P. 32(a)(5) .......... 30

Fed. R. App. P. 32(a)(6) .......... 30

11th Cir. R. 26.1-1 .......... 1

11th Cir. R. 26.1-2 .......... 1

11th Cir. R. 26.1-3 .......... 1

**Other Authorities**

32 Wright & Koch, *Federal Practice and Procedure* § 8248 (2006) .......... 21

James P. Fuller, *Section 482: Revisited Again*, 45 Tax L. Rev. 421, 453 (1990) .......... 8

## INTEREST OF THE *AMICUS CURIAE*[1]

*Amicus Curiae* National Foreign Trade Council, Inc. ("NFTC") is the premier business organization in the United States advocating a rules-based world economy to foster international trade, tax, and investment policies, and economic cooperation. Founded in 1914 to support the open world trade system against the escalating rivalries that erupted into World War I, the NFTC is today the oldest and largest U.S. association of businesses devoted to international trade and tax matters.

The NFTC's mission is to promote efficient and fair global commerce by advocating public policies that foster an open international trade and investment regime. The NFTC's membership includes over 100 companies, representing most major sectors of the U.S. economy, including manufacturing, technology, energy, retail, and agribusiness. The NFTC's membership consists of U.S. firms engaged in all aspects of international business, trade, and investment. NFTC members account for over $6 trillion in global revenue and employ over 6 million people in the United States. They also represent a significant share of total U.S. exports and U.S. private foreign investment.

[1] No counsel for a party authored this brief in whole or in part, and no person or entity, other than *amicus curiae*, its members, and its counsel, made a monetary contribution to the preparation or submission of this brief.

Like the appellant, NFTC members operate globally and face restrictions in several countries that limit the payment of royalties from a foreign corporation to a U.S. parent or affiliate. The NFTC and its members have a substantial interest in the outcome of this case.

## CONSENT OF THE PARTIES

Pursuant to Federal Rule of Appellate Procedure 29, the NFTC has received consent from all parties to file this amicus brief. Fed. R. App. P. 29(a)(2).

## STATEMENT OF THE ISSUES

This amicus brief in support of The Coca-Cola Co. and Subsidiaries ("Coca-Cola") addresses the following issues, among others that Coca-Cola itself addressed in its opening brief:

1. Whether the Internal Revenue Service (IRS)'s "Blocked Income Rule" (26 C.F.R. § 1.482-1(h)(2)(ii)), and its specific requirements for foreign legal restrictions, is procedurally and substantively valid.
2. Whether the IRS's inconsistent and unexplained application of a transfer pricing method to a taxpayer's various foreign subsidiaries is arbitrary and capricious.
3. Whether the IRS may, retroactively and without notice, pull the rug out from under taxpayers who have relied on the agency's longstanding practices and guidance.

## SUMMARY OF THE ARGUMENT

For nearly 15 years the IRS made clear to Coca-Cola, by word and deed, that it should use a specific method to calculate the arm's-length price of certain transactions with foreign subsidiaries under I.R.C. § 482. Then, abruptly and without notice, the IRS decided in 2011 that this longstanding method was no longer appropriate for a select group of Coca-Cola's subsidiaries, and the IRS imposed retroactive liability to the tune of *billions* of dollars on Coca-Cola for

adhering to it. The Tax Court erred in blessing the IRS's bait-and-switch for numerous reasons. NFTC will discuss three reasons in particular.

First, the Tax Court erred in applying the IRS's Blocked Income Rule to the Section 482 calculations for Coca-Cola's Brazilian subsidiary. The Tax Court accepted the validity of the Rule under *Chevron* deference, which the Supreme Court has since discarded. Instead, the Tax Court should have inquired whether the Rule's requirements represent the "single, best meaning" of Section 482, which they do not. Not only does Supreme Court precedent foreclose the Blocked Income Rule's overbroad and baseless requirements, but Congress could not have intended Section 482 to impose the manifestly unjust results that the Rule requires. Moreover, the IRS failed to comply with mandatory procedures under the APA in issuing the Blocked Income Rule. This provides an independent reason why the Tax Court erred in applying it.

Second, the IRS's inconsistent and unexplained shift to a new transfer pricing method for only *some* of Coca-Cola's subsidiaries is arbitrary and capricious. The IRS cannot explain why its choice to apply a new transfer pricing method to Coca-Cola's subsidiaries would correlate nearly perfectly with the subsidiaries' location in countries without a dual-taxation treaty with the United States. This selective and self-serving choice of what *should* be the "best method" of calculating transfer pricing is unlawful under the APA.

Third, the IRS's abrupt imposition of billions of dollars in *retroactive* tax liability, after Coca-Cola relied for nearly 15 years on the agency's guidance, is not only arbitrary and capricious, but likely violates due process as well. Administrative agencies can bind themselves through their pronouncements and guidance, and if they choose to change direction in enforcement, they must give due consideration to the reliance interests and binding commitments that their words and actions have engendered.

## ARGUMENT

### I. The Tax Court Erred in Applying the IRS's Invalid Blocked Income Rule.

#### A. The Blocked Income Rule does not provide the "single, best meaning" of Section 482, as *Loper Bright* requires.

The Tax Court erred in applying *Chevron* deference to enforce the Blocked Income Rule instead of inquiring whether the Rule presents the single, best meaning of Section 482.

The Tax Court relied solely on the IRS's Blocked Income Rule in affirming the agency's Section 482 income allocation. *See Coca-Cola Co. & Subsidiaries v. Comm'r of Internal Revenue*, T.C.M. (RIA) 2023-135, *14 (T.C. 2023). And the Tax Court applied the Rule over Coca-Cola's protests *solely* because it recently upheld the Rule's validity in another case by applying *Chevron* deference, *3M Co. & Subsidiaries v. Commissioner of Internal Revenue*. *See id.* (citing 160 T.C. 50

(2023), *appeal docketed*, No. 23-3772 (8th Cir. Dec. 29, 2023)). Since then, however, the Supreme Court in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), overruled *Chevron* and its deferential progeny. *Loper Bright* held that courts must "independently interpret" the statute at issue to find its "single, best meaning," without deference to interpretations that an agency enshrined in their regulations. *Id.* at 395, 400. The Tax Court here made no attempt to independently assess whether the Blocked Income Rule is the single, best meaning of Section 482. *See Coca-Cola Co.*, T.C.M. 2023-135 at *14. Nor did it in *3M*. *See* 160 T.C. 50 at 254–96.

The Blocked Income Rule cannot in fact be the best interpretation of Section 482, first, because it is inconsistent with Supreme Court precedent holding that blocked income cannot be allocated to a parent company under Section 482, and, second, because it leads to unjust results.

*i. The Blocked Income Rule contravenes the Supreme Court's interpretation of Section 482 in* First Security.

The Blocked Income Rule allows the IRS to allocate to a taxpayer "income" that the taxpayer legally could not receive—an interpretation of Section 482 that the Supreme Court rejected in *Commissioner v. First Security Bank of Utah, N.A.*, 405 U.S. 394, 403 (1972).

Indeed, here the Tax Court assumed that Brazilian law actually blocked Coca-Cola's Brazilian Supply Point from transferring IP royalties (above a negligible threshold) to Coca-Cola. *See Coca-Cola Co.*, T.C.M. 2023-135 at *14. And yet, the Court found that because the blocking law in question was not "generally applicable to all similarly situated persons (both controlled and uncontrolled)," 26 C.F.R. § 1.482-1(h)(2)(ii)(A), the blocking law fails the Blocked Income Rule. *Id.* As a result, the Court concluded that the IRS could permissibly allocate the value of significant IP royalties from the Brazilian Supply Point to Coca-Cola as "income" under Section 482 despite the Brazilian blocking law. *See id.* This holding is incompatible with *First Security*, where the Supreme Court explained that payments that a person is legally blocked from receiving *cannot* be considered "income" under Section 482. *See* 405 U.S. at 403.

The Commissioner may argue that the Supreme Court's recent decision in *Moore v. United States*, 602 U.S. 572, 580 (2024), somehow expanded the Court's definition of "income" under Section 482. The argument is baseless. *Moore* did not concern Section 482—much less the issue of blocked income. And the Court's four opinions in *Moore* are completely silent as to both. *See* 602 U.S. 572. Rather, *Moore* concerned the "precise and narrow" question of whether, under I.R.C. § 965, Congress may attribute to shareholders (and tax) income that a foreign entity realized even though no portion of that income was actually distributed to

the shareholders. *See id.* at 598. In short, *Moore* concerned the *constitutional limits* of pass-through taxation as specifically authorized by Section 965, not the meaning of "income" as used in Section 482. Moreover, even if *Moore* could be construed to overrule *First Security*'s interpretation of Section 482 *sub silentio*, it is for the Supreme Court—and not the Courts of Appeals—to so hold. *See, e.g.*, *United States v. Elbeblawy*, 899 F.3d 925, 941 (11th Cir. 2018) ("[W]e must 'follow the case which directly controls, leaving to th[e] [Supreme] Court the prerogative of overruling its own decisions.'" (quoting *Agostini v. Felton*, 521 U.S. 203, 237 (1997)) (second and third alterations in original)).

Likewise, the Commissioner might contend that *First Security* does not control because it considered a prior version of Section 482, which Congress amended in 1986. This argument is also baseless. The 1986 amendments added more specific guidance regarding how the IRS should valuate transfers of intangible property. *See* Pub. L. No. 99-514, § 1231(e)(1), 100 Stat. 2562-2563 (1986) (adding that "[i]n the case of any transfer (or license) of intangible property . . . the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible"). The 1986 amendments do not purport to define "income," nor do they say anything about blocked income. The 1986 amendments, in short, are completely consistent with the Supreme Court's holding and reasoning in *First Security*. *Cf., e.g.*, James P. Fuller, *Section 482: Revisited*

*Again*, 45 Tax L. Rev. 421, 453 (1990) ("[T]he 1986 Act's commensurate with income standard is not really a new approach to § 482. It appears to be simply a reaffirmation of the functional analysis approach set forth in the IRS audit manual."). Regardless of *how* the IRS values intangible property transfers under Section 482, it may not allocate so-called "income" that is in fact blocked by foreign law.

*ii. The Blocked Income Rule leads to manifestly unjust results that Congress did not authorize and could not have intended.*

Irrespective of *First Security*, the Blocked Income Rule cannot represent the "single, best meaning" of Section 482 because it leads to manifestly unjust results that Congress did not authorize and could not have intended. As real-world examples make clear, it is unfair and unreasonable for the IRS to reallocate foreign income to a U.S. taxpayer that did not—and could not—receive that income.

A consumer goods manufacturing company ("Company"), an NFTC member, illustrates the unfair and unreasonable dilemma that companies are now faced with due to the Blocked Income Rule. The Company owns valuable trademarks, patents, and technical know-how that are located in the United States. In order to allow foreign subsidiaries to sell products in their local jurisdiction, the Company's U.S. operations license this intellectual property to their foreign subsidiaries. Most subsidiaries license the intellectual property for a royalty rate of

up to 10 percent of sales of consumer goods. The Company, however, cannot always guarantee that the foreign subsidiaries will be able to pay the royalty rate of up to 10 percent of sales of consumer goods due to foreign legal restrictions. For example, in countries such as Nigeria, Ghana, and Pakistan, the Company must seek approval for the charged royalty rates from the local regulatory bodies.

In Nigeria, a local regulatory agency called the National Office for Technology Acquisition and Promotion ("NOTAP") must approve of the requested royalty rate. NOTAP registers technology transfer agreements in manufacturing, information and communication technology, finance, insurance, and many other industry sectors. *See* Updated Requirements for the Registration of Technology Transfer Agreements, Nat'l Off. for Tech. Acquisition and Promotion.[2] During this process, NOTAP requires that the Company submit an application that includes the trademark license, net sales of locally manufactured goods that are covered by the trademark, ownership structure of the company, evidence of registration of trademark locally and internationally, and all other documents as contained in the agreement demonstrating the benefit to Nigeria. *Id.*

Similarly, the Ghana Investment Promotion Centre ("GIPC")—a separate governmental body—requires the Company to also seek approval of the royalty rate. In Ghana, the technology transfer agreements must abide by and be

compliant with the Ghana Investment Promotion Centre Act, 2013 (Act 865) ("GIPC Act") and the Technology Transfer Regulations, 1992 (L.I. 1547). *See* Technology Transfer Agreements, Ghana Investment Promotion Ctr.[3] Under the GIPC Act, there are four main types of technology transfer agreement: intellectual property rights; provision of technical services and assistance; provision of technical know-how to acquire, install, and use machinery; and provision of management services. *Id.* The application process is quite extensive, and if the Company's submitted application is non-compliant, then the Company only has two months to correct any deficiency. *Id.*

The State Bank of Pakistan ("State Bank") also has a similar process that requires the Company to seek approval of its requested royalty rate. The State Bank requires that the Company's application for remittance of the royalty or technical fee is submitted to the Foreign Exchange Department, Investment Division in Karachi. *See* F.E. Circular No. 101: Agreements for Transfer of Technology Payment of Royalty/Technical Fee to the Foreign Collaborators, State

---

[2] *Available at* https://perma.cc/CRL4-3XJL (last accessed Feb. 27, 2025).

[3] *Available at* https://gipc.gov.gh/%20technology-transfer-agreements/ (last accessed Feb. 27, 2025).

Bank of Pakistan (Dec. 23, 1992).[4] Once it is received and reviewed, the State Bank will record the application if it complies with the requisite rules. *Id.*

For each of these countries, the foreign actor—whether it is a political branch or national bank—will limit the royalty rate well below an arm's-length royalty rate. The local subsidiary is prohibited from paying a royalty in excess of the amount set by the foreign jurisdiction and, thus, these transactions will fail under the arm's length standard. The deferral method in the Blocked Income Rule does not apply because each country applies its royalty calculations based on a per-taxpayer standard, as opposed to a generally applicable law. Thus, the result is that the Company is exposed to a potential IRS audit and Section 482 adjustment. If the IRS makes an adjustment and increases the royalty rate, the Company will be subject to double taxation because the IRS would impute additional income to the United States without a corresponding payment or deduction abroad.

With the complex and varying foreign country regimes that allow U.S. parent companies to receive little to no royalty income from the foreign subsidiary, and the Blocked Income Rule that insists on imputing income to the United States entity that could never be paid by the foreign subsidiary without any viable exception, the law-abiding Company is stuck in the quintessential "Hobson's choice." It must "decide" to either (1) violate the law of a foreign sovereign in

[4] *Available at* https://www.sbp.org.pk/epd/1992/c101.htm.

connection with business conducted in that sovereign's jurisdiction, so as to satisfy the Blocked Income Rule's requirements; or (2) risk an IRS-initiated adjustment without a corresponding deduction in the foreign jurisdiction, resulting in double taxation on the deemed royalty that could never be legally paid by the foreign subsidiary.

Moreover, the Company cannot qualify for the election to defer income because the restrictions are not publicly promulgated and applied equally to all similarly situated taxpayers. Instead, it is forced into a situation where the only choice is to follow foreign regulations and be subject to double taxation in the United States because of the IRS's rigid Blocked Income Rule.

As the above examples demonstrate, the Blocked Income Rule will inevitably lead to a chilling effect on companies engaged in the cross-border licensing of IP rights which Congress did not authorize and could not have intended. Rather than furthering the arm's length standard of Section 482, the Blocked Income Rule creates an incentive for companies to discontinue these transnational relationships due to the fear of incurring excessive taxation for income the company never received. In a world that is increasingly interconnected, the Blocked Income Rule puts companies with intellectual property located in the United States at a significant competitive disadvantage. The IRS has

not—and cannot—point to any evidence that Congress intended to impose such severe and unfair burdens on U.S. businesses.

**B. The Blocked Income Rule is also procedurally invalid because the IRS failed to consider comments alerting the agency to significant problems and potential remedies.**

The defects noted above could and should have been avoided. Before the Blocked Income Rule went into effect, commentators advised the agency of substantive problems with the Blocked Income Rule, highlighted its ineffectiveness, and offered suggested changes to effectuate express congressional purposes. *See infra.* But the IRS did not just reject those comments, it failed to give them any consideration whatsoever. That procedural error provides a distinct and independent basis for invalidating the Blocked Income Rule.

When reviewing an agency action, the court is tasked with determining whether the agency acted in an arbitrary and capricious manner. *See* 5 U.S.C. § 706. "To satisfy the APA's 'arbitrary and capricious' standard, an agency must 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 203 (D.C. Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency's interpretation cannot be reasonable and, instead, must be arbitrary and capricious when it fails to consider all the relevant factors or

there has been a clear error of judgment. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Sierra Club v. Davies*, 955 F.2d 1188, 1192 (8th Cir. 1992).

Put another way,

> [A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Veh. Mfrs. Ass'n*, 463 U.S. at 43. Thus, the "agency must cogently explain why it has expressed its discretion in a given manner" and effectively show that its decision was a "product of reasoned decision making." *Id.* at 48, 52. To satisfy that requirement, the agency is required to consider *and* respond to significant comments. *See, e.g.*, *Hussion v. Madigan*, 950 F.2d 1546, 1554 (11th Cir. 1992); *Baltimore Gas & Elec. Co. v. United States*, 817 F.2d 108, 116 (D.C. Cir. 1987).

In promulgating the Blocked Income Rule, the IRS did not consider *or* respond to significant comments. Many examples make that clear; the following discussion addresses four illustrative comments for the Court's consideration.

*First*, the Tax Executives Institute ("TEI") commented that the then-proposed regulation "constitue[d] a not-so-subtle attempt to overrule" the Court of

Appeals for the Sixth Circuit's decision in *Procter & Gamble Co. v. Comm'r.* (Tax Ct. Record, Jt. Trial Ex. ("J.T. Ex.") 290-J. at 7.[5]) Besides objecting to the overreach of the IRS in attempting to overturn settled precedent, TEI noted that the legal restriction for the Blocked Income Rule did not apply to all businesses equally. (*Id.*) Also, TEI pointed out that the timing in the proposed rule created a "trap for the unwary," stating that "a taxpayer who believes its pricing satisfies the arm's length standard will not make the deferred income method election – it will have no reason to do so (except on a speculative, protective basis)." (*Id.* at 15, 8.) Thus, TEI concluded that the then-current regulations appropriately balanced the relevant interests as they allowed for an election after the adjustment had been made and before the occurrence of certain events. (*Id.* at 7–8.)

*Second*, the American Petroleum Institute ("API") also submitted a comment, ignored by the IRS, directly bearing on one of the main issues in this appeal. (J.T. Ex. 289-J.) In the comment, API emphasized that the then-proposed regulation could not effectively overrule the reasoning of the U.S. Supreme Court and the Court of Appeals for the Sixth Circuit in *Commissioner v. First Security Bank*, 405 U.S. 394 (1972), and *Procter & Gamble v. Commissioner*, 961 F.2d 1255 (6th Cir. 1992). Thus, API pointed out that the proposal simply reflected the

[5] The Joint Trial Exhibits referenced herein were all filed with the Fourth Stipulation of Facts (Tax Ct. Dkt. No. 197).

IRS's current litigation position—that these cases were wrongly decided—rather than appropriately applying the current status of the law to the agency's action. (*Id.* at 7.)

API next explained that the proposed regulations and restrictions were unrealistic and problematic. The proposed regulation, API warned, was rife with ambiguity that would only ensure the continuation of litigation in this area. In fact, API argued that the proposed regulation created more ambiguity because it was departing from the settled principles in the case law. (*Id.*) Further, API asserted that the issues with the regulation and exception were particularly acute for the oil industry because of the increased level of scrutiny that industry faces from both sovereign governments and transnational organizations. (*Id.*) Specifically, API stated that the regulations imposed a series of restrictions which would effectively negate the intended relief in the proposed rule and would be ineffective in protecting innocent companies from being subject to double taxation. (*Id.* at 8.) This is an issue that NFTC members face today, as described in the real-world examples set out above.

*Third*, TRW, Inc.'s comment likewise pointed to substantive issues with the proposed regulations, including inconsistencies with both precedent from the U.S. Supreme Court and the U.S. Court of Appeals for the Sixth Circuit. (J.T. Ex. 291-J at 1.) Further, TRW stated that it agreed that foreign governments should not

impose restrictions on royalty payments, but disagreed that the agency was the proper forum for U.S. government actions to enforce such a policy. (*Id.*) It noted that this was particularly true given the significant risk that it would create inconsistencies in U.S. tax policy and penalize companies wishing to compete in certain foreign markets. (*Id.*)

TRW then went on to suggest specific changes to the proposed regulation, including eliminating the requirement that foreign law also apply to uncontrolled transactions, and resolving the ambiguity that dividends do not constitute a method for circumventing foreign legal restrictions. (*Id.*) Similarly, TRW suggested that the foreign tax deductions or credits associated with dividends paid by a controlled foreign corporation to its U.S. parent corporation should be immediately available to the U.S. taxpayer. (*Id.* at 2.)

*Fourth*, the United States Council for International Business ("USCIB") commented that the proposed regulation "constitute[d] an obvious attempt by the IRS to override the unfavorable decision" from the *Procter & Gamble* case that undermined the long-standing judicial interpretations of Section 482. (J.T. Ex. 292-J at 1.) In addition to undermining well-settled case law, USCIB noted that the conditions to allow a taxpayer to elect income deferral under the Blocked Income Rule were so restrictive that very few, if any, taxpayers could benefit from the exception. (*Id.* at 3.) Finally, USCIB concluded that the IRS should not be

allowed to "unilaterally make section 482 applicable" to unrelated situations by contorting the plain language of the statute well beyond its intended scope. (*Id.*)

Even a cursory review of these comments shows that they raised substantial issues warranting careful consideration—such that the IRS's failure to give such comments *any* consideration renders the Blocked Income Rule arbitrary and capricious. The IRS's rule cannot be reasonable because it did not consider the practical effects on companies by implementing this regulation. *Citizens to Preserve Overton Park, Inc*, 401 U.S. at 416. Instead, as these comments illustrated, the effects of the IRS's Blocked Income Rule led to more uncertainty in the business community and created opportunities where certain companies are treated differently simply because of where they choose to expand their business globally. Further, similar to *Motor Vehicle Manufacturers Association* where the agency failed to consider relevant alternatives and explain its reasoning in doing so, the IRS here never explained why there could not be a different version of the rule that took practical realities into consideration. 463 U.S. at 50–51. Nor did the agency respond to comments that the election to defer income was virtually impossible to satisfy because of the stringent requirements. Had the IRS considered the arguments, the election could have been tailored to provide taxpayers with an option to delay the recognition of income, which would have mitigated the extreme result of the regulations. Instead, the IRS simply ignored

significant comments that explained the practical repercussions that would ensue from the promulgation of the Blocked Income Rule. *Hussion*, 950 F.2d at 1554.

The IRS's failure to consider relevant comments is not surprising, given that the agency explicitly—and incorrectly—reasoned that the APA's procedural requirements did not apply to its promulgation of the Blocked Income Rule. The IRS stated that "[i]t also has been determined that section 553(b) of the Administrative Procedure Act . . . do[es] not apply to these regulations." 59 Fed. Reg. 34,971-01 (1994). If the IRS had recognized that it, like every other agency subject to the APA, was duty-bound to properly consider and respond to significant comments, it might well have avoided or mitigated the substantial problems infecting the Blocked Income Rule. Instead, the agency simply ignored those comments. This procedural failure alone requires reversal of the Tax Court's decision upholding the agency's rule. *See, e.g.*, *Hussion*, 950 F.2d at 1554.

## II. The Commissioner's Inconsistent and Unexplained Application of Its Transfer Pricing Method Is Arbitrary and Capricious.

Though the IRS exercises discretion in allocating foreign income to a taxpayer under Section 482, this discretion is not boundless. The IRS's own regulations have long held that the agency must allocate income using "the method that, under the facts and circumstances, provides the most reliable measure of an arm's length result" with regard to the income it seeks to valuate. 26 C.F.R.

§ 1.482-1(c)(1). As always, the IRS's decision to use a particular valuation method cannot be arbitrary or capricious—the agency must justify deviations from past practices with a well-reasoned and reasonably articulated explanation. *See Ohio v. EPA*, 603 U.S. 279, 292–93 (2024) (citing *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). The IRS's actions in this case highlight that the agency altered its long-established transfer pricing method selectively and self-servingly, without reason or explanation, which violates its own regulations and is arbitrary and capricious.

### A. Federal agencies may not treat similar situations differently without reasonable explanation.

"It is a bedrock principle of administrative law that an agency must 'treat like cases alike.'" *See Univ. of Texas M.D. Anderson Cancer Ctr. v. United States Dep't of Health & Hum. Servs.*, 985 F.3d 472, 479–80 (5th Cir. 2021) (quoting 32 Wright & Koch, *Federal Practice and Procedure* § 8248, at 431 (2006)) (collecting cases). This principle is foundational to maintaining consistency and fairness in administrative decision making. As a result, "an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently." *See Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) (collecting cases); *see also, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016) ("[A]n '[u]nexplained inconsistency' in agency

policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" (quoting *Nat'l Cable & Telecomm'n Assn. v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005))).

In addition, administrative law requires that an agency provide its reasoning at the time it takes action—post-facto rationalizations during litigation do not suffice. *See, e.g.*, *DHS v. Regents of the Univ. of Cal.*, 591 U.S 1, 20 (2020) ("[J]udicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" (*quoting Michigan v. EPA*, 576 U.S. 743, 758 (2015))). If an agency fails to explain its decision at the outset, any rationale provided afterward cannot cure the original legal deficiency. *See Encino Motorcars*, 579 U.S. at 224 ("It is not the role of the courts to speculate on reasons that might have supported an agency's decision.").

### B. The IRS's inconsistent treatment of Coca-Cola's various Supply Points was unexplained and inexplicable.

When an agency makes an abrupt change in its approach without providing a reasoned explanation, it acts arbitrarily and capriciously, undermining the trust that taxpayers and businesses place in the stability of regulatory enforcement. The IRS's selective application of Section 482 to Coca-Cola's global Supply Points without any reasoned explanation demonstrates the IRS's arbitrary and capricious actions.

For years the IRS used the 10-50-50 transfer pricing method to assess Coca-Cola's international operations, which the agency deemed "appropriate" as late as 2009. However, in 2011 the IRS abruptly changed course for some, but not all, Supply Points—specifically targeting those located in countries without double taxation treaties with the United States.[6] The IRS offered no justification for why, after years of consistent treatment, two different "best methods" of transfer pricing were suddenly required. *See* 26 C.F.R. § 1.482-1(c)(1). Nor did it explain why these different "best methods" happened to coincide with whether a Supply Point was located in a double taxation treaty country.

The IRS's failure to explain this inconsistent treatment is reason enough to find it arbitrary and capricious—regardless of any explanation it may now supply in litigation. *See supra*. The lack of any contemporaneous justification demonstrates the illegitimacy of the IRS's actions and a results-driven approach, rather than an application of reasoned decision making.

Indeed, there can be no reasoned explanation for the IRS's selective approach. It strains credulity that the "most reliable measure of an arm's length result," 26 C.F.R. § 1.482-1(c)(1), regarding Coca-Cola's various Supply Points

[6] All but one of the Supply Points to which the IRS applied a new methodology to increase Coca-Cola's U.S. income under Section 482 were located in non-treaty jurisdictions, and the one outlier (the Mexican Supply Point) was located in a

just happened to correlate with the existence of a mutual taxation treaty in that country. Rather, the IRS's approach evidences that the IRS selectively chose to allocate more taxable income to the United States where double taxation could follow, and conversely refrained from doing so where a treaty would allow a foreign government to challenge the IRS's reallocation pursuant to the mutual agreement procedure in an applicable treaty.[7]

The IRS's approach has implications that extend well beyond Coca-Cola, affecting the broader predictability and stability of the federal tax system. Multinational corporations rely on consistency in federal tax administration to structure their operations and ensure compliance with applicable regulations. When transfer pricing methodologies are applied inconsistently by the IRS, it creates uncertainty, making it more difficult for businesses to anticipate how their tax positions will be assessed and enforced and more likely that these companies will be subject to double taxation.

///

///

---

country where the IRS felt comfortable completely ignoring Coca-Cola's request for treaty-based relief.

[7] The mutual agreement procedure article in a tax treaty provides for a process to eliminate double taxation through direct negotiations by the competent authorities of each treaty partner.

## III. The Commissioner Cannot—Retroactively and Without Notice or Explanation—Pull the Rug out from Under Taxpayers Who Have Relied on the Agency's Longstanding Practices and Guidance.

Taxpayers have valid reliance interests and due process rights based on the IRS's statements and established practices, and courts have increasingly held agencies to account when they attempt to unfairly reverse course on their prior representations to the persons and entities they regulate. Courts have recognized this principle within various contours, according to the different circumstances in which the agency's unfair conduct arises. The underlying mandate remains the same: just as the people must "turn square corners when they deal with the government," "the Government should turn square corners in dealing with the people." *Regents of the Univ. of Cal.*, 591 U.S. at 24.

Government agencies can bind themselves to turn *certain* corners rather than others in various ways.

Courts have long recognized that agencies' guidance and statements to private parties may limit the scope of their (otherwise lawful) discretion. *See generally United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954). Thus, "[a]s a general rule, an agency pronouncement is transformed into a binding norm if so intended by the agency." *Padula v. Webster*, 822 F.2d 97, 100

(D.C. Cir. 1987)[8]; *Rauenhorst v. Comm'r*, 119 T.C. 157, 170–71 (2002) (refusing to allow the IRS to argue "against the principles and public guidance articulated in the Commissioner's currently outstanding revenue rulings"). An agency's intent to transform a "pronouncement" into a "binding norm" is "ascertained by an examination of the statement's language, the context, and any available extrinsic evidence." *Padula*, 822 F.2d at 100. These binding representations might be express, in the form of internal rules or press releases, *see, e.g.*, *Doe v. Hampton*, 566 F.2d 265, 281–82 (D.C. Cir. 1977); *United States v. Leahey*, 434 F.2d 7 (1st Cir. 1970), or they might be implied, such as the agency's longstanding or usual practice in a certain area, *see, e.g.*, *McKay v. Wahlenmaier*, 226 F.2d 35, 41, 43 (D.C. Cir. 1955); *Sangamon Valley Television Corp. v. United States*, 269 F.2d 221, 225 (D.C. Cir. 1959).

Express binding representations also take the form of Closing Agreements, Advance Pricing Agreements, and Issue Resolution Agreements, which the agency is bound to honor just like any contracting private party. *See, e.g.*, *Eaton Corp. v. Comm'r*, 47 F.4th 434, 441 (6th Cir. 2022) ("A closing agreement [between the

---

[8] The D.C. Circuit's application of the *Accardi* principle as articulated in *Padula* (and its predecessor *Doe v. Hampton*, 566 F.2d 265, 281–82 (D.C. Cir. 1977)) has been influential and has gained wide acceptance. *See, e.g.*, *Smriko v. Ashcroft*, 387 F.3d 279, 294 (3d Cir. 2004); *Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 208 (4th Cir. 1989) (applying *Hampton*); *Paige v. Harris*,

IRS and a taxpayer] is a contract, and generally is interpreted under ordinary contract principles." (quoting *Rink v. Comm'r*, 47 F.3d 168, 171 (6th Cir. 1995))).

Even if the agency did not necessarily *intend* to bind itself, it can be arbitrary and capricious for an agency to reverse course on a discretionary matter without notice or reasoned explanation. *See, e.g.*, *Encino Motorcars*, 579 U.S. at 221–22 ("When an agency changes its existing position . . . it . . . must at least . . . 'show that there are good reasons for the new policy' . . . [and] be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009))). Thus, "prior notice is required where a private party justifiably relies upon an agency's past practice and is substantially affected by a change in that practice." *Nat'l Conserv. Political Action Comm. v. FEC*, 626 F.2d 953, 959 (D.C. Cir. 1980).

And when the agency's unexpected reversal results in retroactive liability for conduct that the agency told the regulated party was compliant, it might even constitute a "serious *due process* violation." *PHH Corp. v. CFPB*, 839 F.3d 1, 48 (D.C. Cir. 2016) (Kavanaugh, J.) (emphasis added), *reinstated in pertinent part on reh'g en banc*, 881 F.3d 75, 83 (D.C. Cir. 2018) (en banc); *see also, e.g.*,

---

584 F.2d 178, 184 (7th Cir. 1978) (applying *Hampton*); *Ngure v. Ashcroft*, 367 F.3d 975, 982–83 (8th Cir. 2004).

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) ("[A]gencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'" (quoting *Gates & Fox Co. v. Occupational Safety & Health Review Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986) (Scalia, J.))).

Whether by express representations or simply through a longstanding and mutually understood course of conduct, the IRS might commit to a path with particular private parties—one within its discretion and not specifically mandated by law. If the IRS wants to change its chosen path, it must provide the taxpayer with advance notice and a reasonable basis for the change in direction. Here, the IRS gave Coca-Cola neither, and its abrupt flip-flop resulted in a retroactive penalty in the form of billions of dollars of additional tax liability.

## **CONCLUSION**

For the foregoing reasons, in addition to others Coca-Cola has outlined in its opening brief, this Court should reverse the Tax Court's decision.

Date: March 19, 2025

Respectfully submitted,

*/s/ Charles E. Borden*

By: Charles E. Borden
HOLLAND & KNIGHT LLP
Charles E. Borden
Joshua D. Odintz
800 17th Street N.W., Suite 1100

Washington, D.C. 20006
Tel: (202) 469-5207

HOLLAND & KNIGHT LLP
Sarah Molinoff
Paul W. Matthias-Bennetch
601 SW 2nd Avenue, Suite 1800
Portland, OR 97204
Tel: (503) 243-2300

Anne Gordon
National Trade Foreign Trade
Council, Inc.
1225 New York Ave., NW
Suite 650B
Washington, DC 20005
Tel: (202) 887-0278

*Counsel for National Foreign Trade Council, Inc.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief contains 5874 words in accordance with Federal Rule of Appellate Procedure 29(a)(5). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2019 14-point Times New Roman font.

*/s/ Charles E. Borden*
Charles E. Borden

**CERTIFICATE OF SERVICE**

I, hereby certify that on this day, March 19, 2025, a true and correct copy of the foregoing document was filed with the Clerk of Court and electronically served on counsel of record for all parties using the CM/ECF system of the United States Court of Appeals for the Eleventh Circuit. All participants in this case are registered CM/ECF users.

*/s/ Charles E. Borden*
Charles E. Borden

# ADDENDUM TABLE OF CONTENTS

**Page**

26 C.F.R. § 1.482-1 ........................................................................ ADD1

I.R.C. § 482 ........................................................................ ADD30

I.R.C. § 965 ........................................................................ ADD31

Code of Federal Regulations
Title 26. Internal Revenue
Chapter I. Internal Revenue Service, Department of the Treasury
Subchapter A. Income Tax
Part 1. Income Taxes (Refs & Annos)
Normal Taxes and Surtaxes
Deferred Compensation, Etc.
Methods of Accounting
Adjustments

26 C.F.R. § 1.482–1, Treas. Reg. § 1.482–1

§ 1.482–1 Allocation of income and deductions among taxpayers.

Currentness

**(a) In general—(1) Purpose and scope.** The purpose of section 482 is to ensure that taxpayers clearly reflect income attributable to controlled transactions and to prevent the avoidance of taxes with respect to such transactions. Section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer. This section sets forth general principles and guidelines to be followed under section 482. Section 1.482–2 provides rules for the determination of the true taxable income of controlled taxpayers in specific situations, including controlled transactions involving loans or advances or the use of tangible property. Sections 1.482–3 through 1.482–6 provide rules for the determination of the true taxable income of controlled taxpayers in cases involving the transfer of property. Section 1.482–7T sets forth the cost sharing provisions applicable to taxable years beginning on or after January 5, 2009. Section 1.482–8 provides examples illustrating the application of the best method rule. Finally, § 1.482–9 provides rules for the determination of the true taxable income of controlled taxpayers in cases involving the performance of services.

**(2) Authority to make allocations.** The district director may make allocations between or among the members of a controlled group if a controlled taxpayer has not reported its true taxable income. In such case, the district director may allocate income, deductions, credits, allowances, basis, or any other item or element affecting taxable income (referred to as allocations). The appropriate allocation may take the form of an increase or decrease in any relevant amount.

**(3) Taxpayer's use of section 482.** If necessary to reflect an arm's length result, a controlled taxpayer may report on a timely filed U.S. income tax return (including extensions) the results of its controlled transactions based upon prices different from those actually charged. Except as provided in this paragraph, section 482 grants no other right to a controlled taxpayer to apply the provisions of section 482 at will or to compel the district director to apply such provisions. Therefore, no untimely or amended returns will be permitted to decrease taxable income based on allocations or other adjustments with respect to controlled transactions. See § 1.6662–6T(a)(2) or successor regulations.

**(b) Arm's length standard—(1) In general.** In determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result). However, because identical transactions can rarely be located, whether a transaction produces an arm's length result generally will be determined by reference to the results of comparable transactions under comparable circumstances. See § 1.482–1(d)(2)

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(Standard of comparability). Evaluation of whether a controlled transaction produces an arm's length result is made pursuant to a method selected under the best method rule described in § 1.482–1(c).

**(2) Arm's length methods—(i) Methods.** Sections 1.482–2 through 1.482–7 and 1.482–9 provide specific methods to be used to evaluate whether transactions between or among members of the controlled group satisfy the arm's length standard, and if they do not, to determine the arm's length result. This section provides general principles applicable in determining arm's length results of such controlled transactions, but do not provide methods, for which reference must be made to those other sections in accordance with paragraphs (b)(2)(ii) and (iii) of this section. Section 1.482–7 provides the specific methods to be used to evaluate whether a cost sharing arrangement as defined in § 1.482–7 produces results consistent with an arm's length result.

**(ii) Selection of category of method applicable to transaction.** The methods listed in § 1.482–2 apply to different types of transactions, such as transfers of property, services, loans or advances, and rentals. Accordingly, the method or methods most appropriate to the calculation of arm's length results for controlled transactions must be selected, and different methods may be applied to interrelated transactions if such transactions are most reliably evaluated on a separate basis. For example, if services are provided in connection with the transfer of property, it may be appropriate to separately apply the methods applicable to services and property in order to determine an arm's length result. But see § 1.482–1(f)(2)(i) (Aggregation of transactions). In addition, other applicable provisions of the Code may affect the characterization of a transaction, and therefore affect the methods applicable under section 482. See for example section 467.

**(iii) Coordination of methods applicable to certain intangible development arrangements.** Section 1.482–7 provides the specific methods to be used to determine arm's length results of controlled transactions in connection with a cost sharing arrangement as defined in § 1.482–7. Sections 1.482–4 and 1.482–9, as appropriate, provide the specific methods to be used to determine arm's length results of arrangements, including partnerships, for sharing the costs and risks of developing intangibles, other than a cost sharing arrangement covered by § 1.482–7. See also §§ 1.482–4(g) (Coordination with rules governing cost sharing arrangements) and 1.482–9(m)(3) (Coordination with rules governing cost sharing arrangements).

**(c) Best method rule—(1) In general.** The arm's length result of a controlled transaction must be determined under the method that, under the facts and circumstances, provides the most reliable measure of an arm's length result. Thus, there is no strict priority of methods, and no method will invariably be considered to be more reliable than others. An arm's length result may be determined under any method without establishing the inapplicability of another method, but if another method subsequently is shown to produce a more reliable measure of an arm's length result, such other method must be used. Similarly, if two or more applications of a single method provide inconsistent results, the arm's length result must be determined under the application that, under the facts and circumstances, provides the most reliable measure of an arm's length result. See § 1.482–8 for examples of the application of the best method rule. See § 1.482-7 for the applicable methods in the case of a cost sharing arrangement.

**(2) Determining the best method.** Data based on the results of transactions between unrelated parties provides the most objective basis for determining whether the results of a controlled transaction are arm's length. Thus, in determining which of two or more available methods (or applications of a single method) provides the most reliable measure of an arm's length result, the two primary factors to take into account are the degree of comparability between the controlled transaction (or taxpayer) and any uncontrolled comparables, and the quality of the data and assumptions used in the analysis. In addition, in certain circumstances, it also may be relevant to consider whether the results of an analysis are consistent with the results of an analysis under another method. These factors are explained in paragraphs (c)(2)(i), (ii), and (iii) of this section.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(i) Comparability.** The relative reliability of a method based on the results of transactions between unrelated parties depends on the degree of comparability between the controlled transaction or taxpayers and the uncontrolled comparables, taking into account the factors described in § 1.482–1(d)(3) (Factors for determining comparability), and after making adjustments for differences, as described in § 1.482–1(d)(2) (Standard of comparability). As the degree of comparability increases, the number and extent of potential differences that could render the analysis inaccurate is reduced. In addition, if adjustments are made to increase the degree of comparability, the number, magnitude, and reliability of those adjustments will affect the reliability of the results of the analysis. Thus, an analysis under the comparable uncontrolled price method will generally be more reliable than analyses obtained under other methods if the analysis is based on closely comparable uncontrolled transactions, because such an analysis can be expected to achieve a higher degree of comparability and be susceptible to fewer differences than analyses under other methods. See § 1.482–3(b)(2)(ii)(A). An analysis will be relatively less reliable, however, as the uncontrolled transactions become less comparable to the controlled transaction.

**(ii) Data and assumptions.** Whether a method provides the most reliable measure of an arm's length result also depends upon the completeness and accuracy of the underlying data, the reliability of the assumptions, and the sensitivity of the results to possible deficiencies in the data and assumptions. Such factors are particularly relevant in evaluating the degree of comparability between the controlled and uncontrolled transactions. These factors are discussed in paragraphs (c)(2)(ii) (A), (B), and (C) of this section.

(A) Completeness and accuracy of data. The completeness and accuracy of the data affects the ability to identify and quantify those factors that would affect the result under any particular method. For example, the completeness and accuracy of data will determine the extent to which it is possible to identify differences between the controlled and uncontrolled transactions, and the reliability of adjustments that are made to account for such differences. An analysis will be relatively more reliable as the completeness and accuracy of the data increases.

(B) Reliability of assumptions. All methods rely on certain assumptions. The reliability of the results derived from a method depends on the soundness of such assumptions. Some assumptions are relatively reliable. For example, adjustments for differences in payment terms between controlled and uncontrolled transactions may be based on the assumption that at arm's length such differences would lead to price differences that reflect the time value of money. Although selection of the appropriate interest rate to use in making such adjustments involves some judgement, the economic analysis on which the assumption is based is relatively sound. Other assumptions may be less reliable. For example, the residual profit split method may be based on the assumption that capitalized intangible development expenses reflect the relative value of the intangible property contributed by each party. Because the costs of developing an intangible may not be related to its market value, the soundness of this assumption will affect the reliability of the results derived from this method.

(C) Sensitivity of results to deficiencies in data and assumptions. Deficiencies in the data used or assumptions made may have a greater effect on some methods than others. In particular, the reliability of some methods is heavily dependent on the similarity of property or services involved in the controlled and uncontrolled transaction. For certain other methods, such as the resale price method, the analysis of the extent to which controlled and uncontrolled taxpayers undertake the same or similar functions, employ similar resources, and bear similar risks is particularly important. Finally, under other methods, such as the profit split method, defining the relevant business activity and appropriate allocation of costs, income, and assets may be of particular importance. Therefore, a difference between the controlled and uncontrolled transactions for which an accurate adjustment cannot be made may have a greater effect on the reliability of the results derived under one method than the results derived under another method. For example, differences in management efficiency may have a greater effect on a comparable profits method analysis than

on a comparable uncontrolled price method analysis, while differences in product characteristics will ordinarily have a greater effect on a comparable uncontrolled price method analysis than on a comparable profits method analysis.

**(iii) Confirmation of results by another method.** If two or more methods produce inconsistent results, the best method rule will be applied to select the method that provides the most reliable measure of an arm's length result. If the best method rule does not clearly indicate which method should be selected, an additional factor that may be taken into account in selecting a method is whether any of the competing methods produce results that are consistent with the results obtained from the appropriate application of another method. Further, in evaluating different applications of the same method, the fact that a second method (or another application of the first method) produces results that are consistent with one of the competing applications may be taken into account.

**(d) Comparability—(1) In general.** Whether a controlled transaction produces an arm's length result is generally evaluated by comparing the results of that transaction to results realized by uncontrolled taxpayers engaged in comparable transactions under comparable circumstances. For this purpose, the comparability of transactions and circumstances must be evaluated considering all factors that could affect prices or profits in arm's length dealings (comparability factors). While a specific comparability factor may be of particular importance in applying a method, each method requires analysis of all of the factors that affect comparability under that method. Such factors include the following—

**(i)** Functions;

**(ii)** Contractual terms;

**(iii)** Risks;

**(iv)** Economic conditions; and

**(v)** Property or services.

**(2) Standard of comparability.** In order to be considered comparable to a controlled transaction, an uncontrolled transaction need not be identical to the controlled transaction, but must be sufficiently similar that it provides a reliable measure of an arm's length result. If there are material differences between the controlled and uncontrolled transactions, adjustments must be made if the effect of such differences on prices or profits can be ascertained with sufficient accuracy to improve the reliability of the results. For purposes of this section, a material difference is one that would materially affect the measure of an arm's length result under the method being applied. If adjustments for material differences cannot be made, the uncontrolled transaction may be used as a measure of an arm's length result, but the reliability of the analysis will be reduced. Generally, such adjustments must be made to the results of the uncontrolled comparable and must be based on commercial practices, economic principles, or statistical analyses. The extent and reliability of any adjustments will affect the relative reliability of the analysis. See § 1.482–1(c)(1) (Best method rule). In any event, unadjusted industry average returns themselves cannot establish arm's length results.

**(3) Factors for determining comparability.** The comparability factors listed in § 1.482–1(d)(1) are discussed in this section. Each of these factors must be considered in determining the degree of comparability between transactions or

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

taxpayers and the extent to which comparability adjustments may be necessary. In addition, in certain cases involving special circumstances, the rules under paragraph (d)(4) of this section must be considered.

**(i) Functional analysis.** Determining the degree of comparability between controlled and uncontrolled transactions requires a comparison of the functions performed, and associated resources employed, by the taxpayers in each transaction. This comparison is based on a functional analysis that identifies and compares the economically significant activities undertaken, or to be undertaken, by the taxpayers in both controlled and uncontrolled transactions. A functional analysis should also include consideration of the resources that are employed, or to be employed, in conjunction with the activities undertaken, including consideration of the type of assets used, such as plant and equipment, or the use of valuable intangibles. A functional analysis is not a pricing method and does not itself determine the arm's length result for the controlled transaction under review. Functions that may need to be accounted for in determining the comparability of two transactions include—

(A) Research and development;

(B) Product design and engineering;

(C) Manufacturing, production and process engineering;

(D) Product fabrication, extraction, and assembly;

(E) Purchasing and materials management;

(F) Marketing and distribution functions, including inventory management, warranty administration, and advertising activities;

(G) Transportation and warehousing; and

(H) Managerial, legal, accounting and finance, credit and collection, training, and personnel management services.

**(ii) Contractual terms—**(A) In general. Determining the degree of comparability between the controlled and uncontrolled transactions requires a comparison of the significant contractual terms that could affect the results of the two transactions. These terms include—

(1) The form of consideration charged or paid;

(2) Sales or purchase volume;

(3) The scope and terms of warranties provided;

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(4) Rights to updates, revisions or modifications;

(5) The duration of relevant license, contract or other agreements, and termination or renegotiation rights;

(6) Collateral transactions or ongoing business relationships between the buyer and the seller, including arrangements for the provision of ancillary or subsidiary services; and

(7) Extension of credit and payment terms. Thus, for example, if the time for payment of the amount charged in a controlled transaction differs from the time for payment of the amount charged in an uncontrolled transaction, an adjustment to reflect the difference in payment terms should be made if such difference would have a material effect on price. Such comparability adjustment is required even if no interest would be allocated or imputed under § 1.482–2(a) or other applicable provisions of the Internal Revenue Code or regulations.

(B) Identifying contractual terms—(1) Written agreement. The contractual terms, including the consequent allocation of risks, that are agreed to in writing before the transactions are entered into will be respected if such terms are consistent with the economic substance of the underlying transactions. In evaluating economic substance, greatest weight will be given to the actual conduct of the parties, and the respective legal rights of the parties (see, for example, § 1.482–4(f)(3) (Ownership of intangible property)). If the contractual terms are inconsistent with the economic substance of the underlying transaction, the district director may disregard such terms and impute terms that are consistent with the economic substance of the transaction.

(2) No written agreement. In the absence of a written agreement, the district director may impute a contractual agreement between the controlled taxpayers consistent with the economic substance of the transaction. In determining the economic substance of the transaction, greatest weight will be given to the actual conduct of the parties and their respective legal rights (see, for example, § 1.482–4(f)(3) (Ownership of intangible property)). For example, if, without a written agreement, a controlled taxpayer operates at full capacity and regularly sells all of its output to another member of its controlled group, the district director may impute a purchasing contract from the course of conduct of the controlled taxpayers, and determine that the producer bears little risk that the buyer will fail to purchase its full output. Further, if an established industry convention or usage of trade assigns a risk or resolves an issue, that convention or usage will be followed if the conduct of the taxpayers is consistent with it. See UCC 1–205. For example, unless otherwise agreed, payment generally is due at the time and place at which the buyer is to receive goods. See UCC 2–310.

(C) Examples. The following examples illustrate this paragraph (d)(3)(ii).

**Example 1.**Differences in volume. USP, a United States agricultural exporter, regularly buys transportation services from FSub, its foreign subsidiary, to ship its products from the United States to overseas markets. Although FSub occasionally provides transportation services to URA, an unrelated domestic corporation, URA accounts for only 10% of the gross revenues of FSub, and the remaining 90% of FSub's gross revenues are attributable to FSub's transactions with USP. In determining the degree of comparability between FSub's uncontrolled transaction with URA and its controlled transaction with USP, the difference in volumes involved in the two transactions and the regularity with which these services are provided must be taken into account if such difference would have a material effect on the price charged. Inability to make reliable adjustments for these differences would affect the reliability of the results derived from the uncontrolled transaction as a measure of the arm's length result.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**Example 2.**Reliability of adjustment for differences in volume. (i) FS manufactures product XX and sells that product to its parent corporation, P. FS also sells product XX to uncontrolled taxpayers at a price of $100 per unit. Except for the volume of each transaction, the sales to P and to uncontrolled taxpayers take place under substantially the same economic conditions and contractual terms. In uncontrolled transactions, FS offers a 2% discount for quantities of 20 per order, and a 5% discount for quantities of 100 per order. If P purchases product XX in quantities of 60 per order, in the absence of other reliable information, it may reasonably be concluded that the arm's length price to P would be $100, less a discount of 3.5%.

(ii) If P purchases product XX in quantities of 1,000 per order, a reliable estimate of the appropriate volume discount must be based on proper economic or statistical analysis, not necessarily a linear extrapolation from the 2% and 5% catalog discounts applicable to sales of 20 and 100 units, respectively.

**Example 3.** Contractual terms imputed from economic substance. (i) FP, a foreign producer of wristwatches, is the registered holder of the YY trademark in the United States and in other countries worldwide. In year 1, FP enters the United States market by selling YY wristwatches to its newly organized United States subsidiary, USSub, for distribution in the United States market. USSub pays FP a fixed price per wristwatch. USSub and FP undertake, without separate compensation, marketing activities to establish the YY trademark in the United States market. Unrelated foreign producers of trademarked wristwatches and their authorized United States distributors respectively undertake similar marketing activities in independent arrangements involving distribution of trademarked wristwatches in the United States market. In years 1 through 6, USSub markets and sells YY wristwatches in the United States. Further, in years 1 through 6, USSub undertakes incremental marketing activities in addition to the activities similar to those observed in the independent distribution transactions in the United States market. FP does not directly or indirectly compensate USSub for performing these incremental activities during years 1 through 6. Assume that, aside from these incremental activities, and after any adjustments are made to improve the reliability of the comparison, the price paid per wristwatch by the independent, authorized distributors of wristwatches would provide the most reliable measure of the arm's length price paid per YY wristwatch by USSub.

(ii) By year 7, the wristwatches with the YY trademark generate a premium return in the United States market, as compared to wristwatches marketed by the independent distributors. In year 7, substantially all the premium return from the YY trademark in the United States market is attributed to FP, for example through an increase in the price paid per watch by USSub, or by some other means.

(iii) In determining whether an allocation of income is appropriate in year 7, the Commissioner may consider the economic substance of the arrangements between USSub and FP, and the parties' course of conduct throughout their relationship. Based on this analysis, the Commissioner determines that it is unlikely that, ex ante, an uncontrolled taxpayer operating at arm's length would engage in the incremental marketing activities to develop or enhance intangible property owned by another party unless it received contemporaneous compensation or otherwise had a reasonable anticipation of receiving a future benefit from those activities. In this case, USSub's undertaking the incremental marketing activities in years 1 through 6 is a course of conduct that is inconsistent with the parties' attribution to FP in year 7 of substantially all the premium return from the enhanced YY trademark in the United States market. Therefore, the Commissioner may impute one or more agreements between USSub and FP, consistent with the economic substance of their course of conduct, which would afford USSub an appropriate portion of the premium return from the YY trademark wristwatches. For example, the Commissioner may impute a separate services agreement that affords USSub contingent-payment compensation for its incremental marketing activities in years 1 through 6, which benefited FP by contributing to the value of the trademark owned by FP. In the alternative, the Commissioner may impute a long-term, exclusive agreement to exploit the YY trademark in the United States that allows USSub to benefit from the incremental marketing activities it performed. As another alternative, the Commissioner may require FP to compensate USSub for terminating USSub's imputed long-term, exclusive agreement to exploit the YY trademark in the United States, an agreement that USSub made more valuable at its own expense and risk. The taxpayer may present additional facts that could indicate which of these or other alternative agreements best reflects the economic substance of the underlying transactions, consistent with the parties' course of conduct in the particular case.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**Example 4.** Contractual terms imputed from economic substance. (i) FP, a foreign producer of athletic gear, is the registered holder of the AA trademark in the United States and in other countries worldwide. In year 1, FP enters into a licensing agreement that affords its newly organized United States subsidiary, USSub, exclusive rights to certain manufacturing and marketing intangible property (including the AA trademark) for purposes of manufacturing and marketing athletic gear in the United States under the AA trademark. The contractual terms of this agreement obligate USSub to pay FP a royalty based on sales, and also obligate both FP and USSub to undertake without separate compensation specified types and levels of marketing activities. Unrelated foreign businesses license independent United States businesses to manufacture and market athletic gear in the United States, using trademarks owned by the unrelated foreign businesses. The contractual terms of these uncontrolled transactions require the licensees to pay royalties based on sales of the merchandise, and obligate the licensors and licensees to undertake without separate compensation specified types and levels of marketing activities. In years 1 through 6, USSub manufactures and sells athletic gear under the AA trademark in the United States. Assume that, after adjustments are made to improve the reliability of the comparison for any material differences relating to marketing activities, manufacturing or marketing intangible property, and other comparability factors, the royalties paid by independent licensees would provide the most reliable measure of the arm's length royalty owed by USSub to FP, apart from the additional facts in paragraph (ii) of this Example 4.

(ii) In years 1 through 6, USSub performs incremental marketing activities with respect to the AA trademark athletic gear, in addition to the activities required under the terms of the license agreement with FP, that are also incremental as compared to those observed in the comparables. FP does not directly or indirectly compensate USSub for performing these incremental activities during years 1 through 6. By year 7, AA trademark athletic gear generates a premium return in the United States, as compared to similar athletic gear marketed by independent licensees. In year 7, USSub and FP enter into a separate services agreement under which FP agrees to compensate USSub on a cost basis for the incremental marketing activities that USSub performed during years 1 through 6, and to compensate USSub on a cost basis for any incremental marketing activities it may perform in year 7 and subsequent years. In addition, the parties revise the license agreement executed in year 1, and increase the royalty to a level that attributes to FP substantially all the premium return from sales of the AA trademark athletic gear in the United States.

(iii) In determining whether an allocation of income is appropriate in year 7, the Commissioner may consider the economic substance of the arrangements between USSub and FP and the parties' course of conduct throughout their relationship. Based on this analysis, the Commissioner determines that it is unlikely that, ex ante, an uncontrolled taxpayer operating at arm's length would engage in the incremental marketing activities to develop or enhance intangible property owned by another party unless it received contemporaneous compensation or otherwise had a reasonable anticipation of a future benefit. In this case, USSub's undertaking the incremental marketing activities in years 1 through 6 is a course of conduct that is inconsistent with the parties' adoption in year 7 of contractual terms by which FP compensates USSub on a cost basis for the incremental marketing activities that it performed. Therefore, the Commissioner may impute one or more agreements between USSub and FP, consistent with the economic substance of their course of conduct, which would afford USSub an appropriate portion of the premium return from the AA trademark athletic gear. For example, the Commissioner may impute a separate services agreement that affords USSub contingent-payment compensation for the incremental activities it performed during years 1 through 6, which benefited FP by contributing to the value of the trademark owned by FP. In the alternative, the Commissioner may impute a long-term, exclusive United States license agreement that allows USSub to benefit from the incremental activities. As another alternative, the Commissioner may require FP to compensate USSub for terminating USSub's imputed long-term United States license agreement, a license that USSub made more valuable at its own expense and risk. The taxpayer may present additional facts that could indicate which of these or other alternative agreements best reflects the economic substance of the underlying transactions, consistent with the parties' course of conduct in this particular case.

**Example 5.** Non-arm's length compensation. (i) The facts are the same as in paragraph (i) of Example 4. As in Example 4, assume that, after adjustments are made to improve the reliability of the comparison for any material differences relating to marketing activities, manufacturing or marketing intangible property, and other comparability factors, the royalties paid by independent licensees would provide the most reliable measure of the arm's length royalty owed by USSub to FP, apart from the additional facts described in paragraph (ii) of this Example 5.

(ii) In years 1 through 4, USSub performs certain incremental marketing activities with respect to the AA trademark athletic gear, in addition to the activities required under the terms of the basic license agreement, that are also incremental as compared with those activities observed in the comparables. At the start of year 1, FP enters into a separate services agreement with USSub, which states that FP will compensate USSub quarterly, in an amount equal to specified costs plus X%, for these incremental marketing functions. Further, these written agreements reflect the intent of the parties that USSub receive such compensation from FP throughout the term of the agreement, without regard to the success or failure of the promotional activities. During years 1 through 4, USSub performs marketing activities pursuant to the separate services agreement and in each year USSub receives the specified compensation from FP on a cost of services plus basis.

(iii) In evaluating year 4, the Commissioner performs an analysis of independent parties that perform promotional activities comparable to those performed by USSub and that receive separately-stated compensation on a current basis without contingency. The Commissioner determines that the magnitude of the specified cost plus X% is outside the arm's length range in each of years 1 through 4. Based on an evaluation of all the facts and circumstances, the Commissioner makes an allocation to require payment of compensation to USSub for the promotional activities performed in year 4, based on the median of the interquartile range of the arm's length markups charged by the uncontrolled comparables described in paragraph (e)(3) of this section.

(iv) Given that based on facts and circumstances, the terms agreed by the controlled parties were that FP would bear all risks associated with the promotional activities performed by USSub to promote the AA trademark product in the United States market, and given that the parties' conduct during the years examined was consistent with this allocation of risk, the fact that the cost of services plus markup on USSub's services was outside the arm's length range does not, without more, support imputation of additional contractual terms based on alternative views of the economic substance of the transaction, such as terms indicating that USSub, rather than FP, bore the risk associated with these activities.

**Example 6.** Contractual terms imputed from economic substance. (i) Company X is a member of a controlled group that has been in operation in the pharmaceutical sector for many years. In years 1 through 4, Company X undertakes research and development activities. As a result of those activities, Company X developed a compound that may be more effective than existing medications in the treatment of certain conditions.

(ii) Company Y is acquired in year 4 by the controlled group that includes Company X. Once Company Y is acquired, Company X makes available to Company Y a large amount of technical data concerning the new compound, which Company Y uses to register patent rights with respect to the compound in several jurisdictions, making Company Y the legal owner of such patents. Company Y then enters into licensing agreements with group members that afford Company Y 100% of the premium return attributable to use of the intangible property by its subsidiaries.

(iii) In determining whether an allocation is appropriate in year 4, the Commissioner may consider the economic substance of the arrangements between Company X and Company Y, and the parties' course of conduct throughout their relationship. Based on this analysis, the Commissioner determines that it is unlikely that an uncontrolled taxpayer operating at arm's length would make available the results of its research and development or perform services that resulted in transfer of valuable know how to another party unless it received contemporaneous compensation or otherwise had a reasonable anticipation of receiving a future benefit from those activities. In this case, Company X's undertaking the research and development activities and then providing technical data and know-how to Company Y in year 4 is inconsistent with the registration and subsequent exploitation of the patent by Company Y. Therefore, the Commissioner may impute one or more agreements between Company X and Company Y consistent with the economic substance of their course of conduct, which would afford Company X an appropriate portion of the premium return from the patent rights. For example, the Commissioner may impute a separate services agreement that affords Company X contingent-payment compensation for its services in year 4 for the benefit of Company Y, consisting of making available to Company Y technical data, know-how, and other fruits of research and development conducted in previous years. These services benefited Company Y by giving rise to and contributing to the value of the patent rights that were ultimately registered by Company Y. In the alternative, the Commissioner may impute a transfer of patentable intangible property rights

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

from Company X to Company Y immediately preceding the registration of patent rights by Company Y. The taxpayer may present additional facts that could indicate which of these or other alternative agreements best reflects the economic substance of the underlying transactions, consistent with the parties' course of conduct in the particular case.

**(iii) Risk—**(A) Comparability. Determining the degree of comparability between controlled and uncontrolled transactions requires a comparison of the significant risks that could affect the prices that would be charged or paid, or the profit that would be earned, in the two transactions. Relevant risks to consider include—

(1) Market risks, including fluctuations in cost, demand, pricing, and inventory levels;

(2) Risks associated with the success or failure of research and development activities;

(3) Financial risks, including fluctuations in foreign currency rates of exchange and interest rates;

(4) Credit and collection risks;

(5) Product liability risks; and

(6) General business risks related to the ownership of property, plant, and equipment.

(B) Identification of taxpayer that bears risk. In general, the determination of which controlled taxpayer bears a particular risk will be made in accordance with the provisions of § 1.482–1(d)(3)(ii)(B) (Identifying contractual terms). Thus, the allocation of risks specified or implied by the taxpayer's contractual terms will generally be respected if it is consistent with the economic substance of the transaction. An allocation of risk between controlled taxpayers after the outcome of such risk is known or reasonably knowable lacks economic substance. In considering the economic substance of the transaction, the following facts are relevant—

(1) Whether the pattern of the controlled taxpayer's conduct over time is consistent with the purported allocation of risk between the controlled taxpayers; or where the pattern is changed, whether the relevant contractual arrangements have been modified accordingly;

(2) Whether a controlled taxpayer has the financial capacity to fund losses that might be expected to occur as the result of the assumption of a risk, or whether, at arm's length, another party to the controlled transaction would ultimately suffer the consequences of such losses; and

(3) The extent to which each controlled taxpayer exercises managerial or operational control over the business activities that directly influence the amount of income or loss realized. In arm's length dealings, parties ordinarily bear a greater share of those risks over which they have relatively more control.

(C) Examples. The following examples illustrate this paragraph (d)(3)(iii).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**Example 1.** FD, the wholly-owned foreign distributor of USM, a U.S. manufacturer, buys widgets from USM under a written contract. Widgets are a generic electronic appliance. Under the terms of the contract, FD must buy and take title to 20,000 widgets for each of the five years of the contract at a price of $10 per widget. The widgets will be sold under FD's label, and FD must finance any marketing strategies to promote sales in the foreign market. There are no rebate or buy back provisions. FD has adequate financial capacity to fund its obligations under the contract under any circumstances that could reasonably be expected to arise. In Years 1, 2 and 3, FD sold only 10,000 widgets at a price of $11 per unit. In Year 4, FD sold its entire inventory of widgets at a price of $25 per unit. Since the contractual terms allocating market risk were agreed to before the outcome of such risk was known or reasonably knowable, FD had the financial capacity to bear the market risk that it would be unable to sell all of the widgets it purchased currently, and its conduct was consistent over time, FD will be deemed to bear the risk.

**Example 2.** The facts are the same as in Example 1, except that in Year 1 FD had only $100,000 in total capital, including loans. In subsequent years USM makes no additional contributions to the capital of FD, and FD is unable to obtain any capital through loans from an unrelated party. Nonetheless, USM continues to sell 20,000 widgets annually to FD under the terms of the contract, and USM extends credit to FD to enable it to finance the purchase. FD does not have the financial capacity in Years 1, 2 and 3 to finance the purchase of the widgets given that it could not sell most of the widgets it purchased during those years. Thus, notwithstanding the terms of the contract, USM and not FD assumed the market risk that a substantial portion of the widgets could not be sold, since in that event FD would not be able to pay USM for all of the widgets it purchased.

**Example 3.** S, a Country X corporation, manufactures small motors that it sells to P, its U.S. parent. P incorporates the motors into various products and sells those products to uncontrolled customers in the United States. The contract price for the motors is expressed in U.S. dollars, effectively allocating the currency risk for these transactions to S for any currency fluctuations between the time the contract is signed and payment is made. As long as S has adequate financial capacity to bear this currency risk (including by hedging all or part of the risk) and the conduct of S and P is consistent with the terms of the contract (i.e., the contract price is not adjusted to reflect exchange rate movements), the agreement of the parties to allocate the exchange risk to S will be respected.

**Example 4.** USSub is the wholly-owned U.S. subsidiary of FP, a foreign manufacturer. USSub acts as a distributor of goods manufactured by FP. FP and USSub execute an agreement providing that FP will bear any ordinary product liability costs arising from defects in the goods manufactured by FP. In practice, however, when ordinary product liability claims are sustained against USSub and FP, USSub pays the resulting damages. Therefore, the district director disregards the contractual arrangement regarding product liability costs between FP and USSub, and treats the risk as having been assumed by USSub.

**(iv) Economic conditions.** Determining the degree of comparability between controlled and uncontrolled transactions requires a comparison of the significant economic conditions that could affect the prices that would be charged or paid, or the profit that would be earned in each of the transactions. These factors include—

(A) The similarity of geographic markets;

(B) The relative size of each market, and the extent of the overall economic development in each market;

(C) The level of the market (e.g., wholesale, retail, etc.);

(D) The relevant market shares for the products, properties, or services transferred or provided;

(E) The location-specific costs of the factors of production and distribution;

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(F) The extent of competition in each market with regard to the property or services under review;

(G) The economic condition of the particular industry, including whether the market is in contraction or expansion; and

(H) The alternatives realistically available to the buyer and seller.

**(v) Property or services.** Evaluating the degree of comparability between controlled and uncontrolled transactions requires a comparison of the property or services transferred in the transactions. This comparison may include any intangible property that is embedded in tangible property or services being transferred (embedded intangibles). The comparability of the embedded intangibles will be analyzed using the factors listed in § 1.482–4(c)(2)(iii)(B)(1) (comparable intangible property). The relevance of product comparability in evaluating the relative reliability of the results will depend on the method applied. For guidance concerning the specific comparability considerations applicable to transfers of tangible and intangible property and performance of services, see §§ 1.482–3 through 1.482–6 and § 1.482–9; see also §§ 1.482–3(f), 1.482–4(f)(4), and 1.482–9(m), dealing with the coordination of intangible and tangible property and performance of services rules.

**(4) Special circumstances—(i) Market share strategy.** In certain circumstances, taxpayers may adopt strategies to enter new markets or to increase a product's share of an existing market (market share strategy). Such a strategy would be reflected by temporarily increased market development expenses or resale prices that are temporarily lower than the prices charged for comparable products in the same market. Whether or not the strategy is reflected in the transfer price depends on which party to the controlled transaction bears the costs of the pricing strategy. In any case, the effect of a market share strategy on a controlled transaction will be taken into account only if it can be shown that an uncontrolled taxpayer engaged in a comparable strategy under comparable circumstances for a comparable period of time, and the taxpayer provides documentation that substantiates the following—

(A) The costs incurred to implement the market share strategy are borne by the controlled taxpayer that would obtain the future profits that result from the strategy, and there is a reasonable likelihood that the strategy will result in future profits that reflect an appropriate return in relation to the costs incurred to implement it;

(B) The market share strategy is pursued only for a period of time that is reasonable, taking into consideration the industry and product in question; and

(C) The market share strategy, the related costs and expected returns, and any agreement between the controlled taxpayers to share the related costs, were established before the strategy was implemented.

**(ii) Different geographic markets—**(A) In general. Uncontrolled comparables ordinarily should be derived from the geographic market in which the controlled taxpayer operates, because there may be significant differences in economic conditions in different markets. If information from the same market is not available, an uncontrolled comparable derived from a different geographic market may be considered if adjustments are made to account for differences between the two markets. If information permitting adjustments for such differences is not available, then information derived from uncontrolled comparables in the most similar market for which reliable data is available may be used, but the extent of such

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

differences may affect the reliability of the method for purposes of the best method rule. For this purpose, a geographic market is any geographic area in which the economic conditions for the relevant product or service are substantially the same, and may include multiple countries, depending on the economic conditions.

(B) Example. The following example illustrates this paragraph (d)(4)(ii).

**Example.** Manuco, a wholly-owned foreign subsidiary of P, a U.S. corporation, manufactures products in Country Z for sale to P. No uncontrolled transactions are located that would provide a reliable measure of the arm's length result under the comparable uncontrolled price method. The district director considers applying the cost plus method or the comparable profits method. Information on uncontrolled taxpayers performing comparable functions under comparable circumstances in the same geographic market is not available. Therefore, adjusted data from uncontrolled manufacturers in other markets may be considered in order to apply the cost plus method. In this case, comparable uncontrolled manufacturers are found in the United States. Accordingly, data from the comparable U.S. uncontrolled manufacturers, as adjusted to account for differences between the United States and Country Z's geographic market, is used to test the arm's length price paid by P to Manuco. However, the use of such data may affect the reliability of the results for purposes of the best method rule. See § 1.482–1(c).

(C) Location savings. If an uncontrolled taxpayer operates in a different geographic market than the controlled taxpayer, adjustments may be necessary to account for significant differences in costs attributable to the geographic markets. These adjustments must be based on the effect such differences would have on the consideration charged or paid in the controlled transaction given the relative competitive positions of buyers and sellers in each market. Thus, for example, the fact that the total costs of operating in a controlled manufacturer's geographic market are less than the total costs of operating in other markets ordinarily justifies higher profits to the manufacturer only if the cost differences would increase the profits of comparable uncontrolled manufacturers operating at arm's length, given the competitive positions of buyers and sellers in that market.

(D) Example. The following example illustrates the principles of this paragraph (d)(4)(ii)(C).

**Example.** Couture, a U.S. apparel design corporation, contracts with Sewco, its wholly owned Country Y subsidiary, to manufacture its clothes. Costs of operating in Country Y are significantly lower than the operating costs in the United States. Although clothes with the Couture label sell for a premium price, the actual production of the clothes does not require significant specialized knowledge that could not be acquired by actual or potential competitors to Sewco at reasonable cost. Thus, Sewco's functions could be performed by several actual or potential competitors to Sewco in geographic markets that are similar to Country Y. Thus, the fact that production is less costly in Country Y will not, in and of itself, justify additional profits derived from lower operating costs in Country Y inuring to Sewco, because the competitive positions of the other actual or potential producers in similar geographic markets capable of performing the same functions at the same low costs indicate that at arm's length such profits would not be retained by Sewco.

**(iii) Transactions ordinarily not accepted as comparables—**(A) In general. Transactions ordinarily will not constitute reliable measures of an arm's length result for purposes of this section if—

(1) They are not made in the ordinary course of business; or

(2) One of the principal purposes of the uncontrolled transaction was to establish an arm's length result with respect to the controlled transaction.

(B) Examples. The following examples illustrate the principle of this paragraph (d)(4)(iii).

**Example 1.** Not in the ordinary course of business. USP, a United States manufacturer of computer software, sells its products to FSub, its foreign distributor in country X. Compco, a United States competitor of USP, also sells its products in X through unrelated distributors. However, in the year under review, Compco is forced into bankruptcy, and Compco liquidates its inventory by selling all of its products to unrelated distributors in X for a liquidation price. Because the sale of its entire inventory was not a sale in the ordinary course of business, Compco's sale cannot be used as an uncontrolled comparable to determine USP's arm's length result from its controlled transaction.

**Example 2.** Principal purpose of establishing an arm's length result. USP, a United States manufacturer of farm machinery, sells its products to FSub, its wholly-owned distributor in Country Y. USP, operating at nearly full capacity, sells 95% of its inventory to FSub. To make use of its excess capacity, and also to establish a comparable uncontrolled price for its transfer price to FSub, USP increases its production to full capacity. USP sells its excess inventory to Compco, an unrelated foreign distributor in Country X. Country X has approximately the same economic conditions as that of Country Y. Because one of the principal purposes of selling to Compco was to establish an arm's length price for its controlled transactions with FSub, USP's sale to Compco cannot be used as an uncontrolled comparable to determine USP's arm's length result from its controlled transaction.

**(e) Arm's length range—(1) In general.** In some cases, application of a pricing method will produce a single result that is the most reliable measure of an arm's length result. In other cases, application of a method may produce a number of results from which a range of reliable results may be derived. A taxpayer will not be subject to adjustment if its results fall within such range (arm's length range).

**(2) Determination of arm's length range—(i) Single method.** The arm's length range is ordinarily determined by applying a single pricing method selected under the best method rule to two or more uncontrolled transactions of similar comparability and reliability. Use of more than one method may be appropriate for the purposes described in paragraph (c)(2)(iii) of this section (Best method rule).

**(ii) Selection of comparables.** Uncontrolled comparables must be selected based upon the comparability criteria relevant to the method applied and must be sufficiently similar to the controlled transaction that they provide a reliable measure of an arm's length result. If material differences exist between the controlled and uncontrolled transactions, adjustments must be made to the results of the uncontrolled transaction if the effect of such differences on price or profits can be ascertained with sufficient accuracy to improve the reliability of the results. See § 1.482–1(d)(2) (Standard of comparability). The arm's length range will be derived only from those uncontrolled comparables that have, or through adjustments can be brought to, a similar level of comparability and reliability, and uncontrolled comparables that have a significantly lower level of comparability and reliability will not be used in establishing the arm's length range.

**(iii) Comparables included in arm's length range—**(A) In general. The arm's length range will consist of the results of all of the uncontrolled comparables that meet the following conditions: the information on the controlled transaction and the uncontrolled comparables is sufficiently complete that it is likely that all material differences have been identified, each such difference has a definite and reasonably ascertainable effect on price or profit, and an adjustment is made to eliminate the effect of each such difference.

(B) Adjustment of range to increase reliability. If there are no uncontrolled comparables described in paragraph (e)(2)(iii)(A) of this section, the arm's length range is derived from the results of all the uncontrolled comparables, selected pursuant to paragraph (e)(2)(ii) of this section, that achieve a similar level of comparability and reliability. In such

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

cases the reliability of the analysis must be increased, where it is possible to do so, by adjusting the range through application of a valid statistical method to the results of all of the uncontrolled comparables so selected. The reliability of the analysis is increased when statistical methods are used to establish a range of results in which the limits of the range will be determined such that there is a 75 percent probability of a result falling above the lower end of the range and a 75 percent probability of a result falling below the upper end of the range. The interquartile range ordinarily provides an acceptable measure of this range; however a different statistical method may be applied if it provides a more reliable measure.

(C) Interquartile range. For purposes of this section, the interquartile range is the range from the 25th to the 75th percentile of the results derived from the uncontrolled comparables. For this purpose, the 25th percentile is the lowest result derived from an uncontrolled comparable such that at least 25 percent of the results are at or below the value of that result. However, if exactly 25 percent of the results are at or below a result, then the 25th percentile is equal to the average of that result and the next higher result derived from the uncontrolled comparables. The 75th percentile is determined analogously.

**(3) Adjustment if taxpayer's results are outside arm's length range.** If the results of a controlled transaction fall outside the arm's length range, the district director may make allocations that adjust the controlled taxpayer's result to any point within the arm's length range. If the interquartile range is used to determine the arm's length range, such adjustment will ordinarily be to the median of all the results. The median is the 50th percentile of the results, which is determined in a manner analogous to that described in paragraph (e)(2)(iii)(C) of this section (Interquartile range). In other cases, an adjustment normally will be made to the arithmetic mean of all the results. See § 1.482–1(f)(2)(iii)(D) for determination of an adjustment when a controlled taxpayer's result for a multiple year period falls outside an arm's length range consisting of the average results of uncontrolled comparables over the same period.

**(4) Arm's length range not prerequisite to allocation.** The rules of this paragraph (e) do not require that the district director establish an arm's length range prior to making an allocation under section 482. Thus, for example, the district director may properly propose an allocation on the basis of a single comparable uncontrolled price if the comparable uncontrolled price method, as described in § 1.482–3(b), has been properly applied. However, if the taxpayer subsequently demonstrates that the results claimed on its income tax return are within the range established by additional equally reliable comparable uncontrolled prices in a manner consistent with the requirements set forth in § 1.482–1(e)(2)(iii), then no allocation will be made.

**(5) Examples.** The following examples illustrate the principles of this paragraph (e).

**Example 1.** Selection of comparables. (i) To evaluate the arm's length result of a controlled transaction between USSub, the United States taxpayer under review, and FP, its foreign parent, the district director considers applying the resale price method. The district director identifies ten potential uncontrolled transactions. The distributors in all ten uncontrolled transactions purchase and resell similar products and perform similar functions to those of USSub.

(ii) Data with respect to three of the uncontrolled transactions is very limited, and although some material differences can be identified and adjusted for, the level of comparability of these three uncontrolled comparables is significantly lower than that of the other seven. Further, of those seven, adjustments for the identified material differences can be reliably made for only four of the uncontrolled transactions. Therefore, pursuant to § 1.482–1(e)(2)(ii) only these four uncontrolled comparables may be used to establish an arm's length range.

**Example 2.** Arm's length range consists of all the results. (i) The facts are the same as in Example 1. Applying the resale price method to the four uncontrolled comparables, and making adjustments to the uncontrolled comparables pursuant to § 1.482–1(d)(2), the district director derives the following results:

| Comparable | Result (price) |
| --- | --- |
| 1 | $44.00 |
| 2 | 45.00 |
| 3 | 45.00 |
| 4 | 45.50 |

(ii) The district director determines that data regarding the four uncontrolled transactions is sufficiently complete and accurate so that it is likely that all material differences between the controlled and uncontrolled transactions have been identified, such differences have a definite and reasonably ascertainable effect, and appropriate adjustments were made for such differences. Accordingly, if the resale price method is determined to be the best method pursuant to § 1.482–1(c), the arm's length range for the controlled transaction will consist of the results of all of the uncontrolled comparables, pursuant to paragraph (e)(2)(iii)(A) of this section. Thus, the arm's length range in this case would be the range from $44 to $45.50.

**Example 3.** Arm's length range limited to interquartile range. (i) The facts are the same as in Example 2, except in this case there are some product and functional differences between the four uncontrolled comparables and USSub. However, the data is insufficiently complete to determine the effect of the differences. Applying the resale price method to the four uncontrolled comparables, and making adjustments to the uncontrolled comparables pursuant to § 1.482–1(d)(2), the district director derives the following results:

| Uncontrolled comparable | Result (price) |
| --- | --- |
| 1 | $42.00 |
| 2 | 44.00 |
| 3 | 45.00 |
| 4 | 47.50 |

(ii) It cannot be established in this case that all material differences are likely to have been identified and reliable adjustments made for those differences. Accordingly, if the resale price method is determined to be the best method pursuant to § 1.482–1(c), the arm's length range for the controlled transaction must be established pursuant to paragraph (e)(2)(iii)(B) of this section. In this case, the district director uses the interquartile range to determine the arm's length range, which is the range from $43 to $46.25. If USSub's price falls outside this range, the district director may make an allocation. In this case that allocation would be to the median of the results, or $44.50.

**Example 4.** Arm's length range limited to interquartile range. (i) To evaluate the arm's length result of controlled transactions between USP, a United States manufacturing company, and FSub, its foreign subsidiary, the district director considers applying the comparable profits method. The district director identifies 50 uncontrolled taxpayers within the same industry that potentially could be used to apply the method.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(ii) Further review indicates that only 20 of the uncontrolled manufacturers engage in activities requiring similar capital investments and technical know-how. Data with respect to five of the uncontrolled manufacturers is very limited, and although some material differences can be identified and adjusted for, the level of comparability of these five uncontrolled comparables is significantly lower than that of the other 15. In addition, for those five uncontrolled comparables it is not possible to accurately allocate costs between the business activity associated with the relevant transactions and other business activities. Therefore, pursuant to § 1.482–1(e)(2)(ii) only the other fifteen uncontrolled comparables may be used to establish an arm's length range.

(iii) Although the data for the fifteen remaining uncontrolled comparables is relatively complete and accurate, there is a significant possibility that some material differences may remain. The district director has determined, for example, that it is likely that there are material differences in the level of technical expertise or in management efficiency. Accordingly, if the comparable profits method is determined to be the best method pursuant to § 1.482–1(c), the arm's length range for the controlled transaction may be established only pursuant to paragraph (e)(2)(iii)(B) of this section.

**(f) Scope of review—(1) In general.** The authority to determine true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer is other than it would have been had the taxpayer, in the conduct of its affairs, been dealing at arm's length with an uncontrolled taxpayer.

**(i) Intent to evade or avoid tax not a prerequisite.** In making allocations under section 482, the district director is not restricted to the case of improper accounting, to the case of a fraudulent, colorable, or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income, deductions, credits, or allowances.

**(ii) Realization of income not a prerequisite—**(A) In general. The district director may make an allocation under section 482 even if the income ultimately anticipated from a series of transactions has not been or is never realized. For example, if a controlled taxpayer sells a product at less than an arm's length price to a related taxpayer in one taxable year and the second controlled taxpayer resells the product to an unrelated party in the next taxable year, the district director may make an appropriate allocation to reflect an arm's length price for the sale of the product in the first taxable year, even though the second controlled taxpayer had not realized any gross income from the resale of the product in the first year. Similarly, if a controlled taxpayer lends money to a related taxpayer in a taxable year, the district director may make an appropriate allocation to reflect an arm's length charge for interest during such taxable year even if the second controlled taxpayer does not realize income during such year. Finally, even if two controlled taxpayers realize an overall loss that is attributable to a particular controlled transaction, an allocation under section 482 is not precluded.

(B) Example. The following example illustrates this paragraph (f)(1)(ii).

**Example.** USSub is a U.S. subsidiary of FP, a foreign corporation. Parent manufactures product X and sells it to USSub. USSub functions as a distributor of product X to unrelated customers in the United States. The fact that FP may incur a loss on the manufacture and sale of product X does not by itself establish that USSub, dealing with FP at arm's length, also would incur a loss. An independent distributor acting at arm's length with its supplier would in many circumstances be expected to earn a profit without regard to the level of profit earned by the supplier.

**(iii) Nonrecognition provisions may not bar allocation—**(A) In general. If necessary to prevent the avoidance of taxes or to clearly reflect income, the district director may make an allocation under section 482 with respect to transactions that otherwise qualify for nonrecognition of gain or loss under applicable provisions of the Internal Revenue Code (such as section 351 or 1031).

(B) Example. The following example illustrates this paragraph (f)(1)(iii).

**Example.** (i) In Year 1 USP, a United States corporation, bought 100 shares of UR, an unrelated corporation, for $100,000. In Year 2, when the value of the UR stock had decreased to $40,000, USP contributed all 100 shares of UR stock to its wholly-owned subsidiary in exchange for subsidiary's capital stock. In Year 3, the subsidiary sold all of the UR stock for $40,000 to an unrelated buyer, and on its U.S. income tax return, claimed a loss of $60,000 attributable to the sale of the UR stock. USP and its subsidiary do not file a consolidated return.

(ii) In determining the true taxable income of the subsidiary, the district director may disallow the loss of $60,000 on the ground that the loss was incurred by USP. National Securities Corp. v Commissioner, 137 F.2d 600 (3rd Cir. 1943), cert. denied, 320 U.S. 794 (1943).

**(iv) Consolidated returns.** Section 482 and the regulations thereunder apply to all controlled taxpayers, whether the controlled taxpayer files a separate or consolidated U.S. income tax return. If a controlled taxpayer files a separate return, its true separate taxable income will be determined. If a controlled taxpayer is a party to a consolidated return, the true consolidated taxable income of the affiliated group and the true separate taxable income of the controlled taxpayer must be determined consistently with the principles of a consolidated return.

**(2) Rules relating to determination of true taxable income.** The following rules must be taken into account in determining the true taxable income of a controlled taxpayer.

**(i)**(A) through (E) [Reserved]. For further guidance see § 1.482–1T(f)(2)(i)(A) through (E).

**(ii) Allocation based on taxpayer's actual transactions—**(A) In general. The Commissioner will evaluate the results of a transaction as actually structured by the taxpayer unless its structure lacks economic substance. However, the Commissioner may consider the alternatives available to the taxpayer in determining whether the terms of the controlled transaction would be acceptable to an uncontrolled taxpayer faced with the same alternatives and operating under comparable circumstances. In such cases the Commissioner may adjust the consideration charged in the controlled transaction based on the cost or profit of an alternative as adjusted to account for material differences between the alternative and the controlled transaction, but will not restructure the transaction as if the alternative had been adopted by the taxpayer. See paragraph (d)(3) of this section (factors for determining comparability; contractual terms and risk); §§ 1.482–3(e), 1.482–4(d), and 1.482–9(h) (unspecified methods).

(B) [Reserved]. For further guidance see § 1.482–1T(f)(2)(ii)(B).

**(iii) Multiple year data—**(A) In general. The results of a controlled transaction ordinarily will be compared with the results of uncontrolled comparables occurring in the taxable year under review. It may be appropriate, however, to consider data relating to the uncontrolled comparables or the controlled taxpayer for one or more years before or after the year under review. If data relating to uncontrolled comparables from multiple years is used, data relating to the controlled taxpayer for the same years ordinarily must be considered. However, if such data is not available, reliable data from other years, as adjusted under paragraph (d)(2) (Standard of comparability) of this section may be used.

(B) Circumstances warranting consideration of multiple year data. The extent to which it is appropriate to consider multiple year data depends on the method being applied and the issue being addressed. Circumstances that may warrant consideration of data from multiple years include the extent to which complete and accurate data are available for the taxable year under review, the effect of business cycles in the controlled taxpayer's industry, or the effects of life cycles of the product or intangible property being examined. Data from one or more years before or after the taxable year under review must ordinarily be considered for purposes of applying the provisions of paragraph (d)(3)(iii) of this section (risk), paragraph (d)(4)(i) of this section (market share strategy), § 1.482–4(f)(2) (periodic adjustments), § 1.482–5 (comparable profits method), § 1.482–9(f) (comparable profits method for services), and § 1.482–9(i) (contingent-payment contractual terms for services). On the other hand, multiple year data ordinarily will not be considered for purposes of applying the comparable uncontrolled price method of § 1.482–3(b) or the comparable uncontrolled services price method of § 1.482–9(c) (except to the extent that risk or market share strategy issues are present).

(C) Comparable effect over comparable period. Data from multiple years may be considered to determine whether the same economic conditions that caused the controlled taxpayer's results had a comparable effect over a comparable period of time on the uncontrolled comparables that establish the arm's length range. For example, given that uncontrolled taxpayers enter into transactions with the ultimate expectation of earning a profit, persistent losses among controlled taxpayers may be an indication of non-arm's length dealings. Thus, if a controlled taxpayer that realizes a loss with respect to a controlled transaction seeks to demonstrate that the loss is within the arm's length range, the district director may take into account data from taxable years other than the taxable year of the transaction to determine whether the loss was attributable to arm's length dealings. The rule of this paragraph (f)(2)(iii)(C) is illustrated by Example 3 of paragraph (f)(2)(iii)(E) of this section.

(D) Applications of methods using multiple year averages. If a comparison of a controlled taxpayer's average result over a multiple year period with the average results of uncontrolled comparables over the same period would reduce the effect of short-term variations that may be unrelated to transfer pricing, it may be appropriate to establish a range derived from the average results of uncontrolled comparables over a multiple year period to determine if an adjustment should be made. In such a case the district director may make an adjustment if the controlled taxpayer's average result for the multiple year period is not within such range. Such a range must be determined in accordance with § 1.482–1(e) (Arm's length range). An adjustment in such a case ordinarily will be equal to the difference, if any, between the controlled taxpayer's result for the taxable year and the mid-point of the uncontrolled comparables' results for that year. If the interquartile range is used to determine the range of average results for the multiple year period, such adjustment will ordinarily be made to the median of all the results of the uncontrolled comparables for the taxable year. See Example 2 of § 1.482–5(e). In other cases, the adjustment normally will be made to the arithmetic mean of all the results of the uncontrolled comparables for the taxable year. However, an adjustment will be made only to the extent that it would move the controlled taxpayer's multiple year average closer to the arm's length range for the multiple year period or to any point within such range. In determining a controlled taxpayer's average result for a multiple year period, adjustments made under this section for prior years will be taken into account only if such adjustments have been finally determined, as described in § 1.482–1(g)(2)(iii). See Example 3 of § 1.482–5(e).

(E) Examples. The following examples, in which S and P are controlled taxpayers, illustrate this paragraph (f)(2)(iii). Examples 1 and 4 also illustrate the principle of the arm's length range of paragraph (e) of this section.

**Example 1.** P sold product Z to S for $60 per unit in 1995. Applying the resale price method to data from uncontrolled comparables for the same year establishes an arm's length range of prices for the controlled transaction from $52 to $59 per unit. Since the price charged in the controlled transaction falls outside the range, the district director would ordinarily make

an allocation under section 482. However, in this case there are cyclical factors that affect the results of the uncontrolled comparables (and that of the controlled transaction) that cannot be adequately accounted for by specific adjustments to the data for 1995. Therefore, the district director considers results over multiple years to account for these factors. Under these circumstances, it is appropriate to average the results of the uncontrolled comparables over the years 1993, 1994, and 1995 to determine an arm's length range. The averaged results establish an arm's length range of $56 to $58 per unit. For consistency, the results of the controlled taxpayers must also be averaged over the same years. The average price in the controlled transaction over the three years is $57. Because the controlled transfer price of product Z falls within the arm's length range, the district director makes no allocation.

**Example 2.** (i) FP, a Country X corporation, designs and manufactures machinery in Country X. FP's costs are incurred in Country X currency. USSub is the exclusive distributor of FP's machinery in the United States. The price of the machinery sold by FP to USSub is expressed in Country X currency. Thus, USSub bears all of the currency risk associated with fluctuations in the exchange rate between the time the contract is signed and the payment is made. The prices charged by FP to USSub for 1995 are under examination. In that year, the value of the dollar depreciated against the currency of Country X, and as a result, USSub's gross margin was only 8%.

(ii) UD is an uncontrolled distributor of similar machinery that performs distribution functions substantially the same as those performed by USSub, except that UD purchases and resells machinery in transactions where both the purchase and resale prices are denominated in U.S. dollars. Thus, UD had no currency exchange risk. UD's gross margin in 1995 was 10%. UD's average gross margin for the period 1990 to 1998 has been 12%.

(iii) In determining whether the price charged by FP to USSub in 1995 was arm's length, the district director may consider USSub's average gross margin for an appropriate period before and after 1995 to determine whether USSub's average gross margin during the period was sufficiently greater than UD's average gross margin during the same period such that USSub was sufficiently compensated for the currency risk it bore throughout the period. See § 1.482–1(d)(3)(iii) (Risk).

**Example 3.** FP manufactures product X in Country M and sells it to USSub, which distributes X in the United States. USSub realizes losses with respect to the controlled transactions in each of five consecutive taxable years. In each of the five consecutive years a different uncontrolled comparable realized a loss with respect to comparable transactions equal to or greater than USSub's loss. Pursuant to paragraph (f)(3)(iii)(C) of this section, the district director examines whether the uncontrolled comparables realized similar losses over a comparable period of time, and finds that each of the five comparables realized losses in only one of the five years, and their average result over the five-year period was a profit. Based on this data, the district director may conclude that the controlled taxpayer's results are not within the arm's length range over the five year period, since the economic conditions that resulted in the controlled taxpayer's loss did not have a comparable effect over a comparable period of time on the uncontrolled comparables.

**Example 4.** (i) USP, a U.S. corporation, manufactures product Y in the United States and sells it to FSub, which acts as USP's exclusive distributor of product Y in Country N. The resale price method described in § 1.482–3(c) is used to evaluate whether the transfer price charged by USP to FSub for the 1994 taxable year for product Y was arm's length. For the period 1992 through 1994, FSub had a gross profit margin for each year of 13%. A, B, C and D are uncontrolled distributors of products that compete directly with product Y in country N. After making appropriate adjustments in accordance with §§ 1.482–1(d)(2) and 1.482–3(c), the gross profit margins for A, B, C, and D are as follows:

| | 1992 | 1993 | 1994 | Average |
|---|---|---|---|---|
| A. | 13 | 3 | 8 | 8.00 |
| B. | 11 | 13 | 2 | 8.67 |
| 7C. | 4 | 7 | 13 | 8.00 |

| | | | | |
|---|---|---|---|---|
| 7D | 7 | 9 | 6 | 7.33 |

(ii) Applying the provisions of § 1.482–1(e), the district director determines that the arm's length range of the average gross profit margins is between 7.33 and 8.67. The district director concludes that FSub's average gross margin of 13% is not within the arm's length range, despite the fact that C's gross profit margin for 1994 was also 13%, since the economic conditions that caused S's result did not have a comparable effect over a comparable period of time on the results of C or the other uncontrolled comparables. In this case, the district director makes an allocation equivalent to adjusting FSub's gross profit margin for 1994 from 13% to the mean of the uncontrolled comparables' results for 1994 (7.25%).

**(iv) Product lines and statistical techniques.** The methods described in §§ 1.482–2 through 1.482–6 are generally stated in terms of individual transactions. However, because a taxpayer may have controlled transactions involving many different products, or many separate transactions involving the same product, it may be impractical to analyze every individual transaction to determine its arm's length price. In such cases, it is permissible to evaluate the arm's length results by applying the appropriate methods to the overall results for product lines or other groupings. In addition, the arm's length results of all related party transactions entered into by a controlled taxpayer may be evaluated by employing sampling and other valid statistical techniques.

**(v) Allocations apply to results, not methods—**(A) In general. In evaluating whether the result of a controlled transaction is arm's length, it is not necessary for the district director to determine whether the method or procedure that a controlled taxpayer employs to set the terms for its controlled transactions corresponds to the method or procedure that might have been used by a taxpayer dealing at arm's length with an uncontrolled taxpayer. Rather, the district director will evaluate the result achieved rather than the method the taxpayer used to determine its prices.

(B) Example. The following example illustrates this paragraph (f)(2)(v).

**Example.** (i) FS is a foreign subsidiary of P, a U.S. corporation. P manufactures and sells household appliances. FS operates as P's exclusive distributor in Europe. P annually establishes the price for each of its appliances sold to FS as part of its annual budgeting, production allocation and scheduling, and performance evaluation processes. FS's aggregate gross margin earned in its distribution business is 18%.

(ii) ED is an uncontrolled European distributor of competing household appliances. After adjusting for minor differences in the level of inventory, volume of sales, and warranty programs conducted by FS and ED, ED's aggregate gross margin is also 18%. Thus, the district director may conclude that the aggregate prices charged by P for its appliances sold to FS are arm's length, without determining whether the budgeting, production, and performance evaluation processes of P are similar to such processes used by ED.

**(g) Collateral adjustments with respect to allocations under section 482—(1) In general.** The district director will take into account appropriate collateral adjustments with respect to allocations under section 482. Appropriate collateral adjustments may include correlative allocations, conforming adjustments, and setoffs, as described in this paragraph (g).

**(2) Correlative allocations—(i) In general.** When the district director makes an allocation under section 482 (referred to in this paragraph (g)(2) as the primary allocation), appropriate correlative allocations will also be made with respect to any other member of the group affected by the allocation. Thus, if the district director makes an allocation of income, the district director will not only increase the income of one member of the group, but correspondingly decrease the income

of the other member. In addition, where appropriate, the district director may make such further correlative allocations as may be required by the initial correlative allocation.

**(ii) Manner of carrying out correlative allocation.** The district director will furnish to the taxpayer with respect to which the primary allocation is made a written statement of the amount and nature of the correlative allocation. The correlative allocation must be reflected in the documentation of the other member of the group that is maintained for U.S. tax purposes, without regard to whether it affects the U.S. income tax liability of the other member for any open year. In some circumstances the allocation will have an immediate U.S. tax effect, by changing the taxable income computation of the other member (or the taxable income computation of a shareholder of the other member, for example, under the provisions of subpart F of the Internal Revenue Code). Alternatively, the correlative allocation may not be reflected on any U.S. tax return until a later year, for example when a dividend is paid.

**(iii) Events triggering correlative allocation.** For purposes of this paragraph (g)(2), a primary allocation will not be considered to have been made (and therefore, correlative allocations are not required to be made) until the date of a final determination with respect to the allocation under section 482. For this purpose, a final determination includes—

(A) Assessment of tax following execution by the taxpayer of a Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment) with respect to such allocation;

(B) Acceptance of a Form 870–AD (Offer of Waiver of Restriction on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment);

(C) Payment of the deficiency;

(D) Stipulation in the Tax Court of the United States; or

(E) Final determination of tax liability by offer-in-compromise, closing agreement, or final resolution (determined under the principles of section 7481) of a judicial proceeding.

**(iv) Examples.** The following examples illustrate this paragraph (g)(2). In each example, X and Y are members of the same group of controlled taxpayers and each regularly computes its income on a calendar year basis.

**Example 1.** (i) In 1996, Y, a U.S. corporation, rents a building owned by X, also a U.S. corporation. In 1998 the district director determines that Y did not pay an arm's length rental charge. The district director proposes to increase X's income to reflect an arm's length rental charge. X consents to the assessment reflecting such adjustment by executing Form 870, a Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment. The assessment of the tax with respect to the adjustment is made in 1998. Thus, the primary allocation, as defined in paragraph (g)(2)(i) of this section, is considered to have been made in 1998.

(ii) The adjustment made to X's income under section 482 requires a correlative allocation with respect to Y's income. The district director notifies X in writing of the amount and nature of the adjustment made with respect to Y. Y had net operating losses in 1993, 1994, 1995, 1996, and 1997. Although a correlative adjustment will not have an effect on Y's U.S. income tax

liability for 1996, an adjustment increasing Y's net operating loss for 1996 will be made for purposes of determining Y's U.S. income tax liability for 1998 or a later taxable year to which the increased net operating loss may be carried.

**Example 2.** (i) In 1995, X, a U.S. construction company, provided engineering services to Y, a U.S. corporation, in the construction of Y's factory. In 1997, the district director determines that the fees paid by Y to X for its services were not arm's length and proposes to make an adjustment to the income of X. X consents to an assessment reflecting such adjustment by executing Form 870. An assessment of the tax with respect to such adjustment is made in 1997. The district director notifies X in writing of the amount and nature of the adjustment to be made with respect to Y.

(ii) The fees paid by Y for X's engineering services properly constitute a capital expenditure. Y does not place the factory into service until 1998. Therefore, a correlative adjustment increasing Y's basis in the factory does not affect Y's U.S. income tax liability for 1997. However, the correlative adjustment must be made in the books and records maintained by Y for its U.S. income tax purposes and such adjustment will be taken into account in computing Y's allowable depreciation or gain or loss on a subsequent disposition of the factory.

**Example 3.** In 1995, X, a U.S. corporation, makes a loan to Y, its foreign subsidiary not engaged in a U.S. trade or business. In 1997, the district director, upon determining that the interest charged on the loan was not arm's length, proposes to adjust X's income to reflect an arm's length interest rate. X consents to an assessment reflecting such allocation by executing Form 870, and an assessment of the tax with respect to the section 482 allocation is made in 1997. The district director notifies X in writing of the amount and nature of the correlative allocation to be made with respect to Y. Although the correlative adjustment does not have an effect on Y's U.S. income tax liability, the adjustment must be reflected in the documentation of Y that is maintained for U.S. tax purposes. Thus, the adjustment must be reflected in the determination of the amount of Y's earnings and profits for 1995 and subsequent years, and the adjustment must be made to the extent it has an effect on any person's U.S. income tax liability for any taxable year.

**(3) Adjustments to conform accounts to reflect section 482 allocations—(i) In general.** Appropriate adjustments must be made to conform a taxpayer's accounts to reflect allocations made under section 482. Such adjustments may include the treatment of an allocated amount as a dividend or a capital contribution (as appropriate), or, in appropriate cases, pursuant to such applicable revenue procedures as may be provided by the Commissioner (see § 601.601(d)(2) of this chapter), repayment of the allocated amount without further income tax consequences.

**(ii) Example.** The following example illustrates the principles of this paragraph (g)(3).

**Example.** Conforming cash accounts. (i) USD, a United States corporation, buys Product from its foreign parent, FP. In reviewing USD's income tax return, the district director determines that the arm's length price would have increased USD's taxable income by $5 million. The district director accordingly adjusts USD's income to reflect its true taxable income.

(ii) To conform its cash accounts to reflect the section 482 allocation made by the district director, USD applies for relief under Rev. Proc. 65–17, 1965–1 C.B. 833 (see § 601.601(d)(2)(ii)(b) of this chapter), to treat the $5 million adjustment as an account receivable from FP, due as of the last day of the year of the transaction, with interest accruing therefrom.

**(4) Setoffs—(i) In general.** If an allocation is made under section 482 with respect to a transaction between controlled taxpayers, the Commissioner will take into account the effect of any other non-arm's length transaction between the same controlled taxpayers in the same taxable year which will result in a setoff against the original section 482 allocation. Such setoff, however, will be taken into account only if the requirements of paragraph (g)(4)(ii) of this section are satisfied. If the effect of the setoff is to change the characterization or source of the income or deductions, or otherwise distort taxable income, in such a manner as to affect the U.S. tax liability of any member, adjustments will be made to reflect the correct

amount of each category of income or deductions. For purposes of this setoff provision, the term arm's length refers to the amount defined in paragraph (b) of this section (arm's length standard), without regard to the rules in § 1.482–2(a) that treat certain interest rates as arm's length rates of interest.

**(ii) Requirements.** The district director will take a setoff into account only if the taxpayer—

(A) Establishes that the transaction that is the basis of the setoff was not at arm's length and the amount of the appropriate arm's length charge;

(B) Documents, pursuant to paragraph (g)(2) of this section, all correlative adjustments resulting from the proposed setoff; and

(C) Notifies the district director of the basis of any claimed setoff within 30 days after the earlier of the date of a letter by which the district director transmits an examination report notifying the taxpayer of proposed adjustments or the date of the issuance of the notice of deficiency.

**(iii) Examples.** The following examples illustrate this paragraph (g)(4).

**Example 1.** P, a U.S. corporation, renders construction services to S, its foreign subsidiary in Country Y, in connection with the construction of S's factory. An arm's length charge for such services determined under § 1.482–9 would be $100,000. During the same taxable year P makes available to S the use of a machine to be used in the construction of the factory, and the arm's length rental value of the machine is $25,000. P bills S $125,000 for the services, but does not charge S for the use of the machine. No allocation will be made with respect to the undercharge for the machine if P notifies the district director of the basis of the claimed setoff within 30 days after the date of the letter from the district director transmitting the examination report notifying P of the proposed adjustment, establishes that the excess amount charged for services was equal to an arm's length charge for the use of the machine and that the taxable income and income tax liabilities of P are not distorted, and documents the correlative allocations resulting from the proposed setoff.

**Example 2.** The facts are the same as in Example 1, except that, if P had reported $25,000 as rental income and $25,000 less as service income, it would have been subject to the tax on personal holding companies. Allocations will be made to reflect the correct amounts of rental income and service income.

**(h) Special rules—(1) Small taxpayer safe harbor.** [Reserved]

**(2) Effect of foreign legal restrictions—(i) In general.** The district director will take into account the effect of a foreign legal restriction to the extent that such restriction affects the results of transactions at arm's length. Thus, a foreign legal restriction will be taken into account only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time. In the absence of evidence indicating the effect of the foreign legal restriction on uncontrolled taxpayers, the restriction will be taken into account only to the extent provided in paragraphs (h)(2) (iii) and (iv) of this section (Deferred income method of accounting).

**(ii) Applicable legal restrictions.** Foreign legal restrictions (whether temporary or permanent) will be taken into account for purposes of this paragraph (h)(2) only if, and so long as, the conditions set forth in paragraphs (h)(2)(ii) (A) through (D) of this section are met.

(A) The restrictions are publicly promulgated, generally applicable to all similarly situated persons (both controlled and uncontrolled), and not imposed as part of a commercial transaction between the taxpayer and the foreign sovereign;

(B) The taxpayer (or other member of the controlled group with respect to which the restrictions apply) has exhausted all remedies prescribed by foreign law or practice for obtaining a waiver of such restrictions (other than remedies that would have a negligible prospect of success if pursued);

(C) The restrictions expressly prevented the payment or receipt, in any form, of part or all of the arm's length amount that would otherwise be required under section 482 (for example, a restriction that applies only to the deductibility of an expense for tax purposes is not a restriction on payment or receipt for this purpose); and

(D) The related parties subject to the restriction did not engage in any arrangement with controlled or uncontrolled parties that had the effect of circumventing the restriction, and have not otherwise violated the restriction in any material respect.

**(iii) Requirement for electing the deferred income method of accounting.** If a foreign legal restriction prevents the payment or receipt of part or all of the arm's length amount that is due with respect to a controlled transaction, the restricted amount may be treated as deferrable if the following requirements are met—

(A) The controlled taxpayer establishes to the satisfaction of the district director that the payment or receipt of the arm's length amount was prevented because of a foreign legal restriction and circumstances described in paragraph (h)(2)(ii) of this section; and

(B) The controlled taxpayer whose U.S. tax liability may be affected by the foreign legal restriction elects the deferred income method of accounting, as described in paragraph (h)(2)(iv) of this section, on a written statement attached to a timely U.S. income tax return (or an amended return) filed before the IRS first contacts any member of the controlled group concerning an examination of the return for the taxable year to which the foreign legal restriction applies. A written statement furnished by a taxpayer subject to the Coordinated Examination Program will be considered an amended return for purposes of this paragraph (h)(2)(iii)(B) if it satisfies the requirements of a qualified amended return for purposes of § 1.6664–2(c)(3) as set forth in those regulations or as the Commissioner may prescribe by applicable revenue procedures. The election statement must identify the affected transactions, the parties to the transactions, and the applicable foreign legal restrictions.

**(iv) Deferred income method of accounting.** If the requirements of paragraph (h)(2)(ii) of this section are satisfied, any portion of the arm's length amount, the payment or receipt of which is prevented because of applicable foreign legal restrictions, will be treated as deferrable until payment or receipt of the relevant item ceases to be prevented by the foreign legal restriction. For purposes of the deferred income method of accounting under this paragraph (h)(2)(iv), deductions (including the cost or other basis of inventory and other assets sold or exchanged) and credits properly chargeable against

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

any amount so deferred, are subject to deferral under the provisions of § 1.461–1(a)(4). In addition, income is deferrable under this deferred income method of accounting only to the extent that it exceeds the related deductions already claimed in open taxable years to which the foreign legal restriction applied.

**(v) Examples.** The following examples, in which Sub is a Country FC subsidiary of U.S. corporation, Parent, illustrate this paragraph (h)(2).

**Example 1.** Parent licenses an intangible to Sub. FC law generally prohibits payments by any person within FC to recipients outside the country. The FC law meets the requirements of paragraph (h)(2)(ii) of this section. There is no evidence of unrelated parties entering into transactions under comparable circumstances for a comparable period of time, and the foreign legal restrictions will not be taken into account in determining the arm's length amount. The arm's length royalty rate for the use of the intangible property in the absence of the foreign restriction is 10% of Sub's sales in country FC. However, because the requirements of paragraph (h)(2)(ii) of this section are satisfied, Parent can elect the deferred income method of accounting by attaching to its timely filed U.S. income tax return a written statement that satisfies the requirements of paragraph (h)(2)(iii)(B) of this section.

**Example 2.** (i) The facts are the same as in Example 1, except that Sub, although it makes no royalty payment to Parent, arranges with an unrelated intermediary to make payments equal to an arm's length amount on its behalf to Parent.

(ii) The district director makes an allocation of royalty income to Parent, based on the arm's length royalty rate of 10%. Further, the district director determines that because the arrangement with the third party had the effect of circumventing the FC law, the requirements of paragraph (h)(2)(ii)(D) of this section are not satisfied. Thus, Parent could not validly elect the deferred income method of accounting, and the allocation of royalty income cannot be treated as deferrable. In appropriate circumstances, the district director may permit the amount of the distribution to be treated as payment by Sub of the royalty allocated to Parent, under the provisions of § 1.482–1(g) (Collateral adjustments).

**Example 3.** The facts are the same as in Example 1, except that the laws of FC do not prevent distributions from corporations to their shareholders. Sub distributes an amount equal to 8% of its sales in country FC. Because the laws of FC did not expressly prevent all forms of payment from Sub to Parent, Parent cannot validly elect the deferred income method of accounting with respect to any of the arm's length royalty amount. In appropriate circumstances, the district director may permit the 8% that was distributed to be treated as payment by Sub of the royalty allocated to Parent, under the provisions of § 1.482–1(g) (Collateral adjustments).

**Example 4.** The facts are the same as in Example 1, except that Country FC law permits the payment of a royalty, but limits the amount to 5% of sales, and Sub pays the 5% royalty to Parent. Parent demonstrates the existence of a comparable uncontrolled transaction for purposes of the comparable uncontrolled transaction method in which an uncontrolled party accepted a royalty rate of 5%. Given the evidence of the comparable uncontrolled transaction, the 5% royalty rate is determined to be the arm's length royalty rate.

**(3) Coordination with section 936—(i) Cost sharing under section 936.** If a possessions corporation makes an election under section 936(h)(5)(C)(i)(I), the corporation must make a section 936 cost sharing payment that is at least equal to the payment that would be required under section 482 if the electing corporation were a foreign corporation. In determining the payment that would be required under section 482 for this purpose, the provisions of §§ 1.482–1 and 1.482–4 will be applied, and to the extent relevant to the valuation of intangibles, §§ 1.482–5 and 1.482–6 will be applied. The provisions of section 936(h)(5)(C)(i)(II) (Effect of Election—electing corporation treated as owner of intangible property) do not apply until the payment that would be required under section 482 has been determined.

**(ii) Use of terms.** A cost sharing payment, for the purposes of section 936(h)(5)(C)(i)(I), is calculated using the provisions of section 936 and the regulations thereunder and the provisions of this paragraph (h)(3). The provisions relating to cost sharing under section 482 do not apply to payments made pursuant to an election under section 936(h)(5)(C)(i)(I). Similarly, a profit split payment, for the purposes of section 936(h)(5)(C)(ii)(I), is calculated using the provisions of section 936 and the regulations thereunder, not section 482 and the regulations thereunder.

**(i) Definitions.** The definitions set forth in paragraphs (i)(1) through (i)(10) of this section apply to this section and §§ 1.482–2 through 1.482–9.

**(1)** Organization includes an organization of any kind, whether a sole proprietorship, a partnership, a trust, an estate, an association, or a corporation (as each is defined or understood in the Internal Revenue Code or the regulations thereunder), irrespective of the place of organization, operation, or conduct of the trade or business, and regardless of whether it is a domestic or foreign organization, whether it is an exempt organization, or whether it is a member of an affiliated group that files a consolidated U.S. income tax return, or a member of an affiliated group that does not file a consolidated U.S. income tax return.

**(2)** Trade or business includes a trade or business activity of any kind, regardless of whether or where organized, whether owned individually or otherwise, and regardless of the place of operation. Employment for compensation will constitute a separate trade or business from the employing trade or business.

**(3)** Taxpayer means any person, organization, trade or business, whether or not subject to any internal revenue tax.

**(4)** Controlled includes any kind of control, direct or indirect, whether legally enforceable or not, and however exercisable or exercised, including control resulting from the actions of two or more taxpayers acting in concert or with a common goal or purpose. It is the reality of the control that is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.

**(5)** Controlled taxpayer means any one of two or more taxpayers owned or controlled directly or indirectly by the same interests, and includes the taxpayer that owns or controls the other taxpayers. Uncontrolled taxpayer means any one of two or more taxpayers not owned or controlled directly or indirectly by the same interests.

**(6)** Group, controlled group, and group of controlled taxpayers mean the taxpayers owned or controlled directly or indirectly by the same interests.

**(7)** Transaction means any sale, assignment, lease, license, loan, advance, contribution, or any other transfer of any interest in or a right to use any property (whether tangible or intangible, real or personal) or money, however such transaction is effected, and whether or not the terms of such transaction are formally documented. A transaction also includes the performance of any services for the benefit of, or on behalf of, another taxpayer.

**(8)** Controlled transaction or controlled transfer means any transaction or transfer between two or more members of the same group of controlled taxpayers. The term uncontrolled transaction means any transaction between two or more taxpayers that are not members of the same group of controlled taxpayers.

**(9)** True taxable income means, in the case of a controlled taxpayer, the taxable income that would have resulted had it dealt with the other member or members of the group at arm's length. It does not mean the taxable income resulting to the controlled taxpayer by reason of the particular contract, transaction, or arrangement the controlled taxpayer chose to make (even though such contract, transaction, or arrangement is legally binding upon the parties thereto).

**(10)** Uncontrolled comparable means the uncontrolled transaction or uncontrolled taxpayer that is compared with a controlled transaction or taxpayer under any applicable pricing methodology. Thus, for example, under the comparable profits method, an uncontrolled comparable is any uncontrolled taxpayer from which data is used to establish a comparable operating profit.

**(j) Effective dates—(1)** The regulations in this are generally effective for taxable years beginning after October 6, 1994.

**(2)** Taxpayers may elect to apply retroactively all of the provisions of these regulations for any open taxable year. Such election will be effective for the year of the election and all subsequent taxable years.

**(3)** Although these regulations are generally effective for taxable years as stated, the final sentence of section 482 (requiring that the income with respect to transfers or licenses of intangible property be commensurate with the income attributable to the intangible) is generally effective for taxable years beginning after December 31, 1986. For the period prior to the effective date of these regulations, the final sentence of section 482 must be applied using any reasonable method not inconsistent with the statute. The IRS considers a method that applies these regulations or their general principles to be a reasonable method.

**(4)** These regulations will not apply with respect to transfers made or licenses granted to foreign persons before November 17, 1985, or before August 17, 1986, for transfers or licenses to others. Nevertheless, they will apply with respect to transfers or licenses before such dates if, with respect to property transferred pursuant to an earlier and continuing transfer agreement, such property was not in existence or owned by the taxpayer on such date.

**(5)** The last sentences of paragraphs (b)(2)(i) and (c)(1) of this section and of paragraph (c)(2)(iv) of § 1.482–5 apply for taxable years beginning on or after August 26, 2003.

**(6)(i)** The provisions of paragraphs (a)(1), (d)(3)(ii)(C) Example 3, Example 4, Example 5, and Example 6, (d)(3)(v), (f)(2)(ii)(A), (f)(2)(iii)(B), (g)(4)(i), (g)(4)(iii), and (i) of this section are generally applicable for taxable years beginning after July 31, 2009. The provision of paragraph (b)(2)(iii) of this section is generally applicable on January 5, 2009.

**(ii)** A person may elect to apply the provisions of paragraphs (a)(1), (b)(2)(i), (d)(3)(ii)(C) Example 3, Example 4, Example 5, and Example 6, (d)(3)(v), (f)(2)(ii)(A), (f)(2)(iii)(B), (g)(4)(i), (g)(4)(iii), and (i) of this section to earlier taxable years in accordance with the rules set forth in § 1.482–9(n)(2).

**(7)** [Reserved]. For further guidance see § 1.482–1T(j)(7).

**Credits**

[T.D. 8552, 59 FR 34990, July 8, 1994; T.D. 9088, 68 FR 51177, Aug. 26, 2003; T.D. 9278, 71 FR 44481, Aug. 4, 2006; 71 FR 76903, Dec. 22, 2006; T.D. 9441, 74 FR 351, Jan. 5, 2009; T.D. 9456, 74 FR 38839, Aug. 4, 2009; 74 FR 46345, Sept. 9, 2009; T.D. 9568, 76 FR 80089, Dec. 22, 2011; 77 FR 3606, Jan. 25, 2012; 78 FR 18234, March 26, 2013; T.D. 9738, 80 FR 55541, Sept. 16, 2015]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 31, 1960, unless otherwise noted.

## HISTORICAL NOTES

### Effective and Applicability Notes

September 14, 2015. For dates of applicability, see § 1.482-1T(j)(7)(i).

Current through March 14, 2025, 90 FR 12114. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 26. Internal Revenue Code (Refs & Annos)
Subtitle A. Income Taxes (Refs & Annos)
Chapter 1. Normal Taxes and Surtaxes (Refs & Annos)
Subchapter E. Accounting Periods and Methods of Accounting
Part III. Adjustments

26 U.S.C.A. § 482, I.R.C. § 482

§ 482. Allocation of income and deductions among taxpayers

Currentness

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. In the case of any transfer (or license) of intangible property (within the meaning of section 367(d)(4)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible. For purposes of this section, the Secretary shall require the valuation of transfers of intangible property (including intangible property transferred with other property or services) on an aggregate basis or the valuation of such a transfer on the basis of the realistic alternatives to such a transfer, if the Secretary determines that such basis is the most reliable means of valuation of such transfers.

**CREDIT(S)**

(Aug. 16, 1954, c. 736, 68A Stat. 162; Pub.L. 94-455, Title XIX, § 1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1834; Pub.L. 99-514, Title XII, § 1231(e)(1), Oct. 22, 1986, 100 Stat. 2562; Pub.L. 115-97, Title I, § 14221(b)(2), Dec. 22, 2017, 131 Stat. 2219; Pub.L. 115-141, Div. U, Title IV, § 401(d)(1)(D)(viii)(III), Mar. 23, 2018, 132 Stat. 1207.)

26 U.S.C.A. § 482, 26 USCA § 482
Current through P.L. 119-1. Some statute sections may be more current, see credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
Title 26. Internal Revenue Code (Refs & Annos)
Subtitle A. Income Taxes (Refs & Annos)
Chapter 1. Normal Taxes and Surtaxes (Refs & Annos)
Subchapter N. Tax Based on Income from Sources Within or Without the United States
Part III. Income from Sources Without the United States
Subpart F. Controlled Foreign Corporations (Refs & Annos)

26 U.S.C.A. § 965, I.R.C. § 965

§ 965. Treatment of deferred foreign income upon transition to participation exemption system of taxation

Currentness

**(a) Treatment of deferred foreign income as subpart F income.**--In the case of the last taxable year of a deferred foreign income corporation which begins before January 1, 2018, the subpart F income of such foreign corporation (as otherwise determined for such taxable year under section 952) shall be increased by the greater of--

**(1)** the accumulated post-1986 deferred foreign income of such corporation determined as of November 2, 2017, or

**(2)** the accumulated post-1986 deferred foreign income of such corporation determined as of December 31, 2017.

**(b) Reduction in amounts included in gross income of United States shareholders of specified foreign corporations with deficits in earnings and profits.**--

**(1) In general.**--In the case of a taxpayer which is a United States shareholder with respect to at least one deferred foreign income corporation and at least one E&P deficit foreign corporation, the amount which would (but for this subsection) be taken into account under section 951(a)(1) by reason of subsection (a) as such United States shareholder's pro rata share of the subpart F income of each deferred foreign income corporation shall be reduced by the amount of such United States shareholder's aggregate foreign E&P deficit which is allocated under paragraph (2) to such deferred foreign income corporation.

**(2) Allocation of aggregate foreign E&P deficit.**--The aggregate foreign E&P deficit of any United States shareholder shall be allocated among the deferred foreign income corporations of such United States shareholder in an amount which bears the same proportion to such aggregate as--

**(A)** such United States shareholder's pro rata share of the accumulated post-1986 deferred foreign income of each such deferred foreign income corporation, bears to

**(B)** the aggregate of such United States shareholder's pro rata share of the accumulated post-1986 deferred foreign income of all deferred foreign income corporations of such United States shareholder.

**(3) Definitions related to E&P deficits.**--For purposes of this subsection--

**(A) Aggregate foreign E&P deficit.**--

**(i) In general.**--The term "aggregate foreign E&P deficit" means, with respect to any United States shareholder, the lesser of--

**(I)** the aggregate of such shareholder's pro rata shares of the specified E&P deficits of the E&P deficit foreign corporations of such shareholder, or

**(II)** the amount determined under paragraph (2)(B).

**(ii) Allocation of deficit.**--If the amount described in clause (i)(II) is less than the amount described in clause (i)(I), then the shareholder shall designate, in such form and manner as the Secretary determines--

**(I)** the amount of the specified E&P deficit which is to be taken into account for each E&P deficit corporation with respect to the taxpayer, and

**(II)** in the case of an E&P deficit corporation which has a qualified deficit (as defined in section 952), the portion (if any) of the deficit taken into account under subclause (I) which is attributable to a qualified deficit, including the qualified activities to which such portion is attributable.

**(B) E&P deficit foreign corporation.**--The term "E&P deficit foreign corporation" means, with respect to any taxpayer, any specified foreign corporation with respect to which such taxpayer is a United States shareholder, if, as of November 2, 2017--

**(i)** such specified foreign corporation has a deficit in post-1986 earnings and profits,

**(ii)** such corporation was a specified foreign corporation, and

**(iii)** such taxpayer was a United States shareholder of such corporation.

**(C) Specified E&P deficit.**--The term "specified E&P deficit" means, with respect to any E&P deficit foreign corporation, the amount of the deficit referred to in subparagraph (B).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(4) Treatment of earnings and profits in future years.**--

**(A) Reduced earnings and profits treated as previously taxed income when distributed.**--For purposes of applying section 959 in any taxable year beginning with the taxable year described in subsection (a), with respect to any United States shareholder of a deferred foreign income corporation, an amount equal to such shareholder's reduction under paragraph (1) which is allocated to such deferred foreign income corporation under this subsection shall be treated as an amount which was included in the gross income of such United States shareholder under section 951(a).

**(B) E&P deficits.**--For purposes of this title, with respect to any taxable year beginning with the taxable year described in subsection (a), a United States shareholder's pro rata share of the earnings and profits of any E&P deficit foreign corporation under this subsection shall be increased by the amount of the specified E&P deficit of such corporation taken into account by such shareholder under paragraph (1), and, for purposes of section 952, such increase shall be attributable to the same activity to which the deficit so taken into account was attributable.

**(5) Netting among United States shareholders in same affiliated group.**--

**(A) In general.**--In the case of any affiliated group which includes at least one E&P net surplus shareholder and one E&P net deficit shareholder, the amount which would (but for this paragraph) be taken into account under section 951(a)(1) by reason of subsection (a) by each such E&P net surplus shareholder shall be reduced (but not below zero) by such shareholder's applicable share of the affiliated group's aggregate unused E&P deficit.

**(B) E&P net surplus shareholder.**--For purposes of this paragraph, the term "E&P net surplus shareholder" means any United States shareholder which would (determined without regard to this paragraph) take into account an amount greater than zero under section 951(a)(1) by reason of subsection (a).

**(C) E&P net deficit shareholder.**--For purposes of this paragraph, the term "E&P net deficit shareholder" means any United States shareholder if--

**(i)** the aggregate foreign E&P deficit with respect to such shareholder (as defined in paragraph (3)(A) without regard to clause (i)(II) thereof), exceeds

**(ii)** the amount which would (but for this subsection) be taken into account by such shareholder under section 951(a)(1) by reason of subsection (a).

**(D) Aggregate unused E&P deficit.**--For purposes of this paragraph--

**(i) In general.**--The term "aggregate unused E&P deficit" means, with respect to any affiliated group, the lesser of--

**(I)** the sum of the excesses described in subparagraph (C), determined with respect to each E&P net deficit shareholder in such group, or

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(II)** the amount determined under subparagraph (E)(ii).

**(ii) Reduction with respect to E&P net deficit shareholders which are not wholly owned by the affiliated group.**--If the group ownership percentage of any E&P net deficit shareholder is less than 100 percent, the amount of the excess described in subparagraph (C) which is taken into account under clause (i)(I) with respect to such E&P net deficit shareholder shall be such group ownership percentage of such amount.

**(E) Applicable share.**--For purposes of this paragraph, the term "applicable share" means, with respect to any E&P net surplus shareholder in any affiliated group, the amount which bears the same proportion to such group's aggregate unused E&P deficit as--

**(i)** the product of--

**(I)** such shareholder's group ownership percentage, multiplied by

**(II)** the amount which would (but for this paragraph) be taken into account under section 951(a)(1) by reason of subsection (a) by such shareholder, bears to

**(ii)** the aggregate amount determined under clause (i) with respect to all E&P net surplus shareholders in such group.

**(F) Group ownership percentage.**--For purposes of this paragraph, the term "group ownership percentage" means, with respect to any United States shareholder in any affiliated group, the percentage of the value of the stock of such United States shareholder which is held by other includible corporations in such affiliated group. Notwithstanding the preceding sentence, the group ownership percentage of the common parent of the affiliated group is 100 percent. Any term used in this subparagraph which is also used in section 1504 shall have the same meaning as when used in such section.

**(c) Application of participation exemption to included income.**--

**(1) In general.**--In the case of a United States shareholder of a deferred foreign income corporation, there shall be allowed as a deduction for the taxable year in which an amount is included in the gross income of such United States shareholder under section 951(a)(1) by reason of this section an amount equal to the sum of--

**(A)** the United States shareholder's 8 percent rate equivalent percentage of the excess (if any) of--

**(i)** the amount so included as gross income, over

**(ii)** the amount of such United States shareholder's aggregate foreign cash position, plus

**(B)** the United States shareholder's 15.5 percent rate equivalent percentage of so much of the amount described in subparagraph (A)(ii) as does not exceed the amount described in subparagraph (A)(i).

**(2) 8 and 15.5 percent rate equivalent percentages.**--For purposes of this subsection--

**(A) 8 percent rate equivalent percentage.**--The term "8 percent rate equivalent percentage" means, with respect to any United States shareholder for any taxable year, the percentage which would result in the amount to which such percentage applies being subject to a 8 percent rate of tax determined by only taking into account a deduction equal to such percentage of such amount and the highest rate of tax specified in section 11 for such taxable year. In the case of any taxable year of a United States shareholder to which section 15 applies, the highest rate of tax under section 11 before the effective date of the change in rates and the highest rate of tax under section 11 after the effective date of such change shall each be taken into account under the preceding sentence in the same proportions as the portion of such taxable year which is before and after such effective date, respectively.

**(B) 15.5 percent rate equivalent percentage.**--The term "15.5 percent rate equivalent percentage" means, with respect to any United States shareholder for any taxable year, the percentage determined under subparagraph (A) applied by substituting "15.5 percent rate of tax" for "8 percent rate of tax".

**(3) Aggregate foreign cash position.**--For purposes of this subsection--

**(A) In general.**--The term "aggregate foreign cash position" means, with respect to any United States shareholder, the greater of--

**(i)** the aggregate of such United States shareholder's pro rata share of the cash position of each specified foreign corporation of such United States shareholder determined as of the close of the last taxable year of such specified foreign corporation which begins before January 1, 2018, or

**(ii)** one half of the sum of--

**(I)** the aggregate described in clause (i) determined as of the close of the last taxable year of each such specified foreign corporation which ends before November 2, 2017, plus

**(II)** the aggregate described in clause (i) determined as of the close of the taxable year of each such specified foreign corporation which precedes the taxable year referred to in subclause (I).

**(B) Cash position.**--For purposes of this paragraph, the cash position of any specified foreign corporation is the sum of--

**(i)** cash held by such foreign corporation,

**(ii)** the net accounts receivable of such foreign corporation, plus

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(iii)** the fair market value of the following assets held by such corporation:

**(I)** Personal property which is of a type that is actively traded and for which there is an established financial market.

**(II)** Commercial paper, certificates of deposit, the securities of the Federal government and of any State or foreign government.

**(III)** Any foreign currency.

**(IV)** Any obligation with a term of less than one year.

**(V)** Any asset which the Secretary identifies as being economically equivalent to any asset described in this subparagraph.

**(C) Net accounts receivable.**--For purposes of this paragraph, the term "net accounts receivable" means, with respect to any specified foreign corporation, the excess (if any) of--

**(i)** such corporation's accounts receivable, over

**(ii)** such corporation's accounts payable (determined consistent with the rules of section 461).

**(D) Prevention of double counting.**--Cash positions of a specified foreign corporation described in clause (ii), (iii)(I), or (iii)(IV) of subparagraph (B) shall not be taken into account by a United States shareholder under subparagraph (A) to the extent that such United States shareholder demonstrates to the satisfaction of the Secretary that such amount is so taken into account by such United States shareholder with respect to another specified foreign corporation.

**(E) Cash positions of certain non-corporate entities taken into account.**--An entity (other than a corporation) shall be treated as a specified foreign corporation of a United States shareholder for purposes of determining such United States shareholder's aggregate foreign cash position if any interest in such entity is held by a specified foreign corporation of such United States shareholder (determined after application of this subparagraph) and such entity would be a specified foreign corporation of such United States shareholder if such entity were a foreign corporation.

**(F) Anti-abuse.**--If the Secretary determines that a principal purpose of any transaction was to reduce the aggregate foreign cash position taken into account under this subsection, such transaction shall be disregarded for purposes of this subsection.

**(d) Deferred foreign income corporation; accumulated post-1986 deferred foreign income.**--For purposes of this section--

**(1) Deferred foreign income corporation.**--The term "deferred foreign income corporation" means, with respect to any United States shareholder, any specified foreign corporation of such United States shareholder which has accumulated post-1986 deferred foreign income (as of the date referred to in paragraph (1) or (2) of subsection (a)) greater than zero.

**(2) Accumulated post-1986 deferred foreign income.**--The term "accumulated post-1986 deferred foreign income" means the post-1986 earnings and profits except to the extent such earnings--

**(A)** are attributable to income of the specified foreign corporation which is effectively connected with the conduct of a trade or business within the United States and subject to tax under this chapter, or

**(B)** in the case of a controlled foreign corporation, if distributed, would be excluded from the gross income of a United States shareholder under section 959.

To the extent provided in regulations or other guidance prescribed by the Secretary, in the case of any controlled foreign corporation which has shareholders which are not United States shareholders, accumulated post-1986 deferred foreign income shall be appropriately reduced by amounts which would be described in subparagraph (B) if such shareholders were United States shareholders.

**(3) Post-1986 earnings and profits.**--The term "post-1986 earnings and profits" means the earnings and profits of the foreign corporation (computed in accordance with sections 964(a) and 986, and by only taking into account periods when the foreign corporation was a specified foreign corporation) accumulated in taxable years beginning after December 31, 1986, and determined--

**(A)** as of the date referred to in paragraph (1) or (2) of subsection (a), whichever is applicable with respect to such foreign corporation, and

**(B)** without diminution by reason of dividends distributed during the taxable year described in subsection (a) other than dividends distributed to another specified foreign corporation.

**(e) Specified foreign corporation.**--

**(1) In general.**--For purposes of this section, the term "specified foreign corporation" means--

**(A)** any controlled foreign corporation, and

**(B)** any foreign corporation with respect to which one or more domestic corporations is a United States shareholder.

**(2) Application to certain foreign corporations.**--For purposes of sections 951 and 961, a foreign corporation described in paragraph (1)(B) shall be treated as a controlled foreign corporation solely for purposes of taking into account the subpart F income of such corporation under subsection (a) (and for purposes of applying subsection (f)).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(3) Exclusion of passive foreign investment companies.**--Such term shall not include any corporation which is a passive foreign investment company (as defined in section 1297) with respect to the shareholder and which is not a controlled foreign corporation.

**(f) Determinations of pro rata share.**--

**(1) In general.**--For purposes of this section, the determination of any United States shareholder's pro rata share of any amount with respect to any specified foreign corporation shall be determined under rules similar to the rules of section 951(a)(2) by treating such amount in the same manner as subpart F income (and by treating such specified foreign corporation as a controlled foreign corporation).

**(2) Special rules.**--The portion which is included in the income of a United States shareholder under section 951(a)(1) by reason of subsection (a) which is equal to the deduction allowed under subsection (c) by reason of such inclusion--

**(A)** shall be treated as income exempt from tax for purposes of sections 705(a)(1)(B) and 1367(a)(1)(A), and

**(B)** shall not be treated as income exempt from tax for purposes of determining whether an adjustment shall be made to an accumulated adjustment account under section 1368(e)(1)(A).

**(g) Disallowance of foreign tax credit, etc.**--

**(1) In general.**--No credit shall be allowed under section 901 for the applicable percentage of any taxes paid or accrued (or treated as paid or accrued) with respect to any amount for which a deduction is allowed under this section.

**(2) Applicable percentage.**--For purposes of this subsection, the term "applicable percentage" means the amount (expressed as a percentage) equal to the sum of--

**(A)** 0.771 multiplied by the ratio of--

**(i)** the excess to which subsection (c)(1)(A) applies, divided by

**(ii)** the sum of such excess plus the amount to which subsection (c)(1)(B) applies, plus

**(B)** 0.557 multiplied by the ratio of--

**(i)** the amount to which subsection (c)(1)(B) applies, divided by

**(ii)** the sum described in subparagraph (A)(ii).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(3) Denial of deduction.**--No deduction shall be allowed under this chapter for any tax for which credit is not allowable under section 901 by reason of paragraph (1) (determined by treating the taxpayer as having elected the benefits of subpart A of part III of subchapter N).

**(4) Coordination with section 78.**--With respect to the taxes treated as paid or accrued by a domestic corporation with respect to amounts which are includible in gross income of such domestic corporation by reason of this section, section 78 shall apply only to so much of such taxes as bears the same proportion to the amount of such taxes as--

**(A)** the excess of--

**(i)** the amounts which are includible in gross income of such domestic corporation by reason of this section, over

**(ii)** the deduction allowable under subsection (c) with respect to such amounts, bears to

**(B)** such amounts.

**(h) Election to pay liability in installments.**--

**(1) In general.**--In the case of a United States shareholder of a deferred foreign income corporation, such United States shareholder may elect to pay the net tax liability under this section in 8 installments of the following amounts:

**(A)** 8 percent of the net tax liability in the case of each of the first 5 of such installments,

**(B)** 15 percent of the net tax liability in the case of the 6th such installment,

**(C)** 20 percent of the net tax liability in the case of the 7th such installment, and

**(D)** 25 percent of the net tax liability in the case of the 8th such installment.

**(2) Date for payment of installments.**--If an election is made under paragraph (1), the first installment shall be paid on the due date (determined without regard to any extension of time for filing the return) for the return of tax for the taxable year described in subsection (a) and each succeeding installment shall be paid on the due date (as so determined) for the return of tax for the taxable year following the taxable year with respect to which the preceding installment was made.

**(3) Acceleration of payment.**--If there is an addition to tax for failure to timely pay any installment required under this subsection, a liquidation or sale of substantially all the assets of the taxpayer (including in a title 11 or similar case), a cessation of business by the taxpayer, or any similar circumstance, then the unpaid portion of all remaining installments shall be due on the date of such event (or in the case of a title 11 or similar case, the day before the petition is filed). The preceding sentence

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

shall not apply to the sale of substantially all the assets of a taxpayer to a buyer if such buyer enters into an agreement with the Secretary under which such buyer is liable for the remaining installments due under this subsection in the same manner as if such buyer were the taxpayer.

**(4) Proration of deficiency to installments.**--If an election is made under paragraph (1) to pay the net tax liability under this section in installments and a deficiency has been assessed with respect to such net tax liability, the deficiency shall be prorated to the installments payable under paragraph (1). The part of the deficiency so prorated to any installment the date for payment of which has not arrived shall be collected at the same time as, and as a part of, such installment. The part of the deficiency so prorated to any installment the date for payment of which has arrived shall be paid upon notice and demand from the Secretary. This subsection shall not apply if the deficiency is due to negligence, to intentional disregard of rules and regulations, or to fraud with intent to evade tax.

**(5) Election.**--Any election under paragraph (1) shall be made not later than the due date for the return of tax for the taxable year described in subsection (a) and shall be made in such manner as the Secretary shall provide.

**(6) Net tax liability under this section.**--For purposes of this subsection--

**(A) In general.**--The net tax liability under this section with respect to any United States shareholder is the excess (if any) of--

**(i)** such taxpayer's net income tax for the taxable year in which an amount is included in the gross income of such United States shareholder under section 951(a)(1) by reason of this section, over

**(ii)** such taxpayer's net income tax for such taxable year determined--

**(I)** without regard to this section, and

**(II)** without regard to any income or deduction properly attributable to a dividend received by such United States shareholder from any deferred foreign income corporation.

**(B) Net income tax.**--The term “net income tax” means the regular tax liability reduced by the credits allowed under subparts A, B, and D of part IV of subchapter A.

**(i) Special rules for S corporation shareholders.**--

**(1) In general.**--In the case of any S corporation which is a United States shareholder of a deferred foreign income corporation, each shareholder of such S corporation may elect to defer payment of such shareholder's net tax liability under this section with respect to such S corporation until the shareholder's taxable year which includes the triggering event with respect to such liability. Any net tax liability payment of which is deferred under the preceding sentence shall be assessed on the return of tax as an addition to tax in the shareholder's taxable year which includes such triggering event.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(2) Triggering event.**--

**(A) In general.**--In the case of any shareholder's net tax liability under this section with respect to any S corporation, the triggering event with respect to such liability is whichever of the following occurs first:

**(i)** Such corporation ceases to be an S corporation (determined as of the first day of the first taxable year that such corporation is not an S corporation).

**(ii)** A liquidation or sale of substantially all the assets of such S corporation (including in a title 11 or similar case), a cessation of business by such S corporation, such S corporation ceases to exist, or any similar circumstance.

**(iii)** A transfer of any share of stock in such S corporation by the taxpayer (including by reason of death, or otherwise).

**(B) Partial transfers of stock.**--In the case of a transfer of less than all of the taxpayer's shares of stock in the S corporation, such transfer shall only be a triggering event with respect to so much of the taxpayer's net tax liability under this section with respect to such S corporation as is properly allocable to such stock.

**(C) Transfer of liability.**--A transfer described in clause (iii) of subparagraph (A) shall not be treated as a triggering event if the transferee enters into an agreement with the Secretary under which such transferee is liable for net tax liability with respect to such stock in the same manner as if such transferee were the taxpayer.

**(3) Net tax liability.**--A shareholder's net tax liability under this section with respect to any S corporation is the net tax liability under this section which would be determined under subsection (h)(6) if the only subpart F income taken into account by such shareholder by reason of this section were allocations from such S corporation.

**(4) Election to pay deferred liability in installments.**--In the case of a taxpayer which elects to defer payment under paragraph (1)--

**(A)** subsection (h) shall be applied separately with respect to the liability to which such election applies,

**(B)** an election under subsection (h) with respect to such liability shall be treated as timely made if made not later than the due date for the return of tax for the taxable year in which the triggering event with respect to such liability occurs,

**(C)** the first installment under subsection (h) with respect to such liability shall be paid not later than such due date (but determined without regard to any extension of time for filing the return), and

**(D)** if the triggering event with respect to any net tax liability is described in paragraph (2)(A)(ii), an election under subsection (h) with respect to such liability may be made only with the consent of the Secretary.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(5) Joint and several liability of S corporation.**--If any shareholder of an S corporation elects to defer payment under paragraph (1), such S corporation shall be jointly and severally liable for such payment and any penalty, addition to tax, or additional amount attributable thereto.

**(6) Extension of limitation on collection.**--Any limitation on the time period for the collection of a liability deferred under this subsection shall not be treated as beginning before the date of the triggering event with respect to such liability.

**(7) Annual reporting of net tax liability.**--

**(A) In general.**--Any shareholder of an S corporation which makes an election under paragraph (1) shall report the amount of such shareholder's deferred net tax liability on such shareholder's return of tax for the taxable year for which such election is made and on the return of tax for each taxable year thereafter until such amount has been fully assessed on such returns.

**(B) Deferred net tax liability.**--For purposes of this paragraph, the term "deferred net tax liability" means, with respect to any taxable year, the amount of net tax liability payment of which has been deferred under paragraph (1) and which has not been assessed on a return of tax for any prior taxable year.

**(C) Failure to report.**--In the case of any failure to report any amount required to be reported under subparagraph (A) with respect to any taxable year before the due date for the return of tax for such taxable year, there shall be assessed on such return as an addition to tax 5 percent of such amount.

**(8) Election.**--Any election under paragraph (1)--

**(A)** shall be made by the shareholder of the S corporation not later than the due date for such shareholder's return of tax for the taxable year which includes the close of the taxable year of such S corporation in which the amount described in subsection (a) is taken into account, and

**(B)** shall be made in such manner as the Secretary shall provide.

**(j) Reporting by S corporation.**--Each S corporation which is a United States shareholder of a specified foreign corporation shall report in its return of tax under section 6037(a) the amount includible in its gross income for such taxable year by reason of this section and the amount of the deduction allowable by subsection (c). Any copy provided to a shareholder under section 6037(b) shall include a statement of such shareholder's pro rata share of such amounts.

**(k) Extension of limitation on assessment.**--Notwithstanding section 6501, the limitation on the time period for the assessment of the net tax liability under this section (as defined in subsection (h)(6)) shall not expire before the date that is 6 years after the return for the taxable year described in such subsection was filed.

**(l) Recapture for expatriated entities.**--

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(1) In general.**--If a deduction is allowed under subsection (c) to a United States shareholder and such shareholder first becomes an expatriated entity at any time during the 10-year period beginning on the date of the enactment of the Tax Cuts and Jobs Act (with respect to a surrogate foreign corporation which first becomes a surrogate foreign corporation during such period), then--

**(A)** the tax imposed by this chapter shall be increased for the first taxable year in which such taxpayer becomes an expatriated entity by an amount equal to 35 percent of the amount of the deduction allowed under subsection (c), and

**(B)** no credits shall be allowed against the increase in tax under subparagraph (A).

**(2) Expatriated entity.**--For purposes of this subsection, the term “expatriated entity” has the same meaning given such term under section 7874(a)(2), except that such term shall not include an entity if the surrogate foreign corporation with respect to the entity is treated as a domestic corporation under section 7874(b).

**(3) Surrogate foreign corporation.**--For purposes of this subsection, the term “surrogate foreign corporation” has the meaning given such term in section 7874(a)(2)(B).

**(m) Special rules for United States shareholders which are real estate investment trusts.**--

**(1) In general.**--If a real estate investment trust is a United States shareholder in 1 or more deferred foreign income corporations--

**(A)** any amount required to be taken into account under section 951(a)(1) by reason of this section shall not be taken into account as gross income of the real estate investment trust for purposes of applying paragraphs (2) and (3) of section 856(c) to any taxable year for which such amount is taken into account under section 951(a)(1), and

**(B)** if the real estate investment trust elects the application of this subparagraph, notwithstanding subsection (a), any amount required to be taken into account under section 951(a)(1) by reason of this section shall, in lieu of the taxable year in which it would otherwise be included in gross income (for purposes of the computation of real estate investment trust taxable income under section 857(b)), be included in gross income as follows:

**(i)** 8 percent of such amount in the case of each of the taxable years in the 5-taxable year period beginning with the taxable year in which such amount would otherwise be included.

**(ii)** 15 percent of such amount in the case of the 1st taxable year following such period.

**(iii)** 20 percent of such amount in the case of the 2nd taxable year following such period.

**(iv)** 25 percent of such amount in the case of the 3rd taxable year following such period.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(2) Rules for trusts electing deferred inclusion.**--

**(A) Election.**--Any election under paragraph (1)(B) shall be made not later than the due date for the first taxable year in the 5-taxable year period described in clause (i) of paragraph (1)(B) and shall be made in such manner as the Secretary shall provide.

**(B) Special rules.**--If an election under paragraph (1)(B) is in effect with respect to any real estate investment trust, the following rules shall apply:

**(i) Application of participation exemption.**--For purposes of subsection (c)(1)--

**(I)** the aggregate amount to which subparagraph (A) or (B) of subsection (c)(1) applies shall be determined without regard to the election,

**(II)** each such aggregate amount shall be allocated to each taxable year described in paragraph (1)(B) in the same proportion as the amount included in the gross income of such United States shareholder under section 951(a)(1) by reason of this section is allocated to each such taxable year.

**(III) No installment payments.**--The real estate investment trust may not make an election under subsection (g) for any taxable year described in paragraph (1)(B).

**(ii) Acceleration of inclusion.**--If there is a liquidation or sale of substantially all the assets of the real estate investment trust (including in a title 11 or similar case), a cessation of business by such trust, or any similar circumstance, then any amount not yet included in gross income under paragraph (1)(B) shall be included in gross income as of the day before the date of the event and the unpaid portion of any tax liability with respect to such inclusion shall be due on the date of such event (or in the case of a title 11 or similar case, the day before the petition is filed).

**(n) Election not to apply net operating loss deduction.**--

**(1) In general.**--If a United States shareholder of a deferred foreign income corporation elects the application of this subsection for the taxable year described in subsection (a), then the amount described in paragraph (2) shall not be taken into account--

**(A)** in determining the amount of the net operating loss deduction under section 172 of such shareholder for such taxable year, or

**(B)** in determining the amount of taxable income for such taxable year which may be reduced by net operating loss carryovers or carrybacks to such taxable year under section 172.

**(2) Amount described.**--The amount described in this paragraph is the sum of--

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(A)** the amount required to be taken into account under section 951(a)(1) by reason of this section (determined after the application of subsection (c)), plus

**(B)** in the case of a domestic corporation which chooses to have the benefits of subpart A of part III of subchapter N for the taxable year, the taxes deemed to be paid by such corporation under subsections (a) and (b) of section 960 for such taxable year with respect to the amount described in subparagraph (A) which are treated as a dividends [1] under section 78.

**(3) Election.**--Any election under this subsection shall be made not later than the due date (including extensions) for filing the return of tax for the taxable year and shall be made in such manner as the Secretary shall prescribe.

**(o) Regulations.**--The Secretary shall prescribe such regulations or other guidance as may be necessary or appropriate to carry out the provisions of this section, including--

**(1)** regulations or other guidance to provide appropriate basis adjustments, and

**(2)** regulations or other guidance to prevent the avoidance of the purposes of this section, including through a reduction in earnings and profits, through changes in entity classification or accounting methods, or otherwise.

**CREDIT(S)**

(Added Pub.L. 108-357, Title IV, § 422(a), Oct. 22, 2004, 118 Stat. 1514; amended Pub.L. 109-135, Title IV, § 403(q), Dec. 21, 2005, 119 Stat. 2627; Pub.L. 115-97, Title I, § 14103(a), Dec. 22, 2017, 131 Stat. 2195.)

**Footnotes**

1 So in original.

26 U.S.C.A. § 965, 26 USCA § 965
Current through P.L. 119-1. Some statute sections may be more current, see credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.