IN THE

# United States Court of Appeals
# For The Eleventh Circuit

No. 24-13470

**THE COCA-COLA CO. & SUBSIDIARIES,**

*Petitioner-Appellant,*

vs.

**COMMISSIONER OF INTERNAL REVENUE,**

*Respondent-Appellee.*

---

**On Appeal from**
**The United States Tax Court**
**Case No. 31183-15**

---

**BRIEF OF PWC US TAX LLP,**
**DELOITTE TAX LLP, AND KPMG LLP AS AMICI**
**CURIAE IN SUPPORT OF PETITIONER-APPELLANT**
**THE COCA-COLA CO. & SUBSIDIARIES**

---

Matthew D. Lerner
Joshua J. Fougere
Madeleine Joseph
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005

*Counsel for Amici Curiae PwC US Tax LLP, Deloitte Tax LLP, and KPMG LLP*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rules of Appellate Procedure 26.1, 29(a)(4)(A), and 29(b)(4), PwC US Tax LLP states that it is a limited liability partnership organized under the laws of Delaware, that it has no stock, and that therefore no publicly traded company owns 10 percent or more of its stock.

In accordance with Federal Rules of Appellate Procedure 26.1, 29(a)(4)(A), and 29(b)(4), Deloitte Tax LLP states that it is a limited liability partnership organized under the laws of Delaware, that it has no stock, and that therefore no publicly traded company owns 10 percent or more of its stock.

In accordance with Federal Rules of Appellate Procedure 26.1, 29(a)(4)(A), and 29(b)(4), KPMG LLP states that it is a limited liability partnership organized under the laws of Delaware, that it has no stock, and that therefore no publicly traded company owns 10 percent or more of its stock.

In accordance with Eleventh Circuit Rule 26.1-1(a)(1), PwC US Tax LLP, Deloitte Tax LLP, and KPMG LLP certify that the following individuals or entities have or may have an interest in this case:[1]

- Altman, John M., Counsel for Respondent-Appellee in the Tax Court

[1] *Amici* make this certification in accordance with Rule 26.1-1(a)(1) but note that they do not have direct knowledge of these parties and have taken this information from the Brief of Petitioner-Appellant.

- Bailie, Huong T., Counsel for Respondent-Appellee in the Tax Court
- Bowers, Christopher, Counsel for Petitioner-Appellant in the Eleventh Circuit
- Campolieta, Justin L., Counsel for Respondent-Appellee in the Tax Court
- Carden, Nathaniel, Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court
- Christensen, Jacob Earl, Counsel for Respondent-Appellee in the Eleventh Circuit
- Craig, John F., III, Counsel for Petitioner-Appellant in the Tax Court
- Desmond, Michael J., Counsel for Respondent-Appellee in the Tax Court
- Dixon, Steven R., Counsel for Petitioner-Appellant in the Tax Court
- Dvoretzky, Shay, Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court
- Fiedler, Shannon C., Counsel for Petitioner-Appellant in the Eleventh Circuit
- Fisher, Miriam L., Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court
- Flores, Elizabeth P., Counsel for Respondent-Appellee in the Tax Court
- Franklin, Barbara B., Counsel for Respondent-Appellee in the Tax Court
- Frisch, Jill A., Counsel for Respondent-Appellee in the Tax Court
- Garre, Gregory G., Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court
- Garza, Steven D., Counsel for Respondent-Appellee in the Tax Court

- Gasper, Julie Ann P., Counsel for Respondent-Appellee in the Tax Court
- Gerling-Ritters, Hans D., Counsel for Petitioner-Appellant in the Tax Court
- Gibson Dunn & Crutcher LLP, Counsel for Petitioner-Appellant in the Tax Court
- Goldberg, Lisa M., Counsel for Respondent-Appellee in the Tax Court
- Greenhouse, Robin L., Counsel for Respondent-Appellee in the Tax Court
- Hagley, Judith A., Counsel for Respondent-Appellee in the Eleventh Circuit
- Haji, Sakina, Counsel for Petitioner-Appellant in the Eleventh Circuit
- Hintermeister, Anne O'Brien, Counsel for Respondent-Appellee in the Tax Court
- Hoory, Eli, Counsel for Respondent-Appellee in the Tax Court
- Hubbert, David A., Counsel for Respondent-Appellee in the Eleventh Circuit
- Internal Revenue Service, Respondent-Appellee
- Jacinto, Jarrett Y., Counsel for Petitioner-Appellant in the Tax Court
- Kaplan Hecker & Fink LLP, Counsel for Petitioner-Appellant in the Tax Court
- Kautter, David, Respondent-Appellee (Former Acting)
- Kenworthy, Kevin L., Counsel for Petitioner-Appellant in the Tax Court
- Konopka, Eric J., Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court

- Koskinen, John A., Respondent-Appellee (Former)
- Kummer, Michael D., Counsel for Petitioner-Appellant in the Tax Court
- Lampert, Heather L., Counsel for Respondent-Appellee in the Tax Court
- Latham & Watkins LLP, Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court
- Lauber, Albert G., Tax Court Judge
- Luttig, Hon. J. Michael, Counsel for Petitioner-Appellant in the Tax Court
- Magee, John B., Counsel for Petitioner-Appellant in the Tax Court
- Massey, Jonathan S., Counsel for Petitioner-Appellant in the Tax Court
- Massey & Gail LLP, Counsel for Petitioner-Appellant in the Tax Court
- Matta, Lamia R., Counsel for Petitioner-Appellant in the Tax Court
- Metcalf, Nicholas R., Counsel for Petitioner-Appellant in the Tax Court
- Mezei, Saul, Counsel for Petitioner-Appellant in the Tax Court
- Miller & Chevalier Chartered, Counsel for Petitioner-Appellant in the Tax Court
- Morgan, Lewis & Bockius LLP, Counsel for Petitioner-Appellant in the Tax Court
- Morrison, Sean T., Counsel for Petitioner-Appellant in the Tax Court
- O'Donnell, Douglas, Respondent-Appellee (Acting)
- Ortiz, Lisandra, Counsel for Petitioner-Appellant in the Tax Court

- Patterson, Kathryn F., Counsel for Respondent-Appellee in the Tax Court
- Paul, William M., Counsel for Respondent-Appellee in the Tax Court
- Rasheed, Raza, Counsel for Petitioner-Appellant in the Eleventh Circuit
- Rettig, Charles P., Respondent-Appellee (Former)
- Richards, Veronica L., Counsel for Respondent-Appellee in the Tax Court
- Rider-Longmaid, Parker, Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court
- Rollinson, Marjorie A., Counsel for Respondent-Appellee in the Eleventh Circuit and the Tax Court
- Rubin, Curt M., Counsel for Respondent-Appellee in the Tax Court
- Skadden, Arps, Slate, Meagher & Flom LLP, Counsel for Petitioner-Appellant in the Eleventh Circuit and the Tax Court
- Stafford, Blake E., Counsel for Petitioner-Appellant in the Eleventh Circuit
- Stark, Sanford W., Counsel for Petitioner-Appellant in the Tax Court
- The Coca-Cola Co., NYSE:KO, Petitioner-Appellant
- Tonuzi, Drita, Counsel for Respondent-Appellee in the Tax Court
- Tribe, Laurence H., Counsel for Petitioner-Appellant in the Tax Court
- Ugolini, Francesca, Counsel for Respondent-Appellee in the Eleventh Circuit and the Tax Court
- U.S. Commissioner of Internal Revenue, Respondent-Appellee

- U.S. Department of Justice, Tax Division, Appellate Section, Counsel for Respondent-Appellee in the Eleventh Circuit and the Tax Court
- U.S. Department of the Treasury, Respondent-Appellee
- Ussing, Carl T., Counsel for Petitioner-Appellant in the Tax Court
- Werfel, Daniel I., Respondent-Appellee (Former)
- Wilkins, William J., Counsel for Respondent-Appellee in the Tax Court
- Zemil, Nicholas A., Counsel for Petitioner-Appellant in the Tax Court

Dated: March 19, 2025

Respectfully submitted,

_/s/ Matthew D. Lerner

Matthew D. Lerner

*Counsel for amici curiae PwC US Tax LLP, Deloitte Tax LLP, and KPMG LLP*

# TABLE OF CONTENTS


INTEREST OF *AMICI CURIAE* .......... 1

INTRODUCTION AND SUMMARY .......... 4

ARGUMENT .......... 6

I. THE IRS'S CONDUCT IN COCA-COLA'S CASE WAS ARBITRARY AND CONTRARY TO PRINCIPLES OF SOUND TAX ADMINISTRATION. .......... 6

A. The IRS Arbitrarily Abandoned the Method Agreed Upon in the Closing Agreement. .......... 7

B. The IRS Arbitrarily and Selectively Adjusted Coca-Cola's Income in Relation to Supply Points Outside of U.S. Treaty Jurisdictions. .......... 13

C. The IRS's Arbitrary Decision Contravenes Principles of Sound Tax Administration. .......... 16

II. THE IRS'S CONDUCT IN THIS CASE RAISES SERIOUS AND COSTLY CHALLENGES FOR MULTINATIONAL COMPANIES. .......... 20

A. Multinational Companies Invest Significant Time and Resources in Transfer Pricing Compliance in Reliance on IRS Consistency .......... 20

B. The IRS's Sudden Departure from Its Prior Agreement Is Part of a Broader Trend That Creates Uncertainty and Imposes Material Costs. .......... 25

CONCLUSION .......... 26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amazon.com Inc. v. Comm'r*,
934 F.3d 976 (9th Cir. 2019) ....................................6

*Bausch & Lomb v. Comm'r*,
933 F.2d 1084 (2d. Cir. 1991) ....................................6

*Bessenyey v. Comm'r*,
379 F.2d 252 (2d Cir. 1967) ....................................21

*Brittingham v. Comm'r*,
598 F.2d 1375 (5th Cir. 1979) ....................................6

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012)....................................8

*Comm'r v. Bilder*,
369 U.S. 499 (1962)....................................20

*DHS v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020)....................................8, 19

*Eaton Corp. v. Comm'r*,
47 F.4th 434 (6th Cir. 2022) ....................................26

*Eli Lilly & Co. v. Comm'r*,
856 F.2d 855 (7th Cir. 1988) ....................................6

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)....................................10

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
92 F.3d 1248 (D.C. Cir. 1996)....................................15

*Okla. Tax Comm'n v. Chickasaw Nation*,
515 U.S. 450 (1995)....................................20, 25

*Steger v. Def. Investigative Serv. Dep't of Def.*,
717 F.2d 1402 (D.C. Cir. 1983)....................................15

*Thor Power Tool Co. v. Comm'r*,
439 U.S. 522 (1979) .......... 20

*United States v. Byrum*,
408 U.S. 125 (1972) .......... 20

*United States v. Generes*,
405 U.S. 93 (1972) .......... 20

*Westar Energy, Inc. v. FERC*,
473 F.3d 1239 (D.C. Cir. 2007) .......... 15

**Statutes and Regulations**

I.R.C. § 7803(a)(3) .......... 17

Treas. Reg. § 1.482-1(b)(1) .......... 9

Treas. Reg. § 1.482-1(c) .......... 10

Treas. Reg. § 1.482-8 .......... 10

Treas. Reg. § 1.6662-6(d)(2) .......... 11

**Administrative Decisions**

*Analog Devices, Inc. v. Comm'r*,
147 T.C. 429 (2016) .......... 9

*Coca-Cola Co. v. Comm'r*,
149 T.C. 446 (2017) .......... 13

*Medtronic, Inc. v. Comm'r*,
T.C. Memo. 2016-112 at *67, *rev'd and remanded*, 900 F.3d 610 (8th Cir. 2018), *decision on remand*, T.C. Memo. 2022-84 .......... 25

*Veritas Software Corp. v. Comm'r*,
133 T.C. 297 (2009) .......... 27

**Other Authorities**

*Internal Revenue Manual*, https://www.irs.gov/irm .......... 17

IRS, *IRS Inflation Reduction Act Strategic Operating Plan*, https://www.irs.gov/pub/irs-pdf/p3744.pdf ........ 17

IRS, *Taxpayer Bill of Rights*, https://www.irs.gov/taxpayer-bill-of-rights ........ 17

*United States Model Income Tax Convention*, https://home.treasury.gov/system/files/131/Treaty-US-Model-2016_1.pdf ........ 14

## INTEREST OF *AMICI CURIAE*[2]

*Amici curiae* PwC US Tax LLP, Deloitte Tax LLP, and KPMG LLP are professional services firms that provide tax services, including services related to transfer pricing, in the United States. The networks of professional firms to which *Amici* belong provide such services in over 150 countries around the world. *Amici* and their respective networks represent three of the world's "Big Four" accounting, tax, and advisory professional service organizations.[3]

PwC US Tax LLP, a Delaware limited liability partnership, is a United States member firm of the global network of member firms of PricewaterhouseCoopers International Limited, a UK private company limited by guarantee. Each member firm is a separate and independent legal entity. The global network firms provide audit, assurance, advisory, and tax services to many of the world's largest corporations. During its 2024 fiscal year, the PricewaterhouseCoopers global network firms employed more than 370,000 people across offices in 149 countries and provided services to 89 percent of the companies comprising the Fortune 500.

---

[2] No party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money to fund the preparation or submission of this brief; and no other person except *amici curiae*, their members, or their counsel contributed money intended to fund the preparation or submission of this brief. Both parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a).

[3] The fourth, Ernst & Young LLP, is the financial statement auditor of The Coca-Cola Company (Coca-Cola) and accordingly declined to participate.

Deloitte Tax LLP, a Delaware limited liability partnership owned by Deloitte LLP and its individual partners and principals who actively participate in its business, provides tax services to a variety of clients located in and outside of the United States. Deloitte LLP is a United States member firm of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee. Deloitte Touche Tohmatsu Limited's global network of member firms consists of separate and independent legal entities with approximately 457,000 people in more than 150 countries and territories, and this global network is a leading global provider of audit and assurance, consulting, financial advisory, risk advisory, tax, and related services, serving among other clients, Fortune Global 500 companies.

KPMG LLP is the U.S. member firm of the KPMG global organization of independent member firms providing Audit, Tax and Advisory services. The KPMG global organization operates in 142 countries and territories and has more than 275,000 people working in member firms around the world. Each KPMG firm is a legally distinct and separate entity and describes itself as such. The KPMG independent member firms are affiliated with KPMG International Limited, a private English company limited by guarantee. KPMG International Limited and its related entities do not provide services to clients.

*Amici* and their affiliated network firms employ approximately one million professionals. *Amici* frequently advise multinational enterprises on questions related

to transfer pricing. These transfer pricing services aid multinational enterprises in their preparation of accurate tax returns in the countries where they operate, and the amounts reported on those returns and the risks they may present are an integral part of the preparation of financial statements. *Amici* and/or their affiliated network firms also audit the financial statements of multinational enterprises and other clients in accordance with applicable auditing standards to provide reasonable assurance that financial statements are free of material misstatements. Such reasonable assurance is vital to the smooth functioning and integrity of the capital markets. When taxing authorities change their position unexpectedly and without a factual predicate, the tax alleged to be due can vary dramatically, requiring unexpected changes to financial reports. Such changes in turn can have significant effects on those companies and the markets' perception of their performance. As part of the Big Four accounting, tax, and advisory networks, *amici* have a unique, global perspective on—and substantial expertise and interest in—transfer pricing matters like those at issue in this case and the effect that changing transfer pricing standards can have on financial reporting.

## ISSUE PRESENTED

Whether the IRS's section 482 transfer-pricing adjustments for the 2007-2009 tax years are arbitrary, capricious, or otherwise unlawful.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Leveraging that unique perspective, *amici* are well-positioned to address two core points about Coca-Cola's case: (1) whether the Internal Revenue Service (IRS) acted in an arbitrary and unreasonable manner under the standards of Internal Revenue Code § 482,[4] and (2) the significant adverse consequences to multinational enterprises that would arise if this Court were to affirm the Tax Court's decision.

*First,* the facts and circumstances surrounding the adjustments in this case reflect a pattern of arbitrary, capricious, and unreasonable conduct on the part of the IRS under well-settled judicial tests in both tax and non-tax cases. It was arbitrary and unreasonable to depart abruptly from applying a transfer pricing method that had been approved by the IRS in a closing agreement and in more than 10 years of subsequent IRS audits. That is particularly true when the IRS did not identify any material factual differences for the license transactions at issue nor any changes in applicable law that would explain or support the IRS's abandonment of the previously agreed upon methodology. Coca-Cola Br. 3. For the years at issue, moreover, the IRS selectively applied its new transfer pricing method only to certain transactions, while continuing to apply the previous transfer pricing method to other transactions—even though both sets of transactions involved the same basic facts and circumstances. *Id.* at 4. And the IRS's conduct cannot be squared with

[4] All statutory citations in this brief are to the Internal Revenue Code, Title 26.

fundamental principles of fair tax administration and the agency's own stated mission to help taxpayers "understand and meet their tax responsibilities."

*Second*, affirming the Tax Court's decision and the underlying IRS conduct would risk significant negative consequences for the U.S. tax system. Taxpayers rely on the IRS taking consistent positions over time in designing and implementing frameworks for transfer pricing compliance. Taxpayers invest significant time and resources in setting transfer pricing policies and implementing operational systems that allow them to adhere to the adopted policies. The IRS's unsupported *ad hoc* departure from an earlier agreed upon tax position can lead to unanticipated burdens that could have material effects on the timing of cash flows and on a company's financial statements and its valuation in the capital markets. Moreover, the IRS's actions in this case, if allowed to stand, would undermine taxpayer reliance and incentivize a broader trend—one in which the IRS feels free to discard or disavow prior agreements and audit history with taxpayers without providing a justification for the proposed change. If this court does not restrain the IRS's unjustified shifts in position, other taxpayers will likely be subjected to similar arbitrary and unreasonable behavior, contributing to an erosion of confidence in the fairness of the U.S. tax system. The Tax Court's decision should be reversed.

## ARGUMENT

### I. THE IRS'S CONDUCT IN COCA-COLA'S CASE WAS ARBITRARY AND CONTRARY TO PRINCIPLES OF SOUND TAX ADMINISTRATION.

Section 482 of the Internal Revenue Code authorizes the IRS to distribute, apportion, or allocate gross income, deductions, credits, or allowances among taxpayers owned or controlled by the same interests, but only after determining that such an adjustment is necessary to prevent the evasion of taxes or clearly to reflect the income of the relevant taxpayers. Although the IRS has broad discretion in applying section 482, its discretion is not unlimited. An adjustment that is arbitrary, capricious, or unreasonable cannot be sustained, as the Courts of Appeals have consistently held.[5]

In Coca-Cola's case, the IRS abruptly departed from a transfer pricing method that had been agreed upon by the parties in their Closing Agreement[6] and that had been reviewed and blessed by the IRS multiple times since. And the IRS abandoned that method selectively, discarding it only for jurisdictions that lack an income tax treaty with the United States under which Coca-Cola could object to the adjustments.

---

[5] *See*, *e.g.*, *Amazon.com Inc. v. Comm'r,* 934 F.3d 976 (9th Cir. 2019)*; Bausch & Lomb v. Comm'r*, 933 F.2d 1084 (2d. Cir. 1991); *Eli Lilly & Co. v. Comm'r*, 856 F.2d 855 (7th Cir. 1988); *Brittingham v. Comm'r*, 598 F.2d 1375 (5th Cir. 1979).

[6] The Closing Agreement was a binding contractual agreement entered into by the Commissioner of Internal Revenue and Coca-Cola pursuant to section 7121, resolving an IRS transfer pricing audit issue and agreeing that the 10-50-50 method (described later) reached an arm's-length result for the taxable years 1987–1995.

Worse, the IRS failed to justify its departure based on any relevant change in law or facts. The IRS's actions contravened basic principles of reasoned decision-making and were inconsistent with the agency's own regulations, its governing statutes, and its guiding principles.

### A. The IRS Arbitrarily Abandoned the Method Agreed Upon in the Closing Agreement.

*Amici* have extensive experience with closing agreements entered into between taxpayers and the IRS. In many of these agreements, the IRS and the taxpayer decide to resolve their dispute by agreeing to an outcome, but without a concession from either side that the agreed outcome is substantively correct. In other words, in *amici*'s experience, when the IRS wishes to write an agreement without espousing a view on the correctness of the agreed position, it knows very well how to do so. That is not what happened here. As discussed below, two elements of Coca-Cola's Closing Agreement set it apart: (1) the acknowledgment that the 10-50-50 method[7] produced an arm's-length result; and (2) the provision for protection against penalties so long as Coca-Cola continued to abide by that method. And in subsequent tax years, the IRS reaffirmed its judgment that the 10-50-50 method was appropriate.

[7] The 10-50-50 method is the transfer-pricing method Coca-Cola and the IRS had agreed upon in the Closing Agreement to determine arm's length royalties from supply point companies and then was sustained in audits for more than a decade.

In light of these features, the IRS's decision to abruptly abandon the 10-50-50 method was arbitrary and capricious. Agencies act arbitrarily when they "impose potentially massive liability" on regulated parties without "fair warning." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155–56 (2012) (agency acts arbitrarily when it changes without reason a position reasonably relied on by regulated parties). Here, in the tax years at issue, Coca-Cola reasonably relied on specific language in the Closing Agreement and the IRS's past actions in using the 10-50-50 method in the period after execution of the Closing Agreement; the IRS's abandonment of that method "result[ed] in precisely the kind of 'unfair surprise'" that the Supreme Court's caselaw has "long warned" agencies against. *Id.*; *see also, e.g.*, *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (agency should be "cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account'" (quoting *Encino Motorcars, LLC v. Navarro*, 579 U. S. 211, 222 (2016)).

Coca-Cola reasonably relied on assurances from the IRS about the 10-50-50 method in the years following the period covered by the 1996 Closing Agreement. The recitals in the Closing Agreement explicitly stated that the IRS and Coca-Cola "have agreed on a method for computing the arm's length amount of the Product

Royalties."[8] For more than a decade following the execution of the Closing Agreement, the IRS rigorously examined Coca-Cola's compliance with the 10-50-50 method and did not propose any adjustments to the results arising from the application of that method. Even as late as 2009, the IRS stated in an audit report that "the continuing application of [the 10-50-50 method] to the post 1995 tax years seems appropriate."[9] Each audit-cycle without adjustment would lead a reasonable taxpayer in Coca-Cola's position to believe that the IRS continued to agree that the 10-50-50 method was acceptable and produced an arm's length result.

The IRS's own regulations confirm the reasonableness of that judgment. They require the IRS to apply the arm's length standard consistently, using the "best method" for determining the "arm's length result" of a transaction. *See* Treas. Reg. § 1.482-1(b)(1) (requiring application of the "arm's length" standard "in every case"). IRS regulations define "arm's length result" as "the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under

---

[8] The Tax Court cited *Analog Devices, Inc. v. Commissioner,* 147 T.C. 429, 446 (2016), for the principle that recitals in a closing agreement are not binding but failed to highlight important context accompanying that statement—namely that "recitals are explanatory and can give insight into the intent of the parties." As a general matter, "[c]losing agreements are contracts, and they are subject to the rules of Federal common law contract interpretation. Contracts are construed according to the intent of the parties as of the time of entering into the agreement." *Id.* (internal citations omitted).

[9] Ex. 246-J, pg. 2 (cited in Coca-Cola Br. 15).

the same circumstances." *See id*. And the "best method" is the one that "under the facts and circumstances, provides the most reliable measure of an arm's length result." *Id.* § 1.482-1(c)(1); *see also id*. § 1.482-8. Notably, although the agency's rules contemplate that another method may subsequently be selected, switching methods requires a comparative demonstration—that the new method "produce[s] a *more reliable measure* of an arm's length result." *Id*. § 1.482-1(c) (emphasis added).[10]

Here, the IRS did not identify any changes in the relevant facts or circumstances that justified a change. Nor did the law change: the transfer pricing method the IRS switched to (the comparable profits method, or CPM) was available to the IRS when it entered into the Closing Agreement in 1996. *See id.* § 1.482-4(a).[11] Changing position without identifying changes to the relevant facts, circumstances, or law is a hallmark of arbitrary decision-making. *Encino Motorcars*,

---

[10] Part II of Petitioner's brief addresses Coca-Cola's position with respect to the lack of reliability of the method applied by the IRS for the 2007–2009 taxable years.

[11] This regulation describes the transfer pricing methods applicable to related-party transfers of intangibles like licenses. It contemplates that either a specified method (like the CPM) or an unspecified method (like the 10-50-50 method) can be applied, as long as the method applied satisfies the requirements of the best method rule and other reliability requirements in Treas. Reg. § 1.482-1. Treas. Reg. § 1.482-4(a) was promulgated in 1994 and applied to the final years covered by the Closing Agreement. It also remained unchanged and in effect for the years at issue in this case.

579 U.S. at 212 (explaining that "'[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice' (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

Further, the Closing Agreement's penalty protections (read in light of the IRS's own regulations) "engendered serious" and reasonable "reliance" on the 10-50-50 method by Coca-Cola. *Id.* By way of background, the IRS's regulations governing penalties provide that a taxpayer may be excused from an accuracy-related penalty based upon (among other things) the reasonableness of the taxpayer's transfer pricing methodology. As relevant here, the regulations state that the reasonableness of the taxpayer's methodology may depend on "[t]he extent to which the taxpayer relied on a transfer pricing methodology ... specifically approved by the Internal Revenue Service pursuant to a transfer pricing audit of the transactions at issue for a prior taxable year" Treas. Reg. § 1.6662-6(d)(2)(ii)(A)(6); *see also id.* § 1.6662-6(d)(2)(ii)(A)(4) ("A study or analysis that was reasonably relied upon in a prior year may reasonably be relied upon in the current year if the relevant facts and circumstances have not changed.").

The Closing Agreement provided a definitive resolution of any potential penalty issue, incorporating an operative provision stating that, if Coca-Cola continued to use the 10-50-50 method beyond the years covered by the Closing Agreement, then Coca-Cola "shall be considered to have met the reasonable cause

and good faith exception" of the penalty regulation.[12] This provision of the Closing Agreement remained in effect at the time Coca-Cola filed its tax returns for 2007 to 2009. Especially considering that penalties can amount to 40% of an underpayment of tax, the IRS's decision to provide Coca-Cola with this penalty protection reasonably led Coca-Cola to believe that the IRS approved of the 10-50-50 method going forward. Indeed, as even the Tax Court acknowledged, Coca-Cola "was bound in a practical sense," by the method agreed to in the Closing Agreement, because switching methods "would have caused it to forfeit penalty protection that the closing agreement afforded."[13]

To be clear, *amici* are not asserting that the 1996 Closing Agreement relating to Coca-Cola's 1987-1995 taxable years was *dispositive* of Coca-Cola's tax liability for the 2007-2009 taxable years at issue in this case. Rather, in *amici*'s view, the Tax Court failed to give proper weight to the statements that the 10-50-50 method produced an arm's length price, which were made both in the Closing Agreement and in the IRS's subsequent conclusions following further income tax examinations. Those actions induced reasonable reliance on the conclusion that the 10-50-50 method was the proper pricing method, and a departure therefrom without any principled determination that the facts on which the prior agreement were based had

[12] *See* Ex. 242-J, pg. 20 (cited in Coca-Cola Br. 26).

[13] Doc. 740, pg. 226.

changed was arbitrary. The Court thus can and should remedy the unfairness inherent in that decision and reverse.

### B. The IRS Arbitrarily and Selectively Adjusted Coca-Cola's Income in Relation to Supply Points Outside of U.S. Treaty Jurisdictions.

The IRS's actions here were arbitrary for another, independent reason: the IRS selectively adjusted Coca-Cola's income only in relation to supply-point companies in jurisdictions that lacked income tax treaties with the United States. For the supply-point companies in jurisdictions with which the United States has income tax treaties, the IRS left the methodology (i.e., the 10-50-50 method) the same.[14] That blatant disparity was improper where, as here, there was no factual basis given and no principled reason for the disparate treatment.

Income tax treaties are intended to provide a framework for ensuring that qualifying taxpayers are not subject to double taxation. Such a framework is needed because transfer pricing is inherently two-sided—an upward adjustment in one country could result in double taxation in the counterparty jurisdiction absent a

[14] The one exception was an adjustment to Coca-Cola's Mexican supply point (a branch of a United States taxpayer, not a separate entity for U.S. federal income tax purposes). Even in that case, however, the IRS denied Coca-Cola access to treaty-based relief. *See Coca-Cola Co. v. Comm'r*, 149 T.C. 446, 453 (2017). ("[T]he IRS notified petitioner that it would not participate in competent authority proceedings with Mexico because it had 'designated for litigation the issue pertaining to the transfer pricing adjustments for tax years 2007, 2008, and 2009.'"). Coca-Cola was instead required to litigate as a means of seeking to alleviate double taxation. The IRS thereby avoided defending its position before any non-U.S. tax authority.

mechanism for relief. So, one cornerstone of the United States's tax treaties is a framework for the treaty partners to agree on the proper allocation of income under the arm's length standard for a given taxpayer through a mutual agreement procedure ("MAP"). A MAP generally allows a taxpayer to present its case to the competent authority of one or both parties to the double tax treaty.[15] Then, each treaty partner's revenue authority negotiates with its counterpart and attempts to resolve transfer pricing disputes related to the taxpayer's operations. For multinationals like Coca-Cola, these treaties offer a critical venue for relief from double taxation arising from adjustments imposed by the IRS or foreign tax authorities. Without MAP, relief from double taxation in the counterparty jurisdiction is generally not possible.

Coca-Cola's supply points were located in foreign jurisdictions with different treaty statuses—some governments have entered into income tax treaties with the United States but others have not. Well aware of which jurisdictions are and are not covered by income tax treaties, the IRS selectively focused its adjustments on Coca-Cola's transactions with supply points located in non-treaty jurisdictions. Apart from the unique Mexican branch issue noted above, the IRS left untouched all transactions with supply points located in treaty jurisdictions—where Coca-Cola could invoke

---

[15] *See* United States Model Income Tax Convention, Art. 25, https://home.treasury.gov/system/files/131/Treaty-US-Model-2016_1.pdf.

the treaties to require the IRS to defend its adjustments in bilateral negotiations with foreign tax administrations.

A federal agency "can be said to be at its most arbitrary" when it does what the IRS did here: "treat similar situations dissimilarly." *Steger v. Def. Investigative Serv. Dep't of Def.*, 717 F.2d 1402, 1406 (D.C. Cir. 1983). "A fundamental norm of administrative procedure requires an agency to treat like cases alike," *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007), or "provide a legitimate reason for failing to do so," *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996). The IRS did neither when it adjusted Coca-Cola's income in relation to non-treaty-country supply points but *not* in relation to treaty-country supply points.

Nor could the IRS have provided a legitimate reason for that action even if it had tried. Under section 482 and its implementing regulations, the treaty status of the counterparty jurisdiction is irrelevant to the selection of the best method and the determination of taxable income. Instead, the underlying factual circumstances determine the best method for arriving at an arm's length result. Yet factual differences could not explain why—under the IRS's view—the 10-50-50 method continued to produce an arm's length result for supply points in treaty jurisdictions but no longer produced an arm's length result for supply points located in non-treaty jurisdictions. Confirming as much, the IRS's own expert testified that "if the facts

were such that the 10-50-50 was the right transfer pricing method, then the facts wouldn't be consistent with the CPM being the right transfer pricing method."[16]

Adjustments like those the IRS made here raise significant alarm bells for taxpayers about the objectivity (or lack thereof) of the IRS's application of the arm's length standard. What is more, by selectively directing its adjustments to the income associated with supply points in non-treaty jurisdictions, the IRS shielded its new transfer pricing theories from the fora where foreign tax authorities would thoroughly evaluate—and very likely challenge—the IRS's rationale for changing the longstanding transfer pricing method applied to Coca-Cola's transactions with entities in their jurisdictions.

### C. The IRS's Arbitrary Decision Contravenes Principles of Sound Tax Administration.

The IRS's arbitrary conduct in Coca-Cola's case undermines the goals of sound tax administration. If allowed to stand, it could have a deleterious effect on tax administration by needlessly creating controversies rather than fostering a cooperative environment among taxpayers and the IRS.

As recognized in many IRS pronouncements and authorities, taxpayers should understand the IRS's positions and be able to rely reasonably on those positions. The IRS's stated mission, for example, is to "[p]rovide America's taxpayers top quality

[16] Doc. 700, pg. 8336:11–14 (cited in Coca-Cola Br. 32).

service by helping them understand and meet their tax responsibilities and enforce the law with integrity and fairness to all." *See* Internal Revenue Manual 1.1.1.2, https://www.irs.gov/irm. Likewise, the Taxpayer Bill of Rights affords taxpayers both "the right to know what they need to do to comply with the tax laws" and "the right to expect the tax system to consider facts and circumstances that might affect their underlying liabilities."[17] The Tax Code enshrines a similar principle, at section 7803(a)(3), which requires the Commissioner of Internal Revenue to "ensure that employees of the Internal Revenue Service are familiar with and act in accord with taxpayer rights," including "the right to be informed," "the right to pay no more than the correct amount of tax," "the right to challenge the position of the Internal Revenue Service and be heard," and "the right to a fair and just tax system."

The IRS's actions in Coca-Cola's case are the opposite of "helping taxpayers understand and meet their tax responsibilities." As discussed, the IRS's change in course came without identification of a specific factual or legal basis that would support a change in method. Attempting to understand the IRS's view that the 10-50-50 method no longer produced an arm's length result, Coca-Cola requested that

---

[17] IRS, *Taxpayer Bill of Rights*, https://www.irs.gov/taxpayer-bill-of-rights. The IRS frequently emphasizes the importance of taxpayers' ability to obtain certainty with respect to their compliance obligations *See e.g.,* IRS, *IRS Inflation Reduction Act Strategic Operating Plan*, Initiatives 1.7 and 2.4, https://www.irs.gov/pub/irs-pdf/p3744.pdf.

the IRS identify any and all changes to material facts in support of its position. Third Stip. of Facts ¶ 348. Rather than providing Coca-Cola with the tools necessary to understand its position, the IRS refused to discuss changes to material facts and circumstances with Coca-Cola. *Id.* ¶ 349.

The IRS's abrupt abandonment of the longstanding method in this case itself undermines principles of efficient and sound tax administration. In *amici*'s experience, after achieving an agreed resolution with the IRS regarding the transfer pricing method for a particular transaction, taxpayers are generally disinclined to invite recurring controversies associated with applying a *different* method to the *same* set of facts and circumstances. Consistency on the part of the IRS in applying the arm's length standard would obviate the need for both the IRS and taxpayers to expend significant resources disputing the same fundamental transfer pricing issue again and again and avoid the costs to taxpayers of dealing with sudden changes in position by the IRS with respect to the same facts.[18]

---

[18] Many taxpayers like Coca-Cola are subject to IRS examination on a continuous basis. IRS examination teams often seek extensions of the statutes of limitation for the years at issue in order to provide them with more time to complete their work, and taxpayers generally accede to such requests as a means of fostering a productive examination. Although granting such requests exposes taxpayers to prolonged periods of risk of adverse audit adjustments, taxpayers often accept this exposure on the expectation that the examination team will act in a responsible and reasonable manner, including adherence to understandings reached in prior years absent changes in the underlying law or facts.

Notably, in Coca-Cola's case, had the company abandoned its Closing Agreement position, it would have faced serious consequences. For one thing, it would have lost the legal protection against penalties provided by the Closing Agreement. For another, Coca-Cola also would have invited increased scrutiny, and hence an increased chance of audit adjustments and penalties, for taking a position inconsistent with one the IRS had previously agreed was in fact arm's length. Expectations of consistency in applying the arm's length standard should not be a one-way street where the IRS expects it of taxpayers, but taxpayers cannot reasonably expect consistency from the IRS. *Cf. Regents of the Univ. of Cal.*, 591 U.S. at 24 (just as "men must turn square corners when they deal with the Government," "the Government should turn square corners in dealing with the people" (internal quotation marks omitted)).

In the end, the Tax Court erroneously endorsed the IRS's behavior. That decision incentivizes the IRS to take similar approaches in other cases—with negative consequences for sound administration of the tax laws and taxpayer confidence in the fairness of the U.S. system. This concern is not just theoretical. In the experience of *amici*, IRS employees in administrative proceedings frequently invoke the Tax Court's decision in *Coca-Cola* as support for questionable interpretations and applications of section 482.

## II. THE IRS'S CONDUCT IN THIS CASE RAISES SERIOUS AND COSTLY CHALLENGES FOR MULTINATIONAL COMPANIES.

As tax advisors and auditors to tens of thousands of companies of all sizes, *amici* have firsthand experience with the uncertainty that can arise from inconsistent and *ad hoc* transfer pricing adjustments. The Tax Court blessed such adjustments here. That decision runs contrary to the need for consistency and predictability in tax laws, and it portends a broader and more troubling trend in IRS enforcement actions. The Court should put a stop to these arbitrary actions and reverse.

### A. Multinational Companies Invest Significant Time and Resources in Transfer Pricing Compliance in Reliance on IRS Consistency.

The Supreme Court has repeatedly emphasized "the reality that tax administration requires predictability." *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 459–60 (1995). "[I]n tax law," the Court has said, "certainty is desirable." *United States v. Generes*, 405 U.S. 93, 105 (1972). Put another way, "tax law … can give no quarter to uncertainty," *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 543 (1979), and taxpayers need to be able to "rely with assurance on what appear to be established rules," *United States v. Byrum*, 408 U.S. 125, 135 (1972). There is thus a long-established "need for … uniform rule[s] on" questions of tax law. *Comm'r v.*

*Bilder*, 369 U.S. 499, 501 (1962); *see also Bessenyey v. Comm'r*, 379 F.2d 252, 257 (2d Cir. 1967) ("predictability [is] peculiarly essential in tax matters").

These foundational tenets apply forcefully in the transfer pricing context. Taxpayers invest significant time and resources in developing arm's length transfer pricing policies and implementing operational systems that will enable them to gather the data and perform the complex computations that allow them to adhere to the adopted policies reliably and predictably. This is an integral part of how businesses are run—not only for tax compliance, but also for financial reporting, compliance with customs requirements (where applicable), and effective cash and treasury management.

At the front end, effectively managing transfer pricing and all its implications requires an operational framework that is suited to the particular policy adopted, and there can be substantial process costs associated with investing in a system that is fit for a particular purpose. Large multinational companies with hundreds of subsidiaries around the world and intercompany transactions totaling billions of dollars annually often employ sophisticated—and expensive—enterprise resource planning systems that are customized to allow them to track and true-up the specific metrics that are relevant to their transfer pricing policies. This degree of customization can require significant and extensive modifications to available software, at substantial cost and time. And this is not simply a matter of software:

the taxpayer's employees and outside consultants must adapt their controls, procedures, and routines to the system once it is implemented.

Where these policies and systems are put in place to operationalize a specific transfer pricing method agreed upon between the IRS and a taxpayer, the costs that taxpayer incurs in reliance on the agreement can be significant. Nonetheless, many taxpayers will choose to bear that expense in order to obtain the benefits of certainty. If the IRS unilaterally reneges on an agreed-upon pricing method, a taxpayer that has relied on the IRS's turning square corners and incurred that cost loses the benefit of certainty and is left with two undesirable choices. On the one hand, the taxpayer can pivot to the new method that the IRS says is required, even if the taxpayer believes that the new method is wrong or represents an unjustified departure from a previously agreed approach. That may mean building new systems and gathering different data, both about the company itself and external arm's-length transactions, because different transfer pricing methods frequently require different data and analytics. On the other hand, the taxpayer can continue to adhere to the prior method at the risk of repeated IRS audits and litigation. It should go without saying that both "choices" are unattractive, and a taxpayer that has conducted itself in accordance with a prior agreement with the IRS should not be forced to select either one when its material facts have remained unchanged.

Beyond these upfront operational costs—all of which are put at risk if the IRS can change course retroactively and at its whim—uncertainty and inconsistency in IRS approaches bring additional costs as well. One is that uncertainty and complexity in tax compliance—particularly from transfer pricing adjustments like the ones at issue here—lead to greater difficulty and complexity in financial reporting. The tax consequences of transactions in financial reports must be assessed during the period in which they occur. In order to do that, while acknowledging that tax laws are subject to interpretation, preparers and auditors need to be able to make an informed, well-reasoned assessment of the subject transactions in accordance with the tax laws and regulations *as they have been communicated*. But if the taxing authorities assert that their own past interpretations may not be relied upon by taxpayers, then it becomes challenging for a taxpayer to assess the tax consequences of its transactions with any confidence. Such difficulty could lead to greater uncertainty in financial reporting and more inconsistency in transfer pricing outcomes among taxpayers with multinational operations.

Companies can also incur significant and wide-ranging enforcement-related costs. Just preparing required documentation for section 482 and related regulations governing penalties can be time-consuming and costly. Section 482 adjustments at the examination level bring even more costs and require the commitment of resources extending well beyond a company's tax department. As in this case, those

adjustments can implicate billions of dollars—confronting taxpayers with a practical need to vindicate their position with litigation after years of defending against unsound adjustments by the IRS. Because cases often take more than a decade to resolve, moreover, and because taxpayers often voluntarily extend the statutes of limitations to accommodate IRS examination teams, the associated costs often extend to subsequent years in which the taxpayer maintains a consistent course of conduct, leaving taxpayers uncertain how to report their intercompany transactions for the entire period during which the dispute continues.

Finally, unwarranted adjustments, including those based on sudden reversals of position, can impose non-monetary costs as well. They can, for example, attract publicity, risk legislative branch scrutiny, and subject taxpayers to unwarranted reputational harm. They can even result in companies becoming reluctant to commit to operations that make economic sense, because of uncertainty about tax outcomes. Public reports about transfer pricing often fail to reflect the inherent complexities and the manifold challenges that taxpayers face when trying to comply with the arm's length standard in good faith. In addition, adjustments that inappropriately depart from prior agreements create perverse incentives, like encouraging taxpayers to forgo entry into prospective agreements with the IRS. Such a regime would impose undue costs on everyone, including the government.

As *amici*'s experience makes clear, taxpayers justifiably rely on the IRS to take consistent positions over time throughout the tax administration process. That is especially true when there has been no relevant change in the underlying law and material facts between the time of the agreement with the IRS and the years subject to adjustment. The Tax Court's decision puts all of this in jeopardy and thus undermines "the reality that tax administration requires predictability." *Okla. Tax Comm'n*, 515 U.S. at 459–60.

### B. The IRS's Sudden Departure from Its Prior Agreement Is Part of a Broader Trend That Creates Uncertainty and Imposes Material Costs.

Troubling as the adjustments in this case are, *amici* hold a deeper concern that the IRS's actions in this case are part of a broader pattern of IRS enforcement actions that have whipsawed taxpayers across the country. In our collective experience, the IRS in recent years has routinely felt empowered to discard and disavow prior agreements and audit history without supplying a justification for the proposed change. That magnifies the potential ramifications of the Tax Court's decision to uphold such arbitrary conduct in this case and the uncertainty that it produces.

Two recent decisions highlight the trend. First, in *Medtronic, Inc. v. Commissioner*, the IRS entered into a memorandum of understanding ("MOU") with the taxpayer concerning the royalty rates to be applied for "all future years ... as long as there are no significant changes in any underlying facts," with the IRS agreeing

to "respect those royalty rates." T.C. Memo. 2016-112 at *67, *rev'd and remanded*, 900 F.3d 610 (8th Cir. 2018), *decision on remand*, T.C. Memo. 2022-84. There is no indication from the decision that any significant factual changes were identified, *id.* at *88, and the Commissioner in fact "complet[ed] his initial examination" based on the application of the MOU to the years at issue, *id.* at *69-70. Even so, the IRS repudiated the MOU upon reexamination and made transfer pricing adjustments totaling over $1 billion across two years. *Id.* at *71.

Second, in *Eaton Corp. v. Commissioner*, the IRS sought to break the contract it had signed with the taxpayer and substitute in an entirely different method for the years covered by that contract. The change would have yielded a vastly different tax liability. 47 F.4th 434 (6th Cir. 2022). The IRS was ultimately unsuccessful, and the Sixth Circuit sided with the taxpayer on all issues presented. *Id.* The Court should do the same here.

## CONCLUSION

The IRS's abrupt change in position was arbitrary and capricious. Taxpayers like Coca-Cola, who have agreed with the IRS on an arm's length framework, must be able to rely on that framework and on consistent IRS application of that agreed approach when the material facts remain unchanged. The IRS cannot be allowed to declare that a method reaches an arm's length result and then abandon that conclusion for the very same taxpayer without identifying a factual basis for the

change. Likewise, the IRS cannot be permitted to change its position for some of a taxpayer's transactions but not other factually similar ones, based on whether the U.S. has a tax treaty with the country in which the other transacting party is located, a specious distinction no reasonable taxpayer could foresee. After all, taxpayers "are merely required to be compliant, not prescient." *Veritas Software Corp. v. Comm'r*, 133 T.C. 297, 316 (2009). When no change of fact or law suggests an alteration is necessary or justified, taxpayers should not be forced to bear the burden of an unforeseeable about-face by the government. Indeed, the costs resulting from permitting the uncertainty caused by such arbitrary actions are substantial and have impacts far beyond this taxpayer and this case.

For the foregoing reasons, therefore, *amici* respectfully submit that the Court should reverse.

Date: March 19, 2025

Respectfully submitted,

/s/ Matthew D. Lerner

Matthew D. Lerner
Joshua J. Fougere
Madeleine Joseph
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005

*Counsel for Amici Curiae PwC US Tax LLP, Deloitte Tax LLP, and KPMG LLP*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the length limits permitted by Eleventh Circuit Rule 29-2(c)(2). The brief is 5,621 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f), if applicable. The brief's type size and type face comply with Federal Rule of Appellate Procedure 32(a)(5) and (6).

Date: March 19, 2025

Respectfully submitted,

/s/ Matthew D. Lerner

Matthew D. Lerner
Joshua J. Fougere
Madeleine Joseph
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005

*Counsel for Amici Curiae PwC US Tax LLP, Deloitte Tax LLP, and KPMG LLP*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 19, 2025, the foregoing brief was electronically filed with the Clerk of the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. All parties were served through the Court's CM/ECF system.

Date: March 19, 2025

Respectfully submitted,

/s/ Matthew D. Lerner

Matthew D. Lerner
Joshua J. Fougere
Madeleine Joseph
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005

*Counsel for Amici Curiae PwC US Tax LLP, Deloitte Tax LLP, and KPMG LLP*