# No. 24-13470-G

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

THE COCA-COLA CO. & SUBSIDIARIES,

Petitioner-Appellant

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee

## ON APPEAL FROM THE DECISION OF
## THE UNITED STATES TAX COURT
No. 31183-15 (Senior Judge Albert G. Lauber)

## BRIEF FOR THE APPELLEE

MICHAEL J. HAUNGS          (202) 514-4343
JENNIFER M. RUBIN          (202) 307-0524
JUDITH A. HAGLEY           (202) 514-8126
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

## AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, counsel for the Commissioner of Internal Revenue hereby certifies that, to the best of their knowledge, information, and belief, the following persons[1] and entities have an interest in the outcome of this appeal. Persons added to the amended Certificate of Interested Persons filed by the Commissioner on May 14, 2025, are marked with an "*":

Altman, John M., Office of Chief Counsel, Internal Revenue Service

Bailie, Huong T., Office of Chief Counsel, Internal Revenue Service

Borden, Charles E., Counsel for Amicus National Foreign Trade Council, Inc.

Bowers, Christopher, Counsel for Petitioner-Appellant

---

[1] Some attorneys identified as "Counsel for Petitioner" represented petitioner earlier in this litigation but have ended that representation. Similarly, some attorneys identified as employed by the IRS or the Department of Justice worked at those agencies earlier in this litigation but have ended their employment.

Brookins, Marial A., Counsel for Amicus Chamber of Commerce of the United States of America

Campolieta, Justin L., Office of Chief Counsel, Internal Revenue Service

Carden, Nathaniel, Counsel for Petitioner-Appellant

Chamber of Commerce of the United States of America, Amicus in support of Petitioner-Appellant

Christensen, Jacob Earl, Attorney, Appellate Section, Tax Division, United States Department of Justice

Craig III, John F., Counsel for Petitioner

Deloitte Tax LLP, Amicus in support of Petitioner-Appellant

Dixon, Steven R., Counsel for Petitioner

DLA Piper, Counsel for Petitioner

Dvoretzky, Shay, Counsel for Petitioner-Appellant

Faulkender, Michael, former Acting Commissioner, Internal Revenue Service, Respondent-Appellee

Fiedler, Shannon C., Counsel for Petitioner-Appellant

Fisher, Miriam L., Counsel for Petitioner-Appellant

Flores, Elizabeth P., Office of Chief Counsel, Internal Revenue
Service

Fougere, Joshua J., Counsel for Amici PwC US Tax LLP,
Deloitte Tax LLP, and KPMG LLP

Franklin, Barbara B., Office of Chief Counsel, Internal Revenue
Service

Frisch, Jill A., Office of Chief Counsel, Internal Revenue Service

Garre, Gregory G., Counsel for Petitioner-Appellant

Garza, Steven D., Office of Chief Counsel, Internal Revenue Service

Gasper, Julie Ann P., Office of Chief Counsel, Internal Revenue
Service

Gerling-Ritters, Hans D., Counsel for Petitioner

Gibson, Dunn & Crutcher LLP, Counsel for Petitioner

Goldberg, Lisa M., Office of Chief Counsel, Internal Revenue Service

Gordon, Anne, Counsel for Amicus National Foreign Trade Council,
Inc.

Greenhouse, Robin L., Office of Chief Counsel, Internal Revenue
Service

Hagley, Judith A., Attorney, Appellate Section, Tax Division,

United States Department of Justice, Counsel for Appellee

*Haungs, Michael J., Acting Chief, Appellate Section, Tax Division,

United States Department of Justice, Counsel for Appellee

Haji, Sakina, Counsel for Petitioner-Appellant

Hintermeister, Anne O'Brien, Office of Chief Counsel, Internal

Revenue Service

Holland & Knight LLP, Counsel for Amicus National Foreign Trade

Council, Inc.

Hoory, Eli, Office of Chief Counsel, Internal Revenue Service

Hubbert, David A., former Deputy Assistant Attorney General, Tax

Division, United States Department of Justice

Jacinto, Jarrett Y., Counsel for Petitioner

Joseph, Madeleine, Counsel for Amici PwC US Tax LLP,

Deloitte Tax LLP, and KPMG LLP

Kaplan Hecker & Fink, LLP, Counsel for Petitioner

Kenworthy, Kevin L., Counsel for Petitioner

Klenicki, Erica, Counsel for Amicus National Association of

Manufacturers

Konopka, Erik J., Counsel for Petitioner-Appellant

KPMG LLP, Amicus in support of Petitioner-Appellant

Krause, Melanie, former Acting Commissioner, Internal Revenue

Service, Respondent-Appellee

Kummer, Michael D., Counsel for Petitioner

Lampert, Heather, Office of Chief Counsel, Internal Revenue Service

Latham & Watkins LLP, Counsel for Petitioner-Appellant

Lauber, Albert G., Senior Judge, United States Tax Court

Lerner, Matthew D., Counsel for Amici for PwC US Tax LLP,

Deloitte Tax LLP, and KPMG LLP

*Long, Billy, Commissioner, Internal Revenue Service, Respondent-

Appellee

Luttig, Honorable John Michael, Counsel for Petitioner

Magee, John B., Counsel for Petitioner

Massey, Jonathan S., Counsel for Petitioner

Massey & Gail LLP, Counsel for Petitioner

Matta, Lamia R., Counsel for Petitioner

Matthias-Bennetch, Paul W., Counsel for Amicus National Foreign
Trade Council, Inc.

Metcalf, Nicholas R., Counsel for Petitioner

Mezei, Saul, Counsel for Petitioner

Miller & Chevalier Chartered, Counsel for Petitioner

Molinoff, Sarah, Counsel for Amicus National Foreign Trade Council,
Inc.

Monaghan, Maria C., Counsel for Amicus Chamber of Commerce of
the United States of America

Morgan Lewis & Bockius LLP, Counsel for Petitioner

Morrison, Sean T., Counsel for Petitioner

National Association of Manufacturers, Amicus in support of
Petitioner-Appellant

National Foreign Trade Council, Inc., Amicus in support of
Petitioner-Appellant

Odintz, Joshua D., Counsel for Amicus National Foreign Trade
Council, Inc.

Ortiz, Lisandra, Counsel for Petitioner

Patterson, Kathryn F., Office of Chief Counsel, Internal Revenue
    Service

Paul, William M., Office of Chief Counsel, Internal Revenue Service

PwC US Tax LLP, Amicus in support of Petitioner-Appellant

Rasheed, Raza, Counsel for Petitioner-Appellant

Richards, Veronica L., Office of Chief Counsel, Internal Revenue
    Service

Rider-Longmaid, Parker, Counsel for Petitioner-Appellant

Rollinson, Marjorie, former Chief Counsel, Internal Revenue Service

Rubin, Curt M., Office of Chief Counsel, Internal Revenue Service

Rubin, Jennifer M., Attorney, Appellate Section, Tax Division,
    United States Department of Justice

Sidley Austin LLP, Counsel for Amici PwC US Tax LLP,
    Deloitte Tax LLP, and KPMG LLP

Skadden, Arps, Slate, Meagher & Flom LLP, Counsel for Petitioner-
    Appellant

Stafford, Blake, Counsel for Petitioner-Appellant

Stark, Sanford W., Counsel for Petitioner

The Coca-Cola Company, NYSE: KO, Petitioner-Appellant

Tilghman II, Michael A., Counsel for Amicus National Association of
Manufacturers

Tribe, Laurence H., Counsel for Petitioner

Ugolini, Francesca, former Chief, Appellate Section, Tax Division,
United States Department of Justice

Ussing, Carl Terrell, Counsel for Petitioner

Walker, Christopher J., Counsel for Amici Chamber of Commerce of
the United States of America and National Association of
Manufacturers

Werfel, Daniel, former Commissioner, Internal Revenue Service,
Respondent-Appellee

Wilkins, William J., Office of Chief Counsel, Internal Revenue Service

Zemil, Nicholas A., Counsel for Petitioner

As noted above, appellant The Coca-Cola Company is a publicly
held corporation, and its NYSE ticker symbol is KO.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to 11th Cir. R. 28-1(c) and Fed. R. App. P. 34(a), counsel for the Commissioner respectfully inform this Court that they believe that oral argument may be beneficial in this fact-intensive case.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons and

Corporate Disclosure Statement ................................................... C-1

Statement regarding oral argument............................................................i

Table of contents.......................................................................................ii

Table of authorities ................................................................................. vi

Glossary .................................................................................................. xvi

Introduction ............................................................................................... 1

Statement of the issue............................................................................... 2

Statement of the case ............................................................................... 2

    (i)    Course of proceedings and disposition in the court

        below .............................................................................. 2

    (ii)    Statement of the facts..................................................... 3

        1.    Background:  Transfer pricing .............................. 3

        2.    Coca-Cola's operations.......................................... 8

            a.    Coca-Cola's intangibles ................................. 9

            b.    Bottlers.......................................................... 10

            c.    Coca-Cola's foreign affiliates...................... 12

        3.    Coca-Cola's 2007-2009 tax reporting .................. 15

**Page**

       4.    Tax Court proceedings ......................................... 16

            a.    Commissioner's transfer-pricing

                method ......................................................... 16

            b.    Coca-Cola's transfer-pricing methods ....... 18

            c.    Tax Court opinion ...................................... 19

    (iii)   Standard of review ........................................ 23

Summary of argument .......................................................... 24

Argument ................................................................................ 26

    The Tax Court correctly upheld the Commissioner's

    adjustments to Coca-Cola's income under §482 .................. 26

    A.    Introduction................................................................ 26

    B.    The Commissioner did not abuse his discretion by

         applying the CPM to Coca-Cola's 2007-2009 tax

         years rather than the method the parties agreed to

         use in settling its 1987-1995 tax years ........................ 28

         1.    Closing Agreement ............................................. 29

         2.    Prior audits ......................................................... 33

         3.    Inapposite APA concepts ................................... 37

**Page**

C.  Coca-Cola failed to demonstrate that the
Commissioner abused his discretion in adopting
the CPM as the "best method" ................................... 46

    1.  The Tax Court correctly applied the
regulations when evaluating the
Commissioner's CPM ........................................... 49

    2.  Suppliers did not own unique marketing
intangibles that distinguished them from
Bottlers .................................................................. 56

    3.  Coca-Cola has failed to demonstrate error —
let alone clear error — in treating Bottlers as
comparable to Suppliers ..................................... 62

D.  The Commissioner's §482 adjustments regarding
the Brazilian Supplier were not precluded by
Brazilian restrictions on royalty payments ................. 66

    1.  Brazil did not prohibit Coca-Cola's receipt of
income ................................................................. 67

**Page**

    2.    The plain language of §482 authorizes the

        Commissioner's adjustments ...............................71

Conclusion........................................................................76

Certificate of compliance .........................................77

Certificate of service ................................................78

# TABLE OF AUTHORITIES

**Cases:**                                                    **Page(s)**

*3M Co. v. Commissioner,*

    160 T.C. 50 (2023), *appeal pending,*

    No. 23-3772 (8th Cir.)........................................67, 71, 73

*Affordable Bio Feedstock, Inc. v. United States,*

    42 F.4th 1288 (11th Cir. 2022)......................................36

*Altera Corp. v. Commissioner,*

    926 F.3d 1061 (9th Cir. 2019) ......................................73

*Amgen, Inc. v. Commissioner,*

    No. 16017-21, Order (July 3, 2024)

    (perma.cc/T8BY-3JLY)................................................42

*Analog Devices, Inc. v. Commissioner,*

    147 T.C. 429 (2016)....................................................32

*ATL & Sons Holdings, Inc. v. Commissioner,*

    152 T.C. 138 (2019)....................................................34

*Biddle v. Commissioner,*

    302 U.S. 573 (1938) ...................................................75

\* Cases or authorities chiefly relied upon are marked by asterisks.

**Cases (cont'd):** **Page(s)**

*Bonner v. City of Prichard,*

661 F.2d 1206 (11th Cir. 1981) ...................... 26

*Bowen v. Massachusetts,*

487 U.S. 879 (1988) ........................................ 43

*Brittingham v. Commissioner,*

598 F.2d 1375 (5th Cir. 1979) ...................... 26

*Cent. Bank of the S. v. United States,*

834 F.2d 990 (11th Cir. 1987) ...................... 35

*Commissioner v. First Security Bank,*

405 U.S. 394 (1972) ............................ 70, 73-75

*Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.,*

417 U.S. 134 (1974) ........................................ 52

\* *Commissioner v. Neal,*

557 F.3d 1262 (11th Cir. 2009) .......... 23, 37, 38, 43

*Davis v. Commissioner,*

716 F.3d 560 (11th Cir. 2013) ...................... 62

\* Cases or authorities chiefly relied upon are marked by asterisks.

**Cases (cont'd):** **Page(s)**

*Dickman v. Commissioner,*

465 U.S. 330 (1984) ........................................................ 41

*Dinkins v. Commissioner,*

378 F.2d 825 (8th Cir. 1967) ......................................... 33

*Dixon v. United States,*

381 U.S. 68 (1965) .......................................................... 41

*E. I. Du Pont de Nemours & Co. v. United States,*

608 F.2d 445 (Ct. Cl. 1979) ........................................... 26

\* *Ellinger v. United States,*

470 F.3d 1325 (11th Cir. 2006) ................................. 30, 36

*Encino Motorcars, LLC v. Navarro,*

579 U.S. 211 (2016) ........................................................ 42

*Facebook, Inc. v. Commissioner,*

164 T.C. No. 9, 2025 WL 1493002 (May 22, 2025) ........ 27

*Fitzgerald Truck Parts & Sales, LLC v. United States,*

132 F.4th 937 (6th Cir. 2025) ........................................ 39

\* Cases or authorities chiefly relied upon are marked by asterisks.

**Cases (cont'd):**                                      **Page(s)**

*Gatlin v. Commissioner,*

   754 F.2d 921 (11th Cir. 1985) ...................................... 45

*Greenberg's Express, Inc. v. Commissioner,*

   62 T.C. 324 (1974)........................................................ 45

*Harrison v. Commissioner,*

   138 T.C. 340 (2012)...................................................... 33

*INDOPCO, Inc. v. Commissioner,*

   503 U.S. 79 (1992) ........................................................ 58

*Joseph Gann, Inc. v. Commissioner,*

   701 F.2d 3 (1st Cir. 1983)............................................. 33

\*  *Knight-Ridder Newspapers, Inc. v. United States,*

   743 F.2d 781 (11th Cir. 1984) ................................... 33, 34, 38, 45

*Kroner v. Commissioner,*

   48 F.4th 1272 (11th Cir. 2022)..................................... 40

*Lincoln Elec. Co. v. Commissioner,*

   444 F.2d 491 (6th Cir. 1971) ........................................ 33

\* Cases or authorities chiefly relied upon are marked by asterisks.

**Cases (cont'd):**                                              **Page(s)**

*Loper Bright Enters. v. Raimondo,*

    603 U.S. 369 (2024) ........................................................ 67

*Medtronic, Inc. v. Commissioner,*

    T.C. Memo. 2016-112, *vacated,*

    900 F.3d 610 (8th Cir. 2018) ......................................... 34

*Newark Morning Ledger Co. v. United States,*

    507 U.S. 546 (1993) ........................................................ 58

*PPL Corp. v. Commissioner,*

    569 U.S. 329 (2013) ........................................................ 75

*Procter & Gamble Co. v. Commissioner,*

    961 F.2d 1255 (6th Cir. 1992) ................................. 70, 74

\* *Qinetiq US Holdings, Inc. v. Commissioner,*

    845 F.3d 555 (4th Cir. 2017) ................................... 38, 43

*Ralston Dev. Corp. v. United States,*

    937 F.2d 510 (10th Cir. 1991) ...................................... 35

*Sarma v. Commissioner,*

    45 F.4th 1312 (11th Cir. 2022) ..................................... 52

\* Cases or authorities chiefly relied upon are marked by asterisks.

**Cases (cont'd):**                                          **Page(s)**

*Stone v. Commissioner,*

86 F.4th 1320 (11th Cir. 2023) ...................................... 44

\* *Estate of Streightoff v. Commissioner,*

954 F.3d 713 (5th Cir. 2020) ................................... 38, 43

*Texaco, Inc. v. Commissioner,*

98 F.3d 825 (5th Cir. 1996) ........................................ 74

*Union Equity Coop. Exch. v. Commissioner,*

58 T.C. 397 (1972), *aff'd*, 481 F.2d 812 (10th Cir. 1973).............. 34

*Wood v. Commissioner,*

245 F.2d 888 (5th Cir. 1957) ....................................... 34

**Statutes:**

Administrative Procedure Act, 5 U.S.C. §§551 et seq. ...................... 37

Internal Revenue Code (26 U.S.C.):

\*    §482 ............... 2-5, 7, 13, 15, 22-31, 33, 35, 39-46, 50, 66-68, 70-74

§6212(a) ........................................................ 39

\* Cases or authorities chiefly relied upon are marked by asterisks.

**Statutes (cont'd):**                                                         **Page(s)**

Internal Revenue Code (26 U.S.C.) (cont'd):

§6662(d)(2)(B) ................................................................. 36

§6662(e) ........................................................................... 30

§6662(e)(1)(B) ................................................................... 7

§6662(e)(3)(B) ........................................................... 31, 36

§6662(e)(3)(B)(i) ............................................................... 8

§6662(e)(3)(B)(ii) .............................................................. 8

§6664(c) ........................................................................... 36

§7121 ......................................................................... 15, 26

Tax Reform Act of 1986, P.L. 99-514 ................................ 5

**Regulations and Regulatory Materials:**

Treasury Regulations (26 C.F.R.):

§1.482-1(b)(1) ............................................................. 4, 75

\*   §1.482-1(c) ............................................................. 6, 15, 27

\*   §1.482-1(c)(1) ..................................................... 41, 47, 48

§ 1.482-1(c)(2)(i) ............................................................ 55

§1.482-1(d) ..................................................................... 49

\* Cases or authorities chiefly relied upon are marked by asterisks.

**Regulations and Regulatory Materials (cont'd):**     **Page(s)**

Treasury Regulations (26 C.F.R.) (cont'd):

§1.482-1(d)(1)(iii) ........................................................ 54

§1.482-1(d)(3)(ii)(B) .............................................. 52, 54

§1.482-1(f)(1) .............................................................. 35

§1.482-1(h)(2) ........................................................ 23, 66

§1.482-1(h)(2)(i) .......................................................... 66

§1.482-2(d)(2)(ii) ........................................................... 4

§1.482-4(a) ................................................................... 41

§1.482-4(c) ..................................................................... 6

§1.482-4(c)(2)(iii)(A) .................................................. 64

§1.482-4(c)(2)(iii)(B)(1) .......................................... 7, 64

§1.482-4(c)(2)(iii)(B)(2) ............................................... 7

§1.482-4T(f)(3)(i)(A) .............................................. 50, 53

\* §1.482-5 ................................................................. 6, 17

§1.482-5(a) ............................................................... 7, 46

§1.482-5(b)(2) ........................................................ 17, 49

§1.482-5(b)(2)(e) ........................................................ 49

\* Cases or authorities chiefly relied upon are marked by asterisks.

**Regulations and Regulatory Materials (cont'd):**          **Page(s)**

Treasury Regulations (26 C.F.R.) (cont'd):

\* §1.482-5(b)(2)(i)................................................................56, 60

  §1.482-5(b)(4)(i)..................................................................18

  §1.482-5(b)(4)(iii)................................................................18

  §1.482-5(c)(2)......................................................................49

\* §1.482-5(c)(2)(ii)..........................................................17, 48, 54

\* §1.482-5(c)(2)(iii)............................................................17, 48

  §1.482-5(d)(6)......................................................................61

  §1.482-6..............................................................................41

\* §1.482-8(b)................................................................48, 49, 64

  §1.6662-6(d)(2)(ii)(A)(6).................................7, 27, 29, 31

  §1.6662-6(d)(2)......................................................................8

  §1.6662-6(d)(3)......................................................................8


59 Fed. Reg. 34971 (1994)..........................................5, 7, 64

61 Fed. Reg. 4876 (1996)..................................................29

71 Fed. Reg. 44466 (2006)................................................51

\* Cases or authorities chiefly relied upon are marked by asterisks.

**Regulations and Regulatory Materials (cont'd):** **Page(s)**

IRS Announcement 2025-13, 2025-15 I.R.B. 1392 ............................ 48

Rev. Proc. 68-16, 1968-1 C.B. 770 ...................................................... 32

Rev. Proc. 2015-41, 2015-35 I.R.B. 263 .............................................. 26

**Other Authorities:**

Ryan Finley, *In Coca-Cola, Amici Focus on Procedure*

*and Avoid Substance*, 187 Tax Notes Fed'l 16

(Apr. 7, 2025) (perma.cc/UT98-VY4A) ............................. 27, 42, 44

H.R. Rep. 99-426 (1985) ....................................................... 4, 5, 43, 72

H.R. Rep. 99-841 (1986) ........................................................................ 5

Joint Committee on Tax'n, *Gen'l Explanation of the Tax*

*Reform Act of 1986*, JCS-10-87 (1987) ........................................... 4

\* Cases or authorities chiefly relied upon are marked by asterisks.

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Br. | Opening brief filed by appellant Coca-Cola |
| Chamber-Am.Br. | Amicus brief filed by Chamber of Commerce of the United States of America and National Association of Manufacturers |
| CPM | Comparable profits method |
| CUT | Comparable uncontrolled transaction |
| Doc. | Entries in Tax Court Docket No. 31183-15 |
| Ex. | Trial Exhibits |
| I.R.C. | Internal Revenue Code (26 U.S.C.) |
| IRS | Internal Revenue Service |
| Reg. | Treasury Regulation (26 C.F.R.) |

# INTRODUCTION

This dispute involves the classic case of a U.S. multinational
taxpayer (Coca-Cola) shifting income from its highly profitable U.S.
operations to offshore manufacturing subsidiaries, by charging an
artificially low royalty rate for extraordinarily valuable intangibles.
Following an eight-week trial, the Tax Court issued a 229-page opinion
concluding that Coca-Cola had grossly undervalued its world-renowned
intangibles, thereby underreporting its U.S. income by billions during
2007-2009.  The court upheld the Commissioner's method for pricing
those intangibles, holding that it was well-supported by the relevant
law and facts.  The court rejected Coca-Cola's pricing methods, finding
that they were deeply flawed.

Coca-Cola and its amici make no effort to defend its methods on
appeal.  Instead, they complain that the IRS adjusted Coca-Cola's
pricing in 2007-2009 after accepting it in prior tax years.  But legal
entitlement to a perpetual windfall is not a real thing.  Coca-Cola seeks
to estop the Government from enforcing the tax law based on a "promise
that the Government did not make."  (Doc.740, p.98.)  That Coca-Cola

may have gotten away with massive underreporting in prior years is no defense to the tax it owes for 2007-2009.

## STATEMENT OF THE ISSUE

Coca-Cola developed highly profitable intangibles (including its world-famous brands and secret formula), which it licensed to international manufacturing subsidiaries. Although Coca-Cola controlled the subsidiaries, their income was not subject to U.S. tax. Section 482 of the Internal Revenue Code (26 U.S.C.) authorizes the Commissioner to adjust Coca-Cola's intercompany charges for the use of its intangibles to clearly reflect income subject to U.S. taxation. The question presented is:

Whether the Tax Court correctly upheld the Commissioner's adjustments to Coca-Cola's income under §482.

## STATEMENT OF THE CASE

**(i)     Course of proceedings and disposition in the court below**

In 2015, the Commissioner issued Coca-Cola a notice of deficiency for tax years 2007-2009 that increased its tax liability by $3 billion[2]

---

[2] Dollar figures are approximations.

based on a reallocation of income under §482. (Doc.1, Ex.A.) Coca-Cola

sought review in Tax Court. (Doc.1.) Following an eight-week trial, the

court upheld the Commissioner's transfer-pricing method (Doc.740) and

entered a decision incorporating the parties' agreed-upon computations

(Doc.799).

**(ii)   Statement of the facts**

**1.   Background: Transfer pricing**

U.S. corporations operating through related enterprises, including

affiliated foreign corporations, have long manipulated internal

allocations to avoid U.S. income. For example, a U.S. corporation that

sells products generated through joint efforts of U.S. and foreign

subsidiaries could artificially lower its U.S. taxable income by allocating

most of the income to the foreign subsidiaries. To combat such abuse,

and to ensure that transactions between related parties reflect economic

reality, Congress — for almost 100 years — has given the IRS broad

authority to evaluate pricing of transactions between related parties

(Doc.740, p.89), and to allocate certain tax items (including gross

income) "if [it] determines that such ... allocation is necessary in order

... clearly to reflect the income" of such entities. I.R.C. §482. Under

regulations implementing §482, taxable income of related parties will be determined as if they had conducted their affairs like unrelated entities "dealing at arm's length." Reg. §1.482-1(b)(1).

This case concerns the transfer of the right to use intangibles between related parties. For many years, the arm's-length price for such transfers was determined primarily by reference to comparable transactions between unrelated parties. Reg. §1.482-2(d)(2)(ii) (1985). By the mid-1980s, however, Congress became concerned that this transaction-based approach failed to properly allocate income when related parties transferred "high-profit" intangibles because there were no comparable transactions for such transfers. Joint Committee on Tax'n, *Gen'l Explanation of the Tax Reform Act of 1986*, JCS-10-87, at 1014-1016 (1987).

As relevant here, Congress was particularly concerned about taxpayers transferring "high profit intangibles" to foreign affiliates without requiring the foreign affiliate to pay the U.S. taxpayer a price "commensurate with the income attributable to the intangible." H.R. Rep. 99-426, at 425 (1985). As Congress explained, there "is a strong incentive for taxpayers to transfer intangibles to related [corporations]

in a low tax jurisdiction, particularly when the intangible has a high value relative to manufacturing or assembly costs." *Id*. at 423.

To remedy this problem, Congress adopted a new standard for determining income related to transfers of intangible property by adding the following sentence to §482 in 1986:

> In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

Tax Reform Act of 1986, P.L. 99-514, §1231(e)(1) (codified at I.R.C. §482 (second sentence)).  The stated "objective" of adopting the commensurate-with-income requirement was to ensure "that the division of income between related parties reasonably reflect the relative economic activity undertaken by each."  H.R. Rep. 99-841, at II-637 (1986) (Conf. Rep.).  Congress also directed Treasury to evaluate its transfer-pricing regulations and consider alternative methods for pricing intercompany intangible transfers that did not depend on identifying comparable transfers between unrelated parties.  *Id*. at II-638.

In response, Treasury overhauled its transfer-pricing regulations. 59 Fed. Reg. 34971 (1994).  To remedy the prior inappropriate pricing of

high-profit intangibles by reference to transactions that were not truly comparable, the 1994 regulations (i) heightened the comparability standards for reliance on purportedly comparable transactions between unrelated parties involving intangibles, and (ii) provided alternative, profit-based methods that, in many instances, could more reliably provide an arm's-length price by valuing the intangibles indirectly.

The 1994 regulations provide several methods for determining an arm's-length price for intercompany transactions and require that the "best method" — that is, the method that provides the most reliable arm's-length result for the transaction at issue — be used. Reg. §1.482-1(c). For intercompany transfers or licenses of intangible property (such as trademarks), the methods include (as relevant here) the comparable-uncontrolled-transaction method (CUT), Reg. §1.482-4(c), and the comparable-profits method (CPM), Reg. §1.482-5.

The CUT method directly values the intangibles and determines the arm's-length consideration for the related-party transfer (the "controlled transaction") based on the price used in a transaction between unrelated parties (the "uncontrolled transaction"), and is limited to situations where the intangibles transferred (and the

circumstances of the transfer) are comparable. Reg. §1.482-4(c)(2)(iii)(B)(1)&(2). Without a transaction involving comparable intangible property, the CUT method cannot be used. *Id*.

Unlike the restrictive CUT method, the CPM is far more flexible and does not depend on finding a comparable uncontrolled transaction, which may not exist for high-profit intangibles. 59 Fed. Reg. at 34974. Instead, the CPM determines the arm's-length consideration for a controlled transaction indirectly, "based on objective measures of profitability (profit level indicators) derived from uncontrolled taxpayers that engage in similar business activities under similar circumstances." Reg. §1.482-5(a).

To stem rampant transfer-pricing abuse by multinationals, Congress designed an accuracy-related penalty specifically for §482 adjustments. I.R.C. §6662(e)(1)(B). If a taxpayer uses a transfer-pricing method previously adopted in an expired advance pricing agreement, or specifically approved by the IRS in an audit for a prior year, the taxpayer may rely on that method to defend against this penalty for a subsequent tax year but cannot use the method to avoid the §482 adjustment itself. Reg. §1.6662-6(d)(2)(ii)(A)(6). Taxpayers

can also avoid the penalty by reasonably utilizing one of the methods described in the regulations (*e.g.*, the CPM) and providing certain documentation. I.R.C. §6662(e)(3)(B)(i)&(ii); Reg. §1.6662-6(d)(2)&(3).

## 2. Coca-Cola's operations

Coca-Cola is the world's leading nonalcoholic beverage company, headquartered in the United States with operations and sales worldwide. (Doc.575, ¶3415; Ex.8288-R, pp.7-10.) For decades, including the years at issue (2007-2009), it owned the world's top soft drink brand (Coca-Cola) and three others (Diet Coke, Sprite, and Fanta) within the top five. (Ex.8288-R, pp.7-8.)

For more than 100 years, Coca-Cola has followed a highly successful business model whereby it licensed independent bottling companies (Bottlers) the right to manufacture Coca-Cola products and sell them in a specified region. (Doc.740, pp.12-13, 16-18; Ex.8294-R, p.9.) Coca-Cola and Bottlers worked together to promote Coca-Cola's valuable brands, with Coca-Cola handling consumer marketing and Bottlers handling retail marketing. (Doc.740, pp.30-41.) They also shared manufacturing responsibilities, with Coca-Cola manufacturing the concentrate that Bottlers used to manufacture finished Coca-Cola-

brand beverages.  (Doc.740, pp.20-26.)  Coca-Cola's marketing was handled primarily by service subsidiaries (ServCos), and its concentrate manufacturing was handled by manufacturing subsidiaries (which it called "supply points").  (Doc.740, pp.20-41.)  This case concerns the price that certain supply points paid Coca-Cola for the use of its intangibles to manufacture concentrate and sell it to Bottlers.

### a.    Coca-Cola's intangibles

During the years at issue, Coca-Cola was far more profitable than any of its competitors.  (Ex.8288-R, pp.8-9, 27.)  Its high profitability was due to two sets of uniquely valuable intangibles: (i) brand-related intangibles, including its legendary secret formulas, proprietary marketing processes, and trademarks (which it describes as its most valuable assets), and (ii) the most extensive beverage distribution system in the world.  (Doc.740, pp.7-8, 115-120; Ex.8294-R, pp.2, 22-26; Ex.8288-R, pp.9-10 & n.19; Ex.8407-R, pp.18-19.)  Almost all its revenue was from its core brands (Coke, Diet-Coke, Sprite, and Fanta); Coca-Cola was the legal owner of all worldwide trademarks for those brands (excepting Canada).  (Doc.740, pp.31, 68-69.)  As the party that

contracted with the Bottlers, Coca-Cola also owned its distribution intangibles. (Doc.740, pp.57, 117; Ex.8294-R, p.2.)

Coca-Cola's international operations were managed by a U.S. subsidiary, Coca-Cola Export Corporation. (Doc.740, p.13.) To manufacture and sell its products internationally, Coca-Cola (through Export) licensed its intangibles to independent Bottlers and to wholly owned supply points. (Doc.740, pp.42, 57-59.)

### b. Bottlers

Coca-Cola entered long-term contracts with hundreds of Bottlers that gave them exclusive rights to manufacture and sell finished Coca-Cola products within a specific territory. (Doc.740, pp.57-59.) To perform those functions, Bottlers were granted rights to use Coca-Cola's trademarks and other intangible property. (*Id*.) They purchased concentrate from Coca-Cola and used it to manufacture finished Coca-Cola products, which they marketed and distributed to retail establishments. (Doc.740, pp.25-26, 37-41.)

Bottlers compensated Coca-Cola for the use of its intangibles through the price they paid supply points for concentrate. (Doc.740, p.61.) In exchange for that price, Bottlers received (i) the right to use

Coca-Cola's intangibles, (ii) access to Coca-Cola's approved suppliers and marketing materials, (iii) the expectation of ongoing consumer marketing by Coca-Cola's ServCos, and (iv) concentrate manufactured by Coca-Cola's supply points. (Doc.740, pp.61-62, 132; Doc.698, pp.8073-8075; Doc.702, pp.8673-8677.) Coca-Cola and Bottlers negotiated the concentrate price. (Doc.740, p.62.)

To stimulate demand, Coca-Cola worked with Bottlers to market its products. (Doc.740, p.30.) That marketing included global campaigns coordinated by U.S. headquarters to develop and protect its core global brands, which drove its profits. (Doc.740, pp.18, 31-37, 189; Ex.8407-R, pp.18-33; Doc.631, pp.493-494.) Bottlers worked with Coca-Cola's local marketing personnel to implement these global campaigns. (Doc.740, pp.33-34.) Bottlers were responsible for the trade marketing of Coca-Cola products, i.e., promotions directed toward, and placed at, retail establishments such as supermarkets and restaurants. (Doc.740, pp.37-41.) Their trade-marketing expenses were significant, roughly equal to that spent on Coca-Cola's consumer marketing. (Doc.740, pp.30, 41, 130, 188-190.)

### c.    Coca-Cola's foreign affiliates

The concentrate that Bottlers purchased was manufactured by Coca-Cola's supply points.  (Doc.740, pp.24-25.)  Initially, Coca-Cola established supply points in virtually every country to supply concentrate to local Bottlers.  (Doc.740, p.14.)  Later, it consolidated its concentrate manufacturing into fewer supply points that sold to Bottlers operating in diverse national markets.  (*Id.*)

Coca-Cola's agreements with its supply points generally were one-year contracts terminable by Coca-Cola on short notice.  (Doc.740, p.46.)  Coca-Cola routinely terminated supply points or reduced their production, shifting production to other supply points without compensating the affected supply points.  (Doc.740, pp.27-28, 118.)  Between 1980 and 2010, Coca-Cola reduced its supply points from 52 to 18.  (Doc.740, pp.27-28.)  No supply point was granted exclusive territorial rights, and they were regularly directed to sell concentrate to Bottlers in other supply points' domestic markets.  (Doc.740, p.47.)

Coca-Cola's agreements with its supply points granted them the right to manufacture and sell concentrate to Bottlers designated by Coca-Cola.  (Doc.740, pp.42-46, 128; Doc.575, ¶3418.)  To perform those

functions, supply points were licensed the "limited right" to use Coca-Cola's intangibles, including trademarks, brand names, logos, patents, secret formulas, and proprietary manufacturing processes, but they had no legal or contractual ownership interest in that property — only nonexclusive, terminable access. (Doc.740, pp.7, 42-45, 172-173.) The agreements made clear that Coca-Cola owned the intangibles. (Doc.740, pp.42, 117.) Supply points owned few or no intangibles of their own. (*Id.*) Their manufacturing function was relatively simple, mixing ingredients according to detailed formulas and instructions provided by Coca-Cola. (Doc.575, ¶¶3417-3418.)

This case concerns tax deficiencies that arose from the Commissioner's §482 adjustments to Coca-Cola's income allocations with its supply points in Brazil, Chile, Costa Rica, Ireland, Mexico, and Swaziland (collectively "Suppliers").[3] (Doc.740, pp.14-15, 82-83; Ex.8294-R, p.1.) Most Suppliers had very low effective tax rates. (Ex.8511-R.) Four Suppliers were engaged solely in concentrate production. (Doc.740, pp.19-25.) Two Suppliers (Brazil and Chile) also

---

[3] The Commissioner also adjusted the income of Coca-Cola's Egyptian supply point, but that adjustment did not generate a tax deficiency. (Doc.740, p.83.)

performed the same consumer-marketing activities as performed by Coca-Cola's ServCos. (Doc.740, pp.34 n.13, 110; Doc.702, p.8658.)

Most of Coca-Cola's consumer marketing was performed by its ServCos (with the assistance of third-party marketers). (Doc.740, p.49.) Their agreements with Coca-Cola provided that they assumed no "entrepreneurial risk in developing marketing concepts" because any marketing was "within [Coca-Cola's] guidelines." (Ex.128-J, p.3; Doc.740, pp.53-54, 117.) The agreements also made clear that any "marketing concepts" and "intangibles" created by their marketing activities were owned by Coca-Cola. (*Id.*)

Coca-Cola's practices for compensating ServCos varied, but the Suppliers' role was limited. Sometimes Coca-Cola charged the marketing expense to a Supplier's books. (Doc.740, pp.54-55.) Suppliers were "passive recipients" of those charges and had no role in determining the scope or propriety of the marketing expenses. (Doc.740, pp.54-57.) In other situations, called "split invoicing," Coca-Cola had the ServCo invoice the Bottler directly, and the Bottler would pay a portion of the negotiated concentrate price directly to the ServCo and the remainder to the Supplier. (Doc.740, pp.64-66.)

### 3.    Coca-Cola's 2007-2009 tax reporting

During the tax years at issue (2007-2009), Suppliers paid Coca-Cola for the use of its intangibles based on a formulary method called 10-50-50. (Doc.740, pp.8-11.) Under 10-50-50, Suppliers retained profit equal to 10% of the concentrate proceeds paid by Bottlers, with the remaining amount split 50%-50% with Coca-Cola. (*Id.*) Coca-Cola and the IRS had agreed in 1996 to use that formula to settle Coca-Cola's tax liabilities for 1987-1995, entering into a Closing Agreement under I.R.C. §7121. (*Id.*) The 1996 Closing Agreement did not purport to apply the "best method" — that is, the method that provides the most reliable arm's-length result for the transaction at issue — within the meaning of the regulations. *See* Reg. §1.482-1(c). It merely set out a compromise that the parties agreed to treat as arm's-length pricing for 1987-1995 only. (Doc.740, pp.8-9, 94.) The Agreement did not address what transfer-pricing method would be used for post-1995 years, allowing Coca-Cola to use, and the Commissioner to make §482 adjustments under, a different method. (*Id.*) IRS auditors allowed Coca-Cola to continue using 10-50-50 during 1996-2006. (*Id.*)

After auditing Coca-Cola's consolidated U.S. tax returns for 2007-2009, the IRS determined that Coca-Cola's pricing of its Supplier agreements did not clearly reflect its income and that the "best method" for pricing those agreements was the CPM. (Doc.740, pp.78-79.) Applying the CPM, the IRS further determined Coca-Cola had tax deficiencies of $3 billion for 2007-2009. (Doc.740, p.6.) Coca-Cola petitioned the Tax Court for review. (Doc.1.)

### 4.   Tax Court proceedings

During the Tax Court proceedings, the parties disputed whether the CPM or the CUT method was the best method for determining an arm's-length price for Coca-Cola's intangibles.

### a.   Commissioner's transfer-pricing method

The Commissioner argued that the CPM is the best method for determining an arm's-length price for the intangibles because they were (i) unique and highly valuable, and (ii) owned by only one of the related parties (Coca-Cola).[4] (Doc.740, p.109.) Under the CPM, an arm's-length result is determined by computing the profits that would have

---

[4] Income from local brands owned by foreign affiliates were not allocated to Coca-Cola under the CPM. (Doc.740, pp.144-146; Ex.8295-R, A-1.)

been earned by the "tested party" if its profitability were the same as that of uncontrolled comparable companies performing similar activities under similar circumstances. Reg. §1.482-5. The "tested party" is typically the participant in the controlled transaction that has the least complex operations and lacks unique intangibles. Reg. §1.482-5(b)(2). To apply that method, the Commissioner's expert (Newlon) selected Suppliers as the tested party because they had the least complex function and Coca-Cola owned virtually all the intangibles. (Doc.740, p.79.)

The first step under the CPM is to select companies that are comparable to the tested party (i.e., Suppliers). Reg. §1.482-5(c)(2)(ii)&(iii). Newlon selected the Bottlers as comparable companies because they operated in the same industry, faced similar economic risks, had similar contractual relationships with Coca-Cola, employed many of the same intangible assets (such as Coca-Cola's brands, logos, and trademarks), and ultimately shared the same income stream from sales of Coca-Cola's beverages. (Doc.740, p.10; Ex.8294-R, pp.34-38, App.G/pp.15-19.)

The second step under the CPM is to select a profit-level indicator and apply it to the financial information of the comparable companies to determine their profitability. Reg. §1.482-5(b)(4)(i)-(iii). Because manufacturers (like Suppliers and Bottlers) depend largely upon their on-balance-sheet operating assets to generate profits, Newlon selected the return-on-operating-assets, Reg. §1.482-5(b)(4)(i), as the profit-level indicator. (Ex.8294-R, p.43, App.G/p.23.)

Applying the return-on-operating-assets ratio to the financial information for the Bottlers and the Suppliers, Newlon computed a range of returns earned by Bottlers and compared it to the returns earned by Suppliers. (Doc.740, pp.114, 135-136.) He found that, in 2007-2009, Bottlers had a median return of 15.8% on their assets compared to the Suppliers' 94%-214% return on their assets. (Doc.740, pp.81-82, 135-136; Ex.8294-R, p.47, App.G/p.29.) Relying on the Bottlers' median return, Newlon calculated arm's-length returns for the Suppliers and resulting royalties for 2007-2009. (Ex.8295-R, App.A.)

### b. Coca-Cola's transfer-pricing methods

Coca-Cola did not defend 10-50-50 in the Tax Court, proposing instead three alternative methods. (Doc.740, pp.191-208.) It argued

that the CUT method is the "best method" for pricing Coca-Cola's intangibles. (Doc.599, p.398.) Its expert, however, could not locate an uncontrolled transaction that was comparable, as required to apply that method. (Doc.740, pp.91, 195-196; Doc.699, pp.8129-8132.)

### c.    Tax Court opinion

The Tax Court determined that the Commissioner did not abuse his discretion by using the Bottler-based CPM to reallocate income from Suppliers to Coca-Cola. (Doc.740, pp.114-115.) In so ruling, the court found that Coca-Cola failed to establish that the Commissioner's CPM "implicated significant legal error" or was implemented unreasonably. (Doc.740, pp.91-92.)

As a threshold matter, the Tax Court determined that the Commissioner was not bound by 10-50-50 even though it was applied to past years by the 1996 Closing Agreement and accepted in subsequent audits. (Doc.740, pp.93-98.) The court then found that the case is "particularly susceptible" to a CPM analysis because Coca-Cola owned virtually all the intangibles needed to produce and sell its beverages and the Suppliers' function was less complex than Coca-Cola's — i.e., "routine manufacturing, mixing ingredients specified by [Coca-Cola]

according to manufacturing protocols supplied by [Coca-Cola]."
(Doc.740, pp.116-118.)

The Tax Court further determined that the independent Coca-Cola Bottlers were reasonably treated as "comparable" to Suppliers. (Doc.740, pp.120-121.) Applying the regulatory comparability factors, the court found that Bottlers:

- operated in the "same industry";

- served the "same" product markets;

- faced "similar economic risks";

- performed the same "routine" manufacturing function (mixing ingredients according to Coca-Cola's detailed protocols);

- used a "similar mix of resources" to discharge their manufacturing and distribution functions;

- employed "many of the same intangible assets"; and

- ultimately shared "the same income stream" from sales of Coca-Cola beverages.

(Doc.740, pp.121-127.) The court further found that any differences between the entities actually justified a "higher" return-on-assets for

Bottlers than for Suppliers and thus the CPM was "conservative" in that it tended to "overcompensate" Suppliers. (Doc.740, p.133; *see* Doc.740, pp.80, 123-125.) Finally, the court made detailed findings regarding the reasonableness of the data, assumptions, and comparability adjustments incorporated in the Commissioner's CPM analysis. (Doc.740, pp.133-146.)

The Tax Court rejected Coca-Cola's argument that Suppliers purportedly owned immensely valuable marketing intangibles ignored in the CPM analysis. (Doc.740, pp.150-172.) As the court explained, Coca-Cola owned all the valuable intangibles as a matter of law, contract, and economic substance (*id.*), and structured its operations that way to further a "central element of its corporate strategy — to centralize ownership of its 'crown jewels' in the U.S. parent to ensure their protection under U.S. law" (Doc.740, p.165). Weighing their interests, the court found that Coca-Cola, not the Suppliers, had all the bargaining power. (Doc.740, pp.173-174.) The court alternatively determined that, even if Suppliers were deemed to own valuable marketing intangibles, that fact would not set them apart from Bottlers. (Doc.740, pp.186-190.)

The Tax Court rejected the transfer-pricing methods pressed by Coca-Cola's experts, finding "none of their analyses persuasive." (Doc.740, p.191.) Coca-Cola makes no attempt to defend those methods on appeal and accordingly we do not detail the court's extensive, fact-intensive critique.[5] (*See* Doc.740, pp.191-208.)

The Tax Court allowed Coca-Cola to offset the Suppliers' royalty obligations under the CPM by the amount of dividends that Suppliers paid to Coca-Cola in 2007-2009. (Doc.740, pp.218-229.) The 1996 Closing Agreement permitted Suppliers to offset their §482 royalty obligations under 10-50-50 by paying dividends to Coca-Cola, and Coca-Cola continued to discharge much of the Suppliers' royalty obligations through dividends in subsequent years. (Doc.740, pp.218-219.) The court allowed Coca-Cola to recharacterize dividends as royalties in 2007-2009, despite its failure to comply with the regulatory requirements for dividend-offset treatment, citing the "unusual facts of this case." (Doc.740, p.224.)

---

[5] The Tax Court also upheld the Commissioner's §482 adjustments to the income allocated to ServCos under the split-invoicing arrangement. (Doc.740, pp.83-85, 147-149.) Coca-Cola has not challenged that ruling.

The Tax Court rejected Coca-Cola's argument that Brazilian law restricting the payment of royalties by Brazilian subsidiaries to foreign parents precluded §482 adjustments related to the Brazilian Supplier. (Doc.787.) As the court explained, the Brazil Supplier compensated Coca-Cola by paying dividends, not royalties, and Brazilian law placed no restrictions on the payment of dividends. (Doc.787, pp.9-10.) The court criticized Coca-Cola's attempted bait-and-switch, observing that it "seems inconsistent for [Coca-Cola] to argue that dividends can be treated as deemed royalties up to the amount [it] thought to be correct, but not in the larger amount that the Court has determined to be correct." (Doc.787, p.12.) The court also determined that Coca-Cola's argument was precluded by Reg. §1.482-1(h)(2). (Doc.787, p.14.)

**(iii)  Standard of review**

The Commissioner's deficiency determinations are subject to de novo review in the Tax Court, *Commissioner v. Neal*, 557 F.3d 1262, 1275 (11th Cir. 2009), and this Court reviews Tax Court decisions in the "'same manner'" as those of district courts, *id*. at 1268-1269 (citation omitted). Fact findings are reviewed for clear error, and legal conclusions are reviewed de novo. *Id*.

# SUMMARY OF ARGUMENT

For years, Coca-Cola shifted billions in income from its highly profitable U.S. operations to offshore manufacturing subsidiaries organized in low-tax jurisdictions by charging an artificially low royalty rate for extraordinarily profitable intangibles. Performing a best-method analysis under §482 for Coca-Cola's 2007-2009 tax years, the Commissioner reallocated Coca-Cola's income using the CPM. After an eight-week trial, and based on extensive findings, the Tax Court upheld the Commissioner's method and §482 adjustments. On appeal, Coca-Cola largely ignores the court's sound analysis and well-supported findings.

1. Coca-Cola's primary argument — which relies on a settlement applicable to prior years and government inaction in prior audits — conflicts with terms of that settlement and with binding precedent. In the 1996 Closing Agreement, the Government agreed that Coca-Cola could use 10-50-50 to price its intangibles for 1987-1995 but explicitly did <u>not</u> agree that it could do so for post-1995 years. Although Coca-Cola continued using 10-50-50 for 1996-2006 without objection, courts — including this Court — have repeatedly held that

IRS approval of a tax position during a prior year's audit does not preclude different treatment in a subsequent year. Coca-Cola's attempt to import Administrative Procedure Act (APA) rulemaking requirements into Tax Court deficiency proceedings has been waived and is otherwise baseless.

2. The Tax Court correctly determined that Coca-Cola failed to demonstrate that the Commissioner's selection and application of the CPM was unreasonable. The Commissioner's CPM analysis complied with the regulations and was well-supported by extensive fact finding, most of which Coca-Cola ignores. Coca-Cola has shown no error in the court's thorough, well-reasoned opinion.

3. The Tax Court correctly rejected Coca-Cola's argument that the Commissioner's §482 adjustments related to the Brazilian Supplier were precluded by Brazil's restrictions on royalties. Brazil placed no limits on the payment of dividends, the compensation method that Coca-Cola has long used for its Brazilian Supplier. Moreover, Coca-Cola's argument conflicts with the plain language of §482's commensurate-with-income standard, a provision that post-dates the inapposite case law cited by Coca-Cola.

# ARGUMENT

## The Tax Court correctly upheld the Commissioner's adjustments to Coca-Cola's income under §482

### A.  Introduction

The Commissioner has broad discretion to adjust related-party income allocations under §482, and taxpayers bear the burden of proving the Commissioner's adjustments were "unreasonable, arbitrary, or capricious." *Brittingham v. Commissioner*, 598 F.2d 1375, 1377-1378 (5th Cir. 1979).[6] Whether the Commissioner acted unreasonably turns on whether his §482 adjustments conflicted with the §482 rules or lacked factual support.  *Id*. at 1381-1382; *E. I. Du Pont de Nemours & Co. v. United States*, 608 F.2d 445, 455-456 (Ct. Cl. 1979); Doc.740, pp.90-93.

The Commissioner may voluntarily limit his discretion under §482 by entering into an advance pricing agreement, Rev. Proc. 2015-41, 2015-35 I.R.B. 263, or by executing a closing agreement, I.R.C. §7121. (Doc.740, p.93.)  Under such agreements, the Commissioner and the

---

[6] This Court has adopted decisions of the former Fifth Circuit prior to October 1, 1981, as binding precedent.  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

taxpayer can select a particular transfer-pricing method to apply for a limited time, even if the agreed-upon method is not the "best method" for determining an arm's-length price within the meaning of the §482 regulations. *See* Reg. §1.482-1(c). That contractual limitation does not, however, reach beyond the agreement's terms. If a taxpayer uses a transfer-pricing method specifically approved by the IRS in an expired advance pricing agreement (or in an audit for a prior tax year), the taxpayer can rely on that method to defend against penalties but cannot use the method to avoid the §482 adjustment itself for a subsequent tax year. Reg. §1.6662-6(d)(2)(ii)(A)(6).

The "arbitrary and capricious" standard under §482 is a substantive one whereby the Tax Court engages in its "own factfinding and legal analysis" to evaluate the Commissioner's §482 adjustments, *Facebook, Inc. v. Commissioner*, 164 T.C. No. 9, 2025 WL 1493002, at *32 (May 22, 2025), not to be confused with the similarly worded standard applicable to agency rulemaking under the APA, *see* Ryan Finley, *In Coca-Cola, Amici Focus on Procedure and Avoid Substance*, 187 Tax Notes Fed'l 16, 18-20 (Apr. 7, 2025) (perma.cc/UT98-VY4A). Coca-Cola recognized this distinction when it originally briefed the case

in the Tax Court, arguing that the IRS acted arbitrarily because (in its view) the Commissioner's CPM was legally and factually flawed. (Doc.599, pp.31-32; Doc.623, pp.1-28.)

After the Tax Court soundly rejected its substantive arguments regarding the CPM, Coca-Cola reframed its challenge, filing a motion for reconsideration months out of time that relied chiefly on judicial decisions interpreting the APA and the Fifth Amendment's Due Process Clause. (Doc.762, p.1.) The court correctly rejected that maneuver. (Doc.762.) *See*, below, §B. The court also correctly determined that Coca-Cola failed to prove that the Commissioner's CPM method was unreasonable, *see*, below, §C, or that the Commissioner's §482 adjustments regarding the Brazilian Supplier were precluded by Brazilian restrictions on royalty payments, *see*, below, §D.

### B. The Commissioner did not abuse his discretion by applying the CPM to Coca-Cola's 2007-2009 tax years rather than the method the parties agreed to use in settling its 1987-1995 tax years

Coca-Cola contends (Br.22-32) that, even if it underreported its taxes in 2007-2009 by almost $3 billion (as the Tax Court determined), it is entitled to that windfall because (i) the parties agreed in the 1996 Closing Agreement to use 10-50-50 for Coca-Cola's 1987-1995 tax years,

and (ii) IRS auditors allowed Coca-Cola to continue using that method in subsequent years. Neither of those facts, however, dictates the method to be used in 2007-2009, as the court correctly determined. (Doc.740, pp.93-98.) And the court properly rejected Coca-Cola's primarily APA-based arguments raised belatedly in its out-of-time motion for reconsideration. (Doc.762.)

Treasury regulations have long made clear that a transfer-pricing method specifically approved by the IRS in an expired advance pricing agreement or in an audit for a prior tax year does not preclude the IRS from making §482 adjustments under a different transfer-pricing method for a subsequent tax year; prior approval is relevant only to the imposition of penalties. Reg. §1.6662-6(d)(2)(ii)(A)(6). Those regulations were promulgated in 1996, long before Coca-Cola filed its tax returns in this case. 61 Fed. Reg. 4876 (1996). Coca-Cola cannot transform what is at most a penalty defense into total tax immunity.

### 1.    Closing Agreement

As the text of the Closing Agreement makes clear, the IRS did not "endorse[ ]" 10-50-50 for "future tax years" (Br.25) or "direct[ ]" (Br.24) Coca-Cola to use it during 2007-2009. IRS closing agreements "are to

be strictly construed." *Ellinger v. United States*, 470 F.3d 1325, 1336-1337 (11th Cir. 2006). Taxpayers cannot reasonably rely on anything "'other than the matters specifically agreed upon'" in the agreement. *Id.* at 1337 (citation omitted). In this case, the parties specifically agreed to use 10-50-50 <u>only</u> for Coca-Cola's "taxable years 1987 through 1995." (Ex.242-J, p.4.) Nothing in the Closing Agreement required Coca-Cola to apply — or the Commissioner to accept — 10-50-50 in post-1995 years. (Ex.242-J; Doc.706, p.9303.) Indeed, the parties specifically agreed to pursue advance pricing agreements for "taxable years after 1995," further recognizing that the Closing Agreement did not govern the transfer-pricing method to be used in post-1995 years. (Ex.242-J, p.22.)

The parties also specifically agreed in the Closing Agreement to a penalty provision that further confirms that the Commissioner was free to impose a different transfer-pricing method for post-1995 years. The parties agreed that "to the extent the Taxpayer applies the [10-50-50] method" for "taxable years after 1995," Coca-Cola "shall not be subject to [§6662(e)'s] accuracy-related penalty" for §482 adjustments.[7]

---

[7] The IRS kept this promise by not imposing penalties here.

(Ex.242-J, p.20.)  The conditional language — "to the extent" —
highlights that Coca-Cola was free to <u>not</u> apply 10-50-50.  (*Id*.)  More
importantly, if Coca-Cola chose to continue using 10-50-50 and the IRS
made §482 adjustments under a different method, the Closing
Agreement explicitly provided <u>only</u> "penalty" relief, not relief from the
§482 adjustment itself (consistent with the treatment of taxpayers who
continue using transfer-pricing methods adopted in expired advance
pricing agreements, *see* Reg. §1.6662-6(d)(2)(ii)(A)(6)).  (*Id*.)  This
penalty provision thus apprised Coca-Cola that the Commissioner may
make §482 adjustments under a different method in the future.

That Coca-Cola opted to take advantage of this penalty protection
cannot force the IRS to accept 10-50-50 in future years, as Coca-Cola
suggests (Br.25).  Coca-Cola bargained for, and obtained, protection for
only penalty — not tax — adjustments.  Moreover, Coca-Cola could
have obtained penalty protection for an alternative method in future
years by (among other things) providing documentation that complied
with I.R.C. §6662(e)(3)(B), just like all other taxpayers seeking to avoid
penalties related to their §482 reporting.  But Coca-Cola cannot rewrite
the Closing Agreement after the fact to obtain immunity from §482

itself.  As the Tax Court correctly held, Coca-Cola could not reasonably rely on "a promise that the Government did not make."  (Doc.740, p.98.)

Coca-Cola cites (Br.24) a statement in the Closing Agreement that the parties "agreed on a method for computing the arm's length amount" of the allocable royalties.  (Ex.242-J, p.3.)  But that isolated reference to arm's length is not a determination by the Commissioner that 10-50-50 in fact produces arm's-length results, as Coca-Cola suggests (Br.24); it is part of a prefatory "whereas" clause explaining that the parties settled their "dispute" for 1987-1995 (Ex.242-J, p.3). The Closing Agreement explicitly lists the ten matters that were actually "DETERMINED AND AGREED for Federal income tax purposes" (Doc.242-J, p.4): there is no reference to arm's-length pricing on that list (Doc.242-J, pp.4-22).  Indeed, Coca-Cola has never defended 10-50-50 on the merits in this case and does not argue on appeal that it actually produces an arm's-length result for its valuable intangibles.

Moreover, the Closing Agreement's single reference to "arm's length" is "not binding on the parties" because it appears only in a preliminary recital. *Analog Devices, Inc. v. Commissioner*, 147 T.C. 429, 446 (2016); *see* Rev. Proc. 68-16, §6.05(3), 1968-1 C.B. 770.  The context

of that reference is noting a compromise reached by the parties that was limited to <u>past</u> years (Ex.242-J, p.3), not describing a forward-looking determination by the Commissioner, let alone a determination of the "best method" for determining arm's-length pricing under the regulations (Doc.740, p.95; Doc.762, p.6).

### 2. Prior audits

The Commissioner was not precluded from making §482 adjustments to Coca-Cola's 2007-2009 transfer pricing by his acceptance of 10-50-50 during audits of its 1996-2006 tax years. (Doc.762, p.5.)  It is well established that the Commissioner's "position in prior audits does not bar him from later taking a different position." *Harrison v. Commissioner*, 138 T.C. 340, 347-348 (2012).  Each tax year stands on its own, and taxpayers have no vested rights in IRS acquiescence, as the courts — including this Court — have repeatedly held, including in cases involving the Commissioner's "'discretionary power.'" *Knight-Ridder Newspapers, Inc. v. United States*, 743 F.2d 781, 793 (11th Cir. 1984) (citation omitted); *see Joseph Gann, Inc. v. Commissioner*, 701 F.2d 3, 5 (1st Cir. 1983); *Lincoln Elec. Co. v. Commissioner*, 444 F.2d 491, 493 (6th Cir. 1971); *Dinkins v.*

*Commissioner*, 378 F.2d 825, 829 (8th Cir. 1967); *ATL & Sons Holdings, Inc. v. Commissioner*, 152 T.C. 138, 147 (2019); *see also Medtronic, Inc. v. Commissioner*, T.C. Memo. 2016-112, at *88 (Commissioner did not abuse his discretion by rejecting previously condoned transfer-pricing method), *vacated on other grounds*, 900 F.3d 610 (8th Cir. 2018).

This Court's decision in *Knight-Ridder* illustrates this bedrock principle. There, the Court held that the Commissioner did not abuse his discretion in changing the taxpayer's method of accounting in the tax year at issue even though he had "consent[ed]" to the taxpayer's method "in earlier" years. 743 F.2d at 793. As this Court explained, "[t]his Circuit and others have long held that the Commissioner cannot so easily 'waive for future years the discretionary power which the Congress has granted.'" *Id*. (quoting *Wood v. Commissioner*, 245 F.2d 888, 892 (5th Cir. 1957)). The Commissioner's "decision to consent, for whatever reason, to the use of a method in one year cannot bind his hands in perpetuity." *Id*. This settled precedent precludes Coca-Cola's attempt to bind the Commissioner's hands here.

That Coca-Cola "may have obtained a windfall in prior years does not entitle it to like treatment for the taxable year" at issue. *Union*

*Equity Coop. Exch. v. Commissioner*, 58 T.C. 397, 408 (1972), *aff'd*, 481 F.2d 812 (10th Cir. 1973). Being "driven by a desire to maximize tax revenues" in the tax year at issue, after consenting to a taxpayer's tax-reducing method in prior years, does not constitute arbitrary action. *Ralston Dev. Corp. v. United States*, 937 F.2d 510, 514 (10th Cir. 1991). If the taxpayer owes a tax in the year at issue, it is no defense to that liability that the IRS may have let it avoid the tax in prior audits.

By comparing the Commissioner's §482 adjustments to a "ticket" for jaywalking (Br.27), Coca-Cola confuses tax liability and penalties. The ticket is designed to be penal; §482 adjustments are not. Under §482, the Commissioner determines the correct allocation of income among related parties, and the taxpayer's intent regarding its original allocation is irrelevant. Reg. §1.482-1(f)(1). To prevail "under section 482 and its regulations, taxpayers must present evidence to show what unrelated parties would do in the same or similar circumstances, <u>not why taxpayers did what they did in these circumstances</u>." *Cent. Bank of the S. v. United States*, 834 F.2d 990, 994 (11th Cir. 1987) (emphasis added). That a taxpayer may have acted "in good-faith" (Br.23) and "reasonably believed" (Br.24) that its transfer pricing clearly reflected

its income is wholly irrelevant to whether it owes the tax arising from the Commissioner's income adjustment. *E.g.*, *Ellinger*, 470 F.3d at 1339 (upholding tax liability despite "good-faith attempt" to compute tax according to prior closing agreement and IRS correspondence); *Affordable Bio Feedstock, Inc. v. United States*, 42 F.4th 1288, 1291 (11th Cir. 2022) (rejecting taxpayer's "equitable estoppel" claim based on fact that the IRS previously had "approved" its tax position). The taxpayer's reasonableness is relevant only to whether it owes penalties. *See* I.R.C. §§6662(d)(2)(B), (e)(3)(B), 6664(c).

It bears emphasizing that if Coca-Cola had wanted to bind the IRS to a particular transfer-pricing method for the years at issue, it could have attempted to negotiate a closing agreement or advance pricing agreement that made the method applicable for 2007-2009. But Coca-Cola chose neither course. (Doc.762, pp.6-7.) Instead, it "chose to take its chances with the IRS examiners, hoping that they would not disturb the status quo," but "hope is not something that gives rise to legal or constitutional entitlements." (*Id.*)

### 3.    Inapposite APA concepts

Ignoring the Closing Agreement's limited scope and binding

precedent holding that the IRS does not act arbitrarily by changing a

taxpayer's previously permitted methodology, Coca-Cola and its amici

rely on the APA (5 U.S.C. §§551 et seq.) and related cases.  The Tax

Court correctly held that reliance on those authorities was waived, and

futile in any event.  (Doc.762, pp.1-3, 5-6.)

As a threshold matter, Coca-Cola has failed to demonstrate why

this Court should even consider its APA argument.  The argument was

not raised until Coca-Cola filed its motion for reconsideration 166 days

late.  (Doc.762, pp.1-2.)  The Tax Court did not abuse its discretion in

denying Coca-Cola's motion to file out of time a motion for

reconsideration.  (Doc.762, pp.1-3, 7-8.)  Coca-Cola does not argue

otherwise.  It simply ignores its tardiness.

Waiver aside, reliance on cases addressing the APA's review

procedures and requirements for agency rulemaking is misplaced.

Courts — including this Court — have previously rejected efforts to

import that analysis into Tax Court review of the Commissioner's

determinations.  *Neal*, 557 F.3d at 1273-1275.  Determinations are

subject to de novo review in the Tax Court under the Internal Revenue Code, rather than the APA's review procedures, because "'the APA does not supersede specific statutory provisions for judicial review' such as Congress has granted to the Tax Court." *Id.* at 1274 (citation omitted); *accord Estate of Streightoff v. Commissioner*, 954 F.3d 713, 721-722 (5th Cir. 2020); *Qinetiq US Holdings, Inc. v. Commissioner*, 845 F.3d 555, 559-560 (4th Cir. 2017). Given the "significant variations" under the two statutory schemes, "the APA's general procedures for judicial review, including the requirement of a reasoned explanation in a final agency decision, were not intended by Congress to be superimposed on the Internal Revenue Code's specific procedures for de novo judicial review of the merits of a Notice of Deficiency." *Qinetiq*, 845 F.3d at 561. Thus, the IRS was not required to "justify" rejecting 10-50-50 in 2007-2009 after accepting it for prior years (Br.26-27) because a deficiency determination does not require an agency explanation, only that the governing law and applicable facts support the Commissioner's determination. *See Knight-Ridder* and other cases cited above, pp.33-35.

For similar reasons, the APA's "notice" (Br.19) requirement is also inapplicable to tax-deficiency determinations. The Code permits the Commissioner to adjust a corporation's internal pricing to clearly reflect income and imposes no notice requirement. I.R.C. §482. The only notice required here was the deficiency notice that Coca-Cola received (Doc.1, Ex.A). I.R.C. §6212(a). Indeed, Coca-Cola's current complaint conflicts with its prior representation that it was <u>not</u> arguing that the Commissioner had any "duty to notify" Coca-Cola before adjusting its 2007-2009 returns. (Doc.623, pp.126-127 & n.100, 137.) *See Fitzgerald Truck Parts & Sales, LLC v. United States*, 132 F.4th 937, 952 (6th Cir. 2025) (rejecting "Hail Mary" argument that IRS had "'duty' to inform" taxpayer how law applied to its facts prior to "litigation").

Coca-Cola's related complaint that the Commissioner's deficiency determination is a "retroactive imposition" (Br.19) is unsound. That determination applied the law that governed during the tax years in issue (2007-2009). That the notice of deficiency was issued to Coca-Cola "after" it had already filed its 2007-2009 returns (Br.26) is simply how our tax system works; the taxpayer first "self-reports" its tax liability on its tax return and the IRS later "identifies" a "problem" with that self-

reporting and takes "steps" to correct it. *Kroner v. Commissioner*, 48 F.4th 1272, 1274 (11th Cir. 2022). Correcting a taxpayer's reporting after the fact is not unlawful government action: it is routine tax enforcement. This is particularly true in the §482 context, where an adjustment to a company's internal pricing reported on a return is — by definition — <u>always</u> after the fact.

Nor is the Commissioner's selection of the CPM as the "best method" under the §482 rules a retroactive change (Br.29). The Commissioner has never suggested — let alone determined — that 10-50-50 was the "best method" under the regulations. Neither has Coca-Cola; it was merely a "compromise" reached by the parties to settle Coca-Cola's 1987-1995 tax years. (Doc.706, p.9289; Ex.248-J, pp.2-3.) That the IRS accepted Coca-Cola's use of 10-50-50 during 1996-2006 does not mean that the IRS determined that 10-50-50 was the "best method" during those years and then later "changed its mind" (Br.29). It did not. As the parties stipulated, audits of Coca-Cola's 1996-2006 tax years were "limited" to auditing Coca-Cola's application of 10-50-50. (Doc.195, p.7.) The IRS did not determine the best method for Coca-Cola's transfer pricing until it audited the 2007-2009 tax years and

committed the extensive resources required to make and defend that determination.

There is nothing arbitrary about the IRS imposing a different method during the 2007-2009 tax years where (as here) the method complied with the §482 rules, including the critical "best method" rule. Tellingly, none of the amici argue that the CPM violated those rules. In any event, if the Commissioner had previously determined that 10-50-50 was the "best method" under the regulations (which he never did), he would have been entitled to correct that erroneous "legal determination" (Doc.748, p.24), even if Coca-Cola had relied on the error. *Dickman v. Commissioner*, 465 U.S. 330, 342-343 (1984); *Dixon v. United States*, 381 U.S. 68, 72-73 (1965). A determination that 10-50-50 was the best method would have been obvious legal error. Among other failures, 10-50-50 relies on no articulated data or assumptions, Reg. §1.482-1(c)(1); allocates profits without any relation to the relative contributions of the related parties, Reg. §1.482-6; and fails to compensate Coca-Cola commensurate with the income attributable to the licensed intangibles, Reg. §1.482-4(a). It is hardly surprising that Coca-Cola and its amici make <u>no</u> attempt to defend it.

In arguing that the IRS acted arbitrarily by adjusting Coca-Cola's transfer pricing without providing advance notice or explanation, Coca-Cola and its amici conflate the standard of review applicable to discretionary adjustments authorized by the Internal Revenue Code with the standard of review applicable to agency action under the APA. Although the two standards use the same terminology — "arbitrary and capricious" — they ask "distinct" questions. Finley, above, 187 Tax Notes Fed'l at 19. The question under §482 is whether the Commissioner's adjustments complied with the §482 rules. (Doc.740, pp.90-93 (collecting cases).) The question under the APA, in contrast, is whether "administrative rulemaking" (such as regulations or other official guidance) complied with certain process-focused requirements, including notice and a reasoned explanation. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). The APA cases cited by Coca-Cola and its amici concern formal rules and official policies, not individual determinations applying preexisting rules to a discrete set of facts. *See Amgen, Inc. v. Commissioner*, No. 16017-21, Order at 6 (July 3, 2024) (rejecting similar argument) (perma.cc/T8BY-3JLY); Doc.762, p.6.

To be clear, Treasury regulations, including those implementing §482, are subject to the APA's procedural requirements. But the Commissioner's determinations of how those regulations and other tax laws apply to a particular taxpayer are not. Those individualized determinations are instead subject to the Code's specific review procedures. *See*, above, pp.37-38. By respecting those distinct procedures, decisions like *Neal*, *Qinetiq*, and *Streightoff* do not represent "tax exceptionalism" (Chamber-Am.Br.4) — merely the limits of the APA. *See Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (APA does not override "previously established special statutory procedures relating to specific agencies").

Finally, Coca-Cola's complaint that the IRS did not make §482 adjustments for all 18 supply points (Br.30-31) lacks merit. Nothing in §482 or its implementing regulations requires uniform adjustments across subsidiaries and transactions. The Closing Agreement itself recognizes that different methods could be used among the supply points. (Ex.242-J, pp.4, 22.) Moreover, most Suppliers had very low effective tax rates. (Ex.8511-R.) Congress has identified "low tax" jurisdictions as special targets for concern under §482. H.R. Rep. 99-

426, at 423-425.  It would hardly be arbitrary for the Commissioner to do the same.  In any event, it was up to the IRS — not Coca-Cola — to determine the scope of the audit, a matter that reflects a "'complicated balancing of a number of factors,'" including resource limitations.  *Stone v. Commissioner*, 86 F.4th 1320, 1328 (11th Cir. 2023) (citation omitted).

Attempting to kick up dirt on appeal, Coca-Cola speculates that the IRS adjusted "only" affiliates in non-treaty countries to "evade scrutiny" by foreign taxing authorities (Br.30), a "conspiracy theory" the amici "regurgitate" as "established fact," Finley, above, 187 Tax Notes Fed'l at 21.  That baseless theory conflicts with the record.  The IRS determined deficiencies regarding several affiliates that <u>had</u> treaty rights (i.e., the Mexican Supplier and ServCos in Canada, Turkey, and Venezuela).  (Doc.1, pp.4-6; Doc.82, p.7.)  *See* https://www.irs.gov/pub/irs-lbi/tax-treaty-table-3.pdf (perma.cc/R3AZ-XAP7).  Moreover, as explained during the audit of another treaty-country affiliate (Indonesia), pursuing additional §482 adjustments had to be weighed against "resource limitations."  (Ex.248-J, p.3.)

In any event, inquiries about IRS motives are irrelevant. Courts generally "will not look behind a deficiency notice to examine" the "respondent's motives." *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327 (1974); *see Gatlin v. Commissioner*, 754 F.2d 921, 923 (11th Cir. 1985) (rejecting argument that deficiency notice was "arbitrary" due to Commissioner's alleged "motives") (citing *Greenberg's Express*). The Tax Court correctly "ignored" (Br.31) this baseless argument, which was (at most) hinted at in a footnote in the introduction to Coca-Cola's 600-page post-trial brief. (Doc.599, p.6 n.7.)

In sum, the 1996 Closing Agreement was not a promise that Coca-Cola could use 10-50-50 during post-1995 years, only that the IRS would not penalize that use. Likewise, the IRS's consent to that use in post-1995 years was not a promise that the IRS would consent "in perpetuity." *Knight-Ridder*, 743 F.2d at 793. And the combination of two non-promises does not add up to a promise, as Coca-Cola wishes. Section 482 and its implementing regulations allow the Commissioner to apply the "best method" for pricing a taxpayer's intangibles. That the Commissioner declined to do so for several years does not immunize Coca-Cola from the law's application. Coca-Cola was entitled to prove

that the Commissioner's method was not the best method. Having

failed to do so, it cannot complain that the best method was off-limits

due to a settlement agreement that by its terms imposed a different

method for pre-1996 years only. Whether the Government should have

entered into that deal in the first instance, or required Coca-Cola to pay

more tax in the years following that generous settlement, are not at

issue. The only issue is whether the Commissioner's transfer-pricing

method complied with the §482 rules. Although Coca-Cola prefers to

avoid that battleground (where it lost soundly in the Tax Court), that is

the proper focus of the parties' dispute.

### C. Coca-Cola failed to demonstrate that the Commissioner abused his discretion in adopting the CPM as the "best method"

The CPM evaluates whether the price charged in a controlled

transaction (here, the price for Suppliers' use of Coca-Cola's intangibles)

is arm's length according to objective measures of profitability derived

from comparable uncontrolled companies. Reg. §1.482-5(a). The

Commissioner applied the CPM to determine an arm's-length profit for

Suppliers consistent with the returns earned by comparable companies

(Bottlers). To demonstrate that the Commissioner abused his

discretion, Coca-Cola must establish that the Commissioner's CPM methodology implicated significant legal error or was unreasonably applied. (Doc.740, pp.91-92.) Coca-Cola cannot make either showing, identifying no legal error, *see*, below, §C.1, and raising only baseless factual arguments that were properly rejected by the Tax Court, *see*, below, §C.2-3. Moreover, Coca-Cola's complaints about the CPM (Br.32-51) repeatedly contradict unchallenged fact findings. The extensive, well-reasoned Tax Court opinion may be an inconvenient obstacle for Coca-Cola, but it cannot be ignored. The points raised by Coca-Cola were debated by twenty-five experts during an eight-week trial, and the court determined which side was more persuasive.

Before addressing these arguments, we first correct Coca-Cola's skewed depiction of the regulatory landscape. It asserts (Br.47) that the CUT method applied by one of its experts is the "most reliable" transfer-pricing method and that the CPM is disfavored. But that imagined hierarchy of transfer-pricing methods was explicitly rejected by the 1994 regulations, which provide that "there is no strict priority of methods." Reg. §1.482-1(c)(1). Thus, there no longer is a "thumb on the scale" for CUTs where (as here) there is no uncontrolled transaction

involving the "same intangible," as the Tax Court correctly explained. (Doc.740, pp.107-108.)  Moreover, the court found that the CUT method could not be used because Coca-Cola located no "comparable" transaction and relied on faulty data.  (Doc.740, pp.194-197.)  Since Coca-Cola makes no attempt to challenge those well-supported findings (*e.g.*, Ex.8295-R, pp.57-85; Ex.8288-R, p.27; Ex.8407-R, pp.34-49), the CUT method is ineligible.

Coca-Cola also misconstrues the CPM's critical role in transfer pricing.  *See* IRS Announcement 2025-13, 2025-15 I.R.B. 1392 (almost 80% of advance pricing agreements use the CPM).  It asserts (Br.48) that the CPM must be used "cautiously" and "with strict limitations." But that self-serving assessment conflicts with the regulations, which evidence that no method is inherently more favored than another, Reg. §1.482-1(c)(1), and that the CPM — by design — is the most flexible of the methods, Reg. §§1.482-5(c)(2)(ii)&(iii), -8(b) Ex.6.  Coca-Cola clearly does not like the CPM regulations, but it has never challenged their validity.  They are binding here.

### 1. The Tax Court correctly applied the regulations when evaluating the Commissioner's CPM

**a.** The Tax Court found that the CPM was "ideally suited" here because (i) Coca-Cola "owned virtually all the intangible assets needed to produce and sell" concentrate, whereas Suppliers "owned few (if any) valuable intangibles," and (ii) Suppliers "engaged in routine manufacturing, mixing ingredients specified by [Coca-Cola] according to manufacturing protocols supplied by [Coca-Cola]." (Doc.740, pp.116-118.) The court's assessment is consistent with the governing CPM regulations. *See* Reg. §1.482-5(b)(2), (e), Ex.4; Reg. §1.482-8(b), Ex.9.

The Tax Court likewise correctly applied the regulations in assessing the Commissioner's selection of Bottlers as comparable companies. (Doc.740, pp.120-133.) The court considered the "general comparability factors" provided in Reg. §1.482-1(d) and the CPM-specific factors provided in Reg. §1.482-5(c)(2) and made extensive findings regarding the Suppliers' and Bottlers' "functions performed," "contractual terms," "economic conditions," "resources employed," "risks assumed," and other relevant factors. (*Id.*) The court found that Bottlers and Suppliers were comparable under each factor, and, to the extent there were differences, it was to Coca-Cola's benefit,

overcompensating Suppliers by allocating them the same return earned by Bottlers. (Doc.740, pp.123-125, 133.) Thus, the bottler-based CPM was not just the best method, it was a "conservative" one. (Doc.740, p.115.) The court's extensive findings are supported by the record. (*E.g.*, Ex.8294-R; Ex.8295-R.)

**b.** Coca-Cola contends (Br.39) that the Tax Court's "sole focus" on "legal ownership" of the intangibles conflicts with the regulations. That contention contradicts the regulations and ignores the court's multifaceted opinion, which looked beyond legal ownership. (Doc.740, pp.150-175.)

The Tax Court's reliance on legal ownership is consistent with the governing regulations. Under those regulations, "the sole owner" of intangible property for purposes of §482 will be "[t]he legal owner" under the relevant "intellectual property law" or the "the holder of rights constituting an intangible pursuant to contractual terms." Reg. §1.482-4T(f)(3)(i)(A). The court correctly applied that law and found that Coca-Cola owned the valuable intangibles as both a legal and contractual matter. (Doc.740, pp.155-159.) Coca-Cola's reliance on the

preamble to the 2003 <u>proposed</u> regulations (Br.40) is misplaced[8] and

ignores that the preamble to the <u>applicable</u> regulations confirms that

"legal ownership provides the appropriate framework" for allocating

income attributable to intangibles.  71 Fed. Reg. 44466, 44476 (2006).

Coca-Cola was the legal owner of virtually all the intangibles used

to manufacture and distribute its branded beverages.  (Doc.740, p.156.)

Its agreements with the Suppliers made clear that they were granted <u>no</u>

ownership rights in Coca-Cola's intangibles.  (Doc.740, pp.156-157;

Ex.59-J; Ex.61-J; Ex.82-J; Ex.91-J; Ex.95-J; Ex.96-J.)  And even if the

agreements had provided such rights, they would have been "illusory"

because Coca-Cola could terminate the agreements without

compensation.  (Doc.740, pp.46-47, 157-158, 172-173; Doc.699, p.8257;

Doc.706, p.9268; Doc.643, pp.1796-1798.)  Coca-Cola's termination

rights were not theoretical: they were routinely exercised, with the

company closing (or shifting production away from) 18 supply points

during 1986-2009 alone.  (Doc.740, pp.158, 169-170.)  And Coca-Cola did

so each time without compensating the supply point.  (*Id*.)

---

[8] The 2003 preamble addressed taxpayers that were improperly
applying prior regulations to avoid arm's-length pricing.

Coca-Cola's contracts with its ServCos further confirm Coca-Cola's sole ownership of the intangibles. Those agreements clarified that Coca-Cola (through Export) owned any marketing intangibles generated by the marketing activities that Suppliers paid for. (Doc.740, p.158; *e.g.*, Ex.101-J, p.2; Ex.103-J, p.3.) Those agreements reflected Coca-Cola's "consistent strategy for protection of its 'crown jewels'" by "centralizing ownership of all intangible assets under the U.S. parent to ensure protection under U.S. law." (Doc.740, p.159.)

The form of Coca-Cola's transactions preserved its sole ownership of the intangibles, and the Tax Court correctly held Coca-Cola to that form, noting the well-settled rule "that disregarding contract terms on the basis of economic substance is generally the prerogative of the Commissioner, not of the taxpayer." (Doc.740, p.162.) *See Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974); *Sarma v. Commissioner*, 45 F.4th 1312, 1324 (11th Cir. 2022). That rule is codified in the regulations themselves, Reg. §1.482-1(d)(3)(ii)(B), as the court correctly observed (Doc.740, pp.164-165). In holding Coca-Cola to the form of its transaction, the court did not merely note the <u>absence</u> of contracts recognizing the Suppliers'

ownership of marketing intangibles (Br.42), but also the <u>presence</u> of contracts affirmatively providing that all marketing intangibles belonged to Coca-Cola, not to foreign affiliates (Doc.740, p.164; *e.g.*, Ex.101-J, p.2; Ex.103-J, p.3; Ex.59-J).

The Tax Court correctly recognized that legal or contractual ownership is "not dispositive" if the <u>Commissioner</u> determines that "'such ownership is inconsistent with the economic substance of the underlying transaction.'" (Doc.740, p.155 (quoting Reg. §1.482-4T(f)(3)(i)(A)).) But it found, as a factual matter, that Coca-Cola's formal ownership <u>was</u> fully consistent with the transaction's economic substance. (Doc.740, pp.167-175.) Coca-Cola ignores and has not challenged those findings.

The Tax Court correctly dismissed Coca-Cola's complaint (Br.40-41) that the IRS disregarded the Canadian ServCo's formal ownership of Coca-Cola's trademarks. (Doc.740, p.166 n.52.) The contractual terms there were inconsistent with the transaction's economic substance,[9] whereas the contractual terms here are fully consistent

---

[9] *See* Ex.2921-P, pp.1, 5 (describing how Coca-Cola sold its trademarks to the Canadian ServCo for $1 and guaranteed it a risk-free return).

with the transaction's economic substance (Doc.740, pp.167-175). And even if they were not, the Commissioner — but not taxpayers — may disregard the transaction's form under Reg. §1.482-1(d)(3)(ii)(B).

**c.** Similarly lacking merit is Coca-Cola's contention (Br.42) that the Tax Court violated Reg. §1.482-1(d)(1)(iii) by failing to consider the Suppliers' "economic risks." Again, Coca-Cola ignores the court's opinion. Applying Reg. §§1.482-1(d)(1)(iii), -5(c)(2)(ii), the court made explicit findings regarding "risks assumed" (Doc.740, p.127):

- Bottlers and Suppliers were "comparable" in terms of "risks assumed" because both faced the "same risk to capital employed." (Doc.740, pp.127-128.)

- Bottlers and Suppliers "faced similar risks from economic cycles and the ebb and flow of consumer demand." (Doc.740, p.125.)

- Suppliers' "risk of bottler default" on trade-accounts receivable was "very low." (Doc.740, pp.69-70.)

- Suppliers did not bear "marketing risk" because any marketing expenses charged to their books by Coca-Cola was

done "concurrently" with their receipt of "vastly larger amounts of income" from Bottlers. (Doc.740, p.129.)

- Coca-Cola's documents confirmed that its foreign affiliates did not face "entrepreneurial risk in developing marketing concepts" because all marketing was within Coca-Cola's "strategic guidelines" for "the brands." (Doc.740, p.53.)

Thus, the Tax Court specifically addressed "risk," properly concluding that Bottlers were "highly comparable" to Suppliers in terms of "risks assumed." (Doc.740, p.127.) And while the regulations generally require adjustments for differences (Reg. § 1.482-1(c)(2)(i)), the court's determination that any differences were conservative (i.e., favored Coca-Cola) obviated any need for adjustments (Doc.740, pp.133-146).

Coca-Cola contends (Br.42) that the "terminable" and "non-exclusive" nature of the Suppliers' agreements with Coca-Cola made them "riskier" than the Bottlers' agreements, reducing the royalties Suppliers should pay. But the Tax Court found that, on the facts here, the terminable and non-exclusive nature of the agreements gave Coca-Cola greater, not lesser, bargaining power. (Doc.740, pp.126-127, 172-173.) The expert cited by Coca-Cola (Br.42) did not testify to the

contrary, stating only that in "some cases" a licensee with a terminable, non-exclusive license might pay smaller royalties, depending on the facts (Doc.712, p.9931). The facts here thus supported greater, not lesser, royalties. (Ex.8294-R, p.2; Ex.8288-R, p.20; Doc.681, pp.5863-5866; Doc.706, pp.9226-9228; Doc.712, pp.9881-9885.)

> **2.    Suppliers did not own unique marketing intangibles that distinguished them from Bottlers**

Coca-Cola contends (Br.48-49) that Suppliers owned "valuable" marketing intangibles that "disqualified the CPM." That contention conflicts with the CPM regulation and well-supported Tax Court findings.

Intangible ownership is a concern under the CPM only where (unlike here) the tested party "own[s] valuable intangible property or unique assets that <u>distinguish</u> it from potential uncontrolled comparables." Reg. §1.482-5(b)(2)(i) (emphasis added). The court correctly found there was no such concern here because (i) Suppliers did not acquire marketing intangibles by paying Coca-Cola's marketing expenses (Doc.740, pp.117, 150-172), and (ii) even if they did, it would

not distinguish them from Bottlers, which spent at least as much on marketing as Suppliers did (Doc.740, pp.186-190).

**a.** The Commissioner's CPM did not deny Suppliers "credit" (Br.3) for amounts that they paid for marketing. They got "full credit" for that expense as an offset of revenue in the CPM calculation of operating profit. (Doc.740, pp.110-111, 140, 168; Ex.8294-R, p.46; Doc.642, pp.1676-1677; Doc.698, p.8093.) The Commissioner reasonably refused to accept Coca-Cola's reimagining of that expense as an investment by Suppliers that provided them intangible assets.

Coca-Cola challenges (Br.44) the Tax Court's determination that merely "spending money" on advertising does not create a marketing intangible (Doc.740, p.168). But that fact was supported by the Commissioner's primary expert (Newlon)[10] (Ex.8295-R, pp.13-14) and Coca-Cola's Chief Executive Officer (Doc.630, pp.399-405; Ex.8295-R,

---

[10] Coca-Cola's reliance (Br.36) on another Commissioner expert (Metrick) is misplaced. He testified that Coca-Cola's argument that Suppliers should earn a return based on their "writing checks" for Coca-Cola's marketing expenses was an untested "assumption" with "no theory behind it." (Doc.713, p.10203; *see* Doc.713, pp.10101-10102.) In addition, Coca-Cola's check-writing argument ignores that much of its consumer-marketing expense was paid by Bottlers — not Suppliers — under the split-invoicing arrangement. (Doc.740, pp. 64-66.)

pp.13-14). Moreover, the agreements between Coca-Cola and the ServCos (which generally provided the marketing that Suppliers paid for) made clear that any "marketing concepts" or "intangibles" that they developed belonged to Coca-Cola, the owner of the brands. (Ex.128-J, p.3; Doc.740, pp.158-159.) To the extent that the Suppliers' advertising costs created value, they "added value to the trademarks and brands" owned by Coca-Cola, not Suppliers (Doc.740, pp.168-169; Doc.700, pp.8309-8316; *see*, above, pp.51-52). Coca-Cola's comparison (Br.46) of the Suppliers' payment of marketing costs to Nike's hiring an advertising agency is inapt because Nike — unlike Suppliers — owned the valuable brand being promoted.

Although spending money on marketing could in some circumstances develop a customer-based intangible, like the customer list in *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 561-563 (1993), whether (and to what extent) such spending gives rise to a capital asset instead of a currently deductible expense depends on whether the expenses provided a benefit beyond one year, *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 87-88 (1992). The Tax Court found that Coca-Cola failed to prove that the Suppliers had such a benefit

here.  (Doc.740, pp.168-170; *see* Doc.698, pp.8095-8097; Doc.700, pp.8309-8316.)  Indeed, a critical unchallenged finding thoroughly refutes that claim.  From 1986-2009, Coca-Cola closed multiple supply points that had paid advertising expenses, without paying any compensation for the loss of any purported marketing intangible.  (Doc.740, pp.158, 169-170; Doc.699, p.8257.)  That undisputed fact demonstrates that the "value derived from consumer advertising for [Coca-Cola's] brands belonged to [Coca-Cola] — and exclusively to it — all the while."  (Doc.740, p.170.)

Coca-Cola's hodgepodge of factual arguments does not move the ball.  The 10-50-50 formula was not an "acknowledgement" of Suppliers' purported marketing "investments" (Br.14), but merely a negotiated settlement.  The IRS's conclusion in prior audits that certain marketing expenses should be "charged" to Suppliers rather than to Coca-Cola (Br.44) addressed only which entity could deduct the expense, not whether the expense created a capital investment.  The 1984 ruling cited by Coca-Cola (Ex.46-J-C) says nothing about "investments" (Br.34) made by Coca-Cola's foreign affiliate.  Finally, losses sustained by the Egyptian supply point do not support Coca-Cola's investment theory

(Br.37-38). That the CPM allocated income to that supply point <u>does</u> make "economic" sense (Br.37-38): Coca-Cola's executives testified that it was committed to remaining in Egypt for strategic business reasons, despite temporary losses (Doc.630, pp.412-418; Doc.665, p.3755), and an unrelated manufacturer operating in Egypt would have demanded compensation from Coca-Cola in exchange for implementing that business strategy (Doc.700, pp.8327-8330; Ex.8294-R, App.G/pp.31-32).[11]

**b.** In any event, the Tax Court further found (and Coca-Cola ignores) that even if Suppliers had created separate marketing intangibles by spending money on advertising, Bottlers would have the same routine intangibles because they spent similar sums on advertising. (Doc.740, pp.186-190; *see* Doc.630, pp.399-405; Doc.693, pp.7496-7497.) The CPM was appropriately applied because Suppliers did not "own valuable intangible property or unique assets that <u>distinguish</u>" them from Bottlers. Reg. §1.482-5(b)(2)(i) (emphasis added).

---

[11] The Egyptian losses were de minimis, 0.2% of Suppliers' total profits for 2007-2009. (Doc.740, p.75.)

Moreover, the CPM captured any return that Bottlers earned on intangible assets and allocated the same return to Suppliers through the return-on-assets calculation.[12]  (Ex.8294-R, pp.38, 43; Doc.699, pp.8194, 8200.)  To calculate the return-on-assets, the CPM divided the Bottlers' operating profit by their tangible assets, and that operating profit included profit attributable to their intangibles.  In that way, the "return" in the CPM's return-on-assets calculation included the value of the intangibles.  That intangibles-included return was then allocated to Suppliers.  Thus, the mechanics of the CPM calculation contradict Coca-Cola's assertion (Br.36) that the CPM "excluded the value" of intangibles created through marketing.

Indeed, applying the Bottler-based CPM actually overcompensated Suppliers even if they owned marketing intangibles. (Doc.740, pp.186-190.)  Bottlers owned far more intangibles than Suppliers (i.e., distribution networks, customer relationships, and local marketing knowledge Suppliers lacked), and invested at least as much in Coca-Cola marketing.  (Doc.740, pp.30, 37-41, 190; Ex.8294-R, pp.37,

_____

[12] "[I]ntangibles" and other items not "explicitly recorded" on the books of the tested party and uncontrolled comparables may be accounted for.  Reg. §1.482-5(d)(6).

43-44; Ex.8295-R, pp.10-11; Ex.8486-R, pp.44, 47-48; Doc.698, pp.8091-8092.) Coca-Cola's assertion (Br.49) that Suppliers had more intangible assets relative to tangible assets than Bottlers was refuted by the Commissioner's experts and properly rejected by the Tax Court. (*Id*.)

### 3. Coca-Cola has failed to demonstrate error — let alone clear error — in treating Bottlers as comparable to Suppliers

The Tax Court found that the Commissioner reasonably treated Bottlers as "comparable" to Suppliers. (Doc.740, pp.120-121.) That finding was based on a meticulous review of the governing regulations and extensive findings. (Doc.740, pp.120-133; *see*, above, pp.20-21, 49, 54-55.) Coca-Cola has failed to demonstrate that the court's comparability finding was erroneous, let alone "clearly erroneous." *Davis v. Commissioner*, 716 F.3d 560, 572 (11th Cir. 2013).

Coca-Cola cites the CPM regulation's focus on the "functions performed," "risks assumed," and "resources employed" in the parties' business (Br.49 (quoting Reg. §1.482-5(c)(2)(ii))). But the Tax Court thoroughly examined each of those factors. (Doc.740, pp.122-123 ("functions performed"), p.127 ("resources employed"), pp.127-129 ("risks assumed").) The court found that the parties were "comparable"

under each factor and that differences made Bottlers "deserving of a higher" return-on-assets than Suppliers, thus making the selection of Bottlers as the comparable "conservative." (Doc.740, p.133.)

Coca-Cola simply ignores the Tax Court's findings and asks this Court to reweigh the relevant factors and evidence. It creates a chart from thin air that purports to compare Bottlers and Suppliers (Br.49), citing nothing more than a single page from its expert's report titled "Asset Mix Comparison" (Ex.7251-P, Ex.5). That purported asset-mix comparison was refuted by the Commissioner's experts (Ex.8486-R, pp.7-48; Ex.8294-R, pp.43-45; Ex.8295-R, pp.4-9; Ex.8407-R, pp.8-19), and their testimony was endorsed by the court (Doc.740, pp.187-190), which further found that Coca-Cola's experts "relied on questionable assumptions" (Doc.740, p.131).

Coca-Cola asserts (Br.12) that Bottlers had "extremely limited rights" compared to Suppliers, citing the Tax Court (Doc.740, p.59). But on the cited page, the court found the opposite — that Bottlers and Suppliers were granted "similar" rights to use Coca-Cola's intangibles. (*Id*.) The court further found that Bottlers had more favorable contract terms, acquiring territorial exclusivity and long-term agreements

whereas Suppliers did not. (Doc.740, pp.57, 123-127.) Again, that difference made the CPM conservative, not unreasonable.

Moreover, in nit-picking the comparability of Bottlers and Suppliers, Coca-Cola ignores the larger point that the test for whether a company is comparable under the CPM is far less "strict" than whether a transaction is comparable under the CUT (Coca-Cola's primary method). 59 Fed. Reg. at 34974. Unlike a CUT — which cannot be used to price intangibles if (as here) there is no comparable transaction, Reg. §1.482-4(c)(2)(iii)(A)&(B)(1) — the CPM can price intangibles even if there are "significant differences" that cannot be adjusted for, Reg. §1.482-8(b), Ex.6. (*See* Doc.702, pp.8649-8651.)

The Tax Court determined that Coca-Cola's proffered transfer-pricing methods were fatally flawed (Doc.740, pp.191-208), and Coca-Cola makes no attempt to defend those methods on appeal. Accordingly, the <u>only</u> viable method in this case is the CPM. Coca-Cola suggests (Br.51 n.9) in a footnote that its expert's adjusted version of the CPM could be applied on remand. But the Commissioner demonstrated that that expert's analysis relied on flawed assumptions,

and the court did not clearly err in agreeing. (Doc.740, pp.131, 150-175; Ex.8486-R, pp.7-19, 38-50; Doc.713, pp.10091-10102, 10166-10169.)

Finally, Coca-Cola complains (Br.50-51) about the size of the royalty resulting from the CPM. Its cited expert assumed that Suppliers would be difficult to replace (Ex.7301-P, p.10) but the Tax Court found otherwise (Doc.740, pp.126-127, 173). Coca-Cola has not challenged that adverse finding. Coca-Cola's complaint about the ultimate royalty size also ignores the court's finding that the Suppliers' net revenue upon which the royalties were based was "artificially inflated" because the money they received from the Bottlers included compensation the Bottlers owed Coca-Cola for the use of its valuable intangibles. (Doc.740, p.132; Doc.698, pp.8074-8075.) If that compensation had been paid directly to Coca-Cola, rather than embedded in the concentrate price, the royalties would have been far less. In any event, the reasonableness of the royalties endorsed by the court are fully supported by the record. (*E.g.*, Ex.8294-R; Ex.8295-R; Ex.8288-R; Ex.8472-R; Doc.700, pp.8378-8379.)

**D.    The Commissioner's §482 adjustments regarding the Brazilian Supplier were not precluded by Brazilian restrictions on royalty payments**

The Tax Court correctly sustained the Commissioner's allocation of additional income to Coca-Cola to account for the Brazilian Supplier's use of Coca-Cola's valuable intangibles notwithstanding Brazil's restrictions on royalties.  For decades (including the years at issue), Coca-Cola opted to use dividends rather than royalties to satisfy the Brazilian Supplier's §482 obligations, and Brazilian law imposed no restrictions on the Supplier's payment of dividends, if (as here) it had sufficient earnings.  *See*, below, §D.1.  Moreover, even if Coca-Cola had used royalties rather than dividends, the Commissioner's allocation was authorized by the plain language of §482's second sentence.  *See*, below, §D.2.  Coca-Cola and its amici complain at length about a Treasury regulation (Reg. §1.482-1(h)(2)) that addresses foreign legal restrictions, but this Court need not reach their arguments as this case should be resolved on either alternative ground discussed below.[13]

---

[13]  Under the regulation, a foreign legal restriction will be considered in determining an arm's-length price only if — unlike here (Doc.787, p.14) — the "restriction affects the results of transactions at arm's length."  Reg. §1.482-1(h)(2)(i).  The regulation correctly

(continued…)

### 1. Brazil did not prohibit Coca-Cola's receipt of income

The undisputed facts demonstrate that Brazilian law did not actually "block" the payment of arm's-length amounts for the Brazilian Supplier's use of Coca-Cola's intangibles. During 2007-2009, Brazil capped the amount of payments made by Brazilian companies to foreign parents that could be treated as royalties under Brazilian law, and the parties agree that the capped amount for Coca-Cola's 2007-2009 tax years was $56 million. (Doc.787, pp.3-4.) But, as the parties stipulated, Brazilian law "imposes no restriction" on Brazilian Supplier's ability to pay "dividends" to Coca-Cola out of its earnings. (Doc.197, p.33.) During 2007-2009, Brazilian Supplier paid Coca-Cola dividends of $1.35 billion and had earnings sufficient to pay the total amount of the Brazilian §482 adjustments for 2007-2009 (i.e., $1.8 billion) as dividends. (Doc.787, p.9; Doc.197, pp.33, 38-39.)

---

interprets §482 and is within Treasury's delegated authority. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-395 (2024). The regulation is also procedurally valid for the reasons detailed by the Tax Court. *See 3M Co. v. Commissioner*, 160 T.C. 50, 288-297 (2023), *appeal pending*, No. 23-3772 (8th Cir.); Doc.787, p.4.

Coca-Cola's actions confirm that the Brazilian cap on royalty payments in 2007-2009 at $56 million did not actually block the payment of arm's-length compensation for Brazilian Supplier's use of Coca-Cola's intangibles. During 2007-2009, Coca-Cola treated more than $900 million of the dividends it received from Brazilian Supplier as compensation for its intangibles under 10-50-50. (Doc.195, pp.12-15; Doc.197, p.35; *see* Doc.778, p.20 (Table of Dividends Paid/Recharacterized 2007-2009).) Given the parties' stipulations that Brazil imposed no restriction on Brazilian Supplier distributing additional dividends, and that it had sufficient accumulated profits to do so (Doc.197, pp.33, 38-39), payment of the full arm's-length amount upheld by the Tax Court is not actually blocked.

Coca-Cola's contention (Br.56) that the "IRS may not recharacterize dividends as royalties simply to circumvent Brazilian law" is misconceived. For decades, Coca-Cola — not the IRS — opted to use dividends to satisfy the Suppliers' royalty obligations under §482, including Brazilian Supplier's obligations during 2007-2009. (Ex.242-J; Doc.642, pp.1637-1639.) Doing so allowed Coca-Cola to satisfy U.S. tax obligations while at the same time avoiding the Brazilian withholding

tax that applied to royalties but not to dividends. (Doc.197, pp.30-31, 33.) Coca-Cola has not offered a principled reason for why "dividends can be treated as deemed royalties up to the amount [it] thought to be correct [*i.e.*, $887 million]," without violating Brazilian law, but somehow treating more dividends as deemed royalties would. (Doc.787, p.12.)

Moreover, treating payments that are dividends under Brazilian law as royalties under U.S. tax law does not "circumvent" Brazilian interests (Br.56). Brazil did not limit a Brazilian corporation's ability to pay dividends to a foreign parent or restrict how that payment may be characterized for foreign law purposes, as Coca-Cola's dividend-paying behavior illustrates. Brazil treated royalty payments and dividends differently for Brazilian law purposes because royalties are tax deductible by the Brazilian subsidiary (and thus reduce the Brazilian tax base) whereas dividends are not. (Doc.787, p.13 & n.7.) Payment of dividends in lieu of royalties to a foreign parent does not "circumvent" Brazilian law because non-deductible dividends do not erode the Brazilian tax base, as the Tax Court explained and Coca-Cola ignores. (*Id.*)

The cases cited by Coca-Cola (Br.56-57) do not preclude using dividends to satisfy §482 obligations. *Commissioner v. First Security Bank*, 405 U.S. 394 (1972) (discussed below) involved proposed §482 allocations between sister corporations, not a parent and subsidiary, and therefore did not address dividend payments. Moreover, that case concerned income that was actually blocked and could "not lawfully [be] receive[d]." *Id.* at 405. Coca-Cola could — and did — lawfully receive dividends under Brazilian law that it used to comply with §482.

*Procter & Gamble Co. v. Commissioner*, 961 F.2d 1255 (6th Cir. 1992) is likewise inapposite. There, the taxpayer (i) had not opted to issue dividends in lieu of royalties, (ii) did not concede that foreign law permitted dividends, and (iii) lacked distributable earnings from which to pay dividends. *Id.* at 1259. The facts here are the exact opposite.

In sum, although "dividends" and "royalties" may be different (Br.56), Coca-Cola itself has long treated them as interchangeable for §482 purposes. There is no justification for its attempted bait-and-switch now. Indeed, Coca-Cola relied on its decades-old practice of using dividends to satisfy royalty obligations to argue that the 1996 Closing Agreement (which allowed that practice) was relevant and

should be admitted into evidence. (Doc.144; *see* Doc.195, pp.4-12.) It

further relied on its practice in arguing — successfully (Doc.740, p.219)

— that "dividends should be offset against, i.e., should reduce, the

royalty obligations of the [Suppliers] as determined" by the court.

(Doc.599, pp.23-24.) Having twice convinced the court to rule in its

favor based on its admission that "dividends in form" could be used to

"offset against any increased royalty obligation generated by the

Commissioner's section 482 adjustments" (Doc.144, pp.1-2), it cannot

now contend otherwise.

### 2. The plain language of §482 authorizes the Commissioner's adjustments

Even if Coca-Cola did not have a long history of using dividends to

satisfy §482, the Brazilian restriction on royalties would not preclude

the Commissioner's allocation of additional income to Coca-Cola from

Brazilian Supplier. That adjustment was authorized by the plain text

of §482's second sentence. *See 3M*, 160 T.C. at 304-309. Added to the

statute in 1986, that statutory language controls this issue:

> In the case of <u>any</u> transfer (or license) of intangible property
> ... the <u>income</u> with respect to such transfer or license <u>shall be</u>
> commensurate with the income attributable to the
> intangible.

I.R.C. §482 (emphasis added). This amendment established a new standard for determining "income" in the case of "any" license of intangible property. This means that when a controlled group member licenses intangibles to another group member, the licensor's income from that license <u>must</u> be commensurate with the income generated by the intangibles. The statute provides <u>no</u> exceptions.

Here, Coca-Cola licensed valuable intangibles to its Brazilian Supplier. Brazilian Supplier used those intangibles in its business operations in 2007-2009 to generate net revenue of $3.4 billion. (Ex.8294-R, p.B-5.) Under the plain terms of §482's second sentence, Coca-Cola is required to recognize income from the license of its intangibles to Brazilian Supplier in an amount that is "commensurate with the income attributable to the intangible." I.R.C. §482. That is, Coca-Cola must recognize income commensurate with "the profit or income stream generated by or associated with" the intangibles in Brazilian Supplier's hands. H.R. Rep. 99-426, at 426. That amount is $1.8 billion, as the Tax Court found. (Doc.787, p.3; Doc.740, pp.105-106, 113.)

Coca-Cola's suggestion (Br.55) that the 1986 amendment did not alter §482's meaning is incorrect. The amendment established "a <u>new</u> standard for determining income in the context of intangible transfers among related parties." *3M*, 160 T.C. at 307; *see id.* at 305-309 (describing history and rationale for the new standard). "It is illogical to argue that amending a singular statute does not alter its meaning," as the Ninth Circuit explained in rejecting a similar attempt to rewrite §482 and its history. *Altera Corp. v. Commissioner*, 926 F.3d 1061, 1079 (9th Cir. 2019).

Relying on *First Security*, Coca-Cola argues that because Brazilian Supplier was prohibited by Brazilian law from paying $1.8 billion as tax-deductible royalties, Coca-Cola cannot be forced to recognize this amount as income. In *First Security*, the Supreme Court held that the Commissioner could not allocate insurance-related income to domestic bank members of a controlled group because federal banking law prohibited the banks from receiving such income. But *First Security* was decided in 1972, 14 years before Congress amended §482 to specifically address the precise transaction at issue here, i.e., a license of intangibles. Whatever restrictions *First Security* may impose on the

Commissioner's authority under the first sentence of §482, it has no

bearing on Congress's ability to fashion a new, mandatory rule for

income from intangibles, as reflected in the second sentence of §482.

Therefore, *First Security* does not control this case, nor do the other

cases on which Coca-Cola relies (Br.53), which were all decided under

the old version of the statute. *See Procter*, 961 F.2d at 1257-1258 (tax

years 1978-1979); *Texaco, Inc. v. Commissioner*, 98 F.3d 825, 826 (5th

Cir. 1996) (tax years 1979-1981).

    *First Security* is distinguishable for other reasons. Significantly,

unlike the domestic banks in *First Security*, Coca-Cola is not restricted

by law from receiving (or reporting) any income. Brazilian Supplier's

ability to pay income in the form of <u>royalties</u> may be limited by

Brazilian law, but Brazilian Supplier is free to pay income in the form

of dividends to Coca-Cola — which it did during 2007-2009. As the

ultimate 100% shareholder of Brazilian Supplier, Coca-Cola had full

access to Brazilian Supplier's earnings and profits. Therefore, this case

does not actually involve "blocked income."

    In addition, *First Security* involved a U.S. legal restriction

applicable to controlled and uncontrolled banks alike. This case, in

contrast, involves a foreign law applicable only to related parties (i.e., Brazilian companies controlled by a non-Brazilian parent). *See* Reg. §1.482-1(b)(1). *First Security* says nothing about the effect to be given discriminatory foreign laws, and the Supreme Court has repeatedly held that foreign-law <u>classifications</u> are not controlling in interpreting federal tax law, unless Congress gives them such effect. *See Biddle v. Commissioner*, 302 U.S. 573, 578-579 (1938); *PPL Corp. v. Commissioner*, 569 U.S. 329, 335 (2013). Therefore, *First Security* does not govern this case.

## CONCLUSION

The decision of the Tax Court should be affirmed.

Respectfully submitted,

/s/ Judith A. Hagley

MICHAEL J. HAUNGS         (202) 514-4343
JENNIFER M. RUBIN        (202) 307-0524
JUDITH A. HAGLEY        (202) 514-8126
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*
  *Appellate.TaxCivil@usdoj.gov*
  *judith.a.hagley@usdoj.gov*

JULY 7, 2025

# CERTIFICATE OF COMPLIANCE

## With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

### 1. Type-Volume

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 12,973 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Eleventh Circuit Rule 32-4.

### 2. Typeface and Type-Style

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 with 14-point Century Schoolbook font.

(s)    Judith A. Hagley

Attorney for Commissioner of Internal Revenue

Dated: July 7, 2025

## CERTIFICATE OF SERVICE

I hereby certify that, on July 7, 2025, this brief was filed with the Clerk of the United States Court of Appeals for the Eleventh Circuit by using the Court's CM/ECF system. All parties were served through the Court's CM/ECF system.

/s/ Judith A. Hagley
Judith A. Hagley
*Attorney for the Commissioner*