# No. 24-13470-G

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

**THE COCA-COLA COMPANY & SUBSIDIARIES,**

**Petitioner-Appellant**

**v.**

**COMMISSIONER OF INTERNAL REVENUE,**

**Respondent-Appellee**

**ON APPEAL FROM THE DECISION**
**OF THE UNITED STATES TAX COURT**
**No. 31183-15 (Senior Judge Albert G. Lauber)**

**SUPPLEMENTAL APPENDIX OF**
**RESPONDENT-APPELLEE COMMISSIONER**
**OF INTERNAL REVENUE**
**VOLUME 1 OF 9**

**MICHAEL J. HAUNGS** (202) 514-4343
**JENNIFER M. RUBIN** (202) 307-0524
**JUDITH A. HAGLEY** (202) 514-8126
*Attorneys*
*Tax Division*
*Department of Justice*
*Post Office Box 502*
*Washington, D.C. 20044*

# TABLE OF CONTENTS


**Description** **Docket/Exhibit/Tab No.**

**VOLUME 1**

Doc. 144, Order re: Commissioner's Motion in Limine to Exclude 1996 Closing Agreement (Feb. 23, 2018) ........................................ 144

Doc. 187, Joint Second Stipulation of Facts (without exhibits) (Mar. 5, 2018) ........................................ 187

Doc. 575, Joint Twenty-Fourth Stipulation of Facts (May 11, 2018) ........................................ 575

Doc. 599, Petitioner's Opening Brief (Dec. 7, 2018) (through page 155) ........................................ 599

**VOLUME 2**

Doc. 599, Petitioner's Opening Brief (Dec. 7, 2018) (through page 399) ........................................ 599

**VOLUME 3**

Doc. 599, Petitioner's Opening Brief (Dec. 7, 2018) (through the end) ........................................ 599

**VOLUME 4**

Doc. 623, Petitioner's Answering Brief (without appendices) (May 3, 2019) ........................................ 623

Doc. 631, Revised Trial Transcript Volume 4, from Trial Proceedings held Mar. 6, 2018 (pages 463-497) (July 3, 2019) ........................................ 631

**Description** **Docket/Exhibit/Tab No.**

**VOLUME 5**

Doc. 681, Revised Trial Transcript Volume 74, from Trial Proceedings held Apr. 6, 2018 (pages 5792-5940) (July 3, 2019) ........................681

**VOLUME 6**

Doc. 693, Revised Trial Transcript Volume 89, from Trial Proceedings held Apr. 16, 2018 (pages 7373-7522) (July 3, 2019) ......................693

Doc. 778, Respondent's Supplemental Brief (Mar. 29, 2023) ..............778

**VOLUME 7**

Joint Trial Exhibit 59-J, submitted with Doc. 187, Joint Second Stipulation of Facts (Mar. 5, 2018)................................................59-J

Joint Trial Exhibit 61-J, submitted with Doc. 187, Joint Second Stipulation of Facts (Mar. 5, 2018)................................................61-J

Joint Trial Exhibit 82-J, submitted with Doc. 187, Joint Second Stipulation of Facts (Mar. 5, 2018)................................................82-J

Joint Trial Exhibit 91-J, submitted with Doc. 187, Joint Second Stipulation of Facts (Mar. 5, 2018)................................................91-J

Joint Trial Exhibit 95-J, submitted with Doc. 187, Joint Second Stipulation of Facts (Mar. 5, 2018)................................................95-J

Joint Trial Exhibit 96-J, submitted with Doc. 187, Joint Second Stipulation of Facts (Mar. 5, 2018)................................................96-J

Joint Trial Exhibit 101-J, submitted with Doc. 187, Joint Second Stipulation of Facts (Mar. 5, 2018)..............................................101-J

**Description** **Docket/Exhibit/Tab No.**

Joint Trial Exhibit 103-J, submitted with Doc. 187, Joint Second Stipulation of Facts (Mar. 5, 2018) ............ 103-J

Joint Trial Exhibit 128-J, submitted with Doc. 187, Joint Second Stipulation of Facts (Mar. 5, 2018) ............ 128-J

Joint Trial Exhibit 248-J, submitted with Doc. 195, Joint Third Stipulation of Facts (Mar. 5, 2018) ............ 248-J

Respondent's Trial Exhibit 8288-R, admitted at Doc. 707, Revised Trial Transcript, Volume 105, from Trial Proceedings held Apr. 24, 2018) (page 9412) ............ 8288-R

**VOLUME 8**

Respondent's Trial Exhibit 8295-R, admitted at Doc. 698, Revised Trial Transcript, Volume 94, from Trial Proceedings held Apr. 18, 2018) (page 8028) ............ 8295-R

Respondent's Trial Exhibit 8407-R, admitted at Doc. 702, Revised Trial Transcript, Volume 98, from Trial Proceedings held Apr. 20, 2018) (page 8716) ............ 8407-R

**VOLUME 9**

Respondent's Trial Exhibit 8472-R, admitted at Doc. 707, Revised Trial Transcript, Volume 105, from Trial Proceedings held Apr. 24, 2018) (page 9412) ............ 8472-R

Respondent's Trial Exhibit 8486-R, admitted at Doc. 713, Revised Trial Transcript, Volume 114, from Trial Proceedings held Apr. 26, 2018) (page 10028) ............ 8486-R

Respondent's Trial Exhibit 8511-R, submitted with Doc. 512, Joint Sixteenth Stipulation of Facts (May 11, 2018) ............ 8511-R

# Doc. 144

CZ

**UNITED STATES TAX COURT**
**WASHINGTON, DC 20217**

| | | |
|---|---|---|
| THE COCA-COLA COMPANY AND SUBSIDIARIES, | ) | |
| Petitioner(s), | ) | |
| v. | ) | Docket No. 31183-15. |
| COMMISSIONER OF INTERNAL REVENUE, | ) | |
| Respondent | ) | |

**ORDER**

On February 20, 2018, respondent filed Respondent's Motion in Limine to exclude allegedly irrelevant and inadmissible evidence. In this motion respondent seeks to exclude from the record of this case all material relating to a closing agreement that the parties executed in 1996. We briefly discussed the terms of this closing agreement in The Coca-Cola Company & Subsidiaries v. Commissioner, 149 T.C. No. 21 (Dec. 14, 2017).

Respondent contends that the 1996 closing agreement is irrelevant in determining whether his section 482 adjustments for tax years 2007-2009 are arbitrary, capricious, or unreasonable. In support of that proposition, respondent cites the well-established principle that each tax year stands on its own, so that the Commissioner in a later year may challenge a reporting position that he accepted or condoned in an earlier year. See, e.g., Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d 781, 793 (11th Cir. 1984); Medtronic, Inc. v. Commissioner, T.C. Memo 2016-112, at *88.

Petitioner contends that the 1996 closing agreement has relevance to other arguments it intends to make. These arguments include the contention that certain payments made by petitioner's foreign affiliates, while dividends in form, were treated under the closing agreement as satisfying the affiliates' obligation to pay royalties. Petitioner accordingly contends that those dividends should be offset against any increased royalty obligation generated by the Commissioner's section

**SERVED Feb 26 2018**

482 adjustments (in which case they would lose their character as dividends, with the resulting loss of deemed-paid foreign tax credits under section 902).

Respondent's contention that the 1996 closing agreement is irrelevant in determining the arm's-length character of the affiliates' payments to petitioner during 2007-2009 does not mean that the closing agreement should be excluded from evidence as irrelevant for all purposes of this case. Both parties are free to make whatever arguments they wish to make concerning the relevance of the 1996 closing agreement to the legal issues this case presents. The Court will evaluate those arguments on their merits, but we will do so after admitting the closing agreement and related documentation into evidence.

In consideration of the foregoing, it is

ORDERED that respondent's Motion in Limine is denied.

**(Signed) Albert G. Lauber**
**Judge**

Dated: Washington, D.C.
February 23, 2018

# Doc. 187

SR
US TAX COURT
FILED
WASHINGTON
MAR 05 2018

THE COCA-COLA COMPANY AND SUBSIDIARIES,
Petitioner,

PAPER FILED

v.

Docket No. 31183-15

COMMISSIONER OF INTERNAL REVENUE,
Respondent

# JOINT SECOND STIPULATION OF FACTS

**UNITED STATES TAX COURT**

U. S. TAX COURT
FILED AT
Washington, D.C.
MAR -5 2018

| | | |
|---|---|---|
| THE COCA-COLA COMPANY AND SUBSIDIARIES, | ) | |
| Petitioner, | ) | |
| v. | ) | Docket No. 31183-15 |
| COMMISSIONER OF INTERNAL REVENUE, | ) | Judge Albert G. Lauber |
| Respondent | ) | |

**SECOND STIPULATION OF FACTS**

In accordance with T.C. Rule 91(e), the parties stipulate and agree that, for the purpose of this case, the following statements are accepted as facts. Each party, however, may introduce other and further evidence not inconsistent with this stipulation, and the parties may agree to supplemental stipulations of facts. The parties may not object to said stipulation or any portions thereof on any grounds unless such objection is expressly reserved herein.

In stipulating to a label, description, or characterization of an agreement, the parties are not stipulating to the substance of that agreement for Federal income tax purposes. Headings in the stipulation have no legal effect.

## I. DEFINITIONS

39. "Concentrates" means flavoring ingredients and, depending on the product, sweeteners used to prepare syrups or finished beverages, and includes powders for purified water products such as Dasani.

40. "Syrups" means the beverage ingredients produced by combining concentrates and depending on the product, sweeteners and added water.

41. "Fountain syrups" means syrups that are sold to fountain retailers, such as restaurants and convenience stores, which use dispensing equipment to mix the syrups with sparkling or still water at the time of purchase to produce finished beverages that are served in cups or glasses for immediate consumption.

42. "Sparkling beverages" means nonalcoholic ready-to-drink beverages with carbonation, including carbonated energy drinks and carbonated waters and flavored waters.

43. "Still beverages" means nonalcoholic beverages without carbonation, including noncarbonated waters, flavored waters and enhanced waters, noncarbonated energy drinks, juices and juice drinks, ready-to-drink teas and coffees, and sports drinks.

## II. PRELIMINARY MATTERS

44. The Coca-Cola Company ("TCCC"), a Delaware corporation, is the parent of an affiliated group that files a consolidated Federal income tax return ("petitioner"). TCCC is also the ultimate parent of the worldwide Coca-Cola group (the "Company").

45. At the time the petition was filed, TCCC's principal place of business was One Coca-Cola Plaza NW, Atlanta, Georgia, 30313-2420.

46. Petitioner timely filed consolidated Federal income tax returns for the 2007, 2008, and 2009 tax years on a calendar year basis using the accrual method of accounting.

47. Respondent timely mailed a Statutory Notice of Deficiency (the "Notice") to petitioner on September 15, 2015. In the Notice, respondent determined Federal income tax deficiencies in the following amounts:

| Tax Year | Amount |
|---|---|
| 2007 | $1,114,166,873 |
| 2008 | $1,069,425,951 |
| 2009 | $1,121,220,625 |
| Total | $3,304,813,449 |

## III. CORPORATE ORGANIZATIONAL STRUCTURE

48. The Exhibits attached to paragraphs 49 and 50 below are charts showing the legal ownership and classification for Federal income tax purposes of those entities or branches to which the deficiencies relate during the 2007-2009 tax years. Each entity or branch of the Company is assigned a four-digit accounting code. The charts include the entity's or branch's name, accounting code, and country of incorporation or operation. The entity's or branch's classification for Federal income tax purposes is indicated based on the following legend:



Corporation



Branch



Corporation that elected to be treated as an entity disregarded as separate from its parent

49. Attached as Exhibit 37-J is a chart of select legal entities or branches as of December 31, 2007, and December 31, 2008 (EXHJ_00000252).

50. Attached as Exhibit 38-J is a chart of select legal entities or branches as of December 31, 2009 (EXHJ_00000253).

## IV. FORMATION OF THE COCA-COLA COMPANY

51. The initial Coca-Cola formula was created by Atlanta pharmacist John S. Pemberton in 1886.

52. Asa G. Candler began to acquire control of the Coca-Cola product in 1888, and in 1892, he incorporated The Coca-Cola Company as a Georgia corporation ("The Coca-Cola Company (Georgia)").

53. Until 1899, The Coca-Cola Company (Georgia) was engaged in the sale of syrup to soda fountain operators and the marketing of Coca-Cola in the United States.

54. The Candler family had control of The Coca-Cola Company (Georgia) until 1919 when they sold it to Ernest Woodruff and a group of investors for $25 million.

55. On September 5, 1919, The Coca-Cola Company (Georgia) was reincorporated as a Delaware corporation (*i.e.*, TCCC).

## V. THE INTERNATIONAL BUSINESS AND CONCENTRATE MANUFACTURING OPERATIONS

56. In 1926, TCCC organized the Foreign Department in New York.

57. The Coca-Cola Export Corporation ("Export"), a wholly owned subsidiary of TCCC, was formed as a Delaware corporation on March 13, 1930, and assumed responsibilities of the Foreign Department.

58. The Coca-Cola Export Sales Company ("Export Sales"), a wholly owned subsidiary of TCCC, was formed as a Delaware corporation on March 29, 1941.

59. Export Sales was merged into Export on December 19, 1949.

60. Attached as Exhibit 39-J are Minutes of the Special Meeting of the Executive Committee of The Coca-Cola Export Corporation, dated January 3, 1950 (EXHJ_00000176 – EXHJ_00000185).

61. By 1975, Export had branch operations in 27 countries. Most of these branches produced concentrate.

**A. MEXICO**

62. Manufacturadora de Materiales, S.A. was formed as a wholly owned subsidiary of Export in Mexico in 1938.

63. In 1941, Export Sales purchased from Export the entire capital stock of Manufacturadora de Materiales, S.A., and the name of the company was changed to "Compañía Coca-Cola de México, S.A."

64. Attached as Exhibit 40-J is a report for Compañía Coca-Cola de México, S.A., dated November 30, 1941 (EXHJ_00000157 – EXHJ_00000175).

65. In 1944, Compañía Coca-Cola de México, S.A. discontinued doing business in Mexico and Export Sales established a branch in Mexico. The branch operated under the name "Coca-Cola de Mexico."

66. The branch of Export Sales began manufacturing concentrate in Mexico in 1946.

67. Compañía Coca-Cola de México, S.A. was liquidated in 1947.

68. After the merger of Export Sales into Export on December 19, 1949, Export established a branch in Mexico in 1950.

**B. BRAZIL**

69. A branch of Export Sales in Brazil was authorized by the Brazilian government on August 22, 1944.

70. By October 1949, the branch of Export Sales was manufacturing concentrate in Brazil.

71. After the merger of Export Sales into Export on December 19, 1949, a branch of Export was formed in Brazil on May 23, 1950, and began manufacturing concentrate in Brazil.

72. In 1962, Coca-Cola Indústria e Comercio Limitada was formed as a subsidiary of Export.

73. In 1962, Export transferred certain assets of its Brazilian branch's concentrate manufacturing operations to Coca-Cola Indústria e Comercio Limitada in exchange for substantially all the stock of Coca-Cola Indústria e Comercio Limitada.

74. Attached as Exhibit 41-J is an IRS ruling dated October 27, 1961 (TCCC-00000632 – TCCC-00000638).

75. Attached as Exhibit 42-J is an IRS supplemental ruling dated July 24, 1962 (TCCC-00000639 – TCCC-00000642).

76. In 1971, Export acquired Frutas Soluveis Frusol, S.A. ("Frusol"), a Brazilian entity engaged primarily in the manufacture of coffee in Brazil. Coca-Cola Indústria e Comercio Limitada and Frusol merged into Coca-Cola Indústrias Limitada ("CCIL").

77. Attached as Exhibit 43-J is a translated copy of the Articles of Incorporation for CCIL, dated December 15, 1971 (CCADMIN0051760-T – CCADMIN0051771-T).

78. Attached as Exhibit 44-J is an IRS ruling dated July 23, 1971 (TCCC-00008669 – TCCC-00008673).

79. Attached as Exhibit 45-J is an IRS supplemental ruling dated August 23, 1971 (TCCC-00008703 – TCCC-00008704).

80. In 1988, Export acquired Recofarma Indústria Química e Farmacêutica Ltda., which started producing some concentrate in that year.

81. In 1988, Concentrados do Amazonas Ltda. was formed as a wholly owned Brazilian subsidiary of CCIL. Concentrados do Amazonas Ltda. produced concentrate from 1990 until 1992, when it merged into Recofarma Indústria Química e Farmacêutica Ltda.

82. In 1991, CCIL purchased from Export 100% of the shares of Recofarma Indústria Química e Farmacêutica Ltda. That entity's name was later changed to "Recofarma Indústria do Amazonas Ltda." ("Recofarma").

83. In 1994, CCIL stopped manufacturing concentrate and Recofarma became the Company's sole concentrate manufacturing operation located in Brazil.

84. On January 1, 1997, Recofarma became a disregarded entity of CCIL for U.S. Federal income tax purposes.

85. Coca-Cola Concentrados e Refrigerantes Ltda. ("CCCRL") was formed on August 20, 1979. In 2007 and 2008, TCCC and Coca-Cola Interamerican Corporation ("Interamerican"), a direct, wholly owned subsidiary of TCCC and a member of the consolidated group, had 99.996% and 0.004% interests, respectively, in CCCRL.

86. On August 28, 2009, TCCC transferred 100% of the outstanding shares of CCCRL to Export, which then immediately transferred those shares to CCIL, which then immediately transferred those shares to Recofarma. CCCRL then elected, effective August 29, 2009, to be treated as a disregarded entity of CCIL for U.S. Federal income tax purposes. Petitioner treated this transaction as a reorganization pursuant to section 368(a)(1)(D).

**C. IRELAND**

87. Export established a branch in Ireland in 1974. That branch manufactured concentrate beginning that same year.

88. Atlantic Industries Limited, a wholly owned subsidiary of Export, was formed as a Cayman Islands corporation on May 30, 1979. It initially established business operations through branches in Paraguay, Ecuador, and Egypt.

89. In 1984, Export contributed certain assets of its Irish branch to Atlantic Industries Limited.

90. Attached as Exhibit 46-J is an IRS ruling dated September 25, 1984 (TCCC-00002098 - TCCC-00002109).

91. Attached as Exhibit 47-J is an IRS supplemental ruling dated December 21, 1984 (TCCC-00002095 - TCCC-00002097).

92. Atlantic Industries Limited changed its name to Atlantic Industries ("AI") in 1997.

93. From 2007 through 2009, AI's Irish branch operated manufacturing plants in the cities of Ballina and Athy, Ireland. AI's Irish branch also operated a manufacturing plant in Drogheda, Ireland, in 2007 and part of 2008; that plant ceased operations in 2008.

**D. SWAZILAND**

94. In 1952, Export established a branch in South Africa, which operated a concentrate manufacturing plant in Durban until 1987 when operations were discontinued due to apartheid and economic sanctions imposed on South Africa. The Export branch in South Africa sold its assets to a third party and deregistered with the government of South Africa by June 1988.

95. On September 11, 1986, Conco Ltd., a Cayman Islands corporation, was formed as a wholly owned subsidiary of Export. Conco Ltd. then established a branch in Swaziland to construct a new concentrate plant. The new concentrate plant in Swaziland began production upon its completion in 1987.

96. In 2006, AI acquired all the shares of Conco Ltd. in a transaction treated by petitioner as a reorganization pursuant to section 368(a)(1)(D). Conco Ltd. elected to be treated as a disregarded entity of AI for U.S. Federal income tax purposes.

**E. EGYPT**

97. A branch of Export was registered in Cairo, Egypt in 1947.

98. The Arab League Boycott prevented the Company from operating in Egypt from 1967 to 1979.

99. As a condition to re-entering the Egyptian market in 1979, the Company committed to the Egyptian government to establish a concentrate manufacturing plant.

100. In 1979, the Company restored concentrate sales in Egypt, which ended its boycott against the Company.

101. From 1979 to 1986, the Irish branch of Export and then the Irish branch of Atlantic Industries Limited supplied concentrate to Egyptian bottlers.

102. Atlantic Industries Limited established a branch in Egypt in 1980.

103. The plant that the Company committed to establish was completed in 1986 and commenced operations as part of the Egyptian branch of Atlantic Industries Limited.

**F. CHILE**

104. Export Sales formed a branch in Chile in 1948.

105. After the merger of Export Sales into Export in 1949, Export established a branch in Chile in 1950 and a concentrate manufacturing plant in 1953. The concentrate manufacturing plant began operations in 1954.

106. In 1994, Coca-Cola de Chile, S.A. was formed as a Chilean corporation and a wholly owned subsidiary of Export. The assets of the Chilean branch of Export were transferred to Coca-Cola de Chile, S.A., which began operations on January 1, 1995.

107. On March 17, 2009, Nuevas Bebidas de Colombia Ltda. was formed as a Colombian corporation and a wholly owned subsidiary of Coca-Cola de Chile, S.A. On that same date, it elected to be treated as a disregarded entity of Coca-Cola de Chile, S.A. for U.S. Federal income tax purposes.

## G. COSTA RICA

108. In 1965, Interamerican established a branch in Costa Rica to operate a new concentrate manufacturing plant.

109. In 2001, FTZ Coca-Cola Industrias, S.A. was formed as a wholly owned subsidiary of Interamerican. FTZ Coca-Cola Industrias, S.A. leased from Interamerican the office building and concentrate plant—including the office equipment, machinery, and industrial equipment—and continued concentrate manufacturing operations in Costa Rica.

110. On December 17, 2004, Interamerican exchanged all of its common shares in FTZ Coca-Cola Industrias, S.A. (which changed its name to "Coca-Cola Industrias, S.A.") solely for stock of AI in a transaction treated by petitioner as a reorganization pursuant to section 368(a)(1)(D). On April 1, 2005, Coca-Cola Industrias, S.A. was converted into a *limitada*, changed its name to "Coca-Cola Industrias, Ltda.," and elected to be treated as a disregarded entity of AI for U.S. Federal income tax purposes.

## VI. HISTORY OF BOTTLING OPERATIONS

111. In 1899, Asa G. Candler sold the exclusive rights to build bottling plants and to bottle and distribute the finished Coca-Cola beverage nearly everywhere in the United States to two individuals for $1.

112. Attached as Exhibit 48-J is a document titled "Chronological Listing – Countries with Coca-Cola Bottling Operations and Year Introduced 1906 through April 1969" (EXHJ_00000186 – EXHJ_00000190).

## VII. HEADCOUNT DATA

113. Attached as Exhibit 49-J is a schedule of the headcount in each cost center category function by select legal entity or branch as of December 31, 2007, December 31, 2008, and December 31, 2009 (EXHJ_00000254 – EXHJ_00000261).

114. Attached as Exhibit 50-J is a schedule of cost center category function definitions (EXHJ_00000262 – EXHJ_00000263).

115. Attached as Exhibit 51-J is Supplement 20.1.2 from TCCC's 2009 Standard Accounts and Codes manual, section 20.1 (EXHJ_00000264 – EXHJ_00000265).

116. Attached as Exhibit 52-J is a schedule that shows detailed human resources information for select legal entities and branches (EXHJ_00000266 – EXHJ_00000379).

117. Attached as Exhibit 53-J is a schedule that shows detailed human resources information for corporate center employees (EXHJ_00000380 – EXHJ_00000443).

118. Attached as Exhibit 54-J is a schedule that shows leadership team information for select Operating Groups and Business Units (EXHJ_00000444 – EXHJ_00000464).

## VIII. INTERCOMPANY AGREEMENTS

119. Attached as Exhibit 55-J is an agreement between TCCC and Compañía Coca-Cola de México, S.A. dated July 1, 1941 (TCCC-00003007 – TCCC-00003013).

120. Attached as Exhibit 56-J is an agreement between TCCC and The Coca-Cola Export Corporation, Mexico branch (U1202), dated January 1, 1998 (TCCC-00002996 – TCCC-00003001).

121. Attached as Exhibit 57-J is an agreement between TCCC and The Coca-Cola Export Corporation, Mexico branch (U1202), dated January 1, 2001 (TCCC-00002971 – TCCC-00002978).

122. Attached as Exhibit 58-J is an agreement between TCCC and The Coca-Cola Export Corporation, Mexico branch (U1202), dated December 1, 2005 (TCCC-00003014 – TCCC-00003016).

123. Attached as Exhibit 59-J is an agreement between TCCC and The Coca-Cola Export Corporation, Mexico branch (U1202), dated February 16, 2009 (TCCC-00002969 – TCCC-00002970).

124. Attached as Exhibit 60-J is an agreement between TCCC and Coca-Cola Indústria e Comercio Limitada dated February 1, 1963 (TCCC-00002902 – TCCC-00002906).

125. Attached as Exhibit 61-J is an agreement between TCCC and Coca-Cola Indústria e Comercio Limitada dated February 19, 1963 (TCCC-00003102 – TCCC-00003105).

126. Attached as Exhibit 62-J is an agreement between TCCC and Coca-Cola Indústria e Comercio Limitada dated September 1, 1964 (TCCC-00003083 – TCCC-00003087).

127. Attached as Exhibit 63-J is an agreement between TCCC and Coca-Cola Indústria e Comercio Limitada dated November 1, 1966 (TCCC-00003088 – TCCC-00003091).

128. Attached as Exhibit 64-J is an agreement between TCCC and Coca-Cola Indústrias Limitada (U1702) dated January 21, 1981 (TCCC-00002887 – TCCC-00002891).

129. Attached as Exhibit 65-J is an agreement between TCCC and Coca-Cola Indústrias Limitada (U1702) dated January 30, 1981 (TCCC-00003017 – TCCC-00003022).

130. Attached as Exhibit 66-J is an agreement between TCCC and Coca-Cola Indústrias Limitada (U1702) dated January 30, 1981 (TCCC-00003115 – TCCC-00003117).

131. Attached as Exhibit 67-J is an agreement between TCCC and Coca-Cola Indústrias Limitada (U1702) dated July 14, 1982 (TCCC-00003027 – TCCC-00003029).

132. Attached as Exhibit 68-J is an agreement between TCCC and Coca-Cola Indústrias Limitada (U1702) dated August 21, 1982 (TCCC-00003118 – TCCC-00003120).

133. Attached as Exhibit 69-J is an agreement between TCCC and Coca-Cola Indústrias Limitada (U1702) dated January 2, 1984 (TCCC-00002882 – TCCC-00002884).

134. Attached as Exhibit 70-J is an agreement between TCCC and Coca-Cola Indústrias Limitada (U1702) dated June 6, 1984 (TCCC-00002885 – TCCC-00002886).

135. Attached as Exhibit 71-J is an agreement between TCCC and Coca-Cola Indústrias Limitada (U1702) dated January 2, 1985 (TCCC-00002956 – TCCC-00002957).

136. Attached as Exhibit 72-J is an agreement between TCCC and Coca-Cola Indústrias Limitada (U1702) dated September 18, 1989 (TCCC-00003113 – TCCC-00003114).

137. Attached as Exhibit 73-J is an agreement between TCCC and Coca-Cola Indústrias Limitada (U1702) dated October 14, 1991 (TCCC-00002879 – TCCC-00002881).

138. Attached as Exhibit 74-J is an agreement between TCCC and Coca-Cola Indústrias Limitada (U1702) dated March 25, 1992 (TCCC-00003024 – TCCC-00003026).

139. Attached as Exhibit 75-J is an agreement between TCCC and Coca-Cola Indústrias Limitada (U1702) dated August 30, 1993 (TCCC-00002918 – TCCC-00002942).

140. Attached as Exhibit 76-J is an agreement between TCCC and Coca-Cola Indústrias Limitada (U1702) dated November 28, 1994 (TCCC-00002948 – TCCC-00002955).

141. Attached as Exhibit 77-J is an agreement between TCCC and Coca-Cola Indústrias Limitada (U1702) dated June 14, 1995 (TCCC-00003106 – TCCC-00003112).

142. Attached as Exhibit 78-J is an agreement between TCCC and Coca-Cola Indústrias Limitada (U1702) dated November 22, 1996 (TCCC-00002943 – TCCC-00002947).

143. Attached as Exhibit 79-J is an agreement between Coca-Cola Indústrias Limitada (U1702) and Recofarma Indústria do Amazonas Ltda. (U1775) executed on March 3, 1994, and February 23, 1994, respectively (TCCC-00003092 – TCCC-00003101).

144. Attached as Exhibit 80-J is an agreement between Coca-Cola Indústrias Limitada (U1702) and Recofarma Indústria do Amazonas Ltda. (U1775) dated September 11, 1995 (TCCC-00017930 – TCCC-00017932).

145. Attached as Exhibit 81-J is an agreement between Recofarma Indústria do Amazonas Ltda. (U1775) and Coca-Cola Concentrados e Refrigerantes Ltda. (U0850) dated August 1, 2001 (TCCC-00021448 – TCCC-00021451, TCCC-00021448_T – TCCC-00021451_T).

146. Attached as Exhibit 82-J is an agreement between TCCC and Atlantic Industries Limited, Ireland branch (U1614), dated October 1, 1984 (TCCC-00007791 – TCCC-00007795).

147. Attached as Exhibit 83-J is an agreement between TCCC and Atlantic Industries Limited, Ireland branch (U1614), dated July 1, 1985 (TCCC-00008055 – TCCC-00008059).

148. Attached as Exhibit 84-J is an agreement between TCCC and Atlantic Industries Limited, Ireland branch (U1614), dated October 1, 1987 (TCCC-00002907 – TCCC-00002911).

149. Attached as Exhibit 85-J is an agreement between TCCC and Atlantic Industries Limited, Ireland branch (U1614), dated October 1, 1987 (TCCC-00004473 – TCCC-00004477).

150. Attached as Exhibit 86-J is an agreement between TCCC and Atlantic Industries Limited, Ireland branch (U1614), dated September 28, 1990 (TCCC-00002912 – TCCC-00002913).

151. Attached as Exhibit 87-J is an agreement between TCCC and Atlantic Industries Limited, Ireland branch (U1614), dated September 28, 1990 (TCCC-00002867 – TCCC-00002873).

152. Attached as Exhibit 88-J is an agreement between The Coca-Cola Export Corporation and Atlantic Industries Limited, Ireland branch (U1614), dated January 1, 1996 (TCCC-00002989 – TCCC-00002991).

153. Attached as Exhibit 89-J is an agreement between TCCC and Conco Limited, Swaziland branch (U1656), dated December 18, 1986 (TCCC-00002981 – TCCC-00002988).

154. Attached as Exhibit 90-J is an agreement between The Coca-Cola Export Corporation and Conco Limited, Swaziland branch (U1656), dated January 1, 1987 (TCCC-00002962 – TCCC-00002968).

155. Attached as Exhibit 91-J is an agreement between TCCC and Conco Limited, Swaziland branch (U1656), dated January 1, 1987 (TCCC-00003002 – TCCC-00003006).

156. Attached as Exhibit 92-J is an agreement between TCCC and Conco Limited, Swaziland branch (U1656), dated January 1, 1987 (TCCC-00003078 – TCCC-00003082).

157. Attached as Exhibit 93-J is an agreement between TCCC and Conco Limited, Swaziland branch (U1656), dated January 1, 1997 (TCCC-00002874 – TCCC-00002878).

158. Attached as Exhibit 94-J is an agreement between The Coca-Cola Export Corporation and Conco Limited, Swaziland branch (U1656), dated January 1, 2002 (TCCC-00005482 – TCCC-00005485).

159. Attached as Exhibit 95-J is an agreement between TCCC and Coca-Cola de Chile, S.A. (U1618) dated January 1, 2002 (TCCC-00003075 – TCCC-00003077).

160. Attached as Exhibit 96-J is an agreement between TCCC and FTZ Coca-Cola Industrias, S.A. (U1084) dated November 6, 2001 (TCCC-00002863 – TCCC-00002866).

161. Attached as Exhibit 97-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Coca-Cola Nordic Services A/S (U1006) dated January 1, 2003 (TCCC-00005537 – TCCC-00005540).

162. Attached as Exhibit 98-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Coca-Cola AB (U1802) dated January 1, 2004 (TCCC-00005438 – TCCC-00005441).

163. Attached as Exhibit 99-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Coca-Cola Finland Oy. (U1588) dated January 1, 2004 (TCCC-00005490 – TCCC-00005493).

164. Attached as Exhibit 100-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Coca-Cola Norge AS (U1804) dated January 1, 2004 (TCCC-00005533 – TCCC-00005536).

165. Attached as Exhibit 101-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Coca-Cola Hungary Services Ltd. (U1761) dated May 1, 2004 (TCCC-00005462 – TCCC-00005464).

166. Attached as Exhibit 102-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Coca-Cola Balti Jookide AS (U1711) dated May 1, 2004 (TCCC-00005497 – TCCC-00005500).

167. Attached as Exhibit 103-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Coca-Cola GmbH (Germany corporation) (U1575) dated January 1, 2005 (TCCC-00005446 – TCCC-00005449).

168. Attached as Exhibit 104-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Barlan S&M, d.o.o. (U1188) dated April 1, 2005 (TCCC-00005564 – TCCC-00005567).

169. Attached as Exhibit 105-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Refreshment Services S.A.S. (U1192) dated May 1, 2005 (TCCC-00005366 – TCCC-00005369).

170. Attached as Exhibit 106-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Barlan B-H, d.o.o. (U1185) dated January 1, 2006 (TCCC-00005472 – TCCC-00005475).

171. Attached as Exhibit 107-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Coca-Cola Services France S.A.S. (U1758) dated January 1, 2006 (TCCC-00005549 – TCCC-00005552).

172. Attached as Exhibit 108-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Coca-Cola Hellas S.A. (U1561) dated September 1, 2006 (TCCC-00005390 – TCCC-00005392).

173. Attached as Exhibit 109-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Beverage Services Limited (U1666) dated January 1, 2007 (TCCC-00005137 – TCCC-00005140).

174. Attached as Exhibit 110-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and European Refreshments Limited (U1200) dated January 1, 2007 (TCCC-00005378 – TCCC-00005381).

175. Attached as Exhibit 111-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Compañia de Servicios de Bebidas Refrescantes, S.L. (U1530) dated January 1, 2007 (TCCC-00005486 – TCCC-00005489).

176. Attached as Exhibit 112-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Coca-Cola Romania SRL (U1688) dated January 1, 2008 (TCCC-00005397 – TCCC-00005400).

177. Attached as Exhibit 113-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Coca-Cola GmbH (Austria corporation) (U1583) dated January 1, 2008 (TCCC-00005405 – TCCC-00005408).

178. Attached as Exhibit 114-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Coca-Cola AG (U1811) dated January 1, 2008 (TCCC-00005512 – TCCC-00005515).

179. Attached as Exhibit 115-J is an agreement between S.A. Coca-Cola Services N.V. (U1732) and Coca-Cola Slovakia s.r.o. (U1780) dated January 1, 2009 (TCCC-00005560 – TCCC-00005563).

180. Attached as Exhibit 116-J is an agreement between The Coca-Cola Export Corporation and Coca-Cola Central Africa (Private) Limited (U1010) dated January 1, 1996 (TCCC-00005508 – TCCC-00005511).

181. Attached as Exhibit 117-J is an agreement between The Coca-Cola Export Corporation and Refreshment Product Services, Inc., Israel branch (U1080), dated February 14, 1996 (TCCC-00008953 – TCCC-00008955).

182. Attached as Exhibit 118-J is an agreement between The Coca-Cola Export Corporation and Coca-Cola Services Romania, Ltd. (U1688) dated January 1, 1997 (TCCC-00005417 – TCCC-00005419).

183. Attached as Exhibit 119-J is an agreement between The Coca-Cola Export Corporation and Coca-Cola Far East Limited, Singapore branch (U1645), dated January 1, 1998 (TCCC-00005530 – TCCC-00005532).

184. Attached as Exhibit 120-J is an agreement between The Coca-Cola Export Corporation and Coca-Cola Adria d.o.o. (U1791) dated June 1, 1998 (TCCC-00005409 – TCCC-00005412).

185. Attached as Exhibit 121-J is an agreement between The Coca-Cola Export Corporation and Coca-Cola Far East Limited, Malaysia branch (U1783), dated January 1, 2002 (TCCC-00005453 – TCCC-00005455).

186. Attached as Exhibit 122-J is an agreement between The Coca-Cola Export Corporation and Coca-Cola Bulgaria EOOD (U1689) dated January 1, 2002 (TCCC-00005480 – TCCC-00005481).

187. Attached as Exhibit 123-J is an agreement between The Coca-Cola Export Corporation, the Ireland branch of The Coca-Cola Export Corporation (U1360), and Coca-Cola Italia s.r.l. (U1557) dated January 1, 2003 (TCCC-00005465 – TCCC-00005467).

188. Attached as Exhibit 124-J is an agreement between The Coca-Cola Export Corporation, Ireland branch (U1360), and Coca-Cola Poland Services Sp. z o.o. (U1072) dated January 1, 2004 (TCCC-00005572 – TCCC-00005574).

189. Attached as Exhibit 125-J is an agreement between The Coca-Cola Export Corporation and Coca-Cola Meşrubat Pazarlama ve Danişmanlik Hizmetleri A.Ş. (U1760) dated January 1, 2005 (TCCC-00005413 – TCCC-00005416).

190. Attached as Exhibit 126-J is an agreement between The Coca-Cola Export Corporation and Coca-Cola AG (U1811) dated January 1, 2005 (TCCC-00005568 – TCCC-00005571).

191. Attached as Exhibit 127-J is an agreement between The Coca-Cola Export Corporation and RPSI II Inc. (U1499) dated July 1, 2005 (TCCC-00004251 – TCCC-00004254).

192. Attached as Exhibit 128-J is an agreement between The Coca-Cola Export Corporation and S.A. Coca-Cola Services N.V. (U1732) dated January 1, 2006 (TCCC-00005362 – TCCC-00005365).

193. Attached as Exhibit 129-J is an agreement between The Coca-Cola Export Corporation and Coca-Cola West Africa (U1011) dated January 1, 2006 (TCCC-00005393 – TCCC-00005396).

194. Attached as Exhibit 130-J is an agreement between The Coca-Cola Export Corporation and Coca-Cola East and Central Africa Limited (U1506) dated January 1, 2006 (TCCC-00005401 – TCCC-00005404).

195. Attached as Exhibit 131-J is an agreement between The Coca-Cola Export Corporation and Beverage Services Tunisia (U1766) dated January 1, 2006 (TCCC-00005504 – TCCC-00005507).

196. Attached as Exhibit 132-J is an agreement between The Coca-Cola Export Corporation and PBB Norway A.S. (U1210) dated June 23, 2006 (TCCC-00007053 – TCCC-00007056).

197. Attached as Exhibit 133-J is a foreign-language agreement between The Coca-Cola Export Corporation, Sucursal en México (U1202) and Servicios Integrados de Administración y Alta Gerencia, S.A. de C.V. (U1665) dated January 1, 2007 (EXHJ_00000241 – EXHJ_00000251, EXHJ_00000241-T – EXHJ_00000251-T).

198. Attached as Exhibit 134-J is an agreement between The Coca-Cola Export Corporation and Coca-Cola South Africa (Proprietary) Limited (U1519) dated January 1, 2007 (TCCC-00005468 – TCCC-00005471).

199. Attached as Exhibit 135-J is an agreement between The Coca-Cola Export Corporation and Beverage Services Ghana Limited (U1013) dated January 1, 2007 (TCCC-00005556 – TCCC-00005559).

200. Attached as Exhibit 136-J is an agreement between The Coca-Cola Export Corporation and Coca-Cola Ceská Republika s.r.o. (U1781) dated January 1, 2007 (TCCC-00005476 – TCCC-00005479).

201. Attached as Exhibit 137-J is an agreement between The Coca-Cola Export Corporation and Coca-Cola Ceská Republika s.r.o. (U1781) dated January 1, 2008 (TCCC-00005516 – TCCC-00005519).

202. Attached as Exhibit 138-J is an agreement between The Coca-Cola Export Corporation and Coca-Cola Far East Limited, Bangladesh branch (U1632), dated December 1, 2008 (TCCC-00005456 – TCCC-00005459).

203. Attached as Exhibit 139-J is an agreement between FTZ Coca-Cola Industrias, S.A. (U1084) and Compañía de Servicios del Distrito Norte, S.A. (U1799) dated January 1, 2002 (TCCC-00005460 – TCCC-00005461).

204. Attached as Exhibit 140-J is an agreement between FTZ Coca-Cola Industrias, S.A. (U1084) and Compañía de Servicios del Distrito Central, S.A. de C.V. (U1800) dated January 1, 2002 (TCCC-00005494 – TCCC-00005496).

205. Attached as Exhibit 141-J is an agreement between FTZ Coca-Cola Industrias, S.A. (U1084) and Coca-Cola Interamerican Corporation, Panama branch (U7005), dated January 1, 2002 (TCCC-00005501 – TCCC-00005503).

206. Attached as Exhibit 142-J is an agreement between FTZ Coca-Cola Industrias, S.A. (U1084) and Compañía de Servicios (Nicaragua) S.A. (U1128) dated October 1, 2002 (TCCC-00005450 – TCCC-00005452).

207. Attached as Exhibit 143-J is an agreement between FTZ Coca-Cola Industrias, S.A. (U1084) and Compañía de Servicios (El Salvador) S.A. (U1129) dated November 1, 2002 (TCCC-00005553 – TCCC-00005555).

208. Attached as Exhibit 144-J is an agreement between FTZ Coca-Cola Industrias, S.A. (U1084) and Caribbean Service Company, Ltd. (U1130) dated March 1, 2003 (TCCC-00005435 – TCCC-00005437).

209. Attached as Exhibit 145-J is an agreement between Coca-Cola Industrias, Ltda. (U1084) and Distrito La Hispaniola Compañía de Servicios, S.A. (U1798) dated January 1, 2008 (TCCC-00005442 – TCCC-00005445).

210. Attached as Exhibit 146-J is a foreign-language agreement between FTZ Coca-Cola Service Company Limitada (U1180) and FTZ Coca-Cola Park Administrator, Sociedad de Responsabilidad Limitada (U1181) dated November 1, 2005 (EXHJ_00000208 – EXHJ_00000216, EXHJ_00000208-T – EXHJ_00000216-T).

211. Attached as Exhibit 147-J is a foreign-language agreement between FTZ Coca-Cola Service Company Limitada (U1180) and Coca-Cola Industrias, Sociedad de Responsabilidad Limitada (U1084) dated November 1, 2005 (EXHJ_00000199 – EXHJ_00000207, EXHJ_00000199-T – EXHJ_00000207-T).

212. Attached as Exhibit 148-J is a foreign-language agreement between FTZ Coca-Cola Service Company Limitada (U1180) and Refreshment Product Services Ecuador (RPSE) S.A. (U1762) dated November 1, 2005 (EXHJ_00000191 – EXHJ_00000198, EXHJ_00000191-T – EXHJ_00000198-T).

213. Attached as Exhibit 149-J is a foreign-language agreement between FTZ Coca-Cola Service Company Limitada (U1180) and Coca-Cola Servicios de Colombia, S.A. (U1795) dated January 1, 2007 (EXHJ_00000217 – EXHJ_00000222, EXHJ_00000217-T – EXHJ_00000222-T).

214. Attached as Exhibit 150-J is a foreign-language agreement between FTZ Coca-Cola Service Company Limitada (U1180) and Coca-Cola Servicios de Colombia, S.A. (U1795) dated January 1, 2008 (EXHJ_00000223 – EXHJ_00000229, EXHJ_00000223-T – EXHJ_00000229-T).

215. Attached as Exhibit 151-J is an agreement between TCCC and Coca-Cola New Zealand Limited (U1801) dated January 1, 1999 (TCCC-00004426 – TCCC-00004430).

216. Attached as Exhibit 152-J is an agreement between RPSI II Inc. (U1499) and Coca-Cola South Pacific PTY Limited (U1538) dated July 1, 2005 (TCCC-00004240 – TCCC-00004250).

## IX. ANNUAL REPORTS TO STOCKHOLDERS & FORMS 10-K

217. Attached as Exhibit 153-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1921 (EXHJ_00000465 – EXHJ_00000492).

218. Attached as Exhibit 154-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1922 (EXHJ_00000493 – EXHJ_00000516).

219. Attached as Exhibit 155-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1923 (EXHJ_00000517 – EXHJ_00000540).

220. Attached as Exhibit 156-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1924 (EXHJ_00000541 – EXHJ_00000552).

221. Attached as Exhibit 157-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1925 (EXHJ_00000553 – EXHJ_00000568).

222. Attached as Exhibit 158-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1926 (EXHJ_00000569 – EXHJ_00000584).

223. Attached as Exhibit 159-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1927 (EXHJ_00000585 – EXHJ_00000600).

224. Attached as Exhibit 160-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1928 (EXHJ_00000601 – EXHJ_00000620).

225. Attached as Exhibit 161-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1929 (EXHJ_00000621 – EXHJ_00000640).

226. Attached as Exhibit 162-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1930 (EXHJ_00000641 – EXHJ_00000660).

227. Attached as Exhibit 163-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1931 (EXHJ_00000661 – EXHJ_00000684).

228. Attached as Exhibit 164-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1932 (EXHJ_00000685 – EXHJ_00000707).

229. Attached as Exhibit 165-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1933 (EXHJ_00000708 – EXHJ_00000731).

230. Attached as Exhibit 166-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1934 (EXHJ_00000732 – EXHJ_00000743).

231. Attached as Exhibit 167-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1935 (EXHJ_00000744 – EXHJ_00000755).

232. Attached as Exhibit 168-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1936 (EXHJ_00000756 – EXHJ_00000767).

233. Attached as Exhibit 169-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1937 (EXHJ_00000768 – EXHJ_00000779).

234. Attached as Exhibit 170-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1938 (EXHJ_00000780 – EXHJ_00000791).

235. Attached as Exhibit 171-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1939 (EXHJ_00000792 – EXHJ_00000803).

236. Attached as Exhibit 172-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1940 (EXHJ_00000804 – EXHJ_00000815).

237. Attached as Exhibit 173-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1941 (EXHJ_00000816 – EXHJ_00000827).

238. Attached as Exhibit 174-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1942 (EXHJ_00000828 – EXHJ_00000839).

239. Attached as Exhibit 175-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1943 (EXHJ_00000840 – EXHJ_00000851).

240. Attached as Exhibit 176-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1944 (EXHJ_00000852 – EXHJ_00000863).

241. Attached as Exhibit 177-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1945 (EXHJ_00000864 – EXHJ_00000875).

242. Attached as Exhibit 178-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1946 (EXHJ_00000876 – EXHJ_00000887).

243. Attached as Exhibit 179-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1947 (EXHJ_00000888 – EXHJ_00000895).

244. Attached as Exhibit 180-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1948 (EXHJ_00000896 – EXHJ_00000907).

245. Attached as Exhibit 181-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1949 (EXHJ_00000908 – EXHJ_00000919).

246. Attached as Exhibit 182-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1950 (EXHJ_00000920 – EXHJ_00000931).

247. Attached as Exhibit 183-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1951 (EXHJ_00000932 – EXHJ_00000943).

248. Attached as Exhibit 184-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1952 (EXHJ_00000944 – EXHJ_00000955).

249. Attached as Exhibit 185-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1953 (EXHJ_00000956 – EXHJ_00000967).

250. Attached as Exhibit 186-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1954 (EXHJ_00000968 – EXHJ_00000979).

251. Attached as Exhibit 187-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1955 (EXHJ_00000980 – EXHJ_00000999).

252. Attached as Exhibit 188-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1956 (EXHJ_00001000 – EXHJ_00001019).

253. Attached as Exhibit 189-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1957 (EXHJ_00001020 – EXHJ_00001039).

254. Attached as Exhibit 190-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1958 (EXHJ_00001040 – EXHJ_00001059).

255. Attached as Exhibit 191-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1959 (EXHJ_00001060 – EXHJ_00001079).

256. Attached as Exhibit 192-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1960 (EXHJ_00001080 – EXHJ_00001099).

257. Attached as Exhibit 193-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1961 (EXHJ_00001100 – EXHJ_00001123).

258. Attached as Exhibit 194-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1962 (EXHJ_00001124 – EXHJ_00001139).

259. Attached as Exhibit 195-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1963 (EXHJ_00001140 – EXHJ_00001155).

260. Attached as Exhibit 196-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1964 (EXHJ_00001156 – EXHJ_00001175).

261. Attached as Exhibit 197-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1965 (EXHJ_00001176 – EXHJ_00001191).

262. Attached as Exhibit 198-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1966 (EXHJ_00001192 – EXHJ_00001207).

263. Attached as Exhibit 199-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1967 (EXHJ_00001208 – EXHJ_00001227).

264. Attached as Exhibit 200-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1968 (EXHJ_00001228 – EXHJ_00001243).

265. Attached as Exhibit 201-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1969 (EXHJ_00001244 – EXHJ_00001259).

266. Attached as Exhibit 202-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1970 (EXHJ_00001260 – EXHJ_00001279).

267. Attached as Exhibit 203-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1971 (EXHJ_00001280 – EXHJ_00001299).

268. Attached as Exhibit 204-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1972 (EXHJ_00001300 – EXHJ_00001319).

269. Attached as Exhibit 205-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1973 (EXHJ_00001320 – EXHJ_00001339).

270. Attached as Exhibit 206-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1974 (EXHJ_00001340 – EXHJ_00001367).

271. Attached as Exhibit 207-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1975 (EXHJ_00001368 – EXHJ_00001395).

272. Attached as Exhibit 208-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1976 (EXHJ_00001396 – EXHJ_00001421).

273. Attached as Exhibit 209-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1977 (EXHJ_00001422 – EXHJ_00001449).

274. Attached as Exhibit 210-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1978 (EXHJ_00001450 – EXHJ_00001488).

275. Attached as Exhibit 211-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1979 (EXHJ_00001489 – EXHJ_00001531).

276. Attached as Exhibit 212-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1980 (EXHJ_00001532 – EXHJ_00001582).

277. Attached as Exhibit 213-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1981 (EXHJ_00001583 – EXHJ_00001633).

278. Attached as Exhibit 214-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1982 (EXHJ_00001634 – EXHJ_00001685).

279. Attached as Exhibit 215-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1983 (EXHJ_00001686 – EXHJ_00001745).

280. Attached as Exhibit 216-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1984 (EXHJ_00001746 – EXHJ_00001804).

281. Attached as Exhibit 217-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1985 (EXHJ_00001805 – EXHJ_00001867).

282. Attached as Exhibit 218-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1986 (EXHJ_00001868 – EXHJ_00001930).

283. Attached as Exhibit 219-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1987 (EXHJ_00001931 – EXHJ_00001988).

284. Attached as Exhibit 220-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1988 (EXHJ_00001989 – EXHJ_00002044).

285. Attached as Exhibit 221-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1989 (EXHJ_00002045 – EXHJ_00002112).

286. Attached as Exhibit 222-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1990 (EXHJ_00002113 – EXHJ_00002181).

287. Attached as Exhibit 223-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1991 (EXHJ_00002182 – EXHJ_00002267).

288. Attached as Exhibit 224-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1992 (EXHJ_00002268 – EXHJ_00002343).

289. Attached as Exhibit 225-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1993 (EXHJ_00002344 – EXHJ_00002415).

290. Attached as Exhibit 226-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1994 (EXHJ_00002416 – EXHJ_00002489).

291. Attached as Exhibit 227-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1995 (EXHJ_00002490 – EXHJ_00002567).

292. Attached as Exhibit 228-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1996 (EXHJ_00002568 – EXHJ_00002651).

293. Attached as Exhibit 229-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1997 (EXHJ_00002652 – EXHJ_00002722).

294. Attached as Exhibit 230-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1998 (EXHJ_00002723 – EXHJ_00002790).

295. Attached as Exhibit 231-J is TCCC's Annual Report to Stockholders for the year ended December 31, 1999 (EXHJ_00002791 – EXHJ_00002862).

296. Attached as Exhibit 232-J is TCCC's Annual Report to Stockholders for the year ended December 31, 2000 (EXHJ_00002863 – EXHJ_00002938).

297. Attached as Exhibit 233-J is TCCC's Annual Report to Stockholders for the year ended December 31, 2001 (EXHJ_00002939 – EXHJ_00003032).

298. Attached as Exhibit 234-J is TCCC's Annual Report to Stockholders for the year ended December 31, 2002 (EXHJ_00003033 – EXHJ_00003150).

299. Attached as Exhibit 235-J is TCCC's Form 10-K for the year ended December 31, 2003 (EXHJ_00003151 – EXHJ_00003273).

300. Attached as Exhibit 236-J is TCCC's Form 10-K for the year ended December 31, 2004 (EXHJ_00003274 – EXHJ_00003413).

301. Attached as Exhibit 237-J is TCCC's Form 10-K for the year ended December 31, 2005 (EXHJ_00003414 – EXHJ_00003555).

302. Attached as Exhibit 238-J is TCCC's Form 10-K for the year ended December 31, 2006 (EXHJ_00003556 – EXHJ_00003813).

303. Attached as Exhibit 239-J is TCCC's Form 10-K for the year ended December 31, 2007 (EXHJ_00003814 – EXHJ_00003997).

304. Attached as Exhibit 240-J is TCCC's Form 10-K for the year ended December 31, 2008 (EXHJ_00003998 – EXHJ_00004266).

305. Attached as Exhibit 241-J is TCCC's Form 10-K for the year ended December 31, 2009 (EXHJ_00004267 – EXHJ_00004496).

WILLIAM M. PAUL
Acting Chief Counsel
Internal Revenue Service

By: ______________________

KEVIN L. KENWORTHY
Counsel for Petitioner
Tax Court Bar No. KK0147
Miller & Chevalier Chartered
900 16th Street NW
Washington, DC 20006
Telephone No.: (202) 626-5848

JILL FRISCH
Counsel for Respondent
Special Trial Attorney
Tax Court Bar No. FJ0677
Newark Center, 15th Floor
1065 Raymond Blvd.
Newark, NJ 07102
Telephone No.: (973) 681-6623

Date: 2-28-17

Date: 2-28-17

## APPENDIX A

A table of the stipulated headcount data is set forth below:

| Ex. | Description | Bates Range |
|---|---|---|
| 49-J | Headcount by select legal entity or branch and cost center category function | EXHJ_00000254 – EXHJ_00000261 |
| 50-J | Cost center category function definitions | EXHJ_00000262 – EXHJ_00000263 |
| 51-J | Supplement 20.1.2 from TCCC's 2009 Standard Accounts and Codes manual, section 20.1 | EXHJ_00000264 – EXHJ_00000265 |
| 52-J | Human resources information for select legal entities and branches | EXHJ_00000266 – EXHJ_00000379 |
| 53-J | Human resources information for corporate center employees | EXHJ_00000380 – EXHJ_00000443 |
| 54-J | Leadership team information for select Operating Groups and Business Units | EXHJ_00000444 – EXHJ_00000464 |

## APPENDIX B

A table of the stipulated intercompany agreements is set forth below:

| Ex. | Date | Party 1 | Party 2 | Bates Range |
|---|---|---|---|---|
| 55-J | 7/1/1941 | TCCC | Compañía Coca-Cola de México, S.A. | TCCC-00003007–TCCC-00003013 |
| 56-J | 1/1/1998 | TCCC | The Coca-Cola Export Corporation, Mexico branch (U1202) | TCCC-00002996–TCCC-00003001 |
| 57-J | 1/1/2001 | TCCC | The Coca-Cola Export Corporation, Mexico branch (U1202) | TCCC-00002971–TCCC-00002978 |
| 58-J | 12/1/2005 | TCCC | The Coca-Cola Export Corporation, Mexico branch (U1202) | TCCC-00003014–TCCC-00003016 |
| 59-J | 2/16/2009 | TCCC | The Coca-Cola Export Corporation, Mexico branch (U1202) | TCCC-00002969–TCCC-00002970 |
| 60-J | 2/1/1963 | TCCC | Coca-Cola Indústria e Comercio Limitada | TCCC-00002902–TCCC-00002906 |

| Ex. | Date | Party 1 | Party 2 | Bates Range |
|---|---|---|---|---|
| 61-J | 2/19/1963 | TCCC | Coca-Cola Indústria e Comercio Limitada | TCCC-00003102–TCCC-00003105 |
| 62-J | 9/1/1964 | TCCC | Coca-Cola Indústria e Comercio Limitada | TCCC-00003083–TCCC-00003087 |
| 63-J | 11/1/1966 | TCCC | Coca-Cola Indústria e Comercio Limitada | TCCC-00003088–TCCC-00003091 |
| 64-J | 1/21/1981 | TCCC | Coca-Cola Indústrias Limitada (U1702) | TCCC-00002887–TCCC-00002891 |
| 65-J | 1/30/1981 | TCCC | Coca-Cola Indústrias Limitada (U1702) | TCCC-00003017–TCCC-00003022 |
| 66-J | 1/30/1981 | TCCC | Coca-Cola Indústrias Limitada (U1702) | TCCC-00003115–TCCC-00003117 |
| 67-J | 7/14/1982 | TCCC | Coca-Cola Indústrias Limitada (U1702) | TCCC-00003027–TCCC-00003029 |
| 68-J | 8/21/1982 | TCCC | Coca-Cola Indústrias Limitada (U1702) | TCCC-00003118–TCCC-00003120 |
| 69-J | 1/2/1984 | TCCC | Coca-Cola Indústrias Limitada (U1702) | TCCC-00002882–TCCC-00002884 |
| 70-J | 6/6/1984 | TCCC | Coca-Cola Indústrias Limitada (U1702) | TCCC-00002885–TCCC-00002886 |
| 71-J | 1/2/1985 | TCCC | Coca-Cola Indústrias Limitada (U1702) | TCCC-00002956–TCCC-00002957 |
| 72-J | 9/18/1989 | TCCC | Coca-Cola Indústrias Limitada (U1702) | TCCC-00003113–TCCC-00003114 |
| 73-J | 10/14/1991 | TCCC | Coca-Cola Indústrias Limitada (U1702) | TCCC-00002879–TCCC-00002881 |
| 74-J | 3/25/1992 | TCCC | Coca-Cola Indústrias Limitada (U1702) | TCCC-00003024–TCCC-00003026 |
| 75-J | 8/30/1993 | TCCC | Coca-Cola Indústrias Limitada (U1702) | TCCC-00002918–TCCC-00002942 |
| 76-J | 11/28/1994 | TCCC | Coca-Cola Indústrias Limitada (U1702) | TCCC-00002948–TCCC-00002955 |
| 77-J | 6/14/1995 | TCCC | Coca-Cola Indústrias Limitada (U1702) | TCCC-00003106–TCCC-00003112 |
| 78-J | 11/22/1996 | TCCC | Coca-Cola Indústrias Limitada (U1702) | TCCC-00002943–TCCC-00002947 |

| Ex. | Date | Party 1 | Party 2 | Bates Range |
|---|---|---|---|---|
| 79-J | Executed on 2/23/1994 and 3/3/1994 | Coca-Cola Indústrias Limitada (U1702) | Recofarma Indústria do Amazonas Ltda. (U1775) | TCCC-00003092–TCCC-00003101 |
| 80-J | 9/11/1995 | Coca-Cola Indústrias Limitada (U1702) | Recofarma Indústria do Amazonas Ltda. (U1775) | TCCC-00017930–TCCC-00017932 |
| 81-J | 8/1/2001 | Recofarma Indústria do Amazonas Ltda. (U1775) | Coca-Cola Concentrados e Refrigerantes Ltda. (U0850) | TCCC-00021448–TCCC-00021451<br>TCCC-00021448_T–TCCC-00021451_T |
| 82-J | 10/1/1984 | TCCC | Atlantic Industries Limited, Ireland branch (U1614) | TCCC-00007791–TCCC-00007795 |
| 83-J | 7/1/1985 | TCCC | Atlantic Industries Limited, Ireland branch (U1614) | TCCC-00008055–TCCC-00008059 |
| 84-J | 10/1/1987 | TCCC | Atlantic Industries Limited, Ireland branch (U1614) | TCCC-00002907–TCCC-00002911 |
| 85-J | 10/1/1987 | TCCC | Atlantic Industries Limited, Ireland branch (U1614) | TCCC-00004473–TCCC-00004477 |
| 86-J | 9/28/1990 | TCCC | Atlantic Industries Limited, Ireland branch (U1614) | TCCC-00002912–TCCC-00002913 |
| 87-J | 9/28/1990 | TCCC | Atlantic Industries Limited, Ireland branch (U1614) | TCCC-00002867–TCCC-00002873 |
| 88-J | 1/1/1996 | The Coca-Cola Export Corporation | Atlantic Industries Limited, Ireland branch (U1614) | TCCC-00002989–TCCC-00002991 |
| 89-J | 12/18/1986 | TCCC | Conco Limited, Swaziland branch (U1656) | TCCC-00002981–TCCC-00002988 |
| 90-J | 1/1/1987 | The Coca-Cola Export Corporation | Conco Limited, Swaziland branch (U1656) | TCCC-00002962–TCCC-00002968 |

| Ex. | Date | Party 1 | Party 2 | Bates Range |
|---|---|---|---|---|
| 91-J | 1/1/1987 | TCCC | Conco Limited, Swaziland branch (U1656) | TCCC-00003002–TCCC-00003006 |
| 92-J | 1/1/1987 | TCCC | Conco Limited, Swaziland branch (U1656) | TCCC-00003078–TCCC-00003082 |
| 93-J | 1/1/1997 | TCCC | Conco Limited, Swaziland branch (U1656) | TCCC-00002874–TCCC-00002878 |
| 94-J | 1/1/2002 | The Coca-Cola Export Corporation | Conco Limited, Swaziland branch (U1656) | TCCC-00005482–TCCC-00005485 |
| 95-J | 1/1/2002 | TCCC | Coca-Cola de Chile, S.A. (U1618) | TCCC-00003075–TCCC-00003077 |
| 96-J | 11/6/2001 | TCCC | FTZ Coca-Cola Industrias, S.A. (U1084) | TCCC-00002863–TCCC-00002866 |
| 97-J | 1/1/2003 | S.A. Coca-Cola Services N.V. (U1732) | Coca-Cola Nordic Services A/S (U1006) | TCCC-00005537–TCCC-00005540 |
| 98-J | 1/1/2004 | S.A. Coca-Cola Services N.V. (U1732) | Coca-Cola AB (U1802) | TCCC-00005438–TCCC-00005441 |
| 99-J | 1/1/2004 | S.A. Coca-Cola Services N.V. (U1732) | Coca-Cola Finland Oy. (U1588) | TCCC-00005490–TCCC-00005493 |
| 100-J | 1/1/2004 | S.A. Coca-Cola Services N.V. (U1732) | Coca-Cola Norge AS (U1804) | TCCC-00005533–TCCC-00005536 |
| 101-J | 5/1/2004 | S.A. Coca-Cola Services N.V. (U1732) | Coca-Cola Hungary Services Ltd. (U1761) | TCCC-00005462–TCCC-00005464 |
| 102-J | 5/1/2004 | S.A. Coca-Cola Services N.V. (U1732) | Coca-Cola Balti Jookide AS (U1711) | TCCC-00005497–TCCC-00005500 |
| 103-J | 1/1/2005 | S.A. Coca-Cola Services N.V. (U1732) | Coca-Cola GmbH (Germany corporation) (U1575) | TCCC-00005446–TCCC-00005449 |

| Ex. | Date | Party 1 | Party 2 | Bates Range |
|---|---|---|---|---|
| 104-J | 4/1/2005 | S.A. Coca-Cola Services N.V. (U1732) | Barlan S&M, d.o.o. (U1188) | TCCC-00005564–TCCC-00005567 |
| 105-J | 5/1/2005 | S.A. Coca-Cola Services N.V. (U1732) | Refreshment Services S.A.S. (U1192) | TCCC-00005366–TCCC-00005369 |
| 106-J | 1/1/2006 | S.A. Coca-Cola Services N.V. (U1732) | Barlan B-H, d.o.o. (U1185) | TCCC-00005472–TCCC-00005475 |
| 107-J | 1/1/2006 | S.A. Coca-Cola Services N.V. (U1732) | Coca-Cola Services France S.A.S. (U1758) | TCCC-00005549–TCCC-00005552 |
| 108-J | 9/1/2006 | S.A. Coca-Cola Services N.V. (U1732) | Coca-Cola Hellas S.A. (U1561) | TCCC-00005390–TCCC-00005392 |
| 109-J | 1/1/2007 | S.A. Coca-Cola Services N.V. (U1732) | Beverage Services Limited (U1666) | TCCC-00005137–TCCC-00005140 |
| 110-J | 1/1/2007 | S.A. Coca-Cola Services N.V. (U1732) | European Refreshments Limited (U1200) | TCCC-00005378–TCCC-00005381 |
| 111-J | 1/1/2007 | S.A. Coca-Cola Services N.V. (U1732) | Compañia de Servicios de Bebidas Refrescantes, S.L. (U1530) | TCCC-00005486–TCCC-00005489 |
| 112-J | 1/1/2008 | S.A. Coca-Cola Services N.V. (U1732) | Coca-Cola Romania SRL (U1688) | TCCC-00005397–TCCC-00005400 |
| 113-J | 1/1/2008 | S.A. Coca-Cola Services N.V. (U1732) | Coca-Cola GmbH (Austria corporation) (U1583) | TCCC-00005405–TCCC-00005408 |
| 114-J | 1/1/2008 | S.A. Coca-Cola Services N.V. (U1732) | Coca-Cola AG (U1811) | TCCC-00005512–TCCC-00005515 |
| 115-J | 1/1/2009 | S.A. Coca-Cola Services N.V. (U1732) | Coca-Cola Slovakia s.r.o. (U1780) | TCCC-00005560–TCCC-00005563 |
| 116-J | 1/1/1996 | The Coca-Cola Export Corporation | Coca-Cola Central Africa (Private) Limited (U1010) | TCCC-00005508–TCCC-00005511 |

| Ex. | Date | Party 1 | Party 2 | Bates Range |
|---|---|---|---|---|
| 117-J | 2/14/1996 | The Coca-Cola Export Corporation | Refreshment Product Services, Inc., Israel branch (U1080) | TCCC-00008953–TCCC-00008955 |
| 118-J | 1/1/1997 | The Coca-Cola Export Corporation | Coca-Cola Services Romania, Ltd. (U1688) | TCCC-00005417–TCCC-00005419 |
| 119-J | 1/1/1998 | The Coca-Cola Export Corporation | Coca-Cola Far East Limited, Singapore branch (U1645) | TCCC-00005530–TCCC-00005532 |
| 120-J | 6/1/1998 | The Coca-Cola Export Corporation | Coca-Cola Adria d.o.o. (U1791) | TCCC-00005409–TCCC-00005412 |
| 121-J | 1/1/2002 | The Coca-Cola Export Corporation | Coca-Cola Far East Limited, Malaysia branch (U1783) | TCCC-00005453–TCCC-00005455 |
| 122-J | 1/1/2002 | The Coca-Cola Export Corporation | Coca-Cola Bulgaria EOOD (U1689) | TCCC-00005480–TCCC-00005481 |
| 123-J | 1/1/2003 | The Coca-Cola Export Corporation<br>The Coca-Cola Export Corporation, Ireland branch (U1360) | Coca-Cola Italia, s.r.l. (U1557) | TCCC-00005465–TCCC-00005467 |
| 124-J | 1/1/2004 | The Coca-Cola Export Corporation, Ireland branch (U1360) | Coca-Cola Poland Services Sp. z o.o. (U1072) | TCCC-00005572–TCCC-00005574 |
| 125-J | 1/1/2005 | The Coca-Cola Export Corporation | Coca-Cola Meşrubat Pazarlama ve Danişmanlik Hizmetleri A.Ş. (U1760) | TCCC-00005413–TCCC-00005416 |
| 126-J | 1/1/2005 | The Coca-Cola Export Corporation | Coca-Cola AG (U1811) | TCCC-00005568–TCCC-00005571 |
| 127-J | 7/1/2005 | The Coca-Cola Export Corporation | RPSI II Inc. (U1499) | TCCC-00004251–TCCC-00004254 |
| 128-J | 1/1/2006 | The Coca-Cola Export Corporation | S.A. Coca-Cola Services, N.V. (U1732) | TCCC-00005362–TCCC-00005365 |

| Ex. | Date | Party 1 | Party 2 | Bates Range |
|---|---|---|---|---|
| 129-J | 1/1/2006 | The Coca-Cola Export Corporation | Coca-Cola West Africa (U1011) | TCCC-00005393– TCCC-00005396 |
| 130-J | 1/1/2006 | The Coca-Cola Export Corporation | Coca-Cola East and Central Africa Limited (U1506) | TCCC-00005401– TCCC-00005404 |
| 131-J | 1/1/2006 | The Coca-Cola Export Corporation | Beverage Services Tunisia (U1766) | TCCC-00005504– TCCC-00005507 |
| 132-J | 6/23/2006 | The Coca-Cola Export Corporation | PBB Norway A.S. (U1210) | TCCC-00007053– TCCC-00007056 |
| 133-J | 1/1/2007 | The Coca-Cola Export Corporation, Sucursal en México (U1202) | Servicios Integrados de Administración y Alta Gerencia, S.A. de C.V. (U1665) | EXHJ_00000241 – EXHJ_00000251<br>EXHJ_00000241-T – EXHJ_00000251-T |
| 134-J | 1/1/2007 | The Coca-Cola Export Corporation | Coca-Cola South Africa (Proprietary) Limited (U1519) | TCCC-00005468– TCCC-00005471 |
| 135-J | 1/1/2007 | The Coca-Cola Export Corporation | Beverage Services Ghana Limited (U1013) | TCCC-00005556– TCCC-00005559 |
| 136-J | 1/1/2007 | The Coca-Cola Export Corporation | Coca-Cola Ceská Republika s.r.o. (U1781) | TCCC-00005476– TCCC-00005479 |
| 137-J | 1/1/2008 | The Coca-Cola Export Corporation | Coca-Cola Ceská Republika s.r.o. (U1781) | TCCC-00005516– TCCC-00005519 |
| 138-J | 12/1/2008 | The Coca-Cola Export Corporation | Coca-Cola Far East Limited, Bangladesh branch (U1632) | TCCC-00005456– TCCC-00005459 |
| 139-J | 1/1/2002 | FTZ Coca-Cola Industrias, S.A. (U1084) | Compañía de Servicios del Distrito Norte, S.A. (U1799) | TCCC-00005460– TCCC-00005461 |
| 140-J | 1/1/2002 | FTZ Coca-Cola Industrias, S.A. (U1084) | Compañía de Servicios del Distrito Central, S.A. de C.V. (U1800) | TCCC-00005494– TCCC-00005496 |
| 141-J | 1/1/2002 | FTZ Coca-Cola Industrias, S.A. (U1084) | Coca-Cola Interamerican Corporation, Panama branch (U7005) | TCCC-00005501– TCCC-00005503 |
| 142-J | 10/1/2002 | FTZ Coca-Cola Industrias, S.A. (U1084) | Compañía de Servicios (Nicaragua) S.A. (U1128) | TCCC-00005450– TCCC-00005452 |

| Ex. | Date | Party 1 | Party 2 | Bates Range |
|---|---|---|---|---|
| 143-J | 11/1/2002 | FTZ Coca-Cola Industrias, S.A. (U1084) | Compañía de Servicios (El Salvador) S.A. (U1129) | TCCC-00005553–TCCC-00005555 |
| 144-J | 3/1/2003 | FTZ Coca-Cola Industrias, S.A. (U1084) | Caribbean Service Company, Ltd. (U1130) | TCCC-00005435–TCCC-00005437 |
| 145-J | 1/1/2008 | Coca-Cola Industrias, Ltda. (U1084) | Distrito La Hispaniola Compañía de Servicios, S.A. (U1798) | TCCC-00005442–TCCC-00005445 |
| 146-J | 11/1/2005 | FTZ Coca-Cola Service Company Limitada (U1180) | FTZ Coca-Cola Park Administrator, Sociedad de Responsabilidad Limitada (U1181) | EXHJ_00000208 – EXHJ_00000216<br>EXHJ_00000208-T – EXHJ_00000216-T |
| 147-J | 11/1/2005 | FTZ Coca-Cola Service Company Limitada (U1180) | Coca-Cola Industrias, Sociedad de Responsabilidad Limitada (U1084) | EXHJ_00000199 – EXHJ_00000207<br>EXHJ_00000199-T – EXHJ_00000207-T |
| 148-J | 11/1/2005 | FTZ Coca-Cola Service Company Limitada (U1180) | Refreshment Product Services Ecuador (RPSE) S.A. (U1762) | EXHJ_00000191 – EXHJ_00000198<br>EXHJ_00000191-T – EXHJ_00000198-T |
| 149-J | 1/1/2007 | FTZ Coca-Cola Service Company Limitada (U1180) | Coca-Cola Servicios de Colombia, S.A. (U1795) | EXHJ_00000217 – EXHJ_00000222<br>EXHJ_00000217-T – EXHJ_00000222-T |
| 150-J | 1/1/2008 | FTZ Coca-Cola Service Company Limitada (U1180) | Coca-Cola Servicios de Colombia, S.A. (U1795) | EXHJ_00000223 – EXHJ_00000229<br>EXHJ_00000223-T – EXHJ_00000229-T |
| 151-J | 1/1/1999 | TCCC | Coca-Cola New Zealand Limited (U1801) | TCCC-00004426–TCCC-00004430 |
| 152-J | 7/1/2005 | RPSI II Inc. (U1499) | Coca-Cola South Pacific PTY Limited (U1538) | TCCC-00004240–TCCC-00004250 |

**APPENDIX C**

A table of the stipulated Annual Reports to Stockholders of TCCC is set forth below:

| Ex. | Year | Bates Range |
|---|---|---|
| 153-J | 1921 | EXHJ_00000465 – EXHJ_00000492 |
| 154-J | 1922 | EXHJ_00000493 – EXHJ_00000516 |
| 155-J | 1923 | EXHJ_00000517 – EXHJ_00000540 |
| 156-J | 1924 | EXHJ_00000541 – EXHJ_00000552 |
| 157-J | 1925 | EXHJ_00000553 – EXHJ_00000568 |
| 158-J | 1926 | EXHJ_00000569 – EXHJ_00000584 |
| 159-J | 1927 | EXHJ_00000585 – EXHJ_00000600 |
| 160-J | 1928 | EXHJ_00000601 – EXHJ_00000620 |
| 161-J | 1929 | EXHJ_00000621 – EXHJ_00000640 |
| 162-J | 1930 | EXHJ_00000641 – EXHJ_00000660 |
| 163-J | 1931 | EXHJ_00000661 – EXHJ_00000684 |
| 164-J | 1932 | EXHJ_00000685 – EXHJ_00000707 |
| 165-J | 1933 | EXHJ_00000708 – EXHJ_00000731 |
| 166-J | 1934 | EXHJ_00000732 – EXHJ_00000743 |
| 167-J | 1935 | EXHJ_00000744 – EXHJ_00000755 |
| 168-J | 1936 | EXHJ_00000756 – EXHJ_00000767 |
| 169-J | 1937 | EXHJ_00000768 – EXHJ_00000779 |
| 170-J | 1938 | EXHJ_00000780 – EXHJ_00000791 |
| 171-J | 1939 | EXHJ_00000792 – EXHJ_00000803 |
| 172-J | 1940 | EXHJ_00000804 – EXHJ_00000815 |
| 173-J | 1941 | EXHJ_00000816 – EXHJ_00000827 |
| 174-J | 1942 | EXHJ_00000828 – EXHJ_00000839 |
| 175-J | 1943 | EXHJ_00000840 – EXHJ_00000851 |
| 176-J | 1944 | EXHJ_00000852 – EXHJ_00000863 |
| 177-J | 1945 | EXHJ_00000864 – EXHJ_00000875 |
| 178-J | 1946 | EXHJ_00000876 – EXHJ_00000887 |
| 179-J | 1947 | EXHJ_00000888 – EXHJ_00000895 |
| 180-J | 1948 | EXHJ_00000896 – EXHJ_00000907 |

| Ex. | Year | Bates Range |
|---|---|---|
| 181-J | 1949 | EXHJ_00000908 – EXHJ_00000919 |
| 182-J | 1950 | EXHJ_00000920 – EXHJ_00000931 |
| 183-J | 1951 | EXHJ_00000932 – EXHJ_00000943 |
| 184-J | 1952 | EXHJ_00000944 – EXHJ_00000955 |
| 185-J | 1953 | EXHJ_00000956 – EXHJ_00000967 |
| 186-J | 1954 | EXHJ_00000968 – EXHJ_00000979 |
| 187-J | 1955 | EXHJ_00000980 – EXHJ_00000999 |
| 188-J | 1956 | EXHJ_00001000 – EXHJ_00001019 |
| 189-J | 1957 | EXHJ_00001020 – EXHJ_00001039 |
| 190-J | 1958 | EXHJ_00001040 – EXHJ_00001059 |
| 191-J | 1959 | EXHJ_00001060 – EXHJ_00001079 |
| 192-J | 1960 | EXHJ_00001080 – EXHJ_00001099 |
| 193-J | 1961 | EXHJ_00001100 – EXHJ_00001123 |
| 194-J | 1962 | EXHJ_00001124 – EXHJ_00001139 |
| 195-J | 1963 | EXHJ_00001140 – EXHJ_00001155 |
| 196-J | 1964 | EXHJ_00001156 – EXHJ_00001175 |
| 197-J | 1965 | EXHJ_00001176 – EXHJ_00001191 |
| 198-J | 1966 | EXHJ_00001192 – EXHJ_00001207 |
| 199-J | 1967 | EXHJ_00001208 – EXHJ_00001227 |
| 200-J | 1968 | EXHJ_00001228 – EXHJ_00001243 |
| 201-J | 1969 | EXHJ_00001244 – EXHJ_00001259 |
| 202-J | 1970 | EXHJ_00001260 – EXHJ_00001279 |
| 203-J | 1971 | EXHJ_00001280 – EXHJ_00001299 |
| 204-J | 1972 | EXHJ_00001300 – EXHJ_00001319 |
| 205-J | 1973 | EXHJ_00001320 – EXHJ_00001339 |
| 206-J | 1974 | EXHJ_00001340 – EXHJ_00001367 |
| 207-J | 1975 | EXHJ_00001368 – EXHJ_00001395 |
| 208-J | 1976 | EXHJ_00001396 – EXHJ_00001421 |
| 209-J | 1977 | EXHJ_00001422 – EXHJ_00001449 |
| 210-J | 1978 | EXHJ_00001450 – EXHJ_00001488 |

| Ex. | Year | Bates Range |
|---|---|---|
| 211-J | 1979 | EXHJ_00001489 – EXHJ_00001531 |
| 212-J | 1980 | EXHJ_00001532 – EXHJ_00001582 |
| 213-J | 1981 | EXHJ_00001583 – EXHJ_00001633 |
| 214-J | 1982 | EXHJ_00001634 – EXHJ_00001685 |
| 215-J | 1983 | EXHJ_00001686 – EXHJ_00001745 |
| 216-J | 1984 | EXHJ_00001746 – EXHJ_00001804 |
| 217-J | 1985 | EXHJ_00001805 – EXHJ_00001867 |
| 218-J | 1986 | EXHJ_00001868 – EXHJ_00001930 |
| 219-J | 1987 | EXHJ_00001931 – EXHJ_00001988 |
| 220-J | 1988 | EXHJ_00001989 – EXHJ_00002044 |
| 221-J | 1989 | EXHJ_00002045 – EXHJ_00002112 |
| 222-J | 1990 | EXHJ_00002113 – EXHJ_00002181 |
| 223-J | 1991 | EXHJ_00002182 – EXHJ_00002267 |
| 224-J | 1992 | EXHJ_00002268 – EXHJ_00002343 |
| 225-J | 1993 | EXHJ_00002344 – EXHJ_00002415 |
| 226-J | 1994 | EXHJ_00002416 – EXHJ_00002489 |
| 227-J | 1995 | EXHJ_00002490 – EXHJ_00002567 |
| 228-J | 1996 | EXHJ_00002568 – EXHJ_00002651 |
| 229-J | 1997 | EXHJ_00002652 – EXHJ_00002722 |
| 230-J | 1998 | EXHJ_00002723 – EXHJ_00002790 |
| 231-J | 1999 | EXHJ_00002791 – EXHJ_00002862 |
| 232-J | 2000 | EXHJ_00002863 – EXHJ_00002938 |
| 233-J | 2001 | EXHJ_00002939 – EXHJ_00003032 |
| 234-J | 2002 | EXHJ_00003033 – EXHJ_00003150 |

# APPENDIX D

A table of the stipulated Forms 10-K of TCCC is set forth below:

| Ex. | Year | Bates Range |
|---|---|---|
| 235-J | 2003 | EXHJ_00003151 – EXHJ_00003273 |
| 236-J | 2004 | EXHJ_00003274 – EXHJ_00003413 |
| 237-J | 2005 | EXHJ_00003414 – EXHJ_00003555 |
| 238-J | 2006 | EXHJ_00003556 – EXHJ_00003813 |
| 239-J | 2007 | EXHJ_00003814 – EXHJ_00003997 |
| 240-J | 2008 | EXHJ_00003998 – EXHJ_00004266 |
| 241-J | 2009 | EXHJ_00004267 – EXHJ_00004496 |

# Doc. 575

SR
US TAX COURT
FILED
WASHINGTON
MAY 11 2018

THE COCA-COLA COMPANY AND SUBSIDIARIES,
Petitioner,

PAPER FILED

v.

Docket No. 31183-15

COMMISSIONER OF INTERNAL REVENUE,
Respondent

# JOINT TWENTY-FOURTH STIPULATION OF FACTS

**UNITED STATES TAX COURT**

U. S. TAX COURT
FILED AT
Washington, D.C.
MAY 11 2018

| | |
|---|---|
| THE COCA-COLA COMPANY AND SUBSIDIARIES, | ) |
| Petitioner, | ) |
| v. | ) Docket No. 31183-15 |
| COMMISSIONER OF INTERNAL REVENUE, | ) Judge Albert G. Lauber |
| Respondent | ) |

**TWENTY-FOURTH STIPULATION OF FACTS**

In accordance with T.C. Rule 91(e), the parties stipulate and agree that, for the purpose of this case, the following statements are accepted as facts. All exhibits referred to herein and attached hereto are true and correct copies and are accepted as authentic. Each party, however, may introduce other and further evidence not inconsistent with this stipulation, and the parties may agree to supplemental stipulations of facts. The parties may not object to said stipulation and exhibits, or any portions thereof, on any grounds unless such objection is expressly reserved herein.

In stipulating to a label, description, or characterization of an agreement, the parties are not stipulating to the substance of that agreement for Federal income tax purposes. Headings in the stipulation have no legal effect.

3413. "Trademark Coca-Cola Products" for purposes of this stipulation means those that bear the trademark Coca-Cola or any trademark that includes Coca-Cola (E.g. Diet Coke, Coke Zero, and their variations and line extensions).

3414. The Company's analysis of Trademark Coca-Cola Product concentrate manufacturing processes found in the Supply Points' facilities identified no risks requiring special levels of control and only low levels of risk inherent in food and beverage manufacturing (i.e. those controllable by baseline levels of good manufacturing, housekeeping, and protective clothing or gowning practices).

3415. The Company is the largest nonalcoholic beverage company in the world. Its business is well-established, with its products having been sold since 1886. Further, its brands are well-known around the world, with its products currently sold in more than 200 countries. According to the Company's form 10-K filings, "Coca Cola" was recognized as the world's most valuable brand during the 2007-2009 period (Relevant Period). During this period, the Company marketed four of the world's top five nonalcoholic sparkling brands (Coca Cola, Diet Coke, Fanta, and Sprite). In addition to sparkling beverages, the Company also produces various still beverages (including water, enhanced waters, juices and juice drinks, teas, coffees, and

energy and sports drinks). The Company manufactures beverage concentrates, which it sells to bottling and canning operations.

3416. TCCC is the parent company and global headquarters of the worldwide Coca-Cola group. TCCC generally owns the Company's formulas, trademarks, and other intangibles associated with Trademark Coca-Cola Products, which it makes available to certain subsidiaries through agreements. TCCC also performs overall corporate governance functions on behalf of the Company. TCCC is headquartered in Atlanta, Georgia.

3417. The Supply Points house concentrate manufacturing plants and are responsible for transforming ingredients (including TCCC-provided proprietary flavors and materials sourced from third-party vendors) into concentrate by mixing them in a pre-defined way according to detailed formulas and instructions provided by TCCC for the Trademark Coca-Cola Products. The concentrate manufactured by the Supply Points is a key input (which is subsequently combined with water, carbon dioxide, and as applicable, sweeteners) into Trademark Coca- Cola Products. Sales of the Trademark Coca-Cola Products accounted for 67% of the relevant Supply Points' total net sales during the Relevant Period.

3418. The Supply Points generally sell the concentrate they manufacture to Bottlers in specific geographic areas as directed by TCCC. In general, they

cannot sell to any entities that are not approved and authorized by TCCC. Further, the prices at which they sell finished concentrate to the Bottlers are generally subject to approval by TCCC.

3419. The Supply Points also served as "contingency supply points" for other geographies as necessary. During the Relevant Period, "there were no disruptions in supply for the Supply Points at issue that required activation of a 'designated backup' plant."

3420. The R&D Centers develop new products, packaging, and retail equipment. The responsibilities of the R&D Centers vary somewhat by location. For example, research activities, as defined by the Company, occur at TCCC in Atlanta, while development activities, specific to other geographies, occur across all of the R&D Centers. During 2007-2009 there were six R&D Centers:

- Atlanta, Georgia: supports the North American Group (part of TCCC)
- Apopka, Florida: supports the global juice business (part of TCCC)
- Brussels, Belgium: supports the Eurasia/Africa Group (including Russia and India)
- Shanghai, China: supports the Pacific Group (excluding Japan)
- Tokyo, Japan: supports Japan
- Rio de Janeiro, Brazil: supports Latin America, including Mexico.

3421. R&D Centers also serve as global "Centers of Excellence" ("COE") with respect to one or more products or technologies. For example, the Brussels R&D Center serves as a COE for Fanta and enhanced waters. In its role as a COE, it provides assistance and expertise to other R&D Centers as needed and also serves in a global coordination role in conjunction with TCCC.

3422. The R&D Centers work with the various local marketing teams they support to plan and define new product development pipeline projects. The R&D Centers then develop prototypes of the new products for the local marketing teams to test and provide feedback for further iteration as necessary. Bottlers acquire and reconstitute concentrate from Supply Points, fill and package product, and sell finished products to wholesalers or retailers in specified territories. Each Bottler must generally be approved and authorized by TCCC through a formal Bottler's Agreement. These agreements are generally with TCCC or a U.S. subsidiary

3423. During the Relevant Period, the annual worldwide research and development (R&D) budget for the Company was approximately $200 million, or less than 1 percent of worldwide revenues. (For comparison purposes, the worldwide advertising budget was approximately $3 billion or roughly 10 percent of worldwide revenues during the Relevant Period). The

Company's investment in R&D is limited compared to a number of its key competitors.

3424. The Company's R&D functions consist of two distinct types of activities:

- Research projects consist of new, unproven, and scalable projects that can be leveraged across multiple R&D Centers (and in turn, across multiple products and/or territories). For example, exploration of a new ingredient such as a low-calorie sweetener would be considered a research activity; if successful, such work could be applied to numerous products manufactured and marketed by the Company. Exploration of new packaging materials that could be leveraged across multiple brands, product types and territories would also be considered a research activity. Once a research project has been successfully proven, the resulting output (e.g., new ingredient or packaging material) may then be incorporated into new products as part of development phase projects, described below.
- Development projects, by contrast, are undertaken to create or adapt specific products to given markets based on local consumer preferences or to meet particular regulatory requirements, to improve profitability, or to meet other business objectives. For example, the

R&D Center in Brazil undertook a development project to reduce the amount of sodium chloride and other salts contained in Powerade within the Brazilian market such that it could be classified as isotonic and meet local regulations. Another example was modifying the ingredients within Fanta Orange for consumption in the Zambia, Zimbabwe, and Mozambique markets in order to make the product Halal-compliant.

3425. In general, research activities are performed exclusively in Atlanta by TCCC, while development activities are performed in the field at local R&D Centers.

3426. Research for the Company's products is generally performed in Atlanta by TCCC employees. For certain projects, TCCC works in conjunction with other external entities (e.g., universities, key suppliers, or other companies with relevant technology) to conduct research activities. TCCC's research projects typically take three to five years to complete. Before launching new research projects, TCCC coordinates with the general managers of the R&D Centers to ensure that successful research projects would be of meaningful and practical use.

3427. TCCC is responsible for setting rules for product development, defining formats in which product formulas can be written, and reviewing new product

formulas that have been developed in the field. TCCC also facilitates knowledge-sharing and connection across the global R&D Centers to minimize duplication of activity.

3428. An example of a research project undertaken by TCCC is its work with the sweetener Stevia. Stevia is calorie-free but is known to exhibit a bitter licorice aftertaste. TCCC worked for several years together with a key supplier, Cargill, to develop a grade of Stevia that would work well in beverage applications. TCCC also tested and determined which ingredient blends were optimal from a flavor perspective when combined with Stevia. This research and resulting know-how was then provided to the R&D Centers globally.

3429. Responsibility for all product development activities associated with the Trademark Coca-Cola Products is generally reserved exclusively for TCCC. The development of Coca-Cola Sango by the Brussels R&D Center is the only known exception to TCCC's exclusive development of Trademark Coca-Cola Products. Coke (i.e., the so-called Coca-Cola classic product also known as "regular Coke" or "Coke Red") is standardized around the world, with little-to-no product development performed to tailor it to local markets. Diet Coke and Coke Zero can be adjusted to local markets, but only with respect to the selection of sweeteners used. TCCC in Atlanta has full control

over the Trademark Coca-Cola Product formulas to protect and safeguard their flavor profiles as well as to protect the underlying proprietary formulas and intellectual property.

3430. Development projects performed outside of the U.S. consist of activities to tailor products to meet local market demand and local regulatory requirements. During the Relevant Period, TCCC approval was required before any new products could be sold.

3431. R&D Center employees include nutritionists, bioengineers, chemists, and sensory scientists. The majority of R&D Center employees focus on developing products, with some employees focusing on developing packaging and equipment. To support product development activities, the Brussels and Rio de Janeiro R&D Centers operate small-scale bottling plants that produce beverages for consumer testing and that enable testing and optimization of new process technology.

3432. In general, the R&D Centers outside of the U.S. support their respective Business Units' product pipeline needs through planning over the next 18 to 24 months. The ideas for new product development activities typically come from field marketing personnel, who in turn rely on consumer research and feedback. The R&D Centers work closely with the

various local marketing teams in their territories to plan and define the new product pipeline.

3433. Product development projects also tailor products to meet local regulations. For example, Vitamin Water is fortified with vitamins, which are heavily regulated in most countries.

3434. The General Manager of the Ballina (Ireland) Supply Point has six direct reports covering the main functions of the facility, none of which are R&D: operations managers, HR manager, quality assurance manager, supply chain manager, and finance manager. Whereas performance reviews for the leaders of the R&D Centers are tied to R&D-related objectives (the most important of which is to deliver all the innovation projects that are in the business plans of the BUs that they support on time, within budget and without marketplace issues), performance criteria for leaders of Supply Points are based on the performance of the site on metrics covering costs, quality, service, safety.

3435. The Supply Points receive demand forecasts from the BUs that they serve.

3436. The Supply Points sell the manufactured concentrate to Bottlers. The manufacture, bottling, and labeling of the ready-to-consume beverages occurring at Bottlers is highly standardized. For example, the Bottlers have

their own product-mixing instructions provided by the Company, which specify the concentrate or beverage base (in each case complete units must be used), the number of parts, the sequence and duration of mixing the parts and ingredients (water, carbon dioxide, and sugar) to assure compliance with product standards. The concentrate and any other ingredients are provided in established units and must be used in their entirety by the Bottlers to ensure the quality of the finished beverage. The process of manufacturing and selling complete units of concentrate or beverage base is the cornerstone of the Company's manufacturing philosophy and practice. When necessary, for quality and technical reasons, one unit of finished concentrate or beverage base will consist of one or more parts, and these parts may be in liquid or powder form. No unit is complete – or can be utilized by Bottlers– without all parts being present, and no one part can be used without all the other parts. Bottlers must use the entire contents of any container (liquid or powder) and must not weigh out any portion of a container for use. The packaging and labeling used by the Bottlers is generally at the discretion of the local BUs, subject to standards set by TCCC.

3437. The Company has strict quality control processes in place to protect its brands. The Company considers quality and consistent adherence to quality standards to be critical to the success of its business, as illustrated by

its corporate quality statement: "The Coca-Cola Company exists to benefit and refresh everyone it touches. For us, Quality is more than just something we taste or see or measure. It shows in our every action. We relentlessly strive to exceed the world's ever-changing expectations because keeping our Quality promise in the marketplace is our highest business objective and our enduring obligation."

3438. To achieve its quality assurance goals and standards globally, the Company: 1) establishes and manages the overall quality assurance framework, which is then operationalized by the Supply Points and other Company operations globally; and 2) performs regular audits to ensure compliance against its policies and requirements. Each function is described in more detail below.

3439. The framework for setting and establishing the overall quality assurance for global operations that was in place during the Relevant Period was known as The Coca-Cola Management System ("TCCMS"). Key requirements established by TCCMS include the following:

- Raw materials must be purchased from approved suppliers and must be tested upon receipt to ensure that the Company-approved specifications are met.

- Concentrates and beverage bases must be manufactured in accordance with Good Manufacturing Practice ("GMP") conditions. GMP is part of a quality system covering the manufacture and testing of foods, drugs, and medical devices and is required by many countries.
- Concentrates and beverage bases must be manufactured according to Master Recipes derived from Coca-Cola Master Formulae.
- In-process testing and final product release testing must be performed in accordance with the Company's quality control specifications. Individual product specifications vary based on the product and its specific chemical and physical attributes. For example, juice-based products are more microbiologically sensitive than a preserved low pH sparkling product and thus require different types of quality assurance testing than do sparkling products.
- Concentrates and beverage bases must be shipped to customers in sealed, tamper evident containers.
- Manufacturing supplies and equipment must be cleaned and sanitized in accordance with prescribed requirements.

3440. The requirements for the Supply Points to monitor and measure product quality through a program of product release testing are standardized.

3441. TCCMS also imposes corrective and preventive action program to maintain the integrity of the overall process and drive continuous improvement. Consistent with standard industry practices, TCCMS requires adherence to a Hazard Analysis Critical Control Point ("HACCP") program, which is a systematic preventive approach to food safety that addresses physical, chemical, and biological hazards as a means of prevention rather than finished product inspection. The HACCP Plan is a document prepared in accordance with the principles of HACCP to ensure control of hazards which are significant for food safety in the segment of the food chain under consideration. The HACCP Plan is used to manage the control measures which are applied at Critical Control Points ("CCPs").

3442. The Supply Points and other organizational entities within the Company must then operationalize and incorporate the management systems and specific requirements outlined by the TCCMS framework into their day-to-day processes and activities.

3443. To monitor and enforce compliance with its quality assurance policies, TCCC performs audits on each Supply Point (as well as all other entities) within the Company.

3444. TCCC performs scheduled audits of Supply Points regularly (typically at least every three years). Supply Points that have been found to have problems in the past are audited more frequently.

3445. The Supply Points create flowcharts that break each of the individual processes that occur at the Supply Points into distinct steps. Each of these steps is examined to determine whether a food safety hazard (either biological, chemical, or physical) exists at that step. The flowchart is a prerequisite for completing a Hazard Analysis. Hazards that are identified are assigned to one of the following three categories of increasingly demanding sets of control measures to address them:

- Pre-requisite program (PRPs) - These are basic programs or procedures which are required to operate the facility to required standards.
- Operational pre-requisite program (OPRPs) - programs or procedures more specific to the operation in question. An OPRP control plan is used, giving monitoring & verification details.
- Critical Control Points (CCPs) - Points in the process where control can be applied to eliminate a potential hazard or reduce it to an acceptable level. A CCP control plan is used, giving critical limits and monitoring & verification details. Critical limits must be measurable

and are based upon factors such as: temperature, time, physical dimensions, and weight.

3446. Lowest-level hazards are subject only to PRPs to achieve acceptable levels of control, present throughout the plant (e.g., requirements for pest control, good manufacturing, protective clothing requirements, cleaning and sanitization programs, facility and grounds maintenance, waste water quality). Higher-level risks may require additional procedures to achieve acceptable levels of control; these would be subject to specifically identified OPRPs appropriate to their specific nature. Identification of CCPs requires the highest level of detailed hazard control and reporting, the completion of a HACCP (CCP) Control Plan, which includes additional reporting elements (e.g., acceptable values for critical limits such as time, temperature and flow rate).

3447. The Ballina Supply Point (Ireland) Food Safety Manual identifies nine product types and associated processes for which flow diagrams were completed, outlined in the table below.

**Table 5: Ballina Beverages Processes**

| Process | Grouped Product Name |
|---|---|
| Dry Parts | Filling of Beverage Base Powder parts |
| Beverage Base | Liquid Beverage Base / Blends |
| Beverage Base | Liquid Beverage Base / Juice Only |
| Beverage Base | Liquid Beverage Base / Juice Based Dispersion |
| Beverage Base | Liquid Beverage Base / Thermal Sensitive Juice Based Dispersions |
| Beverage Base | Mucilage - Liquid Beverage Base / Emulsion |
| Pungent Blends | Manufacture of Beverage Base / Pungent Blends |
| Coca-Cola Concentrate / Diet Coke Base | Manufacture of Coca-Cola Concentrate / Diet Coke Base |
| Sprite Extraction | Manufacture of Sprite Extract |

3448. The Ballina (Ireland) Supply Point created a flowchart for the manufacture of Coke concentrate. The flowchart for the "Manufacture of Coke Concentrate" contains eighteen numbered steps, including, for example, "1. Check SMI/BOM of PO," "2. Pre-stage manual additions," and "3. Check bulk raw materials." This flowchart does not contain any CCPs or OPRPs associated with any of the eighteen numbered process steps, indicating that the manufacture of Coke concentrate was determined to be low risk by the Ireland Supply Point.

3449. The "Food Safety Risk Analysis Worksheet for the Manufacture of Coca-Cola Concentrate and Diet Coke Beverage Base," shows no CCPs or OPRPs were identified through the hazard analysis, only basic control measures that would have been in place across the plant. These basic control measures (PRPs) specified within the document consist of good

manufacturing practices, housekeeping procedures, and protective clothing procedures.

3450. Exhibit 1364-J (CCADMIN0011851) sets forth a list of incidents for which Incident Management Crisis Resolution (IMCR) was activated during the years at issue for any of the countries where Coca-Cola manufactures, bottles, distributes or sells its products. None of these incidents occurred at the concentrate facility.

3451. One of the carbonated beverage alert notifications is an incident that occurred in Europe where products including Trademark Coca-Cola Products were recalled due to issues that occurred at Bottlers. This recall occurred in 1999 (prior to the time period in question) and the Company reported that it resulted in direct costs of $28 million. Countries affected by the recall included Belgium, France, Luxembourg, and the Netherlands. The Company indicated that problems along two points in its bottling system led to defects in its products. Specifically, certain soft drinks had been bottled using carbon dioxide that was defective and that led to an off-taste, while certain other products were affected by a package-integrity issue stemming from a substance used to treat wooden pallets used to ship the cans. Both of these issues originated at Bottlers rather than Supply Points.

WILLIAM M. PAUL
Acting Chief Counsel
Internal Revenue Service

JOHN B. MAGEE
Counsel for Petitioner
Tax Court Bar No. MJ0060
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Ave. NW
Washington, DC 20004
Telephone No.: (202) 373-6229

Date: 5/11/18

By: Veronica L Richards for TV0030

JILL FRISCH
Counsel for Respondent
Special Trial Attorney
Tax Court Bar No. FJ0677
One Newark Center, 15th Floor
1085 Raymond Blvd.
Newark, NJ 07102
Telephone No.: (973) 681-6623

Date: 5/11/18

# Doc. 599

## (through page 155)

REDACTED

US TAX COURT
RECEIVED

DEC 7 2018
5:52 PM

CZ

US TAX COURT
eFILED

DEC 7 2018

THE COCA-COLA COMPANY AND SUBSIDIARIES,
Petitioner,

ELECTRONICALLY FILED

v.

Docket No. 31183-15

COMMISSIONER OF INTERNAL REVENUE,
Respondent

# PETITIONER'S SIMULTANEOUS OPENING BRIEF

SERVED Dec 11 2018

***Filed Under Seal***
***Subject to November 21, 2017 Protective Order***

**UNITED STATES TAX COURT**

U.S. TAX COURT
RECEIVED
OCT 1 9 2018
HAND DELIVERED

| | | |
|---|---|---|
| THE COCA-COLA COMPANY AND SUBSIDIARIES, | ) | |
| Petitioner, | ) | |
| v. | ) | Docket No. 31183-15 |
| COMMISSIONER OF INTERNAL REVENUE, | ) | Judge Albert G. Lauber |
| Respondent | ) | |

**PETITIONER'S OPENING BRIEF**

# TABLE OF CONTENTS

Page

I. Executive Summary ........ 1
  A. Intercompany royalty issue ........ 1
  B. Dividend offset ........ 22
  C. Section 987 ........ 25
  D. Brazil blocked income ........ 26
II. Nature of Controversy and Tax Involved ........ 28
  A. Tax years in issue ........ 28
  B. Federal income tax dispute relating primarily to section 482 adjustments ........ 28
  C. Trial ........ 29
    1. Duration and location ........ 29
    2. Stipulations and documentary evidence ........ 29
    3. Witnesses ........ 29
  D. Protective order ........ 30
III. Issues to be Decided ........ 31
IV. Proposed Findings of Fact ........ 32
  A. Jurisdictional matters ........ 32
  B. NARTD industry overview ........ 33
    1. Consumers and competitors differed across and within markets ........ 35
    2. Local factors influenced consumer demand ........ 37
    3. Continuous locally relevant advertising was critical to success in the NARTD business ........ 38
  C. The Coca-Cola System overview ........ 40
  D. The Company operated in a geographically decentralized manner in which responsibility for the core functions resided in the field ........ 43
    1. Strategic planning ........ 47
    2. Franchise leadership ........ 52
    3. Customer and commercial leadership ........ 54

## TABLE OF CONTENTS

**Page**


4. Consumer marketing .......... 60
5. Concentrate manufacturing .......... 91
6. R&D .......... 94
7. Other functions (technical, public relations, and finance) .......... 99
8. The role of operating groups .......... 103

E. The Operating Committee .......... 107

F. CPS .......... 109

G. Corporate headquarters was responsible for governance and stewardship .......... 112

H. Bottlers' distinct role in The Coca-Cola System .......... 113

I. Formation of the Company's international operations .......... 145

1. The Six Foreign Licensees and their predecessors .......... 146
2. Registered trademark ownership .......... 160
3. The intercompany licenses at issue .......... 162
4. The evolution of the Company's foreign-legal-entity-and-intercompany-contractual structure .......... 167
   a. Consolidation of concentrate supply for business reasons .......... 167
   b. The Company's actions to mitigate the risk of double taxation .......... 169
   c. Foreign licensees continued to bear the costs relating to their markets notwithstanding the consolidation and legal-entity restructuring .......... 172
   d. Pro-rata .......... 173
   e. The Company's actions to minimize unrecoverable foreign value-added taxes .......... 175
   f. Split invoicing .......... 176

J. Respondent's historical audits of the royalties due to TCCC from foreign licensees .......... 177

## TABLE OF CONTENTS

**Page**


K. Respondent rejected the Royalty Closing Agreement method for the years in issue....192

L. Nature of a transfer-pricing inquiry....203

M. Arm's-length licensing....212

1. Godiva....214
2. Caribou....223
3. Nestlé....227
4. Honest Tea....228
5. Cadbury....231
6. Margins not used to determine royalty rates at arm's length....234
7. Effect of contractual rights and responsibilities at arm's length....235
    a. Exclusivity....235
    b. Term and termination....236
8. Renegotiation....238

N. Respondent's transfer-pricing methods....239

1. Dr. Newlon's bottler-based CPM....239
    a. CPM in general....242
    b. Bottler comparability....244
    c. ROA....255
    d. Accounting for intangible capital....264
    e. MUTC....277
    f. CPM as Dr. Newlon's method of first resort....281
    g. Experts on both sides recognize the critical importance of ongoing marketing investments....285
    h. Drs. Newlon's and Metrick's rebuttal claims regarding investments....288
    i. Dr. Newlon's treatment of split invoicing....290
    j. Dr. Newlon's "supplemental analysis"....292

**TABLE OF CONTENTS**

**Page**


k. Dr. Newlon's claims regarding distribution networks and customer relationships ....................295

2. Dr. Becker's "forward-looking" CPM....................300

3. Dr. Newlon's bottler-based CPM and the Becker method assume that licensors capture all profits related to the licensed intangibles by virtue of legal ownership; empirical evidence regarding arm's-length licensing behavior and results proves that assumption incorrect....................312

O. Dr. Unni's master-franchise CUT and CPSM analyses....................324

1. Dr. Unni's CUT analysis....................327

2. Dr. Unni's CPSM analysis....................349

P. Dr. Cragg's RPSM approaches....................353

1. Intangible-development-cost-based RPSM....................359

2. Enterprise-value-based RPSM....................363

3. Carveouts and exclusions for intangible property not owned by TCCC....................364

4. Dr. Newlon on the RPSM....................365

Q. Mr. Reams's asset-management model....................365

R. Ownership of intangible property relating to the Company's business in Brazil....................373

1. Prof. Franklyn's analysis....................375

2. Dr. Viegas's and Prof. Contreras's responses to Prof. Franklyn....................379

3. Kuat and other local products....................384

S. Brazilian legal restrictions on royalty remittances....................385

V. Ultimate Findings....................397

A. Intercompany royalties....................397

B. Dividend offset....................399

C. Section 987....................399

D. Brazil blocked income....................400

# TABLE OF CONTENTS

**Page**


VI. Points Relied Upon ....................................................................................400

A. Intercompany royalties ..............................................................................400

B. Dividend offset ...........................................................................................407

C. Section 987 ................................................................................................408

D. Brazil blocked income ................................................................................408

VII. Law & Argument .........................................................................................409

A. Respondent's adjustments based on Dr. Newlon's bottler-based CPM are arbitrary, capricious, or unreasonable; respondent's backup approach based on Dr. Becker fares no better .........................409

1. Applicable law ......................................................................................409

2. Respondent's adjustments premised on Dr. Newlon's bottler-based CPM are arbitrary, capricious, or unreasonable because bottlers are not comparable to the Six Foreign Licensees in any material respect ................................426

a. The Six Foreign Licensees and downstream bottlers did not receive comparable rights to use TCCC's trademarks: The Six Foreign Licensees received and exercised fundamentally broader rights ...........................429

b. The Six Foreign Licensees' and downstream bottlers' functions, investments, and assets were not comparable: The Six Foreign Licensees and downstream bottlers were responsible for different functions, made different investments, and owned different assets ..........................................................433

c. Dr. Newlon's bottler-based CPM is arbitrary, capricious, or unreasonable because the Six Foreign Licensees owned valuable intangible property in addition to their valuable license rights ...........................441

3. Dr. Newlon's ROA PLI demonstrates the arbitrary and capricious nature of his bottler-based CPM .............................443

**TABLE OF CONTENTS**

**Page**


4. Dr. Newlon's admittedly inferior bottler-based CPM with MUTC PLI is arbitrary, capricious, or unreasonable because it suffers from the same critical defects as his ROA and possesses an additional infirmity that renders it unreliable ....... 453
5. Respondent's only alternative approach to Dr. Newlon's bottler-based CPM was presented by Dr. Becker, who entirely failed to assess comparability and ignored material issues with each of the transactions he analyzed, rendering his approach utterly unreliable ....... 456
6. Dr. Newlon's and Dr. Becker's analyses are arbitrary, capricious, or unreasonable because the foundational assumptions underlying their methods are refuted by empirical evidence of arm's-length licensing behavior and results ....... 462
7. Respondent's arm's-length analysis and treatment of CCL's legal ownership of the Canadian trademarks demonstrates that even respondent does not believe that legal ownership entitles licensors to all returns related to the licensed intangibles ....... 471
8. Dr. Newlon's and Dr. Becker's results are arbitrary, capricious, or unreasonable because they ignore market-level differences that significantly affect profitability ....... 474
9. Dr. Newlon's admittedly overly simplistic supplemental analysis, in which the intercompany licenses disappear, rests on false premises and sheds no light on the proper arm's-length prices for the intercompany licenses ....... 480
10. Respondent's and Dr. Newlon's inconsistent split-invoicing adjustments are baseless ....... 482

B. Dr. Newlon's belated attacks on the intercompany licenses, the Six Foreign Licensees' investments, and the foreign legal-entity structure cannot save his bottler-based CPM ....... 484

1. The intercompany licenses were substantively exclusive and long-term; otherwise the Six Foreign Licensees should have paid lower royalty rates ....... 486

## TABLE OF CONTENTS

**Page**


2. Dr. Newlon's revisionist attempt to strip the Six Foreign Licensees of their vast historical investments and reallocate those investments to TCCC is legally incorrect and factually baseless ....495

3. Respondent and petitioner agree that whether the business unit personnel were employed by one of the Six Foreign Licensees or by a service company is inconsequential to the royalties owed to TCCC ....500

C. Dr. Unni's CUT analysis of master-franchise transactions provides the most reliable measure of the arm's-length royalties the Six Foreign Licensees would have paid TCCC at arm's length ...506

1. The master-franchise transactions involved the use of comparable intangible property rights in connection with similar products in the same general industry ....508

2. The Six Foreign Licensees and the master franchisees licensed intangibles with similar profit potential ....511

3. Unlike Dr. Newlon's and Dr. Becker's results, Dr. Unni's results are consistent with the profit splits that would be expected in arm's-length licenses ....515

D. Dr. Cragg's RPSM analysis represents another valid approach for determining arm's-length royalties for the intercompany licenses given the Six Foreign Licensees' historical investments and confirms that Dr. Unni's results are conservative ....517

E. Mr. Reams's asset-management model provides an approach for affording TCCC an appropriate return for its contributions to the Company's foreign business ....523

F. The Six Foreign Licensees are not required to pay TCCC royalties for the use of their own intangible property ....526

1. The Brazil Licensee was the developer of the Coca-Cola, Fanta, and Sprite trademarks registered in Brazil and licensed before November 17, 1985 and should be treated as owning them under the 1968 transfer-pricing regulations ....527

**TABLE OF CONTENTS**

**Page**


2. The Brazil Licensee should also be treated as having owned all Coca-Cola, Sprite, and Fanta trademarks that have been registered in Brazil since November 17, 1985 .......................... 531

3. The Brazil Licensee should not be required to pay TCCC royalties relating to Kuat and other local products that it developed .......................... 534

G. Respondent cannot deny petitioner a dividend offset for dividends paid in satisfaction of the royalty amount under the 10-50-50 Method .......................... 535

1. Dividend offset under IRS revenue procedures .......................... 535

2. Basic principles of equity dictate that respondent cannot insist on strict compliance with Rev. Proc. 99-32 under the facts and circumstances of this case .......................... 538

H. Respondent's section 987 adjustments result from an improper application of section 482 and are at odds with a sensible application of section 987 .......................... 543

1. The Court should not permit respondent to make section 482 allocations that lead only to collateral section 987 adjustments .......................... 543

2. The limited existing guidance in the section 987 realm compels the conclusion that the Court should reject respondent's section 987 adjustment .......................... 547

I. Respondent cannot allocate royalty income to TCCC in excess of the royalties permitted under Brazilian laws that limited the Brazil Licensee's ability to remit royalties to TCCC .......................... 551

1. Applicable Law .......................... 551

2. The intercompany licenses between TCCC and the Brazil Licensee are not subject to the 1994 blocked-income regulation and are governed by the case law that forbids the Commissioner from allocating income when there is a legal restriction prohibiting the payment or receipt of income .......................... 554

**TABLE OF CONTENTS**

**Page**

3. To the extent relevant, Treas. Reg. § 1.482-1(h)(2) is procedurally and substantively invalid under the Administrative Procedure Act and not entitled to Chevron deference ....................556

4. In the event that Treas. Reg. § 1.482-1(h)(2) is valid, the Brazil Licensee should not owe a royalty to TCCC on all Coca-Cola, Fanta, and Sprite products because trademarks relating to those products registered after November 17, 1985 provided the Company with only de minimis additional enforcement value ....................557

VIII. Conclusion ....................559

Appendix A – Table of Defined Terms

Appendix B – List of Testifying Witnesses

Appendix C – Petitioner's Expert Witnesses

Appendix D – Treas. Reg. § 1.482-1(h)(2) Is Invalid

# TABLE OF AUTHORITIES

Page(s)

## CASES

Alamo Nat'l Bank v. Commissioner,
95 F.2d 622 (5th Cir. 1938) ....................................................539

Amazon.com, Inc. v. Commissioner,
148 T.C. __ (Mar. 23, 2017)....................................409, 415, 508, 466

Arizona v. California,
530 U.S. 392 (2000)....................................................495

Arnott v. Am. Oil Co.,
609 F.2d 873 (8th Cir. 1979) ....................................................489

Bonner v. City of Prichard,
661 F.2d 1206 (11th Cir. 1981) ....................................................540

Estate of Branson v. Commissioner,
113 T.C. 6 (1999), aff'd, 264 F.3d 904, 908 (9th Cir. 2001) ..........................542

Butler v. Commissioner,
T.C. Memo. 2012-72....................................................457

Capitol Fed. Sav. & Loan Ass'n v. Commissioner,
96 T.C. 204 (1991)....................................................541

Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,
467 U.S. 837 (1984)....................................................*passim*

Coca-Cola Co. v. Commissioner,
149 T.C. __ (Dec. 14, 2017) .............................................. 1, 488, 543, 544, 550

Commissioner v. First Security Bank of Utah, N.A.,
405 U.S. 394 (1972)....................................................*passim*

Compaq Computer Corp. v. Commissioner,
T.C. Memo. 1999-220....................................................415

Conn. Dep't of Children & Youth Servs. v. Dep't of Health & Human Servs.,
9 F.3d 981 (D.C. Cir. 1993)....................................................474

**TABLE OF AUTHORITIES**

**Page(s)**

In re DeCoro USA, Ltd.,
113 A.F.T.R. 2d 2014-1434 (Bankr. M.D.N.C. 2014) ............................412, 461

DHL Corp. v. Commissioner,
285 F.3d 1210 (9th Cir. 2002) ................................................................*passim*

Exxon Corp. v. Commissioner,
T.C. Memo 1993-616, aff'd sub nom., Texaco, Inc. v. Commissioner, 98 F.3d 825 (5th Cir. 1996)....................................552, 553, 555

Gen. Chem. Corp. v. United States,
817 F.2d 844 (D.C. Cir. 1987)...........................................................................474

H Group Holding v. Commissioner,
T.C. Memo. 1999-334.........................................................................................457

Hosp. Corp. of Am. v. Commissioner,
T.C. Memo. 1996-559.........................................................................................457

Johnston v. United States,
605 F. Supp. 26 (D. Mont. 1984).......................................................................540

Estate of Leichter v. Commissioner,
T.C. Memo. 2003-66...........................................................................................457

Lin v. Att'y Gen.,
543 F.3d 114 (3d Cir. 2008) ..............................................................................541

Lloyd Noland Hosp. & Clinic v. Heckler,
762 F.2d 1561, 1566–1569 (11th Cir. 1985) ....................................................556

McKesson Can. Corp. v. The Queen,
2013 TCC 404, No. 2008-2949(IT)G (Dec. 13, 2013)...................................461

Medtronic, Inc. v. Commissioner,
900 F.3d 610 (8th Cir. 2018) ..............................................................*passim*

Medtronic, Inc. v. Commissioner,
T.C. Memo. 2016-112, vacated on other grounds, 900 F.3d 610 (8th Cir. 2018).....................................................................................424

**TABLE OF AUTHORITIES**

**Page(s)**


Nestlé Holdings, Inc. v. Commissioner,
152 F.3d 83 (2d Cir. 1998) ....................490

Pert v. Commissioner,
105 T.C. 370 (1995)....................495

Procter & Gamble Co. v. Commissioner,
95 T.C. 323 (1990), aff'd, 961 F.2d 1255 (6th Cir. 1992) ..............552, 553, 555

Procter & Gamble,
961 F.2d 1255 (6th Cir. 1992) ....................552

Shell Oil Co. v. Marinello,
307 A.2d 598 (N.J. 1973), cert. denied, 415 U.S. 920 (1974)....................489

Sundstrand Corp. v. Commissioner,
96 T.C. 226 (1991)....................410

United States Steel Corp. v. Commissioner,
617 F.2d 942 (1980), (1977)....................415

Veritas Software Corp. v. Commissioner,
133 T.C. 297 (2009)....................410, 415


**STATUTES & REGULATIONS**


5 U.S.C. § 553 ....................557

26 U.S.C. § 351 ....................154

26 U.S.C. § 367 ....................2, 154, 449

26 U.S.C. § 368 ....................148, 150, 153

26 U.S.C. § 482 ....................*passim*

26 U.S.C. § 901 ....................25, 181, 543

26 U.S.C. § 902 ....................23, 24, 181

26 U.S.C. § 987 ....................*passim*

26 U.S.C. § 6214 ....................547

**TABLE OF AUTHORITIES**

**Page(s)**


26 U.S.C. § 6662 ........ 182, 183

26 U.S.C. § 6664 ........ 182, 183

26 U.S.C. § 7121 ........ 403, 495, 497

26 U.S.C. § 7481 ........ 546

Treas. Reg. § 1.482-1 ........ *passim*

Treas. Reg. § 1.482-1T ........ 413

Treas. Reg. § 1.482-3 ........ 9, 432, 433

Treas. Reg. § 1.482-4 ........ *passim*

Treas. Reg. § 1.482-5 ........ *passim*

Treas. Reg. § 1.482-6 ........ *passim*

Treas. Reg. § 1.987-5 ........ 547, 548

33 Fed. Reg. 5848 (Apr. 16, 1968) ........ *passim*

56 Fed. Reg. 48457 (Sept. 25, 1991) ........ 548

58 Fed. Reg. 5263 (Jan. 21, 1993) ........ *passim*

58 Fed. Reg. 5315 (Jan. 21, 1993) ........ 419

59 Fed. Reg. 34971 (July 8, 1994) ........ *passim*

71 Fed. Reg. 44466 (Aug. 4, 2006) ........ 412

71 Fed. Reg. 52876 (Sept. 7, 2006) ........ 548, 549, 550

81 Fed. Reg. 88806 (Dec. 8, 2016) ........ 548

81 Fed. Reg. 88854 (Dec. 8, 2016) ........ 548


**LEGISLATIVE MATERIALS**


Administrative Procedure Act, Pub. L. No. 79-404, 60 Stat. 237 (1946) ........ *passim*

**TABLE OF AUTHORITIES**

**Page(s)**

Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085 .............................548

**ADMINISTRATIVE MATERIALS**

Announcement 99-1,1999-1 C.B. 302 .............................................................537

Notice 2017-57, 2017-42 I.R.B. 324. ..............................................................548

Notice 2018-57, 2018-26 I.R.B. 774. ..............................................................548

Rev. Proc. 65-17, 1965-1 C.B. 833 ......................................................... *passim*

Rev. Proc. 65-31, 1965-2 C.B. 1024, superseded by Rev. Proc. 99-32, 1999-2 C.B. 296 .......................................................................................497

Rev. Proc. 99-32, 1999-2 C.B. 296 ......................................................... *passim*

Tech. Adv. Memo. 8117012 (Dec. 31, 1980) ....................................................551

**OTHER AUTHORITIES**

Advance Pricing Agreement Study Guide, available at https://www.irs.gov/pub/irs-apa/apa_study_guide_.pdf (last visited Oct. 19, 2018) ........................................................418, 422, 439, 479

Comment Letter from International Chamber of Commerce and Business and Industry Advisory Committee to the OECD, 93 TNT 113-24 (Apr. 22, 1993) ..........................................................................420

Coordinated Issue Paper on Cost Sharing Buy-Ins, 2007 WL 5037894 (Sept. 27, 2007) ....................................................................................487

IRS Industry Director Directive on Section 936 Exit Strategies, 2007 WL 2807373 (Feb. 2, 2007) .........................................................................469

Lorraine Eden, Taxing Multinationals: Transfer Pricing and Corporate Income Taxation in North America (1998) ...........................................420, 469

Outline of Pfizer Testimony: Proposed Section 482 Regulations, 92 TNT 176-34 (Aug. 18, 1992) ..........................................................................420

**TABLE OF AUTHORITIES**

**Page(s)**

**OTHER CASE FILINGS**

First Amended Pretrial Memorandum, Guidant LLC v. Commissioner, T.C. Docket No. 5989-11 (filed July 11, 2016) ........ 303

Simultaneous Opening Brief, 3M Co. v. Commissioner, T.C. Docket No. 5816-13 (filed Mar. 21, 2016) ........ 557

# I. EXECUTIVE SUMMARY

## A. Intercompany royalty issue

The main issue in this case is the proper amount of arm's-length royalties owed to The Coca-Cola Company ("TCCC")[1] by six foreign-affiliated licensees (the "Six Foreign Licensees")[2] under intercompany licenses that permitted the Six Foreign Licensees to exploit trademarks and certain other intangible property in foreign markets. Four of the Six Foreign Licensees—the Ireland Licensee, the Swaziland Licensee, the Egypt Licensee, and the Costa Rica Licensee—were disregarded as separate from their owner, Atlantic Industries, for Federal income tax purposes and therefore for purposes of this case. The other two of the Six Foreign Licensees are the Brazil Licensee and the Chile Licensee.

The Brazil Licensee and Ireland Licensee account for nearly 85% of the disputed income adjustments. They are the longest-serving of the Six Foreign Licensees at issue, with licenses in effect since 1963 and 1984, respectively.[3] Both

---

[1]Although terms are generally defined in this brief when first used, for the Court's convenience attached as Appendix A is a table that defines the terms most often used throughout the brief.

[2]The term "Foreign Licensees" refers to the Six Foreign Licensees together with the Mexico Licensee, which was at issue in this case until the Court ruled in petitioner's favor on summary judgment in December 2017. See Coca-Cola Co. v. Commissioner, 149 T.C. __ (Dec. 14, 2017). The term "foreign licensees" refers generally to foreign-affiliated licensees of TCCC.

[3]The other of the Six Foreign Licensees have been operating as licensees since 1986 (the Egypt Licensee), 1987 (the Swaziland Licensee), 1995 (the Chile

succeeded to foreign branches of The Coca-Cola Export Corporation ("Export") and acquired the active branch businesses and associated intangible property in outbound section 351 transactions that the Internal Revenue Service ("IRS") ruled contemporaneously were tax-free under section 367.[4]

The Company's core business in foreign markets was the sale of concentrate to franchise bottlers.[5] The Company and its bottlers together composed "The Coca-Cola System" or the "System." Together they performed complementary but distinct roles—they were not duplicative. The Company has always owned the underlying trademarks (or the rights to use those trademarks) associated with its products or "brands" and has borne responsibility for developing System strategy, for leading the franchise bottlers, and for the locally relevant consumer marketing and advertising that fueled end-consumer demand for the Company's products and drove business for the entire System. The downstream bottlers had a very different role. They were responsible for the tangible-asset-intensive part of the business—

Licensee), and 2001 (the Costa Rica Licensee). The Chile Licensee and Costa Rica Licensee succeeded to earlier branch operations in those countries, while Egypt and Swaziland were newly established businesses.

[4]Unless otherwise indicated, (1) all "section" references are to the Internal Revenue Code of 1986, as amended and in effect during the years in issue, and (2) all references to "Treas. Reg." are to the Federal income tax regulations in effect during the years in issue.

[5]The "Company" refers to the worldwide group of affiliated entities organized under TCCC. The Company's core business did not include the Company's ownership of bottlers, which it generally sought to refranchise.

finished-product production and distribution to fulfill the demand generated by the Company. The bottlers' distribution activities included trade promotions using materials developed by the Company's business units.

To compete in the beverage industry, the Company required on-the-ground knowledge of local consumers and competitors; a wide product portfolio that catered to local demand; continuous marketing that was tailored to the tastes, cultures, and demographics of each local market; and local management of local bottlers to align their trade marketing with the Company's consumer marketing and deliver finished products to end consumers. Given the inherently local nature of its business, the Company has always operated its foreign business in a decentralized manner that vests profit and loss ("P&L") and strategic decision-making and leadership responsibilities in personnel located in or near their local markets. Under their licenses to exploit TCCC's intangible property, the Six Foreign Licensees bore full responsibility for all aspects of the Company's core business in their markets. The Six Foreign Licensees carried out these responsibilities through their own employees and through other foreign entities (referred to as "service companies") whose expenses the Six Foreign Licensees bore. Relative to the activities carried out by the Six Foreign Licensees or other foreign entities, the U.S. corporate headquarters made only modest contributions to the Company's foreign business. And those corporate headquarters contributions were the same

regardless of whether the foreign business was conducted directly by the Six Foreign Licensees through their own employees or through affiliated foreign service companies paid by the Six Foreign Licensees. Through a mechanism referred to as the "pro-rata" process, TCCC charged out to foreign licensees corporate-headquarters expenses that benefited foreign markets.

Historically, the Company's core business functions in foreign markets were performed directly by a multitude of local affiliated licensees that operated smaller concentrate facilities. Decades before the years in issue, the Company consolidated concentrate manufacturing in larger regional facilities that could supply bottlers in multiple markets. As a consequence, in certain instances (like for the Ireland Licensee), the non-concentrate-manufacturing functions were performed by service companies. In those instances, foreign licensees maintained financial responsibility for those functions. This change did not affect the Company's foreign business, which remained financially and functionally integrated. In multiple instances, including through formal section 367 rulings and multiple closing agreements—some that specifically required the Six Foreign Licensees (not petitioner) to bear the expenses relating to the foreign markets at issue—respondent has long recognized that the Six Foreign Licensees' responsibility for the foreign business and entitlement to returns related to the licensed intangibles did not turn on whether the Six Foreign Licensees performed

the non-concentrate-manufacturing functions directly or through service companies. For the first time in this litigation, respondent has taken a different view.

The IRS has regularly audited and reached agreement with petitioner regarding intercompany royalties since the 1960s. In 1996, petitioner and the IRS resolved the IRS's audit of those intercompany royalties for petitioner's 1987–1995 tax years in a closing agreement (the "Royalty Closing Agreement"), which expressly applied to future tax periods. The agreed-upon method for computing the arm's-length amount of royalties allocable to petitioner under the Royalty Closing Agreement (the "10-50-50 Method") resembled the residual profit split method ("RPSM"). The 10-50-50 Method allowed any foreign licensee (or "supply point")[6] to retain profit equal to 10% of its gross sales, with the remaining profit (i.e., the residual intangible-related operating profit) split evenly with petitioner. By its terms, the Royalty Closing Agreement applied to existing and any future supply points, and it eliminated the prospect of any transfer-pricing penalties and relieved petitioner of the related statutory documentation requirements. Because the Royalty Closing Agreement conditioned those benefits on the absence of material changes in fact, petitioner (i) refrained from altering the

[6]The terms "foreign licensee" and "supply point" are synonymous. PFF ¶ 454. To accurately reflect the record when discussing testimony or a document, petitioner uses the term that the witness or document used.

intercompany licenses or reorganizing its foreign-licensee-and-service-company-legal-entity structure and related contractual arrangements and (ii) applied the same basic license terms, service-company structure, and contractual arrangements to new foreign licensees. Petitioner continued to compute the royalties payable by foreign licensees (including the Six Foreign Licensees) by applying the 10-50-50 Method for the 1996 through 2009 tax years. Respondent accepted the application of the Royalty Closing Agreement and 10-50-50 Method in five successive audit cycles through the audit of petitioner's 2005 and 2006 tax years, which concluded only after petitioner had filed its returns for the years in issue.

Despite the parties' mutual and consistent historical understanding that the Six Foreign Licensees were responsible for making all investments to support the foreign business and were accordingly entitled to share in profits related to the licensed intangibles, respondent abruptly and retroactively discontinued accepting the 10-50-50 Method for the years in issue well after petitioner filed returns for those years.[7] Instead, respondent applied the comparable profits method ("CPM")

---

[7]Respondent's discontinuation was selective and result-oriented. None of the Six Foreign Licensees resided in a country that has a tax treaty with the United States providing for competent authority procedures to resolve double-tax disputes (including those arising from transfer-pricing adjustments). Other foreign licensees were located in treaty countries (e.g., France, India, and China). Petitioner likewise followed the 10-50-50 Method for those foreign licensees. Yet respondent made no adjustments regarding those licensees. Petitioner also applied the 10-50-50 Method during the years in issue for another foreign-affiliated licensee of TCCC that resided in Indonesia (also a treaty county). In that instance,

to allocate approximately 90% of the aggregate operating profits of the Foreign Licensees (and all profits related to the licensed intangibles) to TCCC.[8] The CPM is a one-sided method of last resort that the IRS seeks to apply in outbound (but not inbound) licensing cases to sweep all returns related to the licensed intangibles to the legal owner of intangible property. In the case of an outbound license, this means that the income is allocated to the U.S. licensor.[9]

In trying to validate the CPM's legitimacy in determining arm's-length results, respondent hired Dr. Newlon, who has applied the one-sided CPM to price

---

respondent agreed that the 10-50-50 Method resulted in arm's-length royalties paid by the Indonesia Licensee. Respondent recharacterized (as royalties) dividends paid by the Indonesia Licensee in satisfaction of the 10-50-50 Method even though petitioner had not elected that treatment in accordance with the relevant revenue procedure.

[8]The 90% figure does not account for all payments made under the Royalty Closing Agreement. If all those payments were accounted for, then respondent admits he has allocated more than 100% of the Foreign Licensees' operating profits to TCCC. Answer at ¶ 5.e.1.vi.

[9]Reflective of the inconsistency with which the IRS applies the CPM in outbound versus inbound licensing cases, respondent took the opposite approach in the inbound-licensing context in this case. In proposing adjustments for the Company's Canadian operations, respondent advanced a position that allocated a small routine return to the Canadian legal trademark owner, Coca-Cola, Ltd. ("CCL"), for its local marketing and other service-company functions and all profit related to the licensed intangibles to the U.S. concentrate manufacturers for funding the development, enhancement, and maintenance of the trademarks legally owned by CCL. Respondent's wholesale rejection of the very premise that underlies his royalty adjustments for the Six Foreign Licensees—that all returns related to the licensed intangibles belong to the legal trademark owner—reveals that those royalty adjustments are arbitrary.

licenses of high-value intangibles. Dr. Newlon appeared to have given little, if any, consideration to other methods or even to the pertinent Treasury Regulations. He (and respondent) also failed to realize that the 1994 transfer-pricing regulations, which first introduced the CPM, do not even apply to the Brazil Licensee.

In applying the CPM, Dr. Newlon presumed that at arm's-length legal owners licensing their intangible property seek to and can extract all profits derived from that intangible property and thereby leave their licensees with only routine, margin-measured profits. There is *no* empirical evidence in the record to support Dr. Newlon's unsubstantiated premise. To the contrary, the only empirical evidence of record regarding the manner in which arm's-length parties negotiate licenses and split profits proves that Dr. Newlon's foundational premise is wrong. Parties to arm's-length licenses (including the Company) do *not* look to the licensee's profit margins to determine royalty rates. As Mr. Gioe—the Company employee with the most knowledge regarding beverage licensing and the only licensing fact witness called by the parties—testified, when licensing trademarks from third parties, the Company instead looked to market royalty rates (i.e., comparable uncontrolled transactions ("CUTs")) and sought to equitably split profits based on the licensors' and licensees' relative contributions and risks. And Mr. Lasinski—a licensing expert with extensive arm's-length licensing