**No. 24-13470**

**IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

**THE COCA-COLA CO. & SUBSIDIARIES,**

*Petitioner-Appellant*,

v.

**COMMISSIONER OF INTERNAL REVENUE,**

*Respondent-Appellee.*

On Appeal from the United States Tax Court
Case No. 31183-15

# REPLY BRIEF FOR PETITIONER-APPELLANT THE COCA-COLA CO. & SUBSIDIARIES

Shay Dvoretzky
Christopher Bowers
Parker Rider-Longmaid
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005

Nathaniel Carden
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
320 S. Canal St.
Chicago, IL 60606

Raza Rasheed
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2000 Avenue of the Stars, Ste. 200N
Los Angeles, CA 90067

Gregory G. Garre
Miriam L. Fisher
Eric J. Konopka
Blake E. Stafford
Sakina J. Haji
LATHAM & WATKINS LLP
555 Eleventh St., NW, Ste. 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Shannon C. Fiedler
LATHAM & WATKINS LLP
200 Clarendon St.
Boston, MA 02116

*Counsel for Petitioner-Appellant The Coca-Cola Co. & Subsidiaries*

August 27, 2025

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-2(b), Petitioner-Appellant The Coca-Cola Co. ("Coca-Cola") states that, in addition to the trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations listed in the certificates of interested persons in the party and amicus briefs that have been filed, the following individual has an interest in the outcome of this case:

- Bessent, Scott, Respondent-Appellee (Acting)

Dated: August 27, 2025

Respectfully submitted,

/s/ *Gregory G. Garre*
Gregory G. Garre

*Counsel for Petitioner-Appellant*
*The Coca-Cola Co. & Subsidiaries*

# TABLE OF CONTENTS

**Page**


CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ....... C-1

TABLE OF AUTHORITIES ....... ii

INTRODUCTION ....... 1

ARGUMENT ....... 4

I. THE TAX COURT ERRED IN EXCUSING THE IRS'S ARBITRARY AND CAPRICIOUS ACTIONS ....... 4

II. THE TAX COURT ERRED IN APPROVING THE IRS'S CPM ....... 11

A. The IRS's CPM Fails To Account For Critical Marketing Investments Made By Supply-Point Companies ....... 11

B. The IRS's And Tax Court's Attempts To Paper Over That Fundamental Flaw Fail ....... 13

1. The Legal-Ownership Test Conflicts With The Regulations ....... 13

2. Rejection Of The Supply-Point Companies' Licenses, Marketing Investments, And Risks Is Wrong ....... 17

3. Supply-Point Companies And Bottlers Are Not Comparable ....... 22

C. The Court Should Vacate And Remand For Further Proceedings ....... 24

III. THE TAX COURT ERRED IN APPROVING THE IRS'S REALLOCATION OF BLOCKED INCOME ....... 25

CONCLUSION ....... 28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American National Bank v. FDIC*,
710 F.2d 1528 (11th Cir. 1983) ....................................................................7

*Bragdon v. Abbott*,
524 U.S. 624 (1998)....................................................................................27

*Commissioner v. First Security Bank of Utah, N.A.*,
405 U.S. 394 (1972)....................................................................................26

*ECB USA, Inc. v. Chubb Insurance Co.*,
113 F.4th 1312 (11th Cir. 2024), *cert. denied*,
145 S. Ct. 1431 (2025)..................................................................................5

*Facebook, Inc. v. Commissioner*,
164 T.C. No. 9, 2025 WL 1493002 (2025) ......................................................20

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)......................................................................................4

*FDA v. Wages & White Lion Investments, L.L.C.*,
145 S. Ct. 898 (2025)...............................................................................6, 10

*Fort Stewart School v. FLRA*,
495 U.S. 641 (1990)....................................................................................13

*G.U.R. Co. v. Commissioner*,
117 F.2d 187 (7th Cir. 1941) ..........................................................................4

*Joseph Gann, Inc. v. Commissioner*,
701 F.2d 3 (1st Cir. 1983)...............................................................................9

*Knight-Ridder Newspapers, Inc. v. United States*,
743 F.2d 781 (11th Cir. 1984) ....................................................................8, 9

*Lincoln Electric Co. v. Commissioner*,
444 F.2d 491 (6th Cir. 1971) ..........................................................................9

**Page(s)**

*Mayo Foundation for Medical Education & Research v. United States*,
562 U.S. 44 (2011) .......... 5

*Ohio v. EPA*,
603 U.S. 279 (2024) .......... 4

*Procter & Gamble Co. v. Commissioner*,
961 F.2d 1255 (6th Cir. 1992) .......... 26

*QinetiQ US Holdings, Inc. v. Commissioner*,
845 F.3d 555 (4th Cir. 2017) .......... 5

*Robinette v. Commissioner*,
439 F.3d 455 (8th Cir. 2006) .......... 5

*Shields v. Utah Idaho Central Railroad Co.*,
305 U.S. 177 (1938) .......... 4

*United States v. Williams*,
504 U.S. 36 (1992) .......... 6

## STATUTES AND REGULATIONS

26 U.S.C. § 482 .......... 27

26 C.F.R. § 1.482-1(d)(1)(iii) .......... 20

26 C.F.R. § 1.482-1(d)(3)(i) .......... 12

26 C.F.R. § 1.482-4(b) .......... 12, 14

26 C.F.R. § 1.482-4T(f)(3)(i)(A) .......... 14

26 C.F.R. § 1.482-4T(f)(3)(ii) .......... 15

26 C.F.R. § 1.482-4T(f)(4)(i) .......... 12, 15

26 C.F.R. § 1.482-5(b)(4) .......... 22

**Page(s)**

## OTHER AUTHORITIES

68 Fed. Reg. 53448 (Sept. 10, 2003) ....................15

71 Fed. Reg. 44466 (Aug. 4, 2006) ....................15

Rev. Proc. 68-16, 1968-1 C.B. 770, *modified on other grounds by* Rev. Proc. 94-67, 1994-2 C.B. 800 ....................7

U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* (1947) ....................4

## INTRODUCTION

In one sense, the IRS's response is straight out of its usual playbook—tar the taxpayer as a wrongdoer seeking to game U.S. tax laws and wrap itself in the Tax Court's findings in hopes of diverting this Court's attention from the legal errors infecting the Tax Court's decision. But in another, the IRS's response is far more troubling. To defend the Tax Court's decision, the IRS has staked out—in the most extreme form possible—the position that its actions are unreviewable because it is exempt from the standards that apply to other agencies. That alleged exemption applies not just to the Administrative Procedure Act (APA), but also to the longstanding prohibition against arbitrary and capricious agency action. The IRS's extreme position should be rejected, and the Tax Court's decision reversed.

As a threshold matter, the IRS's repeated insinuation (*e.g.*, at 1, 24) that Coca-Cola engaged in some nefarious scheme to avoid U.S. taxation by "shift[ing] billions in income" to offshore subsidiaries in low-tax jurisdictions is disingenuous. Coca-Cola carefully adhered to a transfer-pricing method (10-50-50) that the IRS itself agreed produced arm's-length results, endorsed in audit after audit, and stipulated would insulate Coca-Cola from penalties. Far from seeking to evade its tax obligations, Coca-Cola carefully structured its operations to adhere to a method that the IRS had repeatedly blessed and, in fact, accepted for numerous other Coca-Cola supply-point companies during the very tax years at issue.

The IRS's inconsistency in its treatment of Coca-Cola's overseas operations—accusing Coca-Cola of evading U.S. tax by applying 10-50-50 to the supply-point companies at issue while accepting the same method for other supply-point companies—is a hallmark of arbitrariness. And here, it is worse, because the IRS's inconsistent treatment of 10-50-50 is purely opportunistic. Despite the IRS's efforts to sweep it under the rug, the fact is that the IRS continued to accept 10-50-50 in jurisdictions that have a double-taxation treaty with the U.S., thereby evading procedures through which Coca-Cola and foreign taxing authorities might challenge the IRS's new method to protect their own interests. As the amici accounting firms have observed, that inconsistency is "specious." PwC-Br.27.

In response, the IRS declares (at 44-45) that no one—including this Court—is allowed to question its motives. But it's not the IRS's *motives*, it's the unexplained inconsistency in methods. Moreover, this inconsistency underscores the bigger problem with the IRS's position. The IRS claims that it is exempt from the fundamental prohibition against arbitrary and capricious agency action that long pre-dated the APA and has always applied to section 482 determinations. Credit the IRS for its candor. But its position is truly stunning. According to the IRS, it is free to "bait and switch" taxpayers and apply the law inconsistently, as it wishes and without explanation. No agency has that power—not even the IRS.

The IRS's defense of its new CPM method fares no better. Under the IRS's own regulations, the question is how arm's-length parties would act. But here, the IRS chose—and the Tax Court accepted—a model that is based solely on *tangible* assets and gives supply-point companies zero credit for their licenses to Coca-Cola's intangibles and their marketing investments that enhance the value of those licenses and the underlying intangibles. The IRS does not deny that its CPM would let supply-point companies keep more profits if they plated their pipes in gold, but not if they invested in marketing that spurred greater revenues and profits. That result makes no sense, and no company dealing at arm's length would ever accept it.

Finally, the IRS's attempt to circumvent Supreme Court precedent holding that *blocked* income is not "income" under section 482 should be rejected. Tellingly, the IRS essentially ignores the regulation on which the Tax Court relied. Instead, the IRS argues there was no "blocked" income to begin with because the Brazilian supply-point company could pay Coca-Cola in dividends instead of royalties. But as the Supreme Court and other courts have already recognized, the possibility of a different means of payment—which theoretically always exists—does not "unblock" the means proscribed by foreign law.

The Tax Court's decision should be reversed.

## ARGUMENT

### I. THE TAX COURT ERRED IN EXCUSING THE IRS'S ARBITRARY AND CAPRICIOUS ACTIONS

Instead of seriously attempting to account for its actions in arriving at its CPM, the IRS takes the extreme position that its actions are essentially unreviewable under the guardrails that apply to other agencies. That is incorrect.

A. At the outset, the IRS claims (at 27, 42) that the basic arbitrary-and-capricious standard is inapplicable to section 482 determinations because the APA is inapplicable. But as Coca-Cola explained—and the IRS ignores—the arbitrary-and-capricious standard pre-dates the APA and sets the "ordinary" limitations that apply to all agencies. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009); *see Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 185 (1938) (pre-APA decision applying arbitrary-and-capricious standard); Chamber-Br.10-14. The APA simply adopted the arbitrary-and-capricious standard that already existed in administrative law, including in transfer-pricing cases. *See G.U.R. Co. v. Commissioner*, 117 F.2d 187, 188 (7th Cir. 1941); U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* 108 (1947) (the APA "restate[s] the scope of the judicial function in reviewing final agency action").[1] Aside from a single *Tax Notes*

[1] The Supreme Court thus relies on APA precedents and principles when applying the arbitrary-and-capricious standard in cases arising under different statutes. *See, e.g.*, *Ohio v. EPA*, 603 U.S. 279, 292-93 (2024); Chamber-Br.22 n.2.

article from a commentator who has devoted his efforts to attacking all aspects of Coca-Cola's position, the IRS musters no authority for its extreme position.

In any event, the IRS is wrong that its actions are immune from APA scrutiny. Even when a statute creates a specific procedure, the APA still provides the substantive standards by which the agency's action is judged. *See Robinette v. Commissioner*, 439 F.3d 455, 460 n.4 (8th Cir. 2006) ("The availability of an adequate remedy in the Tax Court ... does not mean that the judicial review provisions of § 706 of the APA are inapplicable ...."); Opening-Br.28-29 & n.6.[2] If accepted, the IRS's argument that it is immune from the APA would mean the IRS can mislead taxpayers and act as arbitrarily and capriciously as it likes. That reeks of the "tax exceptionalism" the Supreme Court has emphatically rejected. *See Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 55 (2011).

Finally, the IRS's Hail-Mary waiver argument (at 37) fails. The Tax Court did not find waiver. It found the opposite—that Coca-Cola's reconsideration motion simply provided additional authority for arguments Coca-Cola had "raised earlier." Doc.762, pg.2; *see ECB USA, Inc. v. Chubb Ins. Co.*, 113 F.4th 1312, 1320 (11th Cir. 2024) (litigants cannot waive or forfeit authorities), *cert. denied*, 145 S. Ct. 1431

[2] The IRS's cases (at 37-38) simply recognize that features of the APA might be incompatible with the Tax Court's de novo review of certain IRS determinations. *See, e.g.*, *QinetiQ US Holdings, Inc. v. Commissioner*, 845 F.3d 555, 560-61 (4th Cir. 2017). That is a far cry from the wholesale exemption the IRS seeks here.

(2025). Moreover, the Tax Court considered Coca-Cola's arguments, *see* Doc.762, pgs.3-7—providing an independent basis for this Court to consider them, *see United States v. Williams*, 504 U.S. 36, 41 (1992).

B. The IRS's actions flunk arbitrary-and-capricious review and violate basic due process. Notably, the IRS does not dispute any of the facts Coca-Cola set forth as to the IRS's "bait and switch." The IRS's efforts to justify its actions fail.

1. The IRS recasts (at 1, 45) Coca-Cola's position as an "estop[pel]" argument seeking to enforce a "promise" by the IRS to accept 10-50-50 indefinitely. That is a strawman. Coca-Cola is not making an estoppel argument; its position is that the IRS's bait and switch violates the longstanding arbitrary-and-capricious standard—which exists apart from estoppel. Opening-Br.28. Nor has Coca-Cola argued that it is entitled to use 10-50-50 *in perpetuity*. Coca-Cola's position is that, given the unique confluence of circumstances here, the IRS had to consider Coca-Cola's "serious reliance interests" and give Coca-Cola "proper notice" of its new transfer-pricing method before imposing massive tax liability for past years based on a brand-new method. *FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 918 (2025) (citations omitted); *see* Opening-Br.24-26; PwC-Br.7.

2. The IRS's attempts to explain away the individual components of its "bait and switch" fail and, more important, ignore the totality of the circumstances giving rise to Coca-Cola's legitimate reliance interests.

*Closing agreement.* The IRS dismisses the closing agreement as just a deal with no lasting relevance. But that ignores the agreement's text. The IRS expressly "agreed" that, "for Federal income tax purposes," 10-50-50 was a "method for computing the arm's length amount" of royalties. Ex.242-J, pg.3. The IRS emphasizes that the closing agreement settled Coca-Cola's taxes only for 1987-1995. But that misses the point. The IRS's "agree[ment]" that the *method* produced "arm's length" results, *id.*, provided Coca-Cola "critical" going-forward guidance that the IRS viewed 10-50-50 as compliant with section 482, Doc.642, pg.1631:7. A method either produces an "arm's length amount" or it doesn't. That is the key.

The IRS claims (at 32) this language should be ignored because it is in a "recital." But recitals are negotiated parts of an agreement and "provide definitive evidence of the intent of the parties." *American Nat'l Bank v. FDIC*, 710 F.2d 1528, 1534 (11th Cir. 1983). If anything, the fact this statement appears in a prefatory "whereas" clause, Ex.242-J, pg.3, *heightens* its significance as a central "premise[]" upon which the agreement was based, Rev. Proc. 68-16, § 6.05(2), 1968-1 C.B. 770, 779, *modified on other grounds by* Rev. Proc. 94-67, 1994-2 C.B. 800. The IRS's claim that Coca-Cola was wrong to view it as "informative and explanatory" as to the IRS's position is mind boggling. *Id.* § 6.05(3).

*Penalty protection.* The IRS claims (at 30-31) that granting Coca-Cola penalty protection as long as it adhered to 10-50-50 just shows "Coca-Cola was free

to *not* apply 10-50-50." But it misses the point. The penalty protection shows that the IRS itself viewed 10-50-50 as a legitimate way to determine royalties—and not as the product of "obvious legal error," as the IRS now contends (at 41). Moreover, the penalty protection created "a strong disincentive" for Coca-Cola to change methods because doing so would have sacrificed this protection and risked billions of dollars of penalties. Doc.706, pg.9281:8-9; Opening-Br.25. No reasonable taxpayer would take that risk. PwC-Br.7, 11-12, 23-25.

*Compliance history.* Nor does the IRS account for its actions accepting 10-50-50 for periods long after those covered by the closing agreement. The IRS continuously audited Coca-Cola "to make certain [it was] complying with" 10-50-50, Doc.642, pg.1644:12-19, told Coca-Cola as late as 2009 that 10-50-50 "seems appropriate," Ex.246-J, pg.2, and worked with Coca-Cola to convince *other* countries' taxing authorities to accept 10-50-50, *see, e.g.*, Doc.642, pgs.1633:9-19, 1666:16-25; Doc.643, pgs.1779:23-1780:5; Ex.242-J, pg.22. The IRS writes off (at 33) this pattern of reinforcing 10-50-50 because "[e]ach tax year stands on its own." But this is another strawman. The fact that a tax year is *new* does not give the IRS carte blanche to change tax methods in a way that flouts the basic rules governing agency action. Opening-Br.27.

This case is unlike *Knight-Ridder Newspapers, Inc. v. United States*, 743 F.2d 781 (11th Cir. 1984). There, this Court permitted the IRS to impose a different

accounting method on the taxpayer's newly acquired subsidiaries, even though the IRS had "not objecte[d]" to the existing method in prior years, because "a substantial discrepancy appeared between the two methods" following the acquisition. *Id.* at 784-85. Here, the IRS did not merely "not object" to Coca-Cola's use of 10-50-50. In various ways over many years, the IRS reinforced that Coca-Cola could—and should—follow 10-50-50.[3] Moreover, unlike in *Knight-Ridder*, the IRS points to no change in facts warranting a change in transfer-pricing method.

*Totality of circumstances.* Most notably, the IRS ignores the *combination* of its words and conduct, which would "induce[] reliance interests" on the part of any "reasonable taxpayer in Coca-Cola's position." PwC-Br.9, 12. Given these circumstances, then-Judge Kavanaugh's "jaywalking" hypothetical perfectly maps on to the IRS's actions here. Opening-Br.23-24, 27. The only response the IRS musters (at 35) is that a jaywalking ticket is "penal." But the multi-billion-dollar liability the IRS seeks to impose on Coca-Cola for following the method the IRS repeatedly blessed is exponentially more severe than any jaywalking ticket. The IRS's conduct here is far more extreme than in the jaywalking hypothetical.

[3] The IRS's other cases are likewise inapposite. *See Joseph Gann, Inc. v. Commissioner*, 701 F.2d 3, 5 (1st Cir. 1983) (per curiam) (IRS "fail[ed] to challenge a taxpayer's treatment of an item" in past years); *Lincoln Elec. Co. v. Commissioner*, 444 F.2d 491, 493 (6th Cir. 1971) (IRS "made no adjustment" in prior years).

As the Supreme Court recently reaffirmed, there are "numerous ways in which an agency may act arbitrarily and capriciously." *Wages & White Lion*, 145 S. Ct. at 917. One is by "mislead[ing] regulated entities." *Id.* The IRS did just that.

C. The IRS also has no explanation for its inconsistent treatment of 10-50-50. It does not deny this inconsistency. The IRS instead accuses (at 44) Coca-Cola of "[a]ttempting to kick up dirt on appeal" by pointing out that the IRS selectively abandoned 10-50-50 for supply-point companies in countries that lacked a double-taxation treaty with the U.S., thereby permitting the IRS's CPM to escape the scrutiny of foreign taxing authorities. Opening-Br.30-31. But that is not a serious response to an inconsistency that is simply "specious." PwC-Br.27.

Attempting to spin things, the IRS says (at 44) it also determined deficiencies for the Mexican supply-point company. But that does not help its cause. The IRS unilaterally prevented the Mexican taxing authority from scrutinizing the IRS's CPM by "designat[ing]" this case "for litigation" and then refusing to participate in the bilateral process normally available under the U.S.-Mexico double-taxation treaty. Doc.106, pg.12; *see* Opening-Br.30-31 n.7. And the IRS's mentions of the Canadian, Turkish, and Venezuelan *service companies* are inapposite. Service companies were never subject to 10-50-50. Doc.740, pg.84.

Most important, the IRS identifies no basis for treating some of Coca-Cola's supply-point companies one way and some another. Instead, it tries (at 45) to change

the subject and declares that its "motives are irrelevant." But the problem is the unexplained inconsistency in how the IRS is treating the same taxpayer during the same tax years—which is arbitrary *regardless of motive*. The IRS's passing attempt to justify (at 44) this inconsistency based on "resource limitations" is not credible. The IRS does not have a resource problem, it has an inconsistency problem.

In administrative law, process is just as important as results. This Court should invalidate the IRS's arbitrary and capricious actions as to Coca-Cola.

## II. THE TAX COURT ERRED IN APPROVING THE IRS'S CPM

### A. The IRS's CPM Fails To Account For Critical Marketing Investments Made By Supply-Point Companies

The IRS's inconsistent treatment of 10-50-50 also reveals a fundamental flaw in its new method—the CPM. As Newlon, the IRS's expert, recognized, "if the facts were such that the 10-50-50 [method] was the right transfer pricing method"—which the IRS accepted as true for 1987-2006 and continued to accept for numerous supply-point companies thereafter—"then the facts wouldn't be consistent with the CPM being the right transfer pricing method." Doc.700, pg.8336:11-14. That is because 10-50-50 gives supply-point companies credit for their massive marketing investments, whereas the IRS's CPM does not. This undenied fact alone requires invalidation of the IRS's CPM under the IRS's own regulations.

As Coca-Cola explained, the IRS's section 482 regulations require a licensee of intangibles to get credit for its license and the investments it makes to cultivate

the value of its license and the underlying intangibles. Opening-Br.33-35; *see, e.g.*, 26 C.F.R. §§ 1.482-1(d)(3)(i), 1.482-4(b), 1.482-4T(f)(4)(i). That common-sense requirement reflects that rational actors bargaining at "arm's length" would demand to profit from their value-creating investments. Here, that means the supply-point companies must get credit for the billions of dollars they have invested in marketing. As Newlon himself testified, "marketing is a big part" of Coca-Cola's business, stopping the supply-point companies' marketing investments would be "catastrophic" to Coca-Cola's business "over time," and the record establishes that supply-point companies had to bear the marketing expenses for the markets they served. Doc.699, pg.8229:3-4, 14-16; *see id.*, pg.8289:16-22; IRS-Br.14, 54-55.

Yet it is undisputed that the IRS's CPM ignores supply-point companies' critical marketing investments. Doc.700, pg.8357:13-22. It limits supply-point companies to a fixed return on their *tangible* operating assets similar to that achieved by bottlers and shifts any excess profits to Coca-Cola. Opening-Br.36-37. But tangible operating assets do not include marketing investments, which generally are not capitalized as assets on the balance sheet and would be intangible assets if they were. *Id.* at 36, 44.[4] So supply-point companies would earn the same amount

[4] Tangible operating assets also do not include intangibles that the IRS—in a binding 1984 ruling—recognized that Coca-Cola's foreign subsidiaries held. *See* Ex.46-J-C, pg.3. In that way, too, the IRS is acting inconsistently by not giving supply-point companies credit for intangibles it previously recognized.

whether they spent nothing on marketing and sales plummeted or billions on marketing and sales skyrocketed. *Id.* Under the IRS's CPM, the only way supply-point companies can keep more profits is to boost their *tangible* assets—even if all they do is wastefully plate their buildings in gold. *Id.* The IRS denies none of this.

The IRS's CPM directly—and impermissibly—flouts its own regulations and economic common sense by ignoring supply-point companies' substantial marketing investments, giving them zero credit. *See Fort Stewart Sch. v. FLRA*, 495 U.S. 641, 654 (1990) ("[A]n agency must abide by its own regulations."). And this defining feature of the IRS's CPM drove its shift of tax revenues. Indeed, as Coca-Cola's expert (Willig) showed, correcting this error all but eliminates the IRS's transfer-pricing adjustments. Opening-Br.38.[5]

### B. The IRS's And Tax Court's Attempts To Paper Over That Fundamental Flaw Fail

The IRS's defense of its patently defective CPM fails.

#### 1. The Legal-Ownership Test Conflicts With The Regulations

The Tax Court's main reason for disregarding the supply-point companies' marketing expenditures was that they were made to enhance intangibles, such as the

[5] The IRS attempts (at 48) to normalize the CPM by suggesting that it applies to "almost 80% of advance pricing agreements." That statistic is misleading. It references a group of advance pricing agreements that includes transactions—such as sales of *tangible* property—that do not resemble supply-point companies' licenses of Coca-Cola's intangibles. *See* Doc.699, pg.8213:11-14.

Coca-Cola, Sprite, and Fanta trademarks, that the supply-point companies licensed but did not *legally own*. The IRS doubles down on the Tax Court's legal-ownership test, arguing (at 50-51) that Coca-Cola's ownership of these intangibles is dispositive. That argument is wrong as a matter of law.

To begin, the legal-ownership test makes no sense. A licensor and a licensee bargaining at arm's length would *share* profits to reward the licensee's "operating success" and ensure the licensee is incentivized to invest in its own license and the underlying intangibles belonging to the licensor. Ex.7301-P, pg.4. But the legal-ownership test prevents supply-point companies (the licensees) from "shar[ing] in their own success" by allocating all profits over a specified fixed amount to Coca-Cola (the licensor). *Id.* No one would agree to that. Opening-Br.50-51.

Moreover, the legal-ownership test contravenes the section 482 regulations. The regulations treat both "[t]he legal owner of an intangible" *and* "the holder of rights constituting an intangible pursuant to contractual terms" (such as a "license") as "the sole owner of the respective intangible." 26 C.F.R. § 1.482-4T(f)(3)(i)(A). An (1) intangible and a (2) license to that intangible are *separate* intangibles, each with a different "sole owner." Under the regulations, *both* must be considered for transfer-pricing purposes. Opening-Br.39-40; *see* 26 C.F.R. § 1.482-4(b).

In resisting this result, the IRS selectively quotes (at 50) its regulation. But the full text and accompanying example in which the hypothetical company is the

"owner of the license pursuant to the terms of the license, but is not the owner of the trademark," 26 C.F.R. § 1.482-4T(f)(3)(ii), Example 1—which the IRS ignores—show that even if "Coca-Cola was the legal owner of virtually all the intangibles used to manufacture and distribute its branded beverages," the supply-point companies' licenses to those intangibles *still* had to be taken into account, IRS-Br.51.

The IRS claims the preamble to the regulations "confirms that 'legal ownership provides the appropriate framework' for allocating income attributable to intangibles." *Id.* (quoting 71 Fed. Reg. 44466, 44476 (Aug. 4, 2006)). But the IRS is misquoting the preamble. The preamble actually states that "legal ownership provides the appropriate framework *for determining ownership of intangibles under section 482*." 71 Fed. Reg. at 44476 (emphasis added). It does not purport to tie "income attributable to intangibles" to legal ownership. The preamble to the proposed regulations—which are consistent on this issue with the regulations that were ultimately adopted, *contra* IRS-Br.50-51—makes this point expressly, *see* 68 Fed. Reg. 53448, 53449 (Sept. 10, 2003) ("The rules for determining the ownership of an intangible generally should be distinct from the rules for determining the allocation of income from an intangible.").

The regulations likewise require arm's-length royalties to reflect any "contribution by one controlled taxpayer that develops or enhances the value ... of an intangible owned by another controlled taxpayer." 26 C.F.R. § 1.482-4T(f)(4)(1).

Thus, even if supply-point companies' "advertising costs" did nothing more than "'add[] value to the trademarks and brands' owned by Coca-Cola," they were still entitled to compensation for the value the advertising created. IRS-Br.58 (citation omitted). The IRS tellingly does not engage with this aspect of the regulations or the examples in the regulations that contradict its position. Opening-Br.34-35.

Notably, the IRS agreed with all of this when the shoe was on the other foot. Although a Canadian subsidiary of Coca-Cola is the "legal owner" of Canadian trademarks, the IRS properly focused on the "costs and risks" borne by Coca-Cola to develop those trademarks through "extensive marketing, R&D," etc., and determined that Coca-Cola should not owe any royalties to the Canadian subsidiary. *Id.* at 40-41. There, the IRS's treatment of these costs and risks *increased* the income subject to U.S. tax. But there is no basis for the IRS to disregard these costs and risks (as it did here) just because they *decrease* the income subject to U.S. tax.

The IRS contends (at 53) that it disregarded the Canadian subsidiary's ownership because "[t]he contractual terms there were inconsistent with the transaction's economic substance." This "economic substance" argument is absent from the notice the IRS issued to Coca-Cola. *See* Ex.2921-P. The notice instead stated that the regulations—including those about economic substance—reflect the principle that "legal ownership of intangible property alone" is not dispositive, and "allocations of income" should be consistent with "the relative responsibilities for

intangible-development costs and risks necessary to develop the intangible." *Id.*, pgs.8-9. Here, there is no dispute about the economic substance of the supply-point companies' costs and risks, so the regulations require that royalties reflect them.

### 2. Rejection Of The Supply-Point Companies' Licenses, Marketing Investments, And Risks Is Wrong

The IRS also attempts to paper over the supply-point companies' licenses, substantial marketing investments, and risks—rewriting the way Coca-Cola operates. These attempts are belied not just by the record but by common sense.

The IRS characterizes (at 51) supply-point companies' licenses as "'illusory' because Coca-Cola could terminate" them "without compensation." Not so. Many contracts are terminable at will. They may be *risky*, but they are not *illusory*. As the IRS's own expert testified, an unrelated licensee would pay *lower* royalties for such an "uncertain[]" license. Doc.712, pg.9931:16-25. The exponentially *higher* royalties imposed by the IRS's CPM—equaling nearly 50% of supply-point companies' revenue and 90% of their operating income, *on top of* their marketing and other expenses necessary to generate sales in their regions, Ex.7251-P, Exs.7-8—thus make no sense under the IRS's own view of the licenses.

The IRS then tries to erase supply-point companies' substantial marketing investments, embracing "the Tax Court's determination that merely 'spending money' on advertising does not create a marketing intangible." IRS-Br.57 (citation omitted). To begin, all the Tax Court said is that "consumer advertising, without

more," may not "give[] rise to *freestanding* intangible assets." Doc.740, pg.168 (emphasis added). That is just another version of the Tax Court's legal-ownership rule, under which the only intangibles that matter are the trademarks of which Coca-Cola is the legal owner—rendering the supply-point companies' substantial marketing investments irrelevant. *See id.*, pgs.156-57, 168-69. As discussed above, that rule is wrong as a matter of law. *See supra* at 13-17.

In any event, on the very next page of its brief, the IRS concedes (at 58) that "spending money on marketing" *can* create intangibles (as the Supreme Court has recognized). Indeed, the IRS's own expert testified that a licensee's "marketing investment" results in "enhanced contract value" or "enhanced relationship value" intangibles. Doc.713, pg.10119:10-22.[6] That is unquestionably true. Coca-Cola's trademarks and other intangibles are so valuable today not because of the small fee that Coca-Cola paid to register them, but because of the sustained marketing investments by supply-point companies that have made Coca-Cola's brands some of the most recognized in the world. *See* Doc.699, pg.8204:7-25 (Newlon agreeing the "cost" to register a trademark is not "high," whereas "it can be expensive ... to promote the value of a trademark").

---

[6] The IRS's attempt to undermine (at 57 n.10) this testimony of its own expert is unavailing. That he was unsure whether "100 percent" of supply-point companies' marketing investments would be capitalized as intangible assets—as opposed to a lower percentage—does not justify disregarding those investments entirely, in violation of the regulations. Doc.713, pg.10202:7-21.

Shifting gears, the IRS claims (at 57, 61) that it *did* give supply-point companies "full credit" for their marketing investments "as an offset of revenue in the CPM calculation." That is nonsense. The IRS's CPM allows a supply-point company to retain only a fixed percentage of its *tangible* operating assets—which do not include (intangible) marketing investments—as profit. *See supra* at 12-13. So, as Newlon admitted, a supply-point company would be entitled to profits of about 35% of its tangible property, equipment, and the like whether it "spent one dollar on consumer marketing or a billion dollars on consumer marketing." Doc.700, pg.8357:13-22; *see* Opening-Br.36-38. Meanwhile, Coca-Cola, the U.S. parent, gets all the credit even though it spent nothing on marketing. In no way does the IRS's CPM give the supply-point company "credit" for its marketing investments.

Finally, the IRS declares (at 54-57 & n.10) that supply-point companies' marketing investments are risk-free—nothing but "expenses charged to their books by Coca-Cola," as if these expenses were meaningless. But as the IRS has recognized, every multinational company must charge its expenses to the entity responsible for them. *See* Doc.642, pgs.1614:3-1615:5; Doc.699, pg.8289:19-22; Ex.7020-P. Here, the expenses for each region—including marketing investments—had to be charged to the supply-point companies because the supply-point companies are responsible for their particular regions and the sales within them. Opening-Br.9-10, 45-46. Indeed, multiple agreements with the IRS *required*

marketing investments to be charged to the appropriate supply-point company—not to Coca-Cola. Ex.3290-P, pg.1; Ex.3291-P, pg.1; Ex.7021-P, pg.1.

The central question for purposes of the regulations is where the risk lay. 26 C.F.R. § 1.482-1(d)(1)(iii). Supply-point companies bore the risk of their marketing investments; if these investments did not pan out, supply-point companies suffered the consequences, as the Egyptian supply-point company's experience shows. Opening-Br.37-38, 45-46; Doc.655, pgs.2967:14-2969:2 (Belgian supply-point company had to "reinvest massively in advertising" after a "product recall" in Belgium resulted in a "major global media crisis"). Coca-Cola—the U.S. parent—did not bear those risks because it did not have to pay expenses for regions served by foreign supply-point companies. Service companies also did not bear those risks because they were compensated on a cost-plus basis that ensured they were insulated from risk. Doc.642, pg.1615:6-17; Doc.740, pgs.25, 50-52; *cf. Facebook, Inc. v. Commissioner*, 164 T.C. No. 9, 2025 WL 1493002, at *59 (2025) (recognizing that a cost-plus reimbursement arrangement is "risk-insulated").

The IRS's argument (at 56-58 & n.10) that the marketing expenses on supply-point companies' books should be disregarded because they outsourced marketing work to service companies also fails. As Coca-Cola explained, companies commonly pay *other* firms for their marketing services. Opening-Br.46. The IRS does not deny that, but instead defaults (at 58), again, to its argument that supply-

point companies do not *own* "the valuable brand being promoted." But that is irrelevant: The supply-point companies own valuable licenses to the brands they promote, and their profits on those brands rise and fall based on the success—or failure—of their marketing investments. *See supra* at 11-13.

Moreover, the IRS glosses over the fact that some of the supply-point companies—including those in Brazil, Chile, and Egypt—did their own marketing. Doc.740, pg.25. The IRS does not even attempt a response as to those supply-point companies. Nor could it, since Newlon admitted he did not distinguish between "integrated" supply-point companies (those that did their own marketing) and "nonintegrated" ones. Doc.699, pg.8173:9-20.

Ultimately, the IRS seems to be arguing that the billions of dollars of marketing investments made by supply-point companies were a sham. But the IRS has never invoked anything like the economic-substance doctrine or the sham-transaction doctrine to challenge those investments or defend its CPM. And any such challenge would be frivolous. Supply-point companies made billions of dollars of marketing investments in their regions and bore the risk of those investments. Opening-Br.9-10, 45-46. The CPM's undisputed failure to account for a penny of those investments alone renders the IRS's CPM arbitrary and capricious.

### 3. Supply-Point Companies And Bottlers Are Not Comparable

Finally, the IRS doubles down (at 54, 60-65) on its CPM's flawed comparison of supply-point companies and bottlers—different entities with fundamentally different roles and risks—as the record clearly shows.

To start, no comparability analysis could rectify the CPM's central methodological flaw. As the IRS acknowledges (at 18), it is not enough for a CPM to use comparable companies; it must also use a "profit-level indicator" that appropriately reflects the drivers of the companies' profitability. *See* 26 C.F.R. § 1.482-5(b)(4). Once it is recognized that marketing investments are a critical part of supply-point companies' business, a CPM that is wholly indifferent to those investments (like the one at issue here) is patently flawed. *See supra* at 11-21.

Regardless, supply-point companies and bottlers are not comparable. Opening-Br.49-51. Both are involved in the production and sale of Coca-Cola products, but that is where the similarities end. Supply-point companies hold legal rights to manufacture and sell concentrate; bottlers do not. *Id.* at 9-10, 12, 49. And supply-point companies and bottlers perform entirely different functions at different levels of the market: One develops markets through consumer marketing and sells concentrate to the other, which mixes the concentrate with other ingredients, bottles finished products, and distributes them to retailers. *Id.* at 49.

As a result, they have different asset mixes and risk profiles. Relative to revenue, supply-point companies' investments are weighted far more heavily toward marketing, while bottlers' investments are weighted far more toward coolers, trucks, and other tangible assets. *See* Doc.740, pgs.190-91; Ex.7251-P, pgs.23-25; *id.*, Ex.4 (as a percentage of net revenue, supply-point companies' direct marketing expenses were more than four times bottlers' direct marketing expenses). As Willig explained, if investments in marketing are capitalized in a manner similar to investments in physical equipment, nearly 80% of supply-point companies' assets are intangibles, versus 23% for bottlers. Ex.7251-P, Ex.5. Given these vastly different asset profiles, unrelated parties in similar positions would never agree to the same compensation scheme. Yet the IRS's CPM strips supply-point companies of profits on the majority of their asset pool and instead treats them like a heavy-equipment company. That is far from the arm's-length result a transfer-pricing method must achieve.

Although the IRS asserts (at 63) that this "asset-mix comparison was refuted" by its experts, its experts' view was premised on the same erroneous legal position that the IRS advances to defend its CPM generally—that supply-point companies' marketing investments do not count because Coca-Cola was the legal owner of trademarks and other intangibles. *See, e.g.*, Ex.8295-R, pgs.6-7; Ex.8486-R, pg.39; *see also, e.g.*, Doc.698, pgs.8091:16-8092:4 (Newlon recognizing that Coca-Cola is

"intangible asset heavy" and "tangible asset light" but rejecting that terminology for supply-point companies because they "are not the brand owners").

Likewise, the only way in which the IRS can disregard the supply-point companies' unique risks is to recast (at 57 n.10) their marketing investments as nothing more than risk-free "check-writing"—an absurd proposition that ignores the real risks that supply-point companies actually bear. *See* Doc.740, pgs.129-33. These errors, which are another flavor of the IRS's "sham" argument addressed above, plague the IRS's comparability analysis as well.

The IRS's position is also impossible to square with the results of its CPM. As Willig explained, the IRS's CPM skews the allocation of operating income such that, for every dollar of operating income from Coca-Cola products, bottlers' share is nearly *10 times* supply-point companies' share. Ex.7251-P, Ex.6. Bottlers' share is grossly disproportionate even adjusting for their larger revenue base. *Id.*, Exs.4, 6. This disparity in allegedly comparable companies makes no sense.

### C. The Court Should Vacate And Remand For Further Proceedings

For each—and all—of these reasons, the IRS's CPM is arbitrary and capricious and thus cannot stand. The Court should remand with instructions to determine an arm's-length royalty that properly accounts for the supply-point companies' massive marketing investments. *See* Doc.740, pg.92. Contrary to the IRS's view (at 64), Coca-Cola need not defend 10-50-50 to show that the Tax

Court's reliance on the IRS's CPM was flawed, nor is the IRS's CPM "the only viable method." For example, the court did not address Willig's adjusted CPM—which, as explained, uses the IRS's CPM but corrects it to account for supply-point companies' marketing investments. Opening-Br.38, 51 n.9.[7] In any event, on remand the Tax Court must reconsider the appropriate method in light of the guidance provided by this Court's decision.

## III. THE TAX COURT ERRED IN APPROVING THE IRS'S REALLOCATION OF BLOCKED INCOME

The IRS also fails to justify the Tax Court's flawed treatment of the "blocked" Brazilian income, accounting for a significant part of the disputed tax liability.

A. The IRS does not dispute that Brazilian law prohibited royalties above $56 million for the tax years at issue. The only basis on which the Tax Court approved the IRS's allocation of $1.8 billion in royalties from the Brazilian supply-point company to Coca-Cola—notwithstanding that law—was the IRS's blocked-income regulation. Opening-Br.51-53. On appeal, the IRS tellingly runs from its regulation, relegating its response to a footnote (at 66 n.13). That regulation is obviously invalid—which alone requires the Tax Court's decision to be set aside. *Id.* at 53-56; *see* NFTC-Br.5-20; Chamber-Br.24-29.

[7] The IRS glosses over Willig's adjusted CPM presumably because it shows that, once supply-point companies get credit for their marketing investments, the adjustments asserted by the IRS all but disappear. Opening-Br.38.

B. Instead of defending the Tax Court's decision, the IRS centers its response on arguing (at 67-69) that the income it reallocated was not actually "blocked" because the Brazilian supply-point company could pay Coca-Cola in *dividends* instead of royalties. But the possibility of a different means of payment does not "unblock" the means proscribed by law, as cases like *Commissioner v. First Security Bank of Utah, N.A.*, 405 U.S. 394 (1972), and *Procter & Gamble Co. v. Commissioner*, 961 F.2d 1255 (6th Cir. 1992), illustrate.

In *First Security*, federal law prohibited the banks at issue from receiving insurance premiums, and the Supreme Court held that the banks thus "may not lawfully receive" that income. 405 U.S. at 405. The IRS could have reallocated equivalent income to the banks by characterizing it as a different type of payment. But that did not change the result. It is therefore unsurprising that, in *Procter & Gamble*, the Sixth Circuit rejected the IRS's argument that the ability to pay dividends allowed the IRS to ignore foreign legal restrictions on royalties. 961 F.2d at 1259. As the court put it, even if the taxpayer's Spanish subsidiary could have paid a dividend under Spanish law, it had "no ... obligation" to do so because the taxpayer "need not arrange its affairs so as to maximize taxes." *Id.* Same here.

The IRS stresses (at 67-68) that in 2007-2009 the Brazilian supply-point company actually paid dividends, which the parties agreed to treat like royalties under the 10-50-50 method. But, as the IRS acknowledges, those dividends were

made and treated that way only because of the closing agreement—which the IRS entered into fully aware that the Brazilian supply-point company would satisfy its obligations under 10-50-50 with dividends. *See* Doc.642, pg.1645:11-18; Doc.740, pgs.218-26. The IRS cannot have it both ways. Now that it has disavowed the closing agreement and 10-50-50, it cannot demand that the Brazilian supply-point company make additional dividends or treat dividends as royalty payments.

As the Tax Court recognized, royalties and dividends are different. Opening-Br.56. The royalties the IRS wants to allocate from the Brazilian supply-point company to Coca-Cola are income blocked by Brazilian law. Under *First Security*, the IRS cannot unblock that income by forcing Coca-Cola to call it something else.

C. The IRS's attempt to erase *First Security* with the second sentence of section 482 fares no better. That sentence—which was added in 1986 and states that "income with respect to" transfers or licenses of intangibles "shall be commensurate with the income attributable to the intangible"—has nothing to do with this case. 26 U.S.C. § 482. It did not define "income" or override *First Security*'s definition of "income." In adding it, Congress simply used the word "income," confirming it was incorporating existing judicial interpretations. *See Bragdon v. Abbott*, 524 U.S. 624, 645 (1998). Section 482's second sentence thus provides no basis to end-run the longstanding interpretation of section 482 in *First Security*. *See* NFTC-Br.8-9. Indeed, before its brief in this Court, the IRS never claimed that the second sentence

of section 482 or the commensurate-with-income standard justified *any* of its transfer-pricing adjustments here.

* * *

As the amicus briefs from the nation's leading business and accounting organizations emphasize, this is not an ordinary case. The IRS's actions violate settled norms against arbitrary and capricious agency action, raise serious questions of fairness, and undermine predictability and stability. *See* PwC-Br.5; Chamber-Br.7-8; NFTC-Br.20-28. The IRS ignores those amicus briefs, but they are important. As amici explain, IRS employees are already invoking this case "as support for questionable interpretations and applications of section 482." PwC-Br.5. Allowing the Tax Court's decision to stand will only embolden those efforts. *Id.*

## CONCLUSION

The Tax Court's decision should be reversed and the case remanded.

Dated: August 27, 2025

Respectfully submitted,

/s/ *Gregory G. Garre*

Gregory G. Garre
Miriam L. Fisher
Eric J. Konopka
Blake E. Stafford
Sakina J. Haji
LATHAM & WATKINS LLP
555 Eleventh St., NW, Ste. 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Shay Dvoretzky
Christopher Bowers
Parker Rider-Longmaid
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
(202) 371-7370
shay.dvoretzky@skadden.com

Nathaniel Carden
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
320 S. Canal St.
Chicago, IL 60606

Shannon C. Fiedler
LATHAM & WATKINS LLP
200 Clarendon St.
Boston, MA 02116

Raza Rasheed
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
2000 Avenue of the Stars, Ste. 200N
Los Angeles, CA 90067

*Counsel for Petitioner-Appellant The Coca-Cola Co. & Subsidiaries*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,498 words as counted using the word-count feature in Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 with 14-point Times New Roman font.

Dated: August 27, 2025

Respectfully submitted,

/s/ *Gregory G. Garre*
Gregory G. Garre

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 27, 2025, the foregoing brief was electronically filed with the Clerk of the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. All parties were served through the Court's CM/ECF system.

Dated: August 27, 2025

Respectfully submitted,

/s/ *Gregory G. Garre*
Gregory G. Garre