**Gregory G. Garre**
Direct Dial: +1.202.637.2207
gregory.garre@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C.  20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

## LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

March 13, 2026

### VIA CM/ECF

David J. Smith
Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
Elbert P. Tuttle Courthouse
56 Forsyth Street, N.W.
Atlanta, GA 30303

> Re:  *The Coca-Cola Co. & Subsidiaries v. Commissioner*, No. 24-13470
> Response to the Commissioner's March 4, 2026 Letter
> Pursuant to Federal Rule of Appellate Procedure 28(j)

Dear Mr. Smith:

Because the IRS's response omits critical facts about its position on the Eighth Circuit's decision in *3M Co. v. Commissioner*, 154 F.4th 574 (8th Cir. 2025), Coca-Cola files this limited response to complete the record.

In petitioning for rehearing en banc in *3M*:

- The IRS acknowledged that this case involves the same Brazilian "blocked income" issue as in *3M* and, indeed, specifically relied on the Tax Court's (erroneous) decision in this case to challenge the panel decision in *3M*.  *3M* Reh'g Pet. 11-12 (attached).

- The IRS acknowledged that the Eighth Circuit panel decision rebuffed the IRS's attempt to "'purposely evade'" Brazilian law's restrictions on royalties by requiring a Brazilian subsidiary to pay dividends, in lieu of royalties.  *Id.* at 9 (citation omitted).

- The IRS admitted that the Eighth Circuit panel rejected its arguments in *3M* about the meaning of "income" in section 482—the same arguments it makes here.  *Id.* at 14-17; IRS Br. 71-75.

**LATHAM&WATKINS** LLP

- And the IRS pointed to *this* case in arguing that the issue in *3M* was of sufficient "importance" to warrant rehearing en banc. *3M* Reh'g Pet. 18 (noting impact on "other cases, including *Coca-Cola*").

In short, in *3M* the IRS acknowledged in its rehearing petition that this case is on all fours with *3M* when it comes to the Brazilian blocked-income issue here. The Eighth Circuit correctly resolved that issue, and denied rehearing without dissent. There is no reason for this Court to create a circuit split here.

Respectfully submitted,

   /s/ *Gregory G. Garre*
Gregory G. Garre
of LATHAM & WATKINS LLP

*Counsel for Petitioner-Appellant*
*The Coca-Cola Co. & Subsidiaries*

cc: Counsel of record via CM/ECF

## CERTIFICATE OF COMPLIANCE

This letter complies with the word limit of Federal Rule of Appellate Procedure 28(j) because the body of the letter contains 243 words. This letter complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Dated: March 13, 2026        /s/ *Gregory G. Garre*
                                           Gregory G. Garre

## CERTIFICATE OF SERVICE

I hereby certify that, on March 13, 2026, the foregoing document was electronically filed with the Clerk of the Court by using the CM/ECF system. All parties were served through the Court's CM/ECF system.

Dated: March 13, 2026        /s/ *Gregory G. Garre*
                                           Gregory G. Garre

**ATTACHMENT**

# No. 23-3772

**IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

———————————

**3M COMPANY & SUBSIDIARIES,**

*Appellant,*

v.

**COMMISSIONER OF INTERNAL REVENUE,**

*Appellee.*

———————————

**ON APPEAL FROM THE DECISION
OF THE UNITED STATES TAX COURT**

———————————

**PETITION FOR EN BANC REHEARING**

———————————

BRETT A. SHUMATE
 *Assistant Attorney General*
JOSHUA WU
 *Deputy Assistant Attorney General*

JENNIFER M. RUBIN                    (202) 307-0524
MATTHEW S. JOHNSHOY                   (202) 616-1908
 *Attorneys*
 *Tax Litigation Branch*
 *Civil Division*
 *U.S. Department of Justice*
 *Post Office Box 502*
 *Washington, D.C. 20044*

## STATEMENT UNDER FED. R. APP. P. 40(B)(2)

I.R.C. § 482 authorizes the Commissioner of Internal Revenue to remedy income distortions by allocating income and other tax items. Here, 3M Company and its Brazilian subsidiary contracted for an artificially low royalty rate, leaving 3M undercompensated for the use of its valuable intangibles in Brazil. But the panel here held that Section 482 does not authorize the Commissioner to reallocate income to 3M because of a Brazilian law limiting the amount of "royalties."

This holding misreads Section 482 as having a narrower definition of "income" than in other parts of the Code, as established in *Moore v. United States*, 602 U.S. 572 (2024), *Heiner v. Mellon*, 304 U.S. 271 (1938) and *Eder v. Commissioner*, 138 F.2d 27 (2d Cir. 1943), which permitted attribution to a taxpayer of its proportionate share of income, even where income distribution is subject to legal or practical limitations. That reading makes no sense, undermines Congress's intent to ensure that income allocation reflect the economic activity of each related party, and risks substantial harm to the United States Treasury. Given the exceptional importance of this case, this Court should grant rehearing *en banc*.

Appellate Case: 23-3772    Page: 2    Date Filed: 01/29/2026 Entry ID: 5602433

# TABLE OF CONTENTS

**Page**

Statement under Fed. R. App. P. 40(b)(2) ................................................i

Table of contents.....................................................................................ii

Table of authorities ............................................................................ iii

Glossary ..................................................................................................v

Statement of the case .............................................................................1

    A.    Factual background ............................................................... 1

    B.    The panel's opinion .............................................................. 4

Argument:

    A.    The panel's reasoning misreads Section 482, improperly adopting a narrower definition of "income" than elsewhere in the Code ............................................................. 4

    B.    The panel's ruling has significant administrative importance ...................................................................... 18

Conclusion............................................................................................ 19

Certificate of compliance .................................................................... 20

Appellate Case: 23-3772    Page: 3    Date Filed: 01/29/2026 Entry ID: 5602433

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Altera Corp. & Subs. v. Commissioner*,
    926 F.3d 1061 (9th Cir. 2019) ......................................2, 14-16

*Chevron, U.S.A., Inc., v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984), *overruled by Loper Bright*
    *Enters. v. Raimondo*, 603 U.S. 369 (2024) .............................3

*Coca-Cola Co. & Subsidiaries v. Commissioner*,
    T.C. Memo. 2023-135, , *appeal pending*,
    No. 24-13470 (11th Cir.) ...............................................11-12, 18

*Commissioner v. First Security Bank of Utah, N.A.*,
    405 U.S. 394 (1972) ....................................................5, 9, 12-13

*Eder v. Commissioner*,
    138 F.2d 27 (2d Cir. 1943) ..................................i, 7-8, 10, 16

*Heiner v. Mellon*,
    304 U.S. 271 (1938) ..........................................i, 6-8, 10, 12, 16

*Helvering v. Nat'l Grocery Co.*,
    304 U.S. 282 (1938) ..................................................................7

*Liberty Loan Corp. v. United States*,
    498 F.2d 225 (8th Cir. 1974) ..............................................17

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ............................................................13

*Moore v. United States*,
    602 U.S. 572 (2024) .............................................i, 5-10, 12, 16

*Proctor & Gamble Co. v. Commissioner*,
    961 F.2d 1255 (6th Cir. 1992)..............................................9

*Estate of Whitlock v. Commissioner*,
    494 F.2d 1297 (10th Cir. 1974)............................................8

**Statutes:**

Internal Revenue Code (26 U.S.C.):

    § 61(a) ..............................................................................17
    § 63(a) ..............................................................................17
    § 482 .............................................................. i, 2-5, 12-17

**Regulations and Regulatory Materials:**                    **Page(s)**

Treasury Regulations (26 C.F.R.):

§ 1.482-1(h)(2)......................................................................3, 13

Rev. Proc. 99-32, 1999-2 C.B. 296.....................................................2

**Legislative History:**

H.R. Conf. Rep. No. 99-841 (Vol. II) (1986)................................14-15

H.R. Rep. No. 99-426 (1985)...........................................................14

Appellate Case: 23-3772    Page: 5    Date Filed: 01/29/2026 Entry ID: 5602433

# GLOSSARY

3M              Appellant 3M Company & Subsidiaries

3M Brazil       3M do Brazil Ltda.

Add.            Addendum of the Appellant

App.            Joint Appendix

Commissioner    Appellee Commissioner of Internal Revenue

I.R.C.          Internal Revenue Code (26 U.S.C.)

Op.             Panel opinion, issued October 1, 2025

Treas. Reg.     Treasury Regulation (26 C.F.R.)

Appellate Case: 23-3772    Page: 6    Date Filed: 01/29/2026 Entry ID: 5602433

## STATEMENT OF THE CASE

### A.    Factual background

3M Company ("3M") is the parent company of (among other affiliates) a Brazilian subsidiary,[1] 3M do Brazil Ltda. ("3M Brazil"), to which it licensed its intellectual property for manufacturing and selling 3M branded items in Brazil.[2]  (App. 28, 38-39, 44-46.)  Unlike other foreign subsidiaries to whom 3M licensed its intellectual property, (App. 42-45), 3M Brazil's licensing agreement with 3M provided for an artificially low royalty rate versus the revenue generated through the use of 3M's valuable intellectual property, consistent with Brazilian law which limits the amount that Brazilian companies may pay in royalties to related corporations.  (*See* App. 56-57, 88-89).  The lower royalty payments artificially lowered 3M Brazil's costs (thereby artificially increasing 3M Brazil's relative profitability), and artificially reduced 3M's revenue.  Thus, Brazil's royalty restriction had the effect of distorting the true taxable incomes of both 3M and 3M Brazil.

---

[1] During 2006, 3M Brazil was a wholly-owned subsidiary of a subsidiary of a subsidiary of 3M.

[2] 3M and its subsidiaries filed a consolidated federal income tax return for 2006.  (App. 28; Br. 5.).

Appellate Case: 23-3772    Page: 7    Date Filed: 01/29/2026 Entry ID: 5602433

Brazilian law, however, does not prevent 3M from receiving income from 3M Brazil in forms other than royalties, such as dividends. For U.S. tax purposes, taxpayers may elect to recharacterize any foreign payments received, in order to clearly reflect their true U.S. taxable income. *See* Rev. Proc. 99-32, 1999-2 C.B. 296.

After the Commissioner issued a notice of deficiency to 3M for its tax year 2006 consolidated income tax return (App. 29),  3M filed a petition with the Tax Court challenging the Commissioner's deficiency determinations.  (App. 12-24.)  The only item still at issue is the Commissioner's determination re-allocating $23,651,332 in additional royalty income to 3M, under I.R.C. § 482.  (App. 29.)  Section 482 states:

> In any case of two or more … businesses … the Secretary may … allocate gross income, deductions, credits, or allowances between or among such … businesses, if he determines that such … allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such … businesses.  In the case of any transfer (or license) of intangible property …, the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

26 U.S.C. § 482.  Congress added the second sentence in 1986 to ensure income allocation for intangibles followed economic activity.  *Altera Corp. & Subs. v. Commissioner*, 926 F.3d 1061, 1077 (9th Cir. 2019).

The parties stipulated in the Tax Court that the reallocated amount (based on 3M's standard royalty agreement) represented an arm's length amount under Section 482.  (App. 88-89.)  Further, the parties stipulated that 3M Brazil had enough retained earnings and profits in 2006 to cover not only the dividends already paid but also the amount of additional income reallocated to 3M by the Commissioner under Section 482.  (App. 82.)

The Tax Court, in a split *en banc* opinion, sustained the Commissioner's Section 482 determination allocating additional income to 3M from its Brazilian subsidiary.  (*See* Add. 1-346.)  In the lead opinion, written by Judge Morrison (and joined by six other judges), a plurality held that Treas. Reg. § 1.482-1(h)(2) (26 C.F.R.) survived 3M's procedural regulatory attack and that, under the regulation, 3M could not rely on Brazilian law as a foreign legal restriction barring it from receiving adequate compensation from its Brazilian subsidiary.  (Add. 1-274.)  The lead opinion expressly relied on *Chevron, U.S.A., Inc., v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).  Judge Kerrigan separately concurred (Add. 275-80), arguing that the challenged regulation

Appellate Case: 23-3772    Page: 9    Date Filed: 01/29/2026 Entry ID: 5602433

"accomplishes perfectly Congress' purpose in enacting the 1986 amendment" to Section 482 (Add. 277). Concurring only in the result, Judge Copeland argued that the allocation was authorized by Section 482's plain language, as amended in 1986. (Add. 281-86). Eight Tax Court judges dissented. (Add. 287-346.)

## B.    The panel's opinion

On October 1, 2025, this Court reversed the Tax Court's decision, holding that income could not be reallocated to 3M in light of the Brazilian law limiting the payment of royalties. The panel concluded that the best reading of Section 482 was that income can only be allocated under that statute to a taxpayer from a related entity where the taxpayer had complete "dominion or control" over the income. (Op. 9.) It rejected the conclusion that allocation was appropriate here because 3M could have received the income from its Brazilian subsidiary in the form of dividends. (Op. 13-14.)

## ARGUMENT

### A.    The panel's reasoning misreads Section 482, improperly adopting a narrower definition of "income" than elsewhere in the Code

1.    The panel's reasoning—that 3M cannot be allocated its commensurate share of the income generated from the use of its

-4-

valuable intangibles by its wholly-owned subsidiary—relied heavily on the Supreme Court's opinion in *Commissioner v. First Security Bank of Utah, N.A.*, 405 U.S. 394, 401-06 (1972), which interpreted Section 482 before it was amended in 1986.  From *First Security*, the panel reasoned that there is a "foundational principle" of tax law that a U.S. person cannot be taxed on income that they were unable to receive—essentially reading into the Internal Revenue Code an actual receipt or receivability requirement.  (Op. 6, 8.)  This conclusion then underpinned the panel's further notion of the need for sufficient "dominion and control" over income.  (*See* Op. 11; *see generally* Op. 8-13.)

But the central premise of the panel's opinion—that a corporate taxpayer must be able to receive a payment from their subsidiary before such income can be attributed to the corporate parent—misreads *First Security* and is inconsistent with the way that income has traditionally been defined in the Code.  In *First Security*, the Supreme Court sought to apply the standard definition of "income" used elsewhere in the Code.  405 U.S. at 403.  But under that standard definition—as upheld in the Supreme Court's decision in *Moore v. United States*, 602 U.S. 572 (2024), and the numerous prior precedents relied upon by *Moore*— a

-5-

taxpayer *may* be taxed on its proportionate share of income, even where distribution of income is subject to legal or practical limitations.

Specifically, in *Moore*, the Supreme Court upheld a one-time tax imposed on certain shareholders on undistributed income realized by foreign corporations in which those shareholders were minority investors.  602 U.S. at 578, 584, 589-90, 596-98.  The shareholders argued that undistributed income could not be taxed because they had not "realized" the income, by receiving it "through wages, sales, or dividends."  *Id.* at 584.  But the Court explained that the tax in question "*does* tax realized income—namely, income realized by the corporation," and the law "attributes the income of the corporation to the shareholders, and then taxes the shareholders … on their share of that undistributed corporate income."  *Id.* at 584.  The Court surveyed the law, concluding that its "longstanding precedents plainly establish that, when dealing with an entity's undistributed income, Congress may tax either (i) the entity or (ii) its shareholders or partners."  *Id.* at 589-90.

In particular, *Moore* relied on *Heiner v. Mellon*, 304 U.S. 271, 281 (1938),  which held that partners may be taxed on their proportionate share of partnership income, even if that income could not currently be

-6-

distributed to them.   The Court explained that, under the Code, a tax that was "imposed upon the partner's proportionate share of the net income of the partnership," could be attributed to the partner "and *the fact that it may not be currently distributable*, whether by agreement of the parties or *by operation of the law*, is not material."  304 U.S. at 281 (emphasis added).  The same is true for corporate shareholders.  *See Helvering v. Nat'l Grocery Co.*, 304 U.S. 282 (1938) (cited by *Moore*, 602 U.S. at 586).  *Moore*, 602 U.S. at 586, confirmed that the *Mellon* line of cases remains good law, and that under that precedent, a legal "block" on receipt of income does not prevent attribution or allocation for U.S. federal income tax purposes.

*Moore*, 602 U.S. at 587, also cited *Eder v. Commissioner*, 138 F.2d 27, 28 (2d Cir. 1943), which addressed whether so-called "blocked pesos" could be attributed to U.S. taxpayers who wholly owned a foreign personal holding company in Colombia but were barred from repatriating income to the United States.  The *Eder* court concluded the taxpayers could be taxed on the company's undistributed income because there was "no denying that the taxpayers could have invested or spent the 'blocked' pesos in Colombia and, as a result, could there

Appellate Case: 23-3772    Page: 13    Date Filed: 01/29/2026 Entry ID: 5602433

have received economic satisfaction." *Id.* at 28.  The *Eder* court explained: "We do not agree with taxpayers' argument that inability to expend income in the United States, or to use any portion of it in payment of income taxes, necessarily precludes taxability.  In a variety of circumstances, it has been held that the fact that the distribution of income is prevented by operation of law, or by agreement among private parties, is no bar to its taxability." *Id.  See also, e.g.*, *Estate of Whitlock v. Commissioner*, 494 F.2d 1297, 1301 (10th Cir. 1974) (approving the attribution of income and income tax liability to shareholders).

The panel's ruling here ignores *Moore*, *Mellon*, and *Eder* in concluding that, because Brazilian law barred 3M Brazil from paying additional royalties to 3M (but not other kinds of payments), that meant that the Commissioner could not allocate income to 3M.  (Op. 6-10.) Thus, as established in *Moore* and in the various cases upon which it relied, the standard meaning of "income" covers economic gain to a taxpayer, even where the taxpayer cannot force its distribution (as in *Moore*), cannot presently receive the income (as in *Mellon*), and cannot repatriate the income (as in *Eder*).

2.    Moreover, unlike in *First Security*, it is undisputed that 3M *could* have accessed the income allocated to it by the Commissioner— just not in the form of "royalties" deductible under Brazilian law.  (App. 79-82.)  Put simply, unlike in *First Security*, this is not a case where a taxpayer had "taxable income that he did not receive and that he was prohibited from receiving."  405 U.S. at 403.  But as established in *Moore* and in the various cases on which it relies, the profits earned in Brazil from 3M's valuable intangibles fit comfortably within the standard meaning of "income" and, thus, there is no conflict with *First Security*.

The panel asserted that the Commissioner was incorrect to focus on 3M's ability to require its Brazilian subsidiary to pay dividends (from its ample profits) because that would require 3M to "'purposely evade' Brazilian law."  (Op. at 13 (quoting *Proctor & Gamble Co. v. Commissioner*, 961 F.2d 1255, 1259 (6th Cir. 1992).)[3]  But there is no

---

[3] *Proctor & Gamble* is distinguishable on multiple grounds, including that the Spanish subsidiary there did not have profits from which it could pay dividends.  961 F.2d at 1259.  It was also decided before *Moore*, 602 U.S. at 589-90, which emphatically upheld the concept that income may be allocated to a taxpayer who has not received and cannot presently receive that income.

-9-

basis for this claim.  The parties stipulated that there was no barrier under Brazilian law to a profitable subsidiary (as here) paying dividends to its U.S. parent corporation (App. 79-82), and 3M presented no evidence that Brazil would consider a company to have violated Brazilian law by paying "dividends"—for purposes of the Brazilian income tax—that are then substantively reclassified as "royalties" for U.S. income tax purposes.  There is also no dispute that 3M had sufficient "dominion and control" to require distribution of those additional funds.[4]  But that choice is irrelevant to whether such income is attributable to 3M's own economic activity (*i.e.*, its intangibles), instead of that of 3M Brazil.

The same reasoning refutes the panel's complaint that "dividends and royalties are different, both in form and function," (Op. at 14), because that reasoning ignores that the same amount of money could be treated as a dividend by one taxing authority for one purpose and royalties for the purposes of another.  In all events, as explained above, the panel (which ignored *Moore*, *Mellon*, *Eder*, and the other cases cited

---

[4] Put another way, 3M could have forced distribution of the income (unlike in *Moore*), presently received the income (unlike in *Mellon*), and repatriated the income (unlike in *Eder*).

by the Commissioner) misapprehends the true meaning of income and ignores that income and the resulting tax liability may be allocated to a taxpayer that has *any* ability to enjoy the economic gain.

Indeed, another case involving the same Brazilian law illustrates the panel's error. In *Coca-Cola Co. & Subsidiaries v. Commissioner*, T.C. Memo. 2023-135, *appeal pending*, No. 24-13470 (11th Cir.), the parent company licensed its valuable intangibles to its Brazilian subsidiary for a mere $100, with no future royalties required. *Id.* at [*8]. Instead, the subsidiary paid the parent company dividends, consistent with the same royalty formula that the parent company used in its non-Brazilian royalty agreements. *Id.* at [*9]. The parent company (similarly to 3M here) "stipulated that Brazilian law placed no restrictions on the Brazilian [subsidiary's] ability to pay dividends" to the parent company. *Id.* at [*8-9]. The parent company in *Coca-Cola* pushed the same argument that the panel accepted here: that royalties and dividends are different. *Id.* at [*12]. The Tax Court accepted that "as a general proposition," but observed that, in this case, the parent company "treated dividends from the Brazilian [subsidiary] as a *substitute for royalties* for purposes of satisfying what [parent company]

-11-

believed to be the [subsidiary's] royalty obligation." *Id.* The Tax Court further rejected the claim that allocating additional income to the parent company circumvented Brazilian law, given that the parties agreed (as here) that payment of dividends in the amount allocated by the Commissioner would not violate Brazilian law. *Id.* at [*12-13]. As in *Coca-Cola*, 3M legally could receive income from 3M Brazil, denominated as "dividends" for purposes of Brazilian law but treated as "royalties" for purposes of 3M's U.S. tax obligations, without running afoul of Brazilian law.

Moreover, neither Congress in the statutory text nor the Supreme Court in *First Security*—which only interpreted an earlier version of Section 482—has stated that a *foreign* legal restriction, unlike a *federal* legal restriction, should be given any weight in determining whether income realized by the use of U.S. property may be allocated to a U.S. corporation for U.S. tax purposes under Section 482. *See Moore*, 602 U.S. at 577-79, 590-93, 595-97 (explaining Congress's different treatment of U.S.-owned foreign corporations); *see also Mellon*, 304 U.S. at 279-80 (holding that state legal restriction did not preclude Section 482 re-allocation).

-12-

3.    The panel also complained that the blocked-income regulation—which stated that the agency could "take into account the effect of a foreign legal restriction" if it "affected an uncontrolled taxpayer under comparable circumstances," 26 C.F.R. § 1.482-1(h)(2)—is inconsistent with the Commissioner's position on appeal as to the meaning of Section 482's statutory text, and its critical, second sentence.  (Op. 10-11.)  This purported inconsistency is irrelevant: if the best reading of Section 482 is that the statute authorizes the allocation here, then the allocation should be upheld.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

In all events, the regulation facially seeks to harmonize Section 482—which generally requires that income reflect an arm's length price and, for intangibles, that the allocation be "commensurate with income"—with *First Security*.  The regulation does that by evaluating whether a given foreign legal restriction actually does "block income," is a real legal restriction, and is applicable to both related and unrelated entities.  And, here, the Brazilian law neither blocks income, nor does it apply to unrelated entities.  As such, both the statutory analysis and the regulation lead to the same result in this case.

-13-

4.    The Commissioner's reading of Section 482 is also supported by the 1986 amendment to the statute, expressly applicable to cases (like this one) involving intangibles.  In Section 482, Congress expressly granted the Commissioner discretion to re-allocate income (and related tax items) when necessary to clearly reflect true, undistorted taxable income.  In 1986, Congress amended Section 482 to address serious income distortions arising from transfers and licenses of intangibles, adding the second sentence to require that "the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible."  This new standard requires the U.S. taxpayer-licensor to always recognize income commensurate with "the profit or income stream generated by or associated with intangible[s]" by its licensee.  *See* H.R. Rep. No. 99-426, at 426 (1985).  "[T]he division of income between related parties" for the transfer of intangibles, now *must* "reasonably reflect the relative economic activity undertaken by each …."  H.R. Conf. Rep. No. 99-841 (Vol. II), at II-637 (1986).

In *Altera Corp. & Subs. v. Commissioner*, 926 F.3d 1061 (9th Cir. 2019), which the panel ignored, the Ninth Circuit concluded that the amendment did, in fact, mandate income allocation to reflect each

-14-

related entity's economic activity.  In *Altera*, the taxpayer argued that Congress's amendment of Section 482 to add the commensurate-with-income requirement in 1986 "did nothing to change the meaning and operation of the arm's length standard."  926 F.3d at 1078.  The Ninth Circuit disagreed, explaining that: "It is illogical to argue that amending a singular statute does not alter its meaning."  *Id.* at 1079.  Instead, the Ninth Circuit held that the addition of the second sentence did modify the first.  "Congress's objective in amending § 482 [in 1986] was to ensure that income follows economic activity."  *Id.* at 1077 (citing H.R. Conf. Rep. No. 99-841 (Vol. II), at II-637).  *Altera* correctly concluded that, through this amendment, Congress required that all income (and costs that might affect taxable income) be appropriately allocated to each related party to "reasonably reflect the actual economic activity undertaken by each [party …]."  *Id.* (internal quotation marks and citation omitted).

5.    The panel also relied on a "grammatical" interpretation of Section 482, to conclude that the phrase "the income," as used in the second sentence of Section 482, is synonymous with "gross income," a term which appears in the first sentence.  (Op. 8-9.)  But this reasoning

Appellate Case: 23-3772    Page: 21    Date Filed: 01/29/2026 Entry ID: 5602433

is fatally flawed and does not justify applying a narrower definition of income in Section 482 than in the rest of the Code, as interpreted in *Moore*, *Mellon*, and *Eder*.

Section 482 uses the word "income" in four places:  In the first sentence, it states that "*gross income*" (among other items) may be allocated between related parties "in order to prevent evasion of taxes or clearly to reflect *the income*" of the related parties.  In the second sentence, it states that, where intangibles have been transferred or licensed, "*the income* with respect to such transfer or license shall be commensurate with *the income* attributable to the intangible." (Emphasis added.)  Even as a matter of grammar, the panel is incorrect. "[G]ross income" is not the only possible antecedent for the phrase "the income."  (*But see* Op. 9.)  Rather, the natural, prior antecedent of "the income" (in the second sentence) is "the income" (in the first sentence).

Moreover, as courts, including *Altera*, have explained, "the income" in the second sentence does not mean "gross income"—rather, it refers to the economic effects flowing from each related party's contribution to the enterprise.  *See Altera*, 926 F.3d at 1077.  Notably, this Court has already interpreted the phrase "the income" in the first

-16-

sentence of Section 482 to refer to a taxpayer's "true income," which is the undistorted, properly reflected "taxable income" of the taxpayer—from which its proper tax liability will be calculated after correctly accounting for deductible expenses (and all other tax items, including gross income). *See Liberty Loan Corp. v. United States*, 498 F.2d 225, 228 (8th Cir. 1974). Put simply, the phrase "the income" as used throughout Section 482 is not synonymous with "gross income."

This difference is important. Gross income is defined as "all income from whatever source derived." I.R.C. § 61(a). And, in Section 482, gross income is only one kind of tax item that may be re-allocated to reflect "the income" of related parties. Other items that may be re-allocated to reflect "the income" of related parties are deductions, credits, and allowances—which alter net taxable income, but not gross income. *See generally* I.R.C. § 63(a); *see also Liberty Loan*, 498 F.2d at 228 (adjusting interest deductions to eliminate distortions which affect overall tax liability). Because items such as deductions may be re-allocated under Section 482 to reflect "the income" of related parties, the meaning of "the income" is not the same as "gross income."

-17-

### B.    The panel's ruling has significant administrative importance

The panel's ruling is of significant administrative importance not only because of the substantial tax dollars at stake (in this case and in other cases, including *Coca-Cola*), but also because of the importance of the decision to the proper transfer pricing of international transactions between related parties.  The ability to allocate a commensurate share of income to a corporate parent is necessary for the United States to effectively tax the profitable use of valuable income-generating U.S.-owned intangibles.  Indeed, this opinion provides an incentive and a roadmap for companies to delay (perhaps indefinitely) taxation of significant profits from use of intangibles abroad.  As such, the panel's decision, if upheld, will directly erode the U.S. income tax base.  This concern is exacerbated by the fact that this ruling relied on foreign law to limit the reach of a federal tax statute in which Congress directed the Commissioner to ensure that related parties properly allocate income in transactions, like this one, involving the licensing or transfer of highly valuable assets, such as the intangibles at issue here.

Given the significant importance of this area of law to tax administration, this question warrants reconsideration en banc.

-18-

# CONCLUSION

The petition for rehearing *en banc* should be granted.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*
JOSHUA WU
  *Deputy Assistant Attorney General*

/s/ *Matthew S. Johnshoy*

JENNIFER M. RUBIN          (202) 307-0524
MATTHEW S. JOHNSHOY     (202) 616-1908
  *Attorneys*
  *Tax Litigation Branch*
  *Civil Division*
  *U.S. Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

JANUARY 29, 2026

-19-

## CERTIFICATE OF COMPLIANCE

### Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1.  This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[X]   this document contains 3,847 words, **or**

[ ]   this brief uses a monospaced typeface and contains _____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X]   this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Century Schoolbook 14, **or**

[ ]   this brief has been prepared in a monospaced typeface using _____ with _____.

3.  Pursuant to Eighth Circuit Rule 28A(h)(2) [and (if an addendum is also filed) 28A(g)(5)], I further certify that the brief [and addendum] has [have] been scanned for viruses using Microsoft Windows Defender (updated daily), which reports that the file[s] is [are] virus-free.

(s)    /s/ *Matthew S. Johnshoy*

Attorney for   the Commissioner of Internal Revenue

Dated:        January 29, 2026

-20-

# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-3772

_____

3M Company, and Subsidiaries

*Appellant*

v.

Commissioner of Internal Revenue

*Appellee*

------------------------------

Silicon Valley Tax Directors Group; National Taxpayers Union Foundation; Chamber of Commerce of the United States of America; National Foreign Trade Council, Inc.; National Association of Manufacturers

*Amici on Behalf of Appellant(s)*

David A. Weisbach

*Amicus on Behalf of Appellee(s)*

_____

United States Tax Court

_____

Submitted: October 22, 2024
Filed: October 1, 2025

_____

Before SHEPHERD, KELLY, and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

Statutes trump regulations.  Over three decades ago, another court decided that the IRS could not tax a domestic parent company on royalties it could not legally receive from a foreign subsidiary.  *See Procter & Gamble Co. v. Comm'r*, 961 F.2d 1255, 1259 (6th Cir. 1992).  The IRS then authorized by regulation what a statute had not.  That strategy might have worked before, *see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982–83 (2005), but not now, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024), so we reverse.

## I.

3M Company has subsidiaries all over the world.  Its taxes are complicated, but it files a single consolidated federal tax return each year.  This case is about whether the one it filed for 2006 should have reported more royalty income from its Brazilian subsidiary, 3M do Brasil Ltda.

One of 3M's most important assets is its intellectual property.  Its foreign subsidiaries generally pay to use it.  At the time, Brazilian law capped the amount a subsidiary could pay in royalties to a non-Brazilian controlling company like 3M.  Limited to what it could deduct, 3M do Brasil paid only $5.1 million for the intellectual property it used.  3M then reported that amount on its federal tax return for 2006.

Several years later, the IRS sent a Notice of Deficiency letting 3M know it owed considerably more.  As relevant here, the agency reallocated nearly $23.7 million in extra royalty income to reflect what, in its view, 3M *should* have received from its Brazilian subsidiary.  *See* 26 U.S.C. § 482 (giving the IRS authority to reallocate a controlled group's taxable income).  Both sides agree that the amount reflects the compensation an unrelated entity would have paid to use 3M's intellectual property.  *See* 26 C.F.R. § 1.482-1(h)(2).  The dispute here focuses on

-2-

whether the IRS *can* reallocate unpaid royalties that Brazilian law prevented 3M do Brasil from paying.

3M challenged the IRS's determination that it could in the United States Tax Court. One of its arguments was statutory: the IRS could not tax what Brazilian law blocked 3M from receiving. *See* 26 U.S.C. § 482. The other was procedural: the IRS did not follow the Administrative Procedure Act when it adopted the blocked-income regulation, 26 C.F.R. § 1.482-1(h)(2), that purportedly authorized it to do so. *See* 5 U.S.C. § 553 (setting out the requirements).

The vote in the Tax Court could not have been closer. A seven-judge plurality rejected 3M's procedural argument and deferred to the blocked-income regulation as a reasonable interpretation of an ambiguous statute. *See Brand X*, 545 U.S. at 982. Reaching a majority required adding the votes of two concurring judges, who thought the statute *required* the IRS to make the reallocation, regardless of what the regulation said. If allowed to stand, the patchwork judgment would require 3M to pay taxes on nearly $23.7 million more in royalty income.

The eight dissenters would have come out the other way. Some thought the statute unambiguously prohibited the IRS from reallocating income that 3M could not legally receive. *See Comm'r v. First Sec. Bank of Utah, N.A.*, 405 U.S. 394, 403 (1972) (stating that "income" does *not* include what the taxpayer "did not receive and that he was prohibited from receiving"). Others believed that even if the statute was ambiguous, the blocked-income regulation was unenforceable because the IRS had failed to follow the Administrative Procedure Act when adopting it. Six judges agreed with both points.

The legal landscape has changed since the case's last stop. After the Tax Court decision, the Supreme Court decided *Loper Bright Enterprises v. Raimondo*, which frees courts to adopt the "best reading of the statute": the one "the court would have reached if no agency were involved." 603 U.S. at 400 (citation omitted); *see* 5 U.S.C. § 706 (directing that, in a case reviewing administrative action, the "court

Appellate Case: 23-3772    Page: 29    Date Filed: 10/29/2026    Entry ID: 5560243

shall decide all relevant questions of law"). Our task, post *Loper Bright*, is to "use every tool at [our] disposal to . . . resolve [any] ambiguity." 603 U.S. at 400; *see Meyer, Borgman & Johnson, Inc. v. Comm'r*, 100 F.4th 986, 988 (8th Cir. 2024) ("This court reviews de novo the Tax Court's legal conclusions.").

## II.

The text is our guide. *See Artola v. Garland*, 996 F.3d 840, 843 (8th Cir. 2021). The IRS has the authority to "distribute, apportion, or allocate" income among commonly controlled companies, subject to some limitations. 26 U.S.C. § 482. The relevant statutory language provides as follows:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. In the case of any transfer (or license) of intangible property . . . , the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

*Id.* The passage is dense, but the "best reading" of it rules out what the IRS did here. *Loper Bright*, 603 U.S. at 400.

## A.

The first sentence tells us what the IRS can do, which is "distribute, apportion, or allocate gross income, deductions, credits, or allowances" between "two or more . . . businesses" that are "owned or controlled . . . by the same interests." 26 U.S.C. § 482. It is, as the Supreme Court has pointed out, a way for the IRS to

-4-

Appellate Case: 23-3772    Page: 34    Date Filed: 10/29/2025    Entry ID: 5560324333

combat tax gamesmanship and "prevent 'artificial shifting, milking, or distorting of the true net incomes of commonly controlled enterprises.'" *First Sec. Bank*, 405 U.S. at 400 (quoting Boris Bittker & James Eustice, *Federal Income Taxation of Corporations and Shareholders* 15–21 (3d ed. 1971)).

In operation, it is not as complex as the text makes it sound. When a commonly controlled corporation files its consolidated tax return for the whole group, it reports how much each individual company made. The amounts can be arbitrary, because the parent company—here, 3M—usually has the flexibility to structure the transactions among individual subsidiaries or between the subsidiary and the parent to avoid certain unfavorable tax consequences. *See, e.g.*, *Nw. Nat'l Bank of Minneapolis v. United States*, 556 F.2d 889, 892 (8th Cir. 1977). When it does, it opens the door to distortion through the shifting of "income, deductions, credits, or allowances." 26 U.S.C. § 482.

The congressional answer to that problem was IRS reallocation, which is the shifting of individual line items to reflect each entity's true income. *See id.* When it exercises the reallocation power, the IRS typically uses the "arm's length" standard to approximate how "uncontrolled taxpayers" would have structured the transaction. 26 C.F.R. § 1.482-1(b)(1). The problem, of course, is that reallocation can also be arbitrary because it answers a hypothetical question: what would two unrelated and independent entities have done?

This case strikes at the intersection of the IRS's authority and the safeguards built into the statute. One limit is when the IRS can use it: only when "*necessary*" to (1) "prevent evasion of taxes" or (2) "clearly . . . reflect the [controlled entities'] income." 26 U.S.C. § 482 (emphasis added). Given that 3M is just following Brazilian law, the IRS does not suggest it is trying to evade taxes on its 2006 return. Rather, its position is that Brazilian law distorts 3M's income because an unrelated entity would have paid a little over five times as much for use of its intellectual property. These types of payments, after all, can take place, just not to a controlling foreign entity. The IRS would end the analysis there.

A second limitation, however, requires us to keep going. For income to qualify, "a taxpayer must have complete dominion over it," meaning it is money that "*could* have [been] received." *First Sec. Bank*, 405 U.S. at 403 (emphasis added). If the law says otherwise, as 3M claims here, then it lacks "'complete power' to shift income among its [companies]." *Id.* at 404–05; *see id.* ("It is only where [complete] power exists, and has been exercised in such a way that the 'true taxable income' of a subsidiary has been understated, that the [IRS] is authorized to reallocate under § 482."). At least some of the power remains with the Brazilian government, which has prohibited the transaction that the IRS asks us to envision.

In many ways, this case looks a lot like *First Security Bank*. There, multiple related entities structured a transaction to avoid a federal law prohibiting banks from receiving commissions from the sale of insurance products. *See id.* at 398, 402. The IRS, using its § 482 reallocation power, assessed additional taxes on the theory that two banks in the group had artificially shifted their income to a non-bank subsidiary. *See id.* at 400. It made no difference to the IRS that they could not legally receive the income. *See id.* at 401 (noting that the banks "could never have received a share of these premiums").

The Supreme Court took a different view. Starting from the foundational principle that a person cannot "have taxable income that he did not receive and that he was prohibited from receiving," it concluded that the group of companies could not have "shift[ed] or distort[ed]" their income by structuring the transactions to follow federal law. *Id.* at 400, 403–05. If the banks "could not have received" the insurance commissions, then the IRS could not reallocate them as income under § 482. *Id.* at 406 (quoting *L.E. Shunk Latex Prods., Inc. v. Comm'r*, 18 T.C. 940, 961 (1952)).

3M's position is no different. Swap the National Bank Act with Brazilian tax law, and insurance commissions with royalty payments, and the resemblance becomes uncanny. The banks could not receive the income the IRS tried to attribute

-6-

to them, and neither can 3M.  The Supreme Court concluded in *First Security Bank* that "the premium income received by [the non-bank subsidiary] could not be attributable to the Banks."  *Id.* at 407.  In our view, attributing almost $23.7 million in extra royalties to 3M is just as inconsistent with the reality that it could not receive them without placing its Brazilian subsidiary in legal jeopardy.  The point is that, from a plain-and-ordinary-meaning standpoint, shifting income to 3M here would *not* "clearly . . . reflect [its] income."[1]  26 U.S.C. § 482.

## B.

The IRS asks us to focus on a *different* part of the statute.  About a decade after *First Security Bank*, Congress amended it to add the second sentence.  Recall what it says: "In the case of any transfer (or license) of intangible property . . . , the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible."  26 U.S.C. § 482; *see* Pub. L. No. 99-514, § 1231(e)(1), 100 Stat. 2085, 2562–63 (1986).  The multi-million-dollar question is, what does it do?

The IRS has a ready answer.  Whatever *First Security Bank* says about other types of income, the rules have changed when it comes to "intangible property."  26 U.S.C. § 482.  Post amendment, the amount "*shall be* commensurate with the income attributable to the intangible."  *Id.* (emphasis added).  In other words, any income "attributable" to intellectual property counts, including whatever 3M's Brazilian subsidiary earned from it.  Even if it cannot legally pay for what it used.

## 1.

If the statute had only the second sentence, the IRS might have a point.  "[R]easonable statutory interpretation," however, "must account for both the

---

[1]We are not the first court to reach this conclusion.  *See, e.g.*, *L.E. Shunk Latex Prods.*, 18 T.C. at 961; *Procter & Gamble*, 961 F.2d at 1259; *Texaco, Inc. v. Comm'r*, 98 F.3d 825, 830 (5th Cir. 1996).

-7-

specific context in which language is used and the broader context of the statute as a whole." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (citation omitted). A statutory provision, after all, may seem to have one meaning "in isolation," but another when viewed in the context of "the design and structure of the statute as a whole." *Id.* (citation omitted). The most logical place to look for context is in the sentence right before it.

In that one, the statute tells us what the IRS may "apportion" or "allocate": "gross income." 26 U.S.C. § 482. Those two words, as we already know from *First Security Bank*, refer to amounts over which the taxpayer has "dominion or control." 405 U.S. at 404. What the taxpayer "*could* have received," whether it did or not. *Id.* at 403 (emphasis added). The second sentence, upon which the IRS hangs its hat, refers—not once, but twice—to "*the* income." 26 U.S.C. § 482 (emphasis added). To accept the IRS's argument, we must conclude that "the income" in the second sentence means something different than "gross income" in the first.

The roadblock for the IRS is the "presumption that a given term . . . mean[s] the same thing throughout a statute." *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 456 (2012) (citation omitted). The presumption is particularly strong when a word like "the" precedes a previously used noun. *See id.*; *see also Webster's Third New International Dictionary* 2368 (1986). One feature of the English language, which usually goes unnoticed in the background, is that the first mention of a noun is often introduced by an indefinite article like "a" or "an" for singular nouns ("a dollar") or no article at all for plural nouns ("dollars") and mass nouns ("money"). It is a way of introducing a new idea to a reader. Then using "the" in front of later mentions of the same noun signals to the reader that the word is familiar. Like the last two sentences ("a reader," then "the reader"), § 482 follows this same pattern. *Compare* 26 U.S.C. § 482 (giving the IRS authority to "[re]allocate gross income"), *with id.* (referencing "the income" later).

The first sentence introduces a mass noun, "gross income," that has no article in front of it. *Id.* Then the second sentence with the carveout for "intangible

-8-

property" refers twice to "the income." *Id.* The grammatical implication is unmistakable: the shorthand references to "the income" in the second sentence are a callback to "gross income," the only possible antecedent in the statute. Same word, same meaning, at least in the absence of some textual clue ruling it out. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) ("A word . . . is presumed to bear the same meaning throughout a text."); *cf. Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009) ("Congress is presumed to be aware of . . . judicial interpretation[s] of a statute and to adopt that interpretation when it re-enacts a statute without change." (citation omitted)). Here, there are none.

From this grammar lesson comes the statute's true meaning. The best reading—if not the only one—is that the IRS *can* "allocate" income, but only when the taxpayer has "dominion or control" over it. *First Sec. Bank*, 405 U.S. at 404; *see* 26 U.S.C. § 482 (providing that "the Secretary *may*" reallocate income (emphasis added)). The second sentence then says *how* to do it when it involves "intangible property": it "shall be commensurate with the income attributable to the intangible." 26 U.S.C. § 482. The meaning of the word "income" does not change. The power of reallocation always depends on a taxpayer's "complete dominion" over the funds, regardless of the type of property involved. *First Sec. Bank*, 405 U.S. at 403.

Even if the second sentence does not redefine what income means for intangible property, as the IRS seems to suggest, it still does work. It provides a measurement method for the income produced by intangible property, which can be a difficult task given that it has no physical existence. According to the second sentence, the amount "shall be commensurate with the income attributable to the intangible." 26 U.S.C. § 482. "Commensurate," as used here, means "equal in measure or extent," "proportionate," or "corresponding in size, extent, amount, or degree." *Webster's Third New International Dictionary* 456 (1986). It is not particularly helpful guidance until you consider what it does.

-9-

Suppose that Brazil imposed no legal restrictions on royalties among commonly controlled companies. 3M would have "dominion or control," *First Sec. Bank*, 405 U.S. at 404, over the income its intellectual property produced for 3M do Brasil. With no barrier to royalty payments, the IRS *could* reallocate its income, even if it never actually paid any. If it chose to do so, the income attributed to 3M would have to "be commensurate"—that is, equal or proportionate—to "the income attributable to the intangible." 26 U.S.C. § 482. The second sentence answers the how-much question, in other words, not the what-gets-allocated question that the first already answers. For the IRS, it is of no help in reallocating royalties that Brazilian law blocks 3M's subsidiary from paying.

2.

At one point, the IRS hardly put up a fight about the scope of § 482. When the case started, it was all about the blocked-income regulation that it claimed was a reasonable interpretation of a silent statute. *See* 26 C.F.R. § 1.482-1(h)(2) (describing which "foreign legal restrictions . . . will be taken into account"). Silence may have been an interpretive longshot after *First Security Bank*, but it was the hook that allowed it to fish for deference. *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–44 (1984).

The shifting sands of administrative law brought a change in the IRS's position. Center stage in its argument before, the blocked-income regulation is in the background now. Perhaps for good reason. As one of the *amici* points out, the IRS's current position that § 482 *requires* reallocation under the second sentence is both inconsistent with its prior litigating position and the regulations it asks us to consider. *See* 26 C.F.R. § 1.482-1(b)(1) (discussing adjustments); *id.* § 1.482-1(h)(2). To state the obvious, a statute cannot both be "silent as to the precise" question and unambiguously answer it at the same time.

But perhaps the bigger problem is the mismatch between the blocked-income regulation and the argument the IRS presses today. According to the regulation, the

-10-

agency *could* "take into account the effect of a foreign legal restriction" if it "affected an uncontrolled taxpayer under comparable circumstances."  26 C.F.R. § 1.482-1(h)(2).  Whether it did depended on several non-statutory criteria, like whether the "restriction[] [was] publicly promulgated," it "expressly prevented the payment or receipt" of the money, and the taxpayer had "exhausted all remedies prescribed by foreign law."  *Id.* § 1.482-1(h)(2)(ii)(A)–(C).  None singled out intangible property for a bright-line always-reallocate rule.  *See id.*  To the contrary, it allowed the IRS to pick and choose its "distribut[ion], apportion[ment], and allocat[ion]" battles.  26 U.S.C. § 482.

In its post-*Loper Bright* supplemental briefing, the IRS argues that § 482 does the same thing by "delegat[ing] discretionary authority to" make the proposed reallocation.  *Loper Bright*, 603 U.S. at 395.  Even assuming § 482 works in the way the IRS suggests, it is still our job to "fix[] the boundaries of [that] delegated authority" based on the statute's text, as we have done today.  *Id.*  And to the extent the IRS is asking us to defer to an "interpretation[] . . . based upon . . . [its] specialized experience," *id.* at 388 (second ellipsis in original) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (1944)), we decline to do so when the agency recently invented it and the statute has another "be[tter] reading," *id.* at 400.  *See id.* at 388 (noting that the decision to give it "weight" depends on several factors, including "consistency with earlier . . . pronouncements" of the agency (quoting *Skidmore*, 323 U.S. at 140)).

### III.

When it comes to reading the statute, the IRS apparently realizes its biggest problem is the dominion-and-control test from *First Security Bank*.  Even as the legal landscape has changed, the one constant has been its position that this case is factually and legally distinguishable.

-11-

A.

The factual distinction comes from the source of the restriction. In *First Security Bank*, federal law blocked two banks from receiving commissions from the sale of insurance products. *See* 405 U.S. at 402. Here, by contrast, *foreign law* blocks the royalty payments to 3M, at least at amounts above what its Brazilian subsidiary can legally deduct.

It is a distinction, but not one that matters. If dominion or control is the dividing line for income under § 482, and income attribution requires the taxpayer to be an entity that "could have received it," it is not clear why the source of the restriction makes a difference. *Id.* at 403. A foreign restriction, like the one in Brazil, can deprive an American company of control over potential income just as effectively as a federal one. *See id.*; *Procter & Gamble*, 961 F.2d at 1259 ("The Supreme Court focused on whether the controlling interests utilized their control to distort income. We see no reason to alter this analysis because foreign law, as opposed to federal law, prevented payment of royalties.").

B.

The IRS has also spotted a legal distinction, but it makes no difference either. In adopting the dominion-or-control test, the Supreme Court discussed a now-repealed regulation reflecting the "assump[tion]" that the "controlling interest" could have used its "complete power" to ensure that each member of the group "conduct[ed] its affairs [so] that its transactions and accounting records truly reflect[ed] [its] taxable income." *First Sec. Bank*, 405 U.S. at 404 (quoting 26 C.F.R. § 1.482-1(b)(1) (1971)). *First Security Bank* itself notes that the regulation was "consistent" with its holding that the controlling interest must "have complete power to shift income among its subsidiaries," but that the regulation came from "a different context." *Id.* Nevertheless, the IRS draws the conclusion that the Supreme Court would have come out differently in the absence of the regulation.

-12-

The opinion all but says otherwise.  Right from the beginning, the Supreme Court framed the issue around the statute: whether "pursuant to *§ 482* of the Internal Revenue Act[,] . . . the income of taxpayers within a controlled group should be reallocated to reflect the true taxable income of each."  *Id.* at 395 (emphasis added).  Then, in describing its "holding" at the end, it answered the question it posed at the beginning: "The Commissioner's exercise of his *§ 482* authority was . . . unwarranted in this case."  *Id.* at 407 (emphasis added).  In between there are scattered references to the now-repealed regulation, but only to provide further support for the idea that the *statute* imposed a dominion-or-control requirement.  *Id.* at 404 (noting that its dominion-or-control test was "expressly recognize[d]" by and "consistent with" the regulation).  Exactly what we conclude today.

C.

In a last-ditch effort to distinguish this case from *First Security Bank*, the IRS argues that 3M had "dominion or control" because its subsidiary could have paid dividends in lieu of royalties.  For support, it points to the fact that 3M do Brasil paid $64.5 million in dividends in 2006.  Nothing, including Brazilian law, prevented the company from paying nearly $23.7 million more to account for the extra income it received from the use of 3M's intellectual property.

To the extent the IRS is suggesting that 3M had a duty to "purposely evade" Brazilian law, we "firmly" disagree.  *Procter & Gamble*, 961 F.2d at 1259 (rejecting the "suggestion that P&G should purposefully evade [foreign] law by making royalty payments under the guise of calling the payments something else").  As the Supreme Court put it, "'complete power' . . . hardly includes the power to force a subsidiary to violate the law."  *First Sec. Bank*, 405 U.S. at 404–05.

A more charitable reading of the IRS's argument is that 3M had a choice: receive the royalties as dividends or have its Brazilian subsidiary stop using the intellectual property.  It is a familiar argument, reminiscent of the one the IRS made in *First Security Bank*.  There, the IRS argued that it "never forced" the banks to

-13-

violate federal law because they could have "offer[ed] credit life insurance to their borrowers at a lower rate" and refused the commissions. Brief for Petitioner at 31–32, *First Sec. Bank*, 405 U.S. 394 (No. 70-305). That argument, like the one here, may just reflect an expectation that taxpayers ought to structure their affairs to maximize, rather than minimize, the amount of taxes owed.[2]

Even aside from invoking a sense of déjà vu, there are a couple practical problems with the suggestion. For one thing, dividends and royalties are different, both in form and function. Declaring dividends, which take the form of nondeductible returns on contributed capital, is discretionary. *See Aspro, Inc. v. Comm'r*, 32 F.4th 673, 678 (8th Cir. 2022); James D. Cox & Thomas Lee Hazen, 3 *Treatise on the Law of Corporations* § 20:2 (4th ed. 2024). Paying royalties, which are fixed by contract and deductible as business expenses, is not. *See* 26 U.S.C. § 162(a); 10 *Mertens Law of Federal Income Taxation* § 40:21 (Dan Sheaffer ed., 2024). The power to do one has no bearing on the other.

The IRS's argument is also breathtaking in its potential reach. Why stop at dividends? If a parent company *could* force a foreign subsidiary to liquidate to get the royalties it thinks should have been paid, what would prevent the IRS from reallocating under § 482 in those circumstances too? Treating income sources as interchangeable, like the IRS proposes, would mean that "the tax" would no longer "fall on the party that actually receives the [income] rather than on the party that cannot." *First Sec. Bank*, 405 U.S. at 405. In short, IRS reallocation would start "distort[ing] their true . . . incomes," not "truly reflect" them. *Id.* at 404, 407.

---

[2]It makes no difference that recharacterizing income is, by its nature, hypothetical. Although it does not require changing anything in the real world, a determination that following Brazilian law distorted 3M's income sends a clear message about what the company should have done. Not that doing things the IRS's way would have helped. 3M's Brazilian subsidiary paid $64.5 million in dividends *already*. If royalties and dividends are truly interchangeable in these circumstances, as the IRS suggests, then why not just reallocate *those* dividends under § 482 and move on?

Appellate Case: 23-3772    Page: 44    Date Filed: 00/09/2026 Entry ID: 5662403

## IV.

We accordingly reverse and remand for the Tax Court to redetermine the taxes owed by 3M for 2006.

_____

Appellate Case: 23-3772　　Page: 45　　Date Filed: 00/29/2026　Entry ID: 5602403